**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 11-1355**

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

VERIZON,

Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION,

Appellee.

_____

**ON APPEAL FROM AN ORDER OF THE**
**FEDERAL COMMUNICATIONS COMMISSION**
_____

**JOINT BRIEF FOR VERIZON AND METROPCS**
_____

Walter E. Dellinger          Helgi C. Walker*
Brianne Gorod                Eve Klindera Reed
Anton Metlitsky              William S. Consovoy
O'MELVENY & MYERS LLP        Brett A. Shumate
1625 Eye Street, NW          WILEY REIN LLP
Washington, DC 20006         1776 K Street, NW
TEL: (202) 383-5300          Washington, DC 20006
                             TEL: (202) 719-7000
                             E-MAIL: hwalker@wileyrein.com

                             *Attorneys for Verizon*

Dated: July 2, 2012          *Counsel of Record*

*Additional counsel listed on next page*

Michael E. Glover
William H. Johnson
VERIZON
1320 North Courthouse Road
9th Floor
Arlington, VA 22201
TEL: (703) 351-3060

Samir C. Jain
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
TEL: (202) 663-6083

*Attorneys for Verizon*

Stephen B. Kinnaird*
PAUL, HASTINGS, JANOFSKY
& WALKER LLP
875 15th Street, NW
Washington, DC 20005
TEL: (202) 551-1842

Carl W. Northrop
Michael Lazarus
Andrew Morentz
TELECOMMUNICATIONS LAW
PROFESSIONALS PLLC
875 15th Street, NW, Suite 750
Washington, DC 20005
TEL: (202) 789-3120

Mark A. Stachiw
General Counsel, Secretary
& Vice Chairman
METROPCS COMMUNICATIONS, INC.
2250 Lakeside Blvd.
Richardson, TX 75082
TEL: (214) 570-4877

*Attorneys for MetroPCS
Communications, Inc. and its
FCC-licensed affiliates*

*\*Counsel of Record*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The undersigned attorneys of record, in accordance with D.C. Cir. R. 28(a)(1), hereby certify as follows:

A.    <u>Parties and Amici</u>

The principal parties in these consolidated cases are Appellant-Petitioner Verizon, Appellants-Petitioners MetroPCS Communications, Inc. and its FCC-licensed affiliates (MetroPCS 700 MHz, LLC; MetroPCS AWS, LLC; MetroPCS California, LLC; MetroPCS Florida, LLC; MetroPCS Georgia, LLC; MetroPCS Massachusetts, LLC; MetroPCS Michigan, Inc.; MetroPCS Networks California, LLC; MetroPCS Networks Florida LLC; MetroPCS Texas, LLC; and MetroPCS Wireless, Inc.) (collectively "MetroPCS"), Petitioner Free Press, Appellee-Respondent Federal Communications Commission, and Respondent United States of America.

ITTA – The Independent Telephone and Telecommunications Alliance has appeared as intervenor in support of Appellants-Petitioners.  National Association of Regulatory Utility Commissioners, National Association of State Utility Consumer Advocates, Public Knowledge, Vonage Holdings Corporation, the Open Internet Coalition, and CTIA – The Wireless Association® have appeared as intervenors in support of Appellee-Respondents.

The Commonwealth of Virginia has appeared as amicus curiae in support of Appellants-Petitioners.

As set forth in the appendix to the ruling on review, the persons who appeared before the agency in the proceedings below are:

100 Black Men of America *et al.*
2Wire, Inc.
4G Americas, LLC
4Info, Inc.
ACT 1 Group *et al.*
Adam Candeub and Daniel John McCartney
ADTRAN, Inc.
Adventia Innovative Systems
African American Chamber of Commerce - Milwaukee
African Methodist Episcopal Church
Aircell LLC
Akamai Technologies, Inc.
Alabama State Conference of the NAACP
Alarm Industry Communications Committee
Alcatel-Lucent
Allbritton Communications Company
Alliance for Digital Equality
Alliance for Telecommunications Industry Solutions
Amazon.com
American Arab Chamber of Commerce
American Association of Independent Music
American Association of People with Disabilities
American Business Media
American Cable Association
American Center for Law and Justice
American Civil Rights Union
American Consumer Institute CCR
American Council of the Blind
American Federation of Television & Radio Artists, Directors Guild of
     America, International Alliance of Theatrical Stage Employees, Screen
     Actors Guild
American Homeowners Grassroots Alliance

American Indian Chamber of Commerce of Wisconsin
American Legislative Exchange Council
American Library Association, Association of Research Libraries,
    EDUCAUSE
Americans for Prosperity
Americans for Tax Reform and Media Freedom Project
Americans for Tax Reform Digital Liberty Project
Americans for Technology Leadership
Annie McGrady
Anti-Defamation League
AOL Inc.
Arts+Labs
Asian American Justice Center
Assemblywoman Debbie Smith
Association for Competitive Technology
Association of Research Libraries
Association of Research Libraries, EDUCAUSE, Internet2, NYSERNet, and
    ACUTA
AT&T Inc.
Automation Alley
Ball State University Center for Information and Communications Science
Barbara A. Cherry
Barbara S. Esbin
Big Brothers Big Sisters of Will and Grundy Counties
Black Leadership Forum, Inc.
Bret Swanson, President, Entropy Economics LLC
Bright House Networks, LLC
Broadband Institute of California and Broadband Regulatory Clinic
Broadcast Music, Inc.
BT Americas Inc.
Cablevision Systems Corporation
California Consumers for Net Neutrality
California Public Utilities Commission
Camiant, Inc.
Carbon Disclosure Project
Career Link Inc.
Catherine Sandoval and Broadband Institute of California
CDMA Development Group, Inc.
Center for Democracy & Technology
Center for Individual Freedom

Center for Media Justice, Consumers Union, Media Access Project, and
New America
Center for Rural Strategies
Center for Social Media
Central Washington Hispanic Chamber of Commerce
CenturyLink
Chairman Kenneth D. Koehler, McHenry County Board
Chamber of Commerce of St. Joseph County
Charter Communications
Christopher S. Yoo
Christopher Sacca
Cincinnati Bell Wireless LLC
Cisco Systems, Inc.
City of Philadelphia
Clearwire Corporation
Coalition of Minority Chambers
ColorOfChange.org
Comcast Corporation
Communications Workers of America
Communications Workers of America—District 2 in West Virginia
Communications Workers of America—Local 3806
Communications Workers of America—Local 4900
Competitive Enterprise Institute
COMPTEL
CompTIA
Computer & Communications Industry Association
Computer Communications Industry Association, Consumer Electronics
Association
Computing Technology Industry Association
CONNECT
Connecticut Association for United Spanish Action, Inc.
Connecticut Technology Council
Consumer Policy Solutions
Corning Incorporated
Corporation for National Research Initiatives
Council of Baptist Pastors of Detroit & Vicinity, Inc.
Covad Communications Company
Cox Communications, Inc.
Craig Settles (Successful.com)
CREDO Action

Cricket Communications, Inc.
CTIA - The Wireless Association
CWA Indiana State Council
CWA Local 4900
Damian Kulash
Daniel Lyons
Data Foundry, Inc.
David Clark, William Lehr, and Steve Bauer
David D.F. Uran, Mayor, City of Crown Point, Indiana
Deborah Turner
Debra Brown
Derek Leebaert
Dickinson Area Partnership
Digital Education Coalition
Digital Entrepreneurs
Digital Society
DISH Network L.L.C.
Distributed Computing Industry Association
Downtown Springfield, Inc.
EarthLink, Inc.
Eastern Kentucky's Youth Association for the Arts, Inc.
Economic Development Council of Livingston County
Eight Mile Boulevard Association
El Centro
Electronic Frontier Foundation
Elgin Area Chamber
Elizabeth A. Dooley, Ed. D.
Entertainment Software Association
Ericsson Inc.
Erie Neighborhood House
Fiber-to-the-Home Council
Free Press
Frontier Communications
Future of Music Coalition
Future of Privacy Forum
G. Baeslack
General Communication, Inc.
Genesee Regional Chamber of Commerce
George Ou
Georgetown/Scott County Kentucky Chamber of Commerce

Georgia Minority Supplier Development Council
Global Crossing North America, Inc.
Global Intellectual Property Center
Google Inc.
Great River Economic Development Foundation
Greater Kokomo Economic Development Alliance
GSM Association
GVNW Consulting, Inc.
Hamilton County Alliance
Hance Haney
Hannah Miller
Harris Corporation
HB Clark
Hispanic Leadership Fund
Hispanic Technology and Telecommunications Partnership
Hmong/American Friendship Association, Inc.
Hughes Network Systems, LLC
Illinois Hispanic Chamber of Commerce
Independent Creator Organizations
Independent Film & Television Alliance
Independent Telephone & Telecommunications Alliance
Indiana Secretary of State
Indianapolis Urban League
Information and Communications Manufacturers and Service Providers
Information Technology and Innovation Foundation
Information Technology Industry Council
Institute for Emerging Leaders, Inc.
Institute for Liberty
Institute for Policy Innovation
Institute for Policy Integrity
Intellectual Property and Communications Law Program at Michigan State
    University College of Law
International Documentary Association, Film Independent, and others
Internet Freedom Coalition
Internet Innovation Alliance
Internet Society
Intrado Inc. and Intrado Communications Inc.
Ionary Consulting
Jared Morris
Jeanne K. Magill, Pabst Farms Development Inc.

Joe Armstrong, Tennessee State Representative
Joe Homnick
John Palfrey
John Staurulakis, Inc.
Johnson County Board of Commissioners
Joint Center for Political and Economic Studies
Joliet Region Chamber of Commerce & Industry
Kankakee County Farm Bureau
Karen Kerrigan, President & CEO, Small Business & Entrepreneurship
   Council
Karen Maples
Kentucky Commission on the Deaf and Hard of Hearing
Labor Council for Latin American Advancement
Lake Superior Community Partnership
Lakewood Chamber of Commerce
Latin American Chamber of Commerce of Charlotte
Latin Chamber of Commerce of Nevada
Latinos for Internet Freedom and Media Action Grassroots Network
Latinos in Information Sciences & Technology Association
Laurence Brett Glass, d/b/a LARIAT
Lawerence E. Denney, Speaker of the House, State of Idaho
Lawrence County Economic Growth Council
Lawrence Morrow
Leadership East Kentucky
League of United Latin American Citizens
Leap Wireless International, Inc. and Cricket Communications, Inc.
Level 3 Communications LLC
Links Technology Solutions, Inc.
Lisa Marie Hanlon, TelTech Communications LLC
M3X Media, Inc.
Mabuhay Alliance
Maneesh Pangasa
Mary-Anne Wolf
Matthew J. Cybulski
Mayor Brad Stephens
Mayor George Pabey, City of East Chicago, Indiana
Mayor Leon Rockingham, Jr.
Mayor Rudolph Clay, Gary, Indiana
McAllen Solutions

Media Action Grassroots Network, ColorOfChange.org, Presente.org,
    Applied Research Center, Afro-Netizen, National Association of
    Hispanic Journalists, Native Public Media, and Rural Broadband Policy
    Group
MegaPath, Inc. and Covad Communications Company
Messaging Anti-Abuse Working Group
MetroPCS Communications, Inc.
Michele Hodges, Troy Chamber
Microsoft Corp.
Mid-Atlantic Community Papers Association, on behalf of Association of
    Free Community Papers, Community Papers of Michigan, Free
    Community Papers of New York, Community Papers of Florida,
    Midwest Free Community Papers, Community Papers of Ohio and West
    Virginia, Southeastern Advertising Publishers Association, Wisconsin
    Community Papers
Mike Riley
Ministerial Alliance Against the Digital Divide
Mississippi Center for Education Innovation
Mississippi Center for Justice
MLB Advanced Media, L.P.
Mobile Future
Mobile Internet Content Coalition
Motion Picture Association of America, Inc.
Motorola, Inc.
Nacional Records
Nate Zolman
National Association for the Advancement of Colored People
National Association of Manufacturers
National Association of Realtors
National Association of State Utility Consumer Advocates
National Association of Telecommunications Office & Advisors
National Black Chamber of Commerce
National Cable & Telecommunications Association
National Coalition on Black Civic Participation
National Council of La Raza
National Emergency Number Association
National Exchange Carrier Association, Inc.
National Exchange Carrier Association, Inc., National Telecommunications
    Cooperative Association, Organization for the Promotion &

Advancement of Small Telecommunication Companies, Eastern Rural Telecom Association, Western Telecommunications Alliance
National Farmers Union
National Foundation for Women Legislators High Speed Internet Caucus
National Hispanic Caucus of State Legislators
National Hispanic Media Coalition
National Medical Association
National Organization of Black Elected Legislative Women *et al.*
National Organizations
National Rural Health Association
National Spinal Cord Injury Association
National Taxpayers Union
National Telecommunications Cooperative Association
National Urban League
Netflix, Inc.
Network 2010
New America Foundation
New Jersey Rate Counsel
New York State Office of Chief Information Officer/Office for Technology (CIO/OFT)
Nicholas Bramble, Information Society Project at Yale Law School
Nickolaus E. Leggett
Nippon Telegraph and Telephone Corporation
Nokia Siemens Networks US LLC
Northern Nevada Black Cultural Awareness Society
Office of the Attorney General of Virginia
Office of the Mayor, City of Peru
Older Adults Technology Services, Inc.
Open Internet Coalition
Open Media and Information Companies Initiative
Operation Action U.P.
Oregon State Grange
Organization for the Promotion & Advancement of Small Telecommunication Companies
PAETEC Holding Corp.
Patricia Dye
Performing Arts Alliance
Phil Kerpen, Vice President, Americans for Prosperity
Property Rights Alliance
Public Interest Advocates

Public Interest Commenters
QUALCOMM Incorporated
Qwest Communications International Inc.
R. L. Barnes
Rainbow PUSH Coalition
Recording Industry Association of America
Red Hat, Inc.
Rev. W.L.T. Littleton
Richmond Chamber of Commerce
RNK Communications
Robert K. McEwen d/b/a PowerView Systems
Robert Steele, Cook County Commissioner
Rural Cellular Association
Safe Internet Alliance
Saint Xavier University
Sandvine Inc.
Satellite Broadband Commenters
SavetheInternet.com
Scott Cleland
Scott Jordan
Sean Kraft
Sean Sowell
Seth Johnson
Shelby County Development Corporation
Skype Communications S.A.R.L.
Sling Media, Inc.
Smartcomm, LLC
Smithville Telephone Company
Software & Information Industry Association
Songwriters Guild of America
Sony Electronics Inc.
Southern Company Services, Inc.
Southern Wayne County Regional Chamber of Commerce
Sprint Nextel Corp.
St. Louis Society for the Blind and Visually Impaired
Stephen Beck
Steve Forte, Chief Strategy Officer, Telerik
stic.man of Dead Prez
SureWest Communications
Susan Jacobi

TDS Telecommunications Corp.
Tech Council of Maryland
TechAmerica
Telecom Italia, S.P.A.
Telecom Manufacturer Coalition
Telecommunications Industry Association
TeleDimensions, Inc.
Telefonica S.A.
Telephone Association of Maine
Texas Office of Public Utility Counsel
Texas Public Policy Foundation
Texas Statewide Telephone Cooperative, Inc.
The Ad Hoc Telecommunications Users Committee
The Berroteran Group
The Disability Network
The Free State Foundation
The Greater Centralia Chamber of Commerce & Tourism Office
The Greenlining Institute
The Heartland Institute
The Nebraska Rural Independent Companies
The Senior Alliance
Thomas C. Poorman, President, Zanesville-Muskingum County Chamber of
    Commerce
Thomas D. Sydnor II, Senior Fellow and Director, Center for the Study of
    Digital Property at the Progress & Freedom Foundation
Thomas Richard Reinsel, Executive in Residence, Sewickley Oak Capital
Thomas W. Hazlett
Tim Wu
Time Warner Cable Inc.
T-Mobile USA, Inc.
tw telecom inc.
U.S. Chamber of Commerce
Union Square Ventures
United Service Organizations of Illinois
United States Hispanic Chamber of Commerce
United States Telecom Association
UNITY: Journalists of Color, Inc.
Upper Peninsula Economic Development Alliance
Upper Peninsula Health Plan
Urban League of Metropolitan Seattle

Various Advocates for the Open Internet
Verizon and Verizon Wireless
Via Christi Health System eCare-ICU
Village of Maywood
Vincent Watts of the Greater Stark County Urban League
Voice on the Net Coalition
Vonage Holdings Corp.
Voto Latino
Washington State Grange
Wayne Brough, James Gattuso, Hance Haney, Ryan Radia, and James
    Lakely
Windstream Communications, Inc.
Winston-Salem Urban League
Wireless Communications Association International, Inc.
Wireless Internet Service Providers Association
World Institute on Disability *et al.*
Writers Guild of America, East AFL-CIO
Writers Guild of America, West, Inc.
XO Communications, LLC
YWCA of St. Joseph County

B.    Ruling Under Review

Verizon and MetroPCS appeal the final order of the Federal

Communications Commission captioned *In re Preserving the Open Internet;*

*Broadband Industry Practices*, Report and Order, Docket Nos. 09-191, 07-52, 25

F.C.C.R. 17905 (rel. Dec. 23, 2010), 76 Fed. Reg. 59192 (Sept. 23, 2011) (JA__).

C.    Related Cases

This case has been consolidated with Case Nos. 11-1356, 11-1403, 11-1404,

and 11-1411.

This case is related to *Cellco Partnership d/b/a Verizon Wireless v. FCC*,

Nos. 11-1135 & 11-1136 (D.C. Cir.), in that both cases involve substantially the

same parties and the similar legal issue of the Commission's statutory authority under Section 706 and Title III of the Communications Act to regulate broadband Internet access services and the extent to which such regulation constitutes prohibited common-carrier regulation under *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979).[*]

By:  /s/ Helgi C. Walker
_____
Helgi C. Walker
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
TEL: (202) 719-7000


By:  /s/ Stephen B. Kinnaird
_____
Stephen B. Kinnaird
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20006
TEL: (202) 551-1700

---

[*]     MetroPCS does not agree that *Cellco Partnership* is a related case.  *See* MetroPCS Docketing Statement, No. 11-1403 (D.C. Cir. filed Nov. 29, 2011).

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Verizon and MetroPCS hereby submit the following corporate disclosure statements:

The Verizon companies participating in this filing are Cellco Partnership, d/b/a Verizon Wireless, and the regulated, wholly-owned subsidiaries of Verizon Communications Inc.  Cellco Partnership, a general partnership formed under the law of the State of Delaware, is a joint venture of Verizon Communications Inc. and Vodafone Group Plc.  Verizon Communications Inc. and Vodafone Group Plc indirectly hold 55 percent and 45 percent partnership interests, respectively, in Cellco Partnership.  Both Verizon Communications Inc. and Vodafone Group Plc are publicly-traded companies.  Verizon Communications Inc. has no parent company.  No publicly held company owns 10 percent or more of Verizon Communications Inc.'s stock.  Insofar as relevant to this litigation, Verizon's general nature and purpose is to provide communications services, including broadband Internet access services provided by its wholly-owned telephone company and Verizon Online LLC subsidiaries and by Verizon Wireless.

MetroPCS Communications, Inc. is a publicly traded company organized to provide wireless and data service to its customers.  MetroPCS 700 Mhz, LLC; MetroPCS AWS, LLC; MetroPCS California, LLC; MetroPCS Florida, LLC;

MetroPCS Georgia, LLC; MetroPCS Massachusetts, LLC; MetroPCS Michigan,

Inc.; MetroPCS Networks California, LLC; MetroPCS Networks Florida LLC; and

MetroPCS Texas, LLC are wholly-owned subsidiaries of MetroPCS Wireless, Inc.

MetroPCS Wireless, Inc. is a wholly-owned direct subsidiary of MetroPCS, Inc.,

which in turn is a wholly-owned direct subsidiary of MetroPCS Communications,

Inc.  MetroPCS Communications, Inc. has no parent corporation, and only one

publicly-traded company, BlackRock, Inc., through its subsidiary BlackRock

Institutional Trust Company, N.A., owns more than 10 percent of its stock.

## **STATEMENT REGARDING DEFERRED APPENDIX**

The parties have conferred and intend to use a deferred joint appendix.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENTS ................................................... xiv

STATEMENT REGARDING DEFERRED APPENDIX.................................... xvi

TABLE OF AUTHORITIES .............................................................................. xviii

GLOSSARY...................................................................................................... xxvi

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF ISSUES ...................................................................................1

PERTINENT STATUTES.....................................................................................1

PRELIMINARY STATEMENT ...........................................................................2

STATEMENT OF FACTS ....................................................................................4

SUMMARY OF ARGUMENT ...........................................................................11

STANDING .........................................................................................................13

ARGUMENT .......................................................................................................13

STANDARD OF REVIEW .................................................................................13

I.      THE RULES DIRECTLY CONFLICT WITH THE
        COMMUNICATIONS ACT. ...................................................................14

II.     THE FCC LACKS STATUTORY AUTHORITY FOR THE RULES .......21

III.    THE *ORDER* VIOLATES THE FIRST AND FIFTH
        AMENDMENTS. .....................................................................................42

IV.     THE *ORDER* IS ARBITRARY AND CAPRICIOUS. ...............................50

CONCLUSION ....................................................................................................53

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

## CASES

*ACLU v. FCC*,
  823 F.2d 1554 (D.C. Cir. 1987) ........................................................ 14

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993) ......................................................... 53

*American Library Ass'n v. FCC*,
  406 F.3d 689 (D.C. Cir. 2005) ............................................... 13, 21, 24

*Associated Gas Distributors v. FERC*,
  824 F.2d 981 (D.C. Cir. 1987) ......................................................... 51

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ...................................................................... 21

*Bell Atlantic Telephone Cos. v. FCC*,
  24 F.3d 1441 (D.C. Cir. 1994) ......................................................... 42

*Burlington Northern & Santa Fe Railroad Co. v. Surface Transportation Board*,
  403 F.3d 771 (D.C. Cir. 2005) ......................................................... 52

*C-SPAN v. FCC*,
  545 F.3d 1051 (D.C. Cir. 2008) ....................................................... 14

*Cablevision Systems Corp. v. FCC*,
  597 F.3d 1306 (D.C. Cir. 2010) ....................................................... 48

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ...................................................................... 24

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) ....................................................................... 48

*Authorities upon which we chiefly rely are marked with asterisks.

*Comcast Cablevision of Broward County, Inc. v. Broward County*,
    124 F. Supp. 2d 685 (S.D. Fla. 2000) ................................................................44

*Comcast Corp. v. FCC*,
    579 F.3d 1 (D.C. Cir. 2009) ................................................................53

*\*Comcast Corp. v. FCC*,
    600 F.3d 642 (2010)................................................................................................
    .......................2, 5, 6, 18, 22, 24, 25, 26, 27, 28, 29, 30, 32, 36, 37, 39, 41, 42, 53

*Community Television, Inc. v. FCC*,
    216 F.3d 1133 (D.C. Cir. 2000) ................................................................40

*Competitive Telecommunications Ass'n v. FCC*,
    998 F.2d 1058 (D.C. Cir. 1993) ................................................................20

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building &*
    *Construction Trade Council*,
    485 U.S. 568 (1988) ................................................................42

*Environmentel, LLC v. FCC*,
    661 F.3d 80 (D.C. Cir. 2011) ................................................................39

*FCC v. Fox Television Stations, Inc.*,
    129 S. Ct. 1800 (2009) ................................................................32, 52

*\*FCC v. Midwest Video Corp.*,
    440 U.S. 689 (1979)................................................ 11, 14, 15, 16, 17, 19, 24, 53

*FCC v. NBC(KOA)*,
    319 U.S. 239 (1943) ................................................................41

*FCC v. Sanders Brothers*,
    309 U.S. 642 (1940) ................................................................37, 39

*\*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)................................................................12, 22, 23, 24

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ................................................................ 51

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ................................................................23

*Horsehead Resources Development Co. v. Browner*,
16 F.3d 1246 (D.C. Cir. 1994)............................................................51

*Illinois Bell Telephone Co. v. Village of Itasca*,
503 F. Supp. 2d 928 (N.D. Ill. 2007)................................................44

*Iowa Telecommunications Services v. Iowa Utilities Board*,
563 F.3d 743 (8th Cir. 2009) ............................................................18

*Lead Industries Ass'n v. EPA*,
647 F.2d 1130 (D.C. Cir. 1980).........................................................14

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982).........................................................................49

*Los Angeles v. Preferred Communications, Inc.*,
476 U.S. 488 (1986).........................................................................42

*MCI Telecommunications Corp. v. AT&T Co.*,
512 U.S. 218 (1994)....................................................................15, 40

*MPAA v. FCC*,
309 F.3d 796 (D.C. Cir. 2002)...............................................13, 38, 39

*NARUC v. FCC*,
525 F.2d 630 (D.C. Cir. 1976) ....................................................14, 20

*NARUC v. FCC*,
533 F.2d 601 (D.C. Cir. 1976).......................................13, 14, 20, 25

*National Fuel Gas Supply Corp. v. FERC*,
468 F.3d 831 (D.C. Cir. 2006).....................................................50, 52

*NBC v. United States*,
319 U.S. 190 (1943).........................................................................37

*NCTA v. Brand X Internet Services, Inc.*,
545 U.S. 967 (2005)......................................................................5, 15

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978).........................................................................49

*Qi-Zhuo v. Meissner,*
    70 F.3d 136 (D.C. Cir. 1995) ............................................................ 38

*Quincy Cable TV, Inc. v. FCC,*
    768 F.2d 1434 (D.C. Cir. 1985) ........................................................ 46

*Regents of University System v. Carroll,*
    338 U.S. 586 (1950) ......................................................................... 39

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ......................................................................... 22

*Time Warner Telecom, Inc. v. FCC,*
    507 F.3d 205 (3d Cir. 2007) ......................................................... 4, 23

*Time Warner Entertainment Co. v. FCC,*
    56 F.3d 151 ................................................................................ 47, 48

*Turner Broadcasting System v. FCC,*
    512 U.S. 622 (1994) ............................................... 42, 43, 45, 46, 47

*Turner Broadcasting System v. FCC,*
    520 U.S. 180 (1997) ..................................................................... 46, 47

*United States v. O'Brien,*
    391 U.S. 367 (1968) ..................................................................... 45, 46

*United States v. Southwestern Cable Co.,*
    392 U.S. 157 (1968) ......................................................................... 24

*University of Great Falls v. NLRB,*
    278 F.3d 1335 (D.C. Cir. 2002) ........................................................ 14

*U.S. AirWaves, Inc. v. FCC,*
    232 F.3d 227 (D.C. Cir. 2000) ..................................................... 40, 41

*VITELCO v. FCC,*
    198 F.3d 921 (D.C. Cir. 1999) ..................................................... 18, 19

*Western Broadcasting Co. v. FCC,*
    674 F.2d 44 (D.C. Cir. 1982) ....................................................... 40, 41

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................23, 27

## FEDERAL STATUTES

5 U.S.C. § 706(2) ........................................................................14

47 U.S.C. § 153(24) .....................................................................4

*47 U.S.C. § 153(51) ..........................................................4, 11, 15

47 U.S.C. § 153(53) ...............................................................4, 19

47 U.S.C. § 153(h) .....................................................................16

47 U.S.C. § 154(k) .....................................................................42

47 U.S.C. § 160 ..........................................................................29

47 U.S.C. § 201 ..........................................................................20

47 U.S.C. § 201(b) .........................................................17, 30, 34

47 U.S.C. § 202(a) ...............................................................17, 20

47 U.S.C. § 218 ..........................................................................42

47 U.S.C. § 230(b)(2) .........................................................23, 27

47 U.S.C. § 251 ..........................................................................30

47 U.S.C. § 251(a)(1) .................................................................34

47 U.S.C. § 252 ..........................................................................30

47 U.S.C. § 253 ..........................................................................30

47 U.S.C. § 254 ..........................................................................30

47 U.S.C. § 255 ..........................................................................30

47 U.S.C. § 256 ..........................................................................30

47 U.S.C. § 257 ..........................................................................30

47 U.S.C. § 258 ................................................................................30

47 U.S.C. § 259 ................................................................................30

47 U.S.C. § 260 ................................................................................30

47 U.S.C. § 261 ................................................................................30

47 U.S.C. § 303 ................................................................................38

47 U.S.C. § 303(g) ...........................................................................41

47 U.S.C. § 309(a) ...........................................................................41

47 U.S.C. § 309(j)(3) ........................................................................41

47 U.S.C. § 316(a)(1) ..................................................................38, 39

47 U.S.C. § 332(c)(1)(A) .............................................................4, 21

*47 U.S.C. § 332(c)(2) ...........................................................4, 11, 15

47 U.S.C. § 332(d)(1) ........................................................................4

47 U.S.C. § 332(d)(3) ........................................................................4

47 U.S.C. § 335(b)(3) ......................................................................21

47 U.S.C. § 402(a) .............................................................................1

47 U.S.C. § 402(b)(5) ........................................................................1

47 U.S.C. § 522(4) ...........................................................................36

47 U.S.C. § 522(5) ...........................................................................36

47 U.S.C. § 522(13) ..........................................................................36

47 U.S.C. § 536 ................................................................................36

47 U.S.C. § 548(b) ...........................................................................37

47 U.S.C. § 1302(a) ...............................................................28, 29, 30

47 U.S.C. § 1302(b) ..........................................................................33

47 U.S.C. § 1302(c) ...................................................................33

## LEGISLATIVE MATERIALS

Internet Freedom, Broadband Promotion, and Consumer Protection Act of
2011, S. 74, 112th Cong. (2011).........................................................8

Internet Non-Discrimination Act of 2006, S. 2360, 109th Cong. (2006)................8

## ADMINISTRATIVE MATERIALS

*Appropriate Framework for Broadband Access to the Internet Over Wireline
Facilities,*
20 F.C.C.R. 14986 (2005) ...............................................................5

*Appropriate Framework for Broadband Access to the Internet Over Wireline
Facilities,*
20 F.C.C.R. 14853 (2005).............................................................4, 5

*Appropriate Regulatory Treatment for Broadband Access to the Internet
Over Wireless Networks,*
22 F.C.C.R. 5901 (2007) ...............................................................4, 5

*Connect America Fund,*
26 F.C.C.R. 17663 (2011).............................................................34

*Deployment of Wireline Services Offering Advanced Telecommunications
Capability,*
13 F.C.C.R. 24012 (1998) .......................................................6, 29, 30

*Formal Complaint of Free Press et al.,*
23 F.C.C.R. 13028 (2008) ..............................................................5

*Framework for Broadband Internet Service,*
25 F.C.C.R. 7866 (2010)..............................................................7

*High-Speed Access to the Internet Over Cable and Other Facilities,*
17 F.C.C.R. 4798 (2002).............................................................5, 36

*Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934*,
    11 F.C.C.R. 21905 (1996)....................................................................19

*Policy & Rules Concerning Rates for Dominant Carriers*,
    4 F.C.C.R. 2873 (1989).......................................................................30

*Preserving the Open Internet*,
    24 F.C.C.R. 13064 (2009)......................................................................6

*Sixth Broadband Deployment Report*,
    25 F.C.C.R. 9556 (2010).....................................................................33

*Time Warner Cable Request for Declaratory Ruling*,
    22 F.C.C.R. 3513 (WCB 2007) ...........................................................34

## MISCELLANEOUS

A. Schlick, *A Third-Way Legal Framework for Addressing the Comcast Dilemma*,
    2010 WL 1840579 (May 6, 2010) .........................................................7

D. Lyons, *Virtual Takings: The Coming Fifth Amendment Challenge to Net Neutrality Regulation*,
    86 Notre Dame L. Rev. 65 (2011) ........................................................49

FTC, Staff Report:  Broadband Connectivity Competition Policy (2007)..............52

J. Genachowski, *The Third Way: A Narrowly Tailored Broadband Framework*,
    2010 WL 1840578 (May 6, 2010) .........................................................7

Transcript of Oral Argument, *Comcast Corp. v. FCC* (No. 08-1291) ...................24

# <u>GLOSSARY</u>

| | |
|---|---|
| **1996 Act** | Telecommunications Act of 1996 |
| **Act** | Communications Act of 1934 |
| ***Advanced Services Order*** | FCC order released on August 7, 1998 declaring that Section 706(a) of the 1996 Act does not constitute an independent grant of statutory authority to the FCC |
| ***Brand X*** | 2005 Supreme Court opinion affirming *Cable Modem Order* |
| ***Cable Modem Order*** | FCC order released on March 15, 2002 classifying cable modem Internet access service as an information service and not a cable service |
| ***Comcast*** | 2010 D.C. Circuit opinion vacating the *Comcast Order* and holding that the FCC failed to justify the exercise of ancillary authority over Comcast's network management practices |
| ***Comcast Order*** | FCC order released on August 20, 2008 finding that Comcast violated "federal Internet policy" and requiring Comcast to cease certain network management practices |
| **DOJ** | United States Department of Justice |
| **FCC** | Federal Communications Commission |
| **JA** | Joint Appendix |
| ***Midwest Video II*** | 1979 Supreme Court opinion vacating FCC's public access rules as impermissible common-carrier obligations |

| | |
|---|---|
| **MVPDs** | Multichannel Video Programming Distributors |
| ***NARUC I*** | 1976 D.C. Circuit opinion affirming FCC order classifying specialized mobile radio systems as non-common carriers |
| ***NARUC II*** | 1976 D.C. Circuit opinion vacating FCC order preempting state common-carrier regulation over the use of cable system leased access channels for two-way, point-to-point, non-video communications |
| ***NOI*** | FCC notice of Inquiry released on June 17, 2010 proposing to reclassify broadband Internet access service as a telecommunications service in response to the *Comcast* decision |
| ***NPRM*** | FCC Notice of Proposed Rulemaking released on October 22, 2009 inviting comment on proposal to adopt Open Internet rules |
| ***Order*** | FCC order released on December 23, 2010 formally adopting "net neutrality" rules that regulate the broadband Internet access services offered by wireless and wireline providers |
| ***Turner I*** | 1994 Supreme Court opinion holding that the must-carry provisions of Cable Television Consumer Protection and Competition Act of 1992 are subject to intermediate scrutiny under the First Amendment |
| ***Turner II*** | 1997 Supreme Court opinion upholding the must-carry provisions of Cable Television Consumer Protection and Competition Act of 1992 |
| ***VoIP*** | Voice over Internet Protocol |
| **WCB** | FCC Wireline Competition Bureau |

| | |
|---|---|
| ***Wireless Broadband Order*** | FCC order released on March 23, 2007 classifying wireless broadband Internet access service as an information service and further classifying mobile wireless broadband Internet access service as a private mobile service |
| ***Wireline Broadband Order*** | FCC order released on September 23, 2005 classifying wireline broadband Internet access service as an information service |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over Appellants' challenge to *Preserving the Open Internet*, 25 F.C.C.R. 17905 (rel. Dec. 23, 2010), 76 Fed. Reg. 59192 (Sept. 23, 2011) ("*Order*") (JA__), because the *Order* is final, Appellants "hold[]" wireless spectrum "license[s] which ha[ve] been modified … by the Commission," 47 U.S.C. § 402(b)(5); *Order* ¶¶ 133, 135 (JA__, __), and the appeals were timely filed.  The Federal Communications Commission ("FCC") has acknowledged that jurisdiction alternatively exists under 47 U.S.C. § 402(a) because Appellants timely filed Protective Petitions for Review.

## STATEMENT OF ISSUES[1]

1.      Whether the *Order* imposes common-carriage requirements on services that are statutorily exempt from such requirements or otherwise exceeds the FCC's statutory authority.

2.      Whether the *Order* is unconstitutional.

3.      Whether the *Order* is arbitrary and capricious.

## PERTINENT STATUTES

Pertinent statutes are contained in the addendum.

---

[1]      MetroPCS, directly adverse to Verizon in another case involving common-carriage prohibitions, does not join in the common-carrier or Fifth Amendment arguments.

1

## PRELIMINARY STATEMENT

This appeal challenges the FCC's second attempt to conjure a role for itself with respect to regulation of the Internet—in particular, broadband Internet access service. In *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010), this Court vacated the FCC's previous effort as exceeding its statutory authority. Here again, the FCC has acted without statutory authority to insert itself into this crucial segment of the American economy, while failing to show any factual need to do so.

Rather than proceeding with caution in light of *Comcast*, the FCC unilaterally adopted rules that go *even farther* than its prior action and impose dramatic new restrictions on broadband Internet access service providers. The *Order* imposes classic common-carrier obligations on broadband providers, requiring them to carry the traffic of all "edge providers" and even wading into price controls by setting a uniform, nondiscriminatory price of zero for such carriage. This regulation of Internet access service is expressly prohibited by the Communications Act ("Act").

Despite the FCC's concession in *Comcast* that it lacked express authority in this area, the agency's latest theory of authority arrogates unto itself plenary power to control all aspects of broadband Internet access service. Indeed, its sweeping theory extends to all other components of the Internet—from website, application, search engine, and content providers to specialized services to Internet backbone

companies. Tellingly, the FCC found it necessary explicitly to disclaim that the rules currently reach such entities and even to clarify that other entities, *e.g.*, coffee shops and airlines, are not covered.

The Commission based this self-described "broad authority" to adopt the rules not on any express or otherwise clear delegation of authority but on a hodgepodge of provisions scattered throughout the Act "viewed as a whole." *Order* ¶ 116 (JA__). However, none of these provisions remotely suggests that Congress ever intended to empower the agency with such vast authority over the Internet.

The Commission also adopted the *Order* without any evidence of a systematic problem in need of solution, candidly recognizing that the Internet was *already* "open" and working well for consumers. And the Commission singled out broadband providers for burdensome new regulation even though other key providers in the Internet economy have the same theoretical incentive and ability to engage in the conduct that concerned the FCC.

Finally, the *Order* infringes broadband network owners' constitutional rights. It violates the First Amendment by stripping them of control over the transmission of speech on their networks. And it takes network owners' property without compensation by mandating that they turn over those networks for the occupation and use of others at a regulated rate of zero, undermining owners' multi-billion-

3

dollar-backed expectations that they would be able to decide how best to employ their networks to serve consumers and deterring network investment.

## STATEMENT OF FACTS

*Classification of Broadband Internet Access Service.*  The Act defines two mutually exclusive categories of communications service: (i) "telecommunications service," a common-carrier service subject to regulation under Title II, 47 U.S.C. §§ 153(51), 153(53); and (ii) "information service," a service exempt from common-carrier regulation, *id.* §§ 153(24), 153(51).

It also defines two categories of mobile service.  "Commercial mobile service" is a type of wireless telecommunications service that is interconnected with the public switched telephone network and subject to common-carrier regulation under Title II.  47 U.S.C. § 332(c)(1)(A), (d)(1).  Any mobile service that is *not* a "commercial mobile service" constitutes "private mobile service" that is, like information service, immune from common-carrier regulation.  *Id.* § 332(c)(2), (d)(3).

The FCC has held that wireline and wireless broadband Internet access is an information service.[2]  The FCC has also ruled that mobile wireless broadband

---

[2]     *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14853, 14862-65 (¶¶ 12-17) (2005) ("*Wireline Broadband Order*"), *aff'd*, *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007); *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 F.C.C.R. 5901, 5909-12 (¶¶ 19-29) (2007) ("*Wireless*

4

Internet access is a private mobile service. *Wireless Broadband Order*, 22

F.C.C.R. at 5915-21 (¶¶ 37-56). The Commission explained that these

classifications were "consistent with Congressional intent to maintain a regime in

which information service providers are not subject to Title II regulations as

common carriers," *id.* at 5916 (¶ 41), and repeatedly found that Internet service

should exist in "a minimal regulatory environment" to "promote innovative and

efficient communication," *Wireline Broadband Order*, 20 F.C.C.R. at 14855 (¶ 1).

**Comcast Corp. v. FCC.** In 2005, the FCC adopted a policy statement

regarding broadband Internet access service. *Appropriate Framework for*

*Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14986

(2005). The Commission ordered Comcast to cease certain practices that

purportedly "r[an] afoul of" that document. *Formal Complaint of Free Press et*

*al.*, 23 F.C.C.R. 13028, 13050 (¶ 41) (2008) ("*Comcast Order*").

On review, this Court confronted the question "whether the Commission has

authority to regulate an Internet service provider's network management

practices." *Comcast*, 600 F.3d at 644. Noting the FCC's concession "that it has no

express statutory authority over such practices," *id.*, the Court vacated the *Comcast*

*Order* for failure to demonstrate ancillary authority, *id.* at 660. Among other

_____

Broadband Order*"); *see also High-Speed Access to the Internet Over Cable and*

*Other Facilities*, 17 F.C.C.R. 4798, 4822-23 (¶ 38) (2002) ("*Cable Modem*

*Order*"), *aff'd*, *NCTA v. Brand X Internet Servs., Inc.*, 545 U.S. 967 (2005).

things, *Comcast* rejected the FCC's reliance on Section 706(a) of the Telecommunications Act of 1996 ("1996 Act") because an "earlier, still-binding" FCC decision provided "that section 706 'does not constitute an independent grant of authority.'" *Id.* at 658 (quoting *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 F.C.C.R. 24012, 24047 (¶ 77) (1998) ("*Advanced Services Order*")).

**Proceedings Below.**  In October 2009, while *Comcast* was pending, the FCC proposed formal rules regarding broadband Internet access service.  *See Preserving the Open Internet*, Notice of Proposed Rulemaking, 24 F.C.C.R. 13064 (2009) ("*NPRM*") (JA__).  The *NPRM* claimed statutory authority based on the ancillary authority rationale of the *Comcast Order*, *id.* ¶¶ 83-85 (JA__-__), and asserted that Title III provided "additional authority" to regulate broadband service offered "via spectrum-based facilities," *id.* ¶ 86 (JA__).

Numerous commenters demonstrated that the proposed rules were unlawful and unnecessary.  They showed that: the rules constituted prohibited common-carrier regulation; the FCC lacked statutory authority for the rules; the *NPRM*'s unbounded theory of authority would reach all corners of the Internet; and the rules were unconstitutional.  *See, e.g.*, Verizon Comments at 86-123, Docket No. 09-191 (Jan. 14, 2010) (JA__-__); MetroPCS Comments at 4-11, Docket No. 09-191 (Jan. 14, 2010) (JA__-__).  Commenters further showed that: the *NPRM* identified no

6

problem in need of regulatory solution; the rules would hamper innovation and deter network investment; and the focus on broadband providers was irrational because the lines between networks, applications, and devices are fast disappearing, and numerous players in the Internet ecosystem, such as content providers and search engines, play "gatekeeping" roles on the Internet.  Verizon Comments at 31-40, 50-85, 129-30 (JA__, __, __); MetroPCS Comments at 11-14, 24-35, 40-46 (JA__, __, __).

In April 2010, while the *NPRM* was pending, this Court handed down *Comcast*.  FCC officials described *Comcast*'s "undermining" of the Commission's authority as "untenable," creating a "serious problem that must be solved" before the rules could be adopted.  J. Genachowski, *The Third Way: A Narrowly Tailored Broadband Framework*, 2010 WL 1840578, at *3-4 (May 6, 2010) (JA__); *see id.* at *3 (JA__) (stating that *Comcast* "cast serious doubt on the particular legal theory the Commission used ... to justify its ... role with respect to broadband Internet communications"); A. Schlick, *A Third-Way Legal Framework for Addressing the Comcast Dilemma*, 2010 WL 1840579 (May 6, 2010) (JA__).[3]

---

[3]    The FCC then initiated a proceeding to reclassify broadband Internet access as a "telecommunications service" subject to Title II because "*Comcast* appears to undermine prior understandings about the Commission's" authority to regulate broadband.  *Framework for Broadband Internet Service*, Notice of Inquiry, 25 F.C.C.R. 7866, 7866-67 (¶¶ 1-2) (2010) ("*NOI*") (JA__-__).  Numerous parties objected to reclassification because, *inter alia*, it would be unlawful.  *See, e.g.,*

*Comcast* and the general question whether to regulate the Internet have

attracted substantial attention from Congress.  Since 2006, at least eleven pieces of

"net neutrality" legislation were introduced and debated in Congress.  *E.g.*, Internet

Non-Discrimination Act of 2006, S. 2360, 109th Cong. (2006); Internet Freedom,

Broadband Promotion, and Consumer Protection Act of 2011, S. 74, 112th Cong.

(2011).  None was enacted.

**The Order.**  On December 21, 2010, the FCC adopted, by a vote of 3-2,

rules governing "broadband Internet access service."  *Order* ¶ 44 (JA__).  The

*Order* recognized that the Internet "is a level playing field" that allows consumers

to "make their own choices about what applications and services to use" and "to

decide what content they want to access, create, or share."  *Id.* ¶ 3 (JA__).

Nevertheless, the Commission adopted "prophylactic rules" to resolve the

"significant uncertainty" created by *Comcast*.  *Id.* ¶¶ 11, 42 (JA__, __).  The *Order*

asserted that "broadband providers may have economic incentives to block or

otherwise disadvantage" edge providers, *id.* ¶ 21 (JA__), but identified only four

isolated, anecdotal incidents of such supposed conduct, *id.* ¶ 35 (JA__).

The *Order*'s core requirement is that broadband providers carry the Internet

traffic of all edge providers, or specified classes of such providers, free of charge.

---

Verizon Comments at 28-99, Docket No. 10-127 (July 15, 2010) (JA__-__).  There
has been no further action on the *NOI*.

This duty arises out of the "no blocking" rule and the express prohibition on charging edge providers to transmit their traffic. Specifically, the no blocking rule prohibits fixed broadband providers from blocking any "lawful content, applications, services, or non-harmful devices," *id.* at 88 § 8.5 (JA___); *see id.* ¶ 63 (JA___)—*i.e.*, "all traffic transmitted to or from end users of a broadband Internet access service," *id.* ¶ 64 (JA___). Similarly, mobile providers cannot block access to (and thus must transmit all traffic to and from) "lawful websites." *Id.* at 88 § 8.5 (JA___); *see id.* ¶ 99 (JA___). In addition, mobile providers are prohibited from blocking "applications that compete with the provider's voice and video telephony services." *Id.* The FCC paired this rule with an explicit ban on charging "edge providers ... for delivering traffic to or carrying traffic from broadband provider's end-user customers," thus foreclosing a wide range of two-sided pricing models. *Id.* ¶ 67 (JA___); *see id.* ¶¶ 23-24, 99 (JA___-__, __). It also expressly reserved the right to regulate the prices that broadband providers charge their own end-users. *Id.* ¶ 122 n.381 (JA___).

The FCC adopted a second rule prohibiting fixed broadband providers from "unreasonably discriminat[ing] in transmitting lawful network traffic." *Id.* at 88 § 8.7 (JA___); *see id.* ¶¶ 68-79 (JA___-__). The *Order* effectively banned certain potential commercial services—including any "commercial arrangement between a broadband provider and a third party to directly or indirectly favor some traffic

over other traffic"—by stating that "it is unlikely" that such services "would satisfy the 'no unreasonable discrimination' standard." *Id.* ¶ 76 (JA__). "The practice of a broadband Internet access service provider prioritizing its own content, applications, or services" is also effectively prohibited. *Id.* The no blocking and nondiscrimination rules are subject to "reasonable network management." *Id.* at 89 § 8.11(d) (JA__).

Finally, the FCC established a "transparency" rule requiring all broadband providers to "publicly disclose" their network practices, performance characteristics, and commercial terms. *Id.* at 88 § 8.3 (JA__); *id.* ¶¶ 53-61, 97-98 (JA__-__, __-__).

As for statutory authority, the FCC concluded that Congress "expressed its instructions [to the Commission] in multiple sections [of the communications laws] which, viewed as a whole, provide broad authority" to adopt the rules. *Id.* ¶ 116 (JA__). The FCC referenced approximately 24 disparate provisions scattered throughout the Act, but never explained what type of authority any particular provision provided. *Id.* ¶¶ 115-37, 170 (JA__-__, __). In again relying on Section 706(a), the FCC maintained that its "understanding" of that provision as "a specific delegation of legislative authority" was "consistent with" the *Advanced Services Order*. *Id.* ¶¶ 119, 122 (JA__, __). The *Order* acknowledged that its claimed authority could reach other Internet providers, including providers of "specialized

10

services" and "Internet backbone services." *Id.* ¶¶ 47, 112-14 (JA__, __-__). Although the Commission chose not to regulate such providers, it indicated that it might do so in the future. *Id.*

**Dissenting Opinions.** Two commissioners dissented. Commissioner McDowell concluded that the *Order* imposed "sweeping new common carriage-style obligations" on broadband Internet service, and that the Commission's "tortured logic" on statutory authority was "designed to circumvent the effect of the D.C. Circuit's *Comcast* decision." *Id.* at 153, 168 (JA__, __). Commissioner Baker wrote that the FCC had "given itself plenary authority to regulate the Internet." *Id.* at 191 (JA__).

## <u>SUMMARY OF ARGUMENT</u>

The rules adopted in the *Order* are unlawful for several independent reasons. *First*, the Act expressly forbids the FCC from applying common-carrier regulation to broadband Internet access, 47 U.S.C. §§ 153(51), 332(c)(2), but the rules do just that. They subject broadband providers to quintessential common-carrier duties by compelling them to carry the Internet traffic of all comers, and to do so at a uniform, nondiscriminatory price of zero. Accordingly, the rules directly conflict with the Act and thus cannot stand. *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) ("*Midwest Video II*").

*Second*, the FCC otherwise lacks statutory authority for the rules. The Commission points to a hodgepodge of provisions to support its claim of "broad authority," *Order* ¶ 116 (JA__), but does not and could not suggest that any of these provisions expressly authorizes these rules. And it defies "common sense" that Congress would have empowered the agency to "regulate an industry constituting a significant portion of the American economy … in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 159-60 (2000) (citation omitted). Nor do these provisions provide any basis for asserting ancillary authority. Regardless, the FCC has not shown that the rules are necessary to achieve any statutorily-mandated task.

*Third*, the rules are unconstitutional. Broadband networks are the modern-day microphone by which their owners engage in First Amendment speech. The FCC thus must identify an *actual* problem, and narrowly tailor its solution to solve that problem. The FCC's "prophylactic" rules cannot pass that test. The Fifth Amendment likewise protects broadband network owners from government compulsion to turn over their private property for use by others without compensation, especially in light of their multi-billion-dollar investment-backed expectations.

*Finally*, the rules are arbitrary and capricious. While the record is replete with substantial evidence (including analyses by a Nobel-prize winning economist

and former Chief Economists for the FCC and Justice Department) that the rules would deter network investment, it is *devoid* of evidence of any problem sufficient to justify these extensive regulations. The FCC also arbitrarily applied its rules to a single class of service providers even though myriad others in the Internet economy can engage in "gatekeeping."

## STANDING

Appellants have standing because they participated in the proceedings below, are providers of broadband Internet access services subject to the rules, hold wireless spectrum licenses modified by the *Order*, and are otherwise adversely affected and substantially aggrieved by the *Order*.

## ARGUMENT

### STANDARD OF REVIEW

The question whether Congress delegated the FCC authority to regulate broadband Internet access is reviewed *de novo*. *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005); *MPAA v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002). Moreover, the "explicit statutory limitations on Commission authority" in the bans on common-carrier regulation "take[] the case outside of any area of deference to agency interpretation." *NARUC v. FCC*, 533 F.2d 601, 618 (D.C. Cir.

13

1976) ("*NARUC II*").[4]  And where, as here, "an agency's assertion of power into new arenas is under attack, … courts should perform a close and searching analysis of congressional intent." *ACLU v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987).

The constitutional challenge is subject to *de novo* review.  *C-SPAN v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008).  Further, "the constitutional avoidance canon of statutory interpretation trumps *Chevron* deference." *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1340-41 (D.C. Cir. 2002).  The remaining challenges are reviewed under the "arbitrary and capricious" standard.  *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1145 (D.C. Cir. 1980).

## I.    THE RULES DIRECTLY CONFLICT WITH THE COMMUNICATIONS ACT.

An agency exceeds its statutory authority by issuing rules that contravene its governing statute.  5 U.S.C. § 706(2); *Midwest Video II,* 440 U.S. at 706.  The *Order* exceeds the FCC's authority because it subjects broadband Internet access service—which is both an information and private mobile service—to common-carriage regulation, a result expressly prohibited by the Act.  It does so by requiring broadband providers to carry the traffic of all edge providers (or classes

---

[4]     Contrary to the FCC's contention, *Order* ¶ 79 n.248 (JA__), it does not enjoy "any significant discretion in determining who is a common carrier." *NARUC v. FCC*, 525 F.2d 630, 644 (D.C. Cir. 1976) ("*NARUC I*").

thereof) at a common, nondiscriminatory rate of zero. This suffices to invalidate the *Order*. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994).

1. Broadband Internet access service is statutorily exempt from common-carrier regulation. The Act establishes a regulatory dichotomy between "telecommunications service" and "information service," *see supra* p. 4, and expressly states that a "telecommunications carrier shall be treated as a common carrier ... *only* to the extent that it is engaged in providing telecommunications services," 47 U.S.C. § 153(51) (emphasis added). The Act thus "regulates telecommunications carriers, but not information-service providers, as common carriers." *Brand X*, 545 U.S. at 975. And Section 332(c)(2) expressly precludes regulation of a private mobile service provider "as a common carrier for *any* purpose." 47 U.S.C. § 332(c)(2) (emphasis added).

The Commission has classified wireline and wireless broadband Internet access services as "information services," and declared that mobile wireless Internet access is a "private mobile service." *See supra* pp. 4-5. Accordingly, the Commission may not regulate broadband providers as common carriers.

2. The *Order* does precisely what the Act prohibits. Under *Midwest Video II*, this cannot stand. There, the Supreme Court struck down the Commission's "public access" rules as contrary to "the command of § 3(h) of the Act that 'a person engaged in ... broadcasting shall not ... be deemed a common carrier'"

15

because the rules "relegated cable systems, *pro tanto*, to common-carrier status."

440 U.S. at 700-01 (quoting 47 U.S.C. § 153(h)).  "Under the [public access] rules,

cable systems [were] required to hold out dedicated channels on a first-come,

nondiscriminatory basis," "[a]nd the rules delimit[ed] what operators [could]

charge." *Id.* at 701-02.  The rules thus bore the hallmark of common carrier status:

"a duty to hold out facilities indifferently for public use." *Id*. at 707 n.16; *see id*. at

701 ("A common carrier does not 'make individualized decisions, in particular

cases, whether and on what terms to deal.'" (citation omitted)).

So too here.  The FCC's rules constitute classic common-carrier obligations

because they compel broadband providers to carry the Internet traffic of all comers,

and at a uniform, nondiscriminatory price of zero.  The no blocking rule denies

broadband providers discretion in deciding which traffic from so-called edge

providers to carry, except for unlawful material.  *See Order* at 88 § 8.5 (JA___).  It

expressly forces fixed broadband providers to carry "all traffic transmitted to or

from end users of a broadband Internet access service," *id.* ¶ 64 (JA___), so that

edge providers can reach "all U.S. end users," *id.* ¶ 30 (JA___).  Similarly, mobile

broadband providers must carry all traffic to or from "any lawful website," *id.*

¶ 100 (JA___), and guarantee access to "any and all applications that compete with"

their "voice or video telephony services," *id.* ¶ 99 (JA___).  The *Order* thus compels

broadband providers to "hold out" their networks for use by all, thereby depriving

16

them "of all discretion regarding who may exploit their [networks] and what may

be transmitted over such [networks]." *Midwest Video II*, 440 U.S. at 693, 701-02.

Further, the *Order* denies broadband providers discretion over carriage terms

by setting a uniform price of zero; it forbids them from imposing any "charge

[upon] edge providers ... for delivering traffic to or carrying traffic from the

broadband provider's end-user customers." *Order* ¶ 67 (JA__); *see id.* ¶¶ 23-24,

99 (JA__-__, __).  The *Order* thereby limits the ability of providers to employ two-

sided pricing models in which edge providers pay for some costs of the network

(thereby pushing more costs onto consumers).[5]  It also effectively prohibits price

discrimination among edge providers because all must pay the *identical* rate.  In

essence, the *Order* replicates the Act's common-carrier provisions, determining

that the only "reasonable" price for the transmission of edge providers' traffic is

zero, *cf.* 47 U.S.C. § 201(b), and that any deviation from that price would be

unlawful, 47 U.S.C. § 202(a).  Accordingly, the rules exert pervasive control over

"the price and quality of access to end users," *Order* ¶ 21 (JA__), just as the rules

in *Midwest Video II* "circumscribe[d] what operators [could] charge for privileges

of access and use of facilities and equipment" to reach end-users, 440 U.S. at 694.

And "pervasive rate regulation to ensure that the company provides the service at

---

[5]    It is no answer to say that providers can charge end-users at prices that the
competitive market will bear, *Order* ¶ 79 (JA__), because the *Order* still imposes
common-carriage price regulation by mandating a price of zero *for edge providers*.

'reasonable charges'" is a prime "example[] of regulations that apply to Title II common carrier services."  *Comcast*, 600 F.3d at 655.

Although the foregoing features of the *Order* constitute quintessential common-carrier regulation, the explicit nondiscrimination mandate is the icing on the cake.  That rule provides that fixed broadband providers "shall not unreasonably discriminate in transmitting lawful network traffic," *Order* at 88 § 8.7 (JA__), and presumptively prohibits providers from "charging edge providers" for "prioritized access to end users," *id*. ¶ 24 (JA__), or any "additional fees for faster delivery of [certain] content," *id*. ¶ 128 (JA__); *see id*. ¶ 76 (JA__). This mandate regulates provider practices by governing their transmission of traffic and, like the no blocking rule, effectively prohibits price discrimination.

3.  The *Order* asserts that the statutory bans on common-carrier treatment are "not relevant" because broadband providers can still make "individualized decisions" with respect to all potential "end users" of their services.  *Id*. ¶ 79 (JA__).  The *Order*'s myopic focus on retail "end users" is misplaced.

"Neither the Commission nor the courts" have construed common carriage as "limited to end-users of a service."  *VITELCO v. FCC*, 198 F.3d 921, 930 (D.C. Cir. 1999) (quotation and alteration omitted); *see Iowa Telecomms. Servs. v. Iowa Utils. Bd.*, 563 F.3d 743, 747, 750 (8th Cir. 2009).  The FCC has "acknowledged that common carriers' customers need not be 'end users,'" *VITELCO*, 198 F.3d at

929 (citation omitted), and the Act makes clear that service offered to "classes of users" qualifies as common-carrier service, 47 U.S.C. § 153(53).  For example, the FCC has long held that "[c]ommon carrier services include … exchange access service … offered primarily to other carriers" so they can reach end-users. *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934*, 11 F.C.C.R. 21905, 22033 (¶ 265) (1996).  And although the *Order* assumes a bright line between end-users and edge providers here, it elsewhere explains that "[t]hese terms are not mutually exclusive."  *Order* ¶ 4 n.2 (JA__).

Indeed, the rules invalidated in *Midwest Video II* did not concern providers' relationships with end-users.  Rather, they required cable operators to provide channels for "third parties"—"public, educational, local governmental, and leased-access users … who wish to communicate by the cable medium" with end-users. 440 U.S. at 691, 693, 700.  So too here.  The primary means by which the *Order* seeks to achieve "openness" is to regulate broadband providers' relationships with edge providers "who wish to communicate by the [Internet] medium" with end-users.  *Id.* at 700.

The FCC tacitly recognizes this, maintaining that the rules do not amount to common-carrier obligations as to edge providers because they do not require broadband providers to "'carry for all [edge providers] indifferently.'"  *Order* ¶ 79

n.251 (JA__) (alteration in original) (stating that providers may, "under certain circumstances," engage in "reasonable network management," "reasonable discrimination," and "prioritize" some traffic).  But traditional common-carrier nondiscrimination standards have always allowed "reasonable" discrimination. *Competitive Telecomms. Ass'n v. FCC*, 998 F.2d 1058, 1064 (D.C. Cir. 1993).  The *Order* does nothing more—it simply recognizes that there are "beneficial forms of differential treatment," such as "reasonable network management." *Order* ¶ 69 (JA__).  Moreover, a provider's ability to perform "reasonable network management" merely preserves a common carrier's traditional right to "turn[] away [business] either because it is not of the type normally accepted or because the carrier's capacity has been exhausted."  *NARUC I*, 525 F.2d at 424.  Even if providers potentially could "prioritize traffic," that likewise "does not detract from ... common carrier status" because the "general commandment of indifferent service [may be] modified by the ... acceptance … of certain types of priority treatment."  *NARUC II*, 533 F.2d at 609.

    4.  Even if the rules do not amount to full-scale common-carrier regulation, they at a minimum replicate key aspects of Title II by mandating carriage, regulating the terms thereof, and regulating carrier practices.  Title II grants authority to require an entity to offer a service to all comers and to ban "discrimination" in "charges" and "practices."  47 U.S.C. §§ 201, 202(a); *see also*

20

47 U.S.C. §§ 332(c)(1)(A) (authorizing common-carrier regulation of commercial wireless services), 335(b)(3) (requiring satellite providers to sell capacity "upon reasonable prices, terms, and conditions, as determined by the Commission"). But Congress conferred no comparable power in the provisions of the Act the FCC cites as supporting the rules. *See infra* Part II. Where Congress has chosen to use language in certain provisions but not others, that choice must be respected. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). The Act thus forbids importing the basic terms of Title II into parts of the Act where they do not appear.

## II.    THE FCC LACKS STATUTORY AUTHORITY FOR THE RULES.

Apart from the violation of the common-carrier prohibitions, the *Order* fails to identify any statutory authority for the rules. "The FCC, like other federal agencies, literally has no power to act ... unless and until Congress confers power upon it." *Am. Library Ass'n*, 406 F.3d at 708 (quotation and citation omitted). None of the scattered, unrelated provisions of the Act cited in the *Order* grants the FCC authority to so broadly regulate a sector of the economy as significant as the Internet. The Commission's sweeping theory would allow it not only to assert plenary authority over broadband providers, including specialized services and prices for their end-user customers, but to regulate *all* sectors of the Internet economy without limit.

21

1.  As an initial matter, an agency must clearly articulate the basis for its authority.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).  But the FCC has previously *admitted* that it "has no express statutory authority" to regulate the practices of broadband providers.  *Comcast*, 600 F.3d at 644.  Thus, rather than rely on any clear legal foundation for the rules, the *Order* takes a muddled, scattershot approach to the issue.  *Order* ¶¶ 115-37 (JA__-__).  The *Order* lumps together approximately 24 different statutory provisions into one undifferentiated mass, theorizing that Congress delegated "broad authority" for the rules "in multiple sections" of the communications laws "viewed as a whole."  *Id.* ¶ 116 (JA__).  The agency's failure to articulate any specific source of authority is enough to invalidate the *Order.  Chenery*, 332 U.S. at 196-97.

2.  That failure demonstrates the fundamental problem with the *Order*— there is no statutory authority for the rules.  In evaluating whether Congress empowered the FCC to regulate the Internet—"arguably the most important innovation in communications in a generation," *Comcast*, 600 F.3d at 661 (citation omitted)—a reviewing court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency," *Brown & Williamson*, 529 U.S. at 133 (citation omitted).

22

Here, it is implausible that Congress would have empowered the agency to "regulate an industry constituting a significant portion of the American economy… in so cryptic a fashion" as cobbling together so many disparate statutory provisions. *Id.* at 159-60. That the agency cannot clearly identify a delegation of authority over this revolutionary mode of communication is powerful evidence that there is none—Congress does not, after all, "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Indeed, to the extent Congress addressed regulation of the Internet, it provided that it should be "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

Furthermore, the question whether to abandon the established "hands-off" policy for the Internet and enact restrictions on broadband providers (or to give the Commission authority to do so) has been the subject of extensive debate and Congressional attention. *See supra* p. 8. That debate—and Congress's subsequent failure to enact legislation—confirms that the Commission lacks authority to promulgate these rules. *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting claim of delegated authority over issue that was "the subject of an 'earnest and profound debate' across the country"); *Brown & Williamson*, 529 U.S. at 160 (deferring to "Congress' consistent judgment to deny the FDA [its asserted] power").

3.  Nor can the FCC rely on authority "'reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities.'" *Am. Library Ass'n*, 406 F.3d at 692.  Although the Supreme Court recognized the concept of "ancillary authority" in cases such as *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), the Court later observed that it "'strain[s] the outer limits'" of administrative law, *Midwest Video II*, 440 U.S. at 708 (citation omitted).  The doctrine is also inconsistent with recent precedent.[6]

Accordingly, this Court has taken a "very cautious approach in deciding whether the Commission [has] validly invoked its ancillary jurisdiction," *Am. Library Ass'n*, 406 F.3d at 702, explaining that Congress has not given the FCC a roving, do-good mandate over communication by wire or radio, *Comcast,* 600 F.3d at 661.  The FCC must justify the exercise of ancillary authority by: (1) identifying a substantive statutory provision to which the proposed action is ancillary, and (2) showing, with "substantial support in the record," that (3) the action is "necessary" for the effective performance of the Commission's "statutorily mandated

---

[6]     *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (limiting agencies to gap-filling role under direct delegations of authority); *Brown & Williamson*, 529 U.S. at 159-60 (inquiring whether Congress affirmatively delegated agency authority); *see also* Transcript of Oral Argument at 20, *Comcast Corp. v. FCC* (No. 08-1291) (Randolph, J.) (noting inconsistency with contemporary statutory construction).

responsibilities" under that provision. *Id.* at 646, 654; *NARUC II,* 533 F.2d at 614-15.

The FCC does not seriously attempt to satisfy this test. The *Order* never explains which of the many cited provisions provide the basis for ancillary authority, and studiously avoids even using that term. Further, except for the transparency rule, the *Order* does not identify which provisions support the exercise of ancillary authority as to any particular rule. The Commission's approach thus violates *Comcast*'s instruction that "the permissibility of each new exercise of ancillary authority" must be justified "on its own terms" and that the critical point is "whether the particular regulation at issue" satisfies the ancillary authority test. 600 F.3d at 650; *see NARUC II*, 533 F.2d at 612.

The *Order* itself demonstrates the Commission's failure to justify the exercise of ancillary authority. Its stated purpose is to preserve the "openness" of "the Internet," *Order* ¶ 43 (JA__), not to regulate the Internet as a means to accomplish some *other*, statutorily-mandated end, *id.* at 88 § 8.1 (JA__) ("The purpose of this Part is to preserve the Internet as an open platform[.]"). Thus, any exercise of authority here is not "really incidental to" the regulation of a service under "specifically delegated powers," *NARUC II*, 533 F.2d at 612, or "derivative [in] nature," *Comcast*, 600 F.3d at 654, but an assertion of power over the Internet for the sake of regulating the Internet itself.

25

In any event, this Court has already made clear that "rate regulation" of Internet services would exceed the outer boundaries of the FCC's ancillary authority. *Comcast*, 600 F.3d at 655. The *Order* imposes just such regulation by prohibiting providers from charging edge providers for delivering traffic and limiting the use of two-sided pricing models to recover network costs. *See supra* pp. 17-18. If the FCC can "subject … Internet service to pervasive rate regulation," there is "no reason why the Commission would have to stop there," and there are "few examples of regulations that apply to Title II common carrier services ... that the Commission ... would be unable to impose upon Internet service providers." *Comcast,* 600 F.3d at 655.

4. Whether the *Order* is premised purely on a theory of ancillary authority, as the Commission's position in *Comcast* seems to require, or some other theory, it suffers from an additional fatal flaw: the Commission's assertion of regulatory power "appears to have no limiting principle." *Order* at 162 (JA__) (McDowell Statement). *Comcast*, however, made clear that the FCC may not claim "plenary authority over" broadband providers. 600 F.3d at 654.

Yet that is exactly what the *Order* does. It asserts authority to regulate broadband providers based upon nothing other than the agency's notions of "economic and civic benefits" associated with the Internet. *Order* ¶ 4 (JA__); *see e.g.*, *id.* ¶ 3 (JA__) (citing enhancement of "health, education, and the

26

environment"). As the *Order* itself presumes, this theory could apply not just to broadband service, but to all aspects of a broadband provider's business, including specialized services and even retail customer prices. *See supra* pp. 10-11. Indeed, the theory would extend to all sectors of the Internet, from website, application, search engine, and content providers to Internet backbone companies. When the FCC "feels compelled to explicitly 'decline to apply [its] rules directly to coffee shops, bookstores, [and] airlines,' [that only] illustrates the broad scope of these rules, and the lack of any ascertainable outer limits to [its] claimed authority." *Order* at 192 (JA___) (Baker Statement) (quoting *Order* ¶ 52).

In sum, the agency's position "if accepted … would virtually free the Commission from its congressional tether." *Comcast*, 600 F.3d at 655. Indeed, such acceptance would risk ratifying a naked, unconstitutional delegation of legislative authority. *See Whitman*, 531 U.S. at 472.

5. In any event, no provision of the Act cited in the *Order* can serve as a source of substantive regulatory power for the rules.

**Section 230.** The *Order* first cites Section 230, *Order* ¶ 116 (JA___), which provides that "the policy of the United States" is that the Internet should be "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). This Court rejected the FCC's reliance on this provision in *Comcast*, explaining that it contains mere "statements of policy ... not delegations of regulatory authority."

27

600 F.3d at 654.  Accordingly, Section 230 provides no authority for the rules and instead establishes a national policy directly *counter* to them.

**Section 706.**  Next, the *Order* cites Section 706(a), *Order* ¶¶ 117-22 (JA__-__), which provides that the FCC and state regulatory commissions "shall encourage" broadband deployment "by utilizing … price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment."  47 U.S.C. § 1302(a).  As an initial matter, it is implausible to read Section 706(a), which applies to state regulatory commissions, as a grant of federal regulatory power.  Regardless, the FCC does not claim that Section 706(a) expressly authorizes these rules.  Nor, in light of the provision's text, could it: the rules govern the transmission of Internet traffic, not network deployment.

Instead, the FCC attempts a triple-cushion shot to somehow tie the rules to the statute:  (1) the "openness" of the Internet enables the creation of "new content, applications, services, and devices"; (2) those "new uses of the network" will "lead to increased end-user demand for broadband"; and (3) that demand will "drive network improvements."  *Order* ¶ 14 (JA__).  This theory fails.

Section 706(a) directs the Commission to encourage broadband deployment, but only "by utilizing" regulatory authority provided elsewhere in the Act.  If Section 706(a) were a standalone grant of authority, Congress would not have

28

directed the Commission to employ specifically-enumerated "regulating methods" to achieve the stated goal.  47 U.S.C. § 1302(a).  Thus, Section 706(a) "delegate[s] no regulatory authority" to the FCC but "merely … support[s]" agency action that is otherwise "clearly within its statutory authority under other sections of the Act."  *Comcast*, 600 F.3d at 652, 659.[7]  The Commission has long understood that "section 706 does not constitute an independent grant of authority" but "directs the Commission to use the authority granted in other provisions."  *Advanced Services Order*, 13 F.C.C.R. at 24045, 24047 (¶¶ 69, 77).  The *Order* even recognizes that Section 706(a) permits the Commission to act only "by any of the means listed in the provision"—*viz.*, by "using its existing rulemaking, forbearance and adjudicatory powers."  *Order* ¶ 119 (JA__).

Consequently, each of the specific regulatory methods enumerated in Section 706(a) is based on separate statutory authority, with its own limitations that the FCC must honor.  Forbearance, as the *Advanced Services Order* recognized, is authorized by and thus must comply with Section 10 of the Act.  47 U.S.C. § 160. The FCC concedes that Section 706(a) gives it no authority to forbear "over and above what it otherwise possessed" and does not allow it to "trump" any limits on

---

[7]      *Comcast* stated that Section 706(a) "could at least arguably be read to delegate regulatory authority to the Commission," explaining that it "does contain a direct mandate—the Commission 'shall encourage'" broadband deployment. 600 F.3d at 658.  But the provision makes clear *how* the Commission can do so— *viz.*, "by utilizing" other, specifically enumerated powers.

its authority under other provisions of the Act. *Order* ¶ 119 (JA__). "Price cap

regulation" has long been authorized under Title II. 47 U.S.C. § 201(b); *Policy &*

*Rules Concerning Rates for Dominant Carriers*, 4 F.C.C.R. 2873, 3295-307

(¶¶ 881-95) (1989). Part II of Title II provides the authority and substantive

boundaries for "measures that promote competition in the local

telecommunications market," 47 U.S.C. §§ 251-61, and again Section 706(a) does

not allow the FCC to "trump" those boundaries, *Order* ¶ 119 (JA__). Finally, just

as with the preceding items, the Commission must rely on an independent source

of authority to invoke the catch-all phrase covering any "*other* regulating methods

that remove barriers to investment." 47 U.S.C. § 1302(a) (emphasis added); *see*

*Comcast*, 600 F.3d at 659 ("'[S]ection 706(a) does not constitute an independent

grant of forbearance authority *or of authority to employ other regulating*

*methods*.'" (quoting *Advanced Services Order*, 13 F.C.C.R. at 24044 (¶ 69))

(emphasis in original)). This clause, standing alone, does not grant the FCC any

authority to adopt new rules (much less unfettered authority for ones that do not

"remove" a "barrier" to infrastructure investment but instead undermine it). Thus,

the *Order*'s reliance on Section 706(a) begs the question of which *underlying*

authority permits these rules.

  Moreover, the Commission's daisy chain of speculative inferences that the

rules will encourage deployment is contradicted by the record and common sense:

regulations that require providers to carry all traffic and prohibit compensation

from edge providers for carriage will have precisely the *opposite* effect, as world-

renowned economists explained below. *See supra* p. 7. In any case, the

Commission cannot exponentially expand its authority under the guise of making a

predictive judgment about the effect of the rules on deployment.

Finally, if the FCC can justify these rules based on a series of conjectural

links to broadband deployment, there is no stopping point to the authority it could

assert over the Internet.[8] Indeed, since the Commission's theory is premised on the

claim that creation of additional content, applications, and services will lead to

greater deployment, it necessarily would allow regulation of edge providers

(including social media), as well as all other Internet service providers such as

backbone companies and content delivery networks (including their prices).

Tellingly, the Commission does not disclaim authority to engage in such far-

reaching regulation, but rather is forced to repeatedly clarify that its current rules

do not extend to these sectors of the Internet as a matter of policy. *See Order* ¶¶ 47

(JA__), 50 (JA__), 52 (JA__), 102 (JA__), 112-14 (JA__-__), 122 n.381 (JA__).

---

[8]     The Commission points to its subject matter jurisdiction over
"communication by wire and radio" as a restraint on its Section 706(a) powers,
*Order* ¶ 121 (JA__), but that conflates the threshold jurisdictional question with
substantive delegated authority.

In any event, the FCC remains "bound by its earlier conclusion that Section 706 grants no regulatory authority" because it has not "questioned, let alone, overruled" that determination. *Comcast*, 600 F.3d at 659. The Commission essentially ignored *Comcast* and repeated the view that construing Section 706(a) to provide independent authority is "consistent with" the *Advanced Services Order*, *Order* ¶ 119 (JA__), stating in passing that "[t]o the extent the *Advanced Services Order* can be construed as having read Section 706(a) differently, we reject that reading of the statute," *id.* ¶ 119 n.370 (JA__). But *Comcast already* "construed" the *Advanced Services Order* as holding that the statute confers no stand-alone power. The FCC did not overrule the *Advanced Services Order* but simply sought to avoid its clear meaning, as definitively interpreted by this Court.

Regardless, the FCC's action, admittedly aimed at manufacturing legal authority post-*Comcast*, was not grounded in "neutral principles and a reasoned explanation." *FCC v. Fox Television Stations*, 129 S. Ct. 1800, 1823 (2009) (Kennedy, J., concurring). The *Order* makes clear that its legal conclusions regarding Section 706(a) were reverse-engineered to "restore" authority that the Commission believes it rightly possessed "for decades before the *Comcast* decision," *Order* ¶ 122 (JA__), and its footnote "rejection" of its prior reading of Section 706(a) was entirely perfunctory.

32

The *Order* also adverts to Section 706(b) as providing "additional authority" for the rules. *Id.* ¶ 123 (JA__). Section 706(b) states that the FCC shall take "action to accelerate deployment" of broadband to "geographical areas that are not served by any provider of" Internet access service. 47 U.S.C. § 1302(b)-(c). Even if Section 706(b) delegates substantive regulatory power, the rules exceed its scope because they reach beyond any particular "geographical areas that are not served" by any broadband provider and apply *throughout the country*. Section 706(b) suffers from the same basic flaws as Section 706(a) as a predicate for ancillary authority—the lack of any showing that the rules are necessary to the execution of duties under Section 706(b). Further, the "finding" that purportedly triggered Section 706(b), *Order* ¶ 123 n.384 (JA__), arbitrarily contravened five prior agency determinations of reasonable and timely deployment concluding, most recently, that 95% of American households have broadband access, *see id.* at 158-59 (JA__-__) (McDowell Statement) (citing *Sixth Broadband Deployment Report*, 25 F.C.C.R. 9556 (2010)). The FCC certainly marshaled no record evidence that regulating broadband Internet access providers would "accelerate deployment" of broadband capability.

**Title II.** Next, the *Order* relies upon Sections 201(b) and 251(a)(1), *Order* ¶¶ 125-26 (JA__, __), even though it does not and cannot claim express authority under these provisions. Section 201(b) provides the FCC with authority to regulate

common-carrier rates, 47 U.S.C. § 201(b), and Section 251(a)(1) imposes a duty on each "telecommunications carrier" to "interconnect" with other telecommunications carriers, 47 U.S.C. § 251(a)(1). But broadband Internet access service providers do not provide telecommunications service and are not telecommunications carriers.

The provisions cannot support ancillary authority either. There is no evidence—much less substantial evidence—that the rules are necessary to ensure the effective performance of duties under Section 201(b). The FCC can directly address any concerns about unreasonable common-carrier rates by regulating such rates under Section 201(b), rather than indirectly doing so by regulating broadband providers. Further, there is no record validation of the FCC's asserted concerns about VoIP blocking. The only evidence remotely bearing on VoIP is the Madison River example. *Order* ¶ 35 (JA__). But that was a dispute between a VoIP provider and a traditional telephone company over intercarrier compensation; it did not involve any broadband provider. Further, it was resolved by consent decree without any finding of wrongdoing, and the FCC has now resolved the compensation issue and requires traditional telephone companies to deliver VoIP traffic.[9]

---

[9]     *Connect America Fund*, 26 F.C.C.R. 17663, 18002-28 (¶¶ 933-71) (2011); *Time Warner Cable Request for Declaratory Ruling*, 22 F.C.C.R. 3513 (WCB 2007).

Moreover, the rules sweep too broadly to be plausibly linked to any responsibility under Title II. Although the Commission posited a desire to prevent providers of "traditional voice and video services" from discriminating against Internet-based competitors, the rules cover "all types of Internet traffic." *Id.* ¶ 48 (JA__); *id.* ¶ 100 (JA__) (mobile providers cannot block "any lawful website"). If the FCC was truly concerned with protecting on-line voice and video services, it could have narrowed its rules to apply only to such services. The *Order* rejects that option as undesirable policy. *Id.* ¶ 124 (JA__). The Commission's policy views cannot expand its authority.

Finally, there is no evidence that the rules are necessary to the effective performance of the FCC's responsibility under Section 251(a)(1) to ensure interconnection among networks that provide "telecommunications services." Those networks are already interconnected, Verizon Comments at 102-03 (JA__-__), and the FCC does not claim otherwise. Accordingly, there is not a shred of evidence that any "traditional telephone customer" has been unable to enjoy "the intended benefits of telecommunications interconnection under Section 251(a)(1)." *Order* ¶ 126 (JA__). Moreover, Section 251(a)(1) cannot be a source of ancillary authority to protect VoIP providers from supposed blocking of calls by a telecommunications carrier, as the *Order* hypothesizes; VoIP has *not* been classified as a telecommunications service, and such blocking, by definition,

therefore would not "interfere with interconnection between *two telecommunications carriers*." *Id.* (emphasis added). The Commission thus effectively claims that it has ancillary authority to regulate a service over which it has *no* authority (Internet access service) to protect another service the terms of which it does *not* regulate (VoIP), based on unsupported claims that VoIP will "contribute to the market discipline" of common-carrier rates. *Id.* ¶ 125 (JA__).

**Title VI.** The *Order* next cites Sections 616 and 628, *id.* ¶¶ 129-32 (JA__- __), but again makes no assertion of express authority. Nor could it. These provisions authorize regulation of only certain conduct by "cable operators" and/or "multichannel video programming distributors" ("MVPDs"). 47 U.S.C. §§ 536, 548(b). Entities are considered cable operators or MVPDs subject to regulation under Title VI only when they are providing "cable service" via a "cable system" or making available a competing service that provides subscribers with "multiple channels of video programming," *id.* §§ 522(5), (13); *see id.* § 522(4), *not* when they are providing other services such as broadband Internet access. Accordingly, the Commission has found that "cable modem service"—the broadband Internet access service offering of traditional cable operators who also provide "cable service"—"is not … subject to Title VI" because it does not fall within the statutory definition of a "cable service." *Cable Modem Order*, 17 F.C.C.R. at 4838 (¶ 68); *see id.* at 4832-38 (¶¶ 60-68); *see also Comcast*, 600 F.3d

36

at 649 (noting that classification of cable Internet service "as an 'information service'" "removed [it] from Title II and Title VI oversight").

Sections 616 and 628 do not provide any ancillary authority here because the FCC has not mustered substantial evidence that the rules are "necessary" for the effective performance of any statutorily-mandated responsibility thereunder.  The FCC avers loosely that the rules "further our mandate under Section 628" because "MVPDs that offer broadband service have the opportunity and incentive to impede DBS providers and other competing MVPDs" from transmitting video programming online.  *Order* ¶¶ 130-31 (JA__-__).  But the FCC can address directly any such action by cable operators or MVPDs acting as such, and the *Order* does not point to a single instance of an entity acting as a broadband provider impeding an MVPD from delivering its services to consumers.  And as with Title II, the rules reach far more broadly than the particular online service (here, video programming) that is the object of regulatory concern.

**Title III.**  The FCC next relies on its purported "public interest" authority under Title III's spectrum licensing provisions.  *Id.* ¶¶ 133-35 (JA__-__).  There is no support for construing those provisions to authorize the rules.

In Title III, Congress established a federal licensing scheme over radio services.  *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940); *NBC v. United States*, 319 U.S. 190, 210-16 (1943).  To implement this scheme, Congress

37

vested the FCC with specific authority relating to issues such as preventing

interference and assigning classes of stations to particular frequency bands.  *See*

*generally* 47 U.S.C. § 303.[10]  In exercising its Title III authority, the FCC is to

promote the "public interest, convenience, and necessity."  47 U.S.C. § 316(a)(1).

But, as this Court explained, "[t]he FCC cannot act in the 'public interest' if the

agency does not otherwise have the authority to promulgate the regulations at

issue."  *MPAA*, 309 F.3d at 806.

 Thus, the requirement to act in the public interest is "not to be interpreted as

setting up a standard so indefinite as to confer an unlimited power."  *NBC*, 319

U.S. at 216.  Indeed, construing Title III to afford the FCC unbounded authority to

impose or modify conditions on spectrum licenses so long as they satisfied some

loose conception of the public interest would render the substantive grants of

authority in Title III mere surplusage.  *See Qi-Zhuo v. Meissner*, 70 F.3d 136, 139

(D.C. Cir. 1995).  Instead, a license condition or regulation must be tied to the

substantive grants of authority found elsewhere in Title III.

 The *Order* does not explain how the rules are tied to any such grant of

authority.  Instead, it makes the cursory assertion that the FCC possessed authority

to adopt the rules because they "advance the public interest in innovation and

---

[10] Congress's grant of Title II authority over commercial mobile radio services in Section 332(c)(1), *see supra* pp. 4, 21, confirms that authority akin to that contained in Sections 201 and 202 does not otherwise exist in Title III.

investment." *Order* ¶ 134 (JA__).  But that claim confuses the *standard* by which

the FCC must exercise its enumerated authority with the antecedent *grant* of such

authority, and has been squarely rejected by this Court.  *MPAA*, 309 F.3d at 806.

Furthermore, the licensing provisions grant the FCC "no supervisory control

of the programs, of business management or of policy."  *Sanders Bros.*, 309 U.S. at

475.  Because the FCC lacks authority to "determine the validity of contracts

between licensees and others," "the imposition of [licensing] conditions cannot

directly affect the applicant's responsibilities to a third party dealing with the

applicant."  *Regents of Univ. Sys. v. Carroll*, 338 U.S. 586, 600, 602 (1950); *see*

*Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011).  The *Order* reaches

well beyond the outer limits of Title III because the rules directly "regulate the

business" of wireless broadband providers, *Sanders Bros.*, 309 U.S. at 475, by

controlling commercial arrangements for the carriage of Internet traffic, *see Order*

¶ 23 (JA__) (discussing "contract" between broadband providers and edge

providers prohibited by the rules).

None of the particular provisions of Title III cited by the *Order* confers the

necessary authority.  The Commission points to Section 316, *Order* ¶ 133 (JA__),

which states that "[a]ny station license or construction permit may be modified by

the Commission" under a "public interest" standard.  47 U.S.C. § 316(a)(1).  The

use of this authority historically has been limited to technical license changes

regarding interference and basic spectrum management. *See, e.g.*, *FCC v. NBC(KOA)*, 319 U.S. 239 (1943); *Western Broad. Co. v. FCC*, 674 F.2d 44 (D.C. Cir. 1982). The *Order* represents an unprecedented exercise of license-modification authority because there is no such nexus to spectrum management. If the Commission could issue any rules it deemed in the public interest and compel licensees to comply with them simply by modifying their licenses, it is difficult to imagine what sort of obligation the FCC would be unable to impose on wireless licensees.

Whatever the outer limits of the FCC's authority under Section 316, it is clear that the agency's license modification power does not encompass the ability to "fundamental[ly] change" the license's terms. *Cmty. Television, Inc. v. FCC*, 216 F.3d 1133, 1141 (D.C. Cir. 2000); *see MCI*, 512 U.S. at 228. The "introduction of a whole new regime of regulation," *id.* at 234—here, the issuance of unprecedented rules regulating numerous aspects of wireless Internet service—is a dramatic change to wireless licenses that cannot be sustained. And interpreting Section 316 to permit the FCC to induce parties to spend billions of dollars in spectrum auctions and then spring new restrictions on them that significantly limit their ability to make productive use of purchased spectrum would go "beyond the meaning that the statute can bear." *Id.* at 231-32; *U.S. AirWaves, Inc. v. FCC*, 232

F.3d 227, 235 (D.C. Cir. 2000) ("[A]n agency cannot, in fairness, radically change the terms of an auction after the fact.").[11]

Any claim that the cited Title III sections provide a basis for asserting ancillary authority must also fail. The FCC suggests that the rules are needed to ensure broadcasters can "provid[e] audio and video content on the Internet," *Order* ¶ 128 (JA__), but this "is far from the kind of tight ancillary nexus" that courts have required, *id.* at 165 (JA__) (McDowell Statement); *see, e.g.*, *Comcast*, 600 F.3d at 659-60. Again, the FCC relies upon broadband providers' alleged "incentive and ability" to block or degrade broadcast content distributed over the Internet, *Order* ¶ 128 (JA__), but there is no evidence of such misconduct, particularly by *wireless* providers. Regardless, the FCC has not shown that its ability to perform any Title III licensing responsibility is jeopardized by such conduct.

**Sections 4(k) and 218**. Finally, the *Order* cites Sections 4(k) and 218 for the transparency rule. *Id.* ¶¶ 136-37 (JA__-__). Although *Comcast* suggests that

---

[11]    Sections 301 and 304, *Order* ¶ 133 (JA__), which explain the purpose of Title III and require licensees to waive claims to particular frequencies, provide no basis for the rules. Neither does Section 303(g), *id.* ¶ 128 (JA__), which simply directs the FCC to "generally encourage the larger and more effective use of radio in the public interest," 47 U.S.C. § 303(g). Section 309, *Order* ¶ 133 (JA__), is inapposite; it authorizes the Commission to award licenses and issue rules for spectrum auctions. 47 U.S.C. § 309(a), (j)(3).

these information-collection and reporting obligations, *see* 47 U.S.C. §§ 154(k), 218, could support ancillary authority, 600 F.3d at 659, the transparency rule does not relate to any actual reporting or information collection requirement. Its primary stated purpose is, instead, to advance the FCC's "openness" policies. *Order* ¶ 53 (JA__).

6. The doctrine of constitutional avoidance counsels strongly against any finding of statutory authority for the rules because they present serious constitutional problems, such as unconstitutional delegation, and indeed violate the First and Fifth Amendments. *See infra* Section III; *see also supra* p. 27. To the extent there is any doubt about the FCC's lack of authority here, the avoidance canon must tip the balance. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trade Council*, 485 U.S. 568, 570-73 (1988); *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445 (D.C. Cir. 1994).

## III.  THE *ORDER* VIOLATES THE FIRST AND FIFTH AMENDMENTS.

1. The First Amendment protects not only traditional speakers, but other participants in the "communication of ideas." *Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986). For example, it protects those transmitting the speech of others, and those who "exercis[e] editorial discretion" in selecting which speech to transmit and how to transmit it. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("*Turner I*") (quotation omitted). Broadband providers

engage in and transmit speech, and the rules—which limit broadband providers'
own speech and compel carriage of others' speech—cannot survive scrutiny.

Broadband providers transmit their own speech both by developing their
own content and by partnering with other content providers and adopting that
speech as their own.  For example, they develop video services, which draw
information from, and are then made available over, the Internet.  Many also select
or create content for their own over-the-top video services or offer applications that
provide access to particular content.  They also transmit the speech of others:  each
day millions of individuals use the Internet to promote their own opinions and
ideas and to explore those of others, and broadband providers convey those
communications.[12]

In performing these functions, broadband providers possess "editorial
discretion."  Just as a newspaper is entitled to decide which content to publish and
where, broadband providers may feature some content over others.  Although
broadband providers have generally exercised their discretion to allow all content
in an undifferentiated manner, *Order* ¶ 14 (JA__), they nonetheless possess
discretion that these rules preclude them from exercising.  For example, they could

---

[12]    The FCC asserts that broadband providers are mere "conduits for speech."
*Order* ¶ 141 (JA__).  Yet cable operators enjoy First Amendment protection even
though they "function[]" as "conduit[s] for the speech of others."  *Turner I*, 512
U.S. at 628-29.

distinguish their own content from that of other speakers or offer that capability to others.  In fact, some types of speech, such as live streaming high-definition video, could benefit from (or may only be available with) differential treatment, such as prioritization.  Broadband providers could also give differential pricing or priority access to their over-the-top video services or other applications they provide, or otherwise feature that content.  *See Ill. Bell Tel. Co. v. Village of Itasca*, 503 F. Supp. 2d 928, 948-49 (N.D. Ill. 2007); *Comcast Cablevision of Broward Cnty., Inc. v. Broward Cnty.*, 124 F. Supp. 2d 685, 692 (S.D. Fla. 2000).  Indeed, the FCC's concern that broadband providers will differentiate among various content presumes that they will exercise editorial discretion.  *See, e.g.*, *Order* ¶¶ 21-23 (JA__-__).

The *Order*'s broad "prophylactic rules" infringe broadband providers' protected speech rights.  They strip providers of control over which speech they transmit and how they transmit it, and they compel the carriage of others' speech.  They also limit the means by which providers can secure additional revenue, which impairs their ability to deploy new networks and capabilities (or to expand the size of existing ones), thereby limiting their ability to speak and deliver speech.  And they make clear that even "specialized services," such as video services, will be subject to the *Order*'s restrictions if the FCC decides that such services are "retarding the growth of ... broadband Internet access service," or if broadband

providers merely "advertis[e]" these services to consumers as "Internet" services, *id.* ¶ 114 (JA__), thus constraining their marketing speech as well.

The *Order* is thus at the very least subject to intermediate scrutiny.[13]  Under that standard, the *Order* must "further[] an important or substantial governmental interest ... unrelated to the suppression of free expression" and the "incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the furtherance of that interest."  *United States v. O'Brien*, 391 U.S. 367, 377 (1968).  It must not "burden substantially more speech than is necessary to further the government's legitimate interests."  *Turner I*, 512 U.S. at 662 (quotation omitted).

The government bears the burden to establish that intermediate scrutiny is satisfied.  *E.g.*, *id.* at 665 (plurality opinion).  The *Order* fails to meet that burden.  A single paragraph, replete with conclusory assertions, asserts that the rules are sufficiently tailored.  *Order* ¶ 148 (JA__).  The *Order* nowhere explains why these particular regulations are necessary to address the hypothetical problems identified, or presents evidence of their effectiveness.

---

[13]     Because the *Order* treats broadband providers differently than other similarly-situated speakers (like content providers), *Order* ¶¶ 50-51 (JA__-__), strict scrutiny applies, *Turner I*, 512 U.S. at 659.  The FCC did not even attempt to satisfy that standard.

Regardless, the rules fail both prongs of the tailoring inquiry. *First*, the FCC has identified no "important or substantial" governmental interest. *O'Brien*, 391 U.S. at 377. "[T]he mere abstract assertion of a substantial governmental interest, standing alone, is insufficient to justify the subordination of First Amendment freedoms." *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1454 (D.C. Cir. 1985). The government must "do more than simply 'posit the existence of the disease sought to be cured'"; it "must demonstrate that the recited harms are real." *Turner I*, 512 U.S. at 664 (plurality opinion) (quoting *Quincy Cable*, 768 F.2d at 1455). The concerns that justified the must-carry provisions at issue in *Turner* do not justify the compulsory-carriage obligations adopted here: given the competitive choices available to consumers, broadband providers do not exercise "bottleneck monopoly control." *Turner I*, 512 U.S. at 659; *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 197 (1997) ("*Turner II*").

Moreover, in *Turner II*, the Court relied substantially on the "deference [that] must be accorded to [*Congress*'s] findings as to the harm to be avoided and to the remedial measures adopted for that end." *Id.* at 196. There, Congress considered extensive evidence, including evidence of "considerable and growing market power," and concluded that "a real threat justified enactment of the must-carry provisions." *Id.* at 196-97. In addition, there was evidence that cable operators were "tak[ing] actions adverse to local broadcasters," causing broadcast

46

stations to go bankrupt, *id.* at 202, 209.  Here, by contrast, the FCC is acting alone, without evidence of an actual problem.  Indeed, the FCC expressly declined to determine whether broadband providers possess market power and acknowledges that the problems it fears are hypothetical.  *Order* ¶ 24 (JA__) ("broadband providers have not historically imposed ... fees" on edge providers for "access or prioritized access to end users"); *see id.* ¶ 62 (JA__).

To be sure, the FCC points to a handful of supposed "instances of harmful practices," *id.* ¶ 147 (JA__), but the *Order* was motivated not by broadband providers' current practices, but by the FCC's view of their *theoretical* incentives and ability to engage in practices that the FCC disfavors,  *id.* ¶ 12 (JA__) (noting "risk of harmful conduct"); *id.* ¶ 38 (JA__) (noting providers' "increasing ability to [interfere with the open Internet] in the future").  The mere *potential* for harm, however, is not the same as *actual* harm.  *See Turner I*, 512 U.S. at 664; *Quincy Cable*, 768 F.2d at 1454-59.

*Second*, even if the FCC could demonstrate a substantial governmental interest, the *Order* is both over- and under-inclusive.  It is over-inclusive because it is far broader than necessary "to further [any government] interest."  *Turner I*, 512 U.S. at 662.  To start, the FCC did not even attempt to minimize the *Order*'s speech burdens, which itself warrants invalidation.  *Cf. Time Warner Entmt. Co. v. FCC*, 56 F.3d 151, 185-86 (D.C. Cir. 1995).  The rules are also far broader than

47

required under the FCC's own rationale: the rules are admittedly "prophylactic," *Order* ¶ 12 (JA__), and they apply to *all* Internet traffic even though the FCC grasps for statutory authority in provisions related to regulated video and voice services.

The *Order* is under-inclusive because it only applies to a subset of speakers and excludes other participants in the Internet ecosystem, including search portals and app store operators who are similarly able to serve as "gatekeepers" and possess the same theoretical abilities and incentives to restrict access.  *See supra* p. 7; *see also City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (explaining that "the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles").

Apparently aware that it has identified no actual problem and that its solution is vastly overbroad, the FCC contends that the *Order* is nevertheless constitutional because the Commission's "predictive judgments as to the development of a problem and likely injury to the public interest are entitled to great deference."  *Order* ¶ 147 (JA__); *id.* ¶ 41 (JA__).  But this is not true under the First Amendment, which requires the "government … to show that its restriction of speech is narrowly tailored to an important governmental interest, rather than rely on the deference we generally afford agencies." *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1311 (D.C. Cir. 2010).

2.  The *Order* also violates the Fifth Amendment.  It grants the equivalent of a permanent easement on private broadband networks for the use of others without just compensation—a *per se* taking.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).  "In essence," edge providers "receive an unlimited, continuous right of access to broadband providers' private property for free," which "allows them to physically invade broadband networks with their electronic signals and permanently occupy portions of network capacity."  D. Lyons, *Virtual Takings: The Coming Fifth Amendment Challenge to Net Neutrality Regulation*, 86 Notre Dame. L. Rev. 65, 93 (2011).  The resulting occupation is physical, for increases in network traffic consume available capacity and ultimately require the acquisition or construction of additional capacity.

Even without a physical occupation, the rules constitute a regulatory taking because they "interfere[] with [broadband providers'] distinct investment-backed expectations."  *Penn Cent. Trans. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Providers have invested billions in broadband infrastructure on the understanding that they can manage access to network facilities and use those facilities to offer the products that their customers want.  These rules sharply curb providers' ability to do so, thereby frustrating their substantial and reasonable investment-backed expectations.

49

## IV.    THE *ORDER* IS ARBITRARY AND CAPRICIOUS.

Foremost, the record below contains no evidence of a problem in need of industry-wide regulation. *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006). Again, the FCC's stated policy concerns are hypothetical and based not on broadband providers' actual practices but the agency's view of their theoretical incentives and abilities. Indeed, the *Order* frankly acknowledges that the Internet presently "*is* a level playing field," that "consumers *can* make their own choices about what applications and services to use," "*are* free to decide what content they want to access, create, or share with others," and that open competition exists. *Order* ¶ 3 (JA__) (emphasis added).

Even while emphasizing the "prophylactic" nature of the rules, the FCC attempted to amass a supposed industry-wide "record of abuse," *Nat'l Fuel*, 468 F.3d at 839, based on four isolated incidents of alleged blocking over a period of six years—during which time end-users successfully accessed the Internet content, applications, and services of their choice literally billions of times. *Order* ¶ 35 (JA__). None of these examples, other than the vacated *Comcast Order*, which is a legal nullity, involved any adjudicated findings of misconduct, and all were quickly resolved in the marketplace. Beyond this handful of assertions, the *Order* discusses "additional allegations" of such conduct but expressly declines to decide "whether any of these practices violated open Internet principles." *Id.* ¶ 36 (JA__).

50

Even if this handful of incidents constituted legitimate evidence of actual misconduct, the FCC may not impose an "industry-wide solution for a problem that exists only in isolated pockets." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1019 (D.C. Cir. 1987); *cf. Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002) (vacating "prophylactic rule" because a "single incident ... is just not enough to suggest an otherwise significant problem").

Incapable of identifying any existing problem, the *Order*'s "repeated fallback is that network operators have incentives to act badly," *Order* at 182 (JA__) (Baker Statement), but "there is no factual foundation" for presuming "a malign intent on the part of broadband providers," *id.* The most the agency could say was that providers "potentially face ... incentives to reduce the current openness of the Internet," *id.* ¶ 21 (JA__), but the *Order* contradicts itself. It finds that broadband providers today generally provide subscribers access to all lawful content, *id.* ¶ 141 (JA__), and have strong economic incentives to continue to do so, *id.* ¶ 14 (JA__). Under the APA, the FCC may not act based on pure speculation. *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) (per curiam).

The record not only fails to evince any problem sufficient to justify the rules, it demonstrates that the rules will harm innovation and deter investment by increasing costs, foreclosing potential revenue streams, and restricting providers'

ability to meet consumers' evolving needs, especially in the wireless context.  *See supra* pp. 6-7; *see also* Declaration of Gary S. Becker & Dennis W. Carlton ¶¶ 66-69 (JA__-__).  Even the Justice Department and Federal Trade Commission cautioned that broadband regulation could "stifl[e] the infrastructure investments needed to expand broadband access."  *Ex Parte* Submission of the U.S. DOJ at 28, Docket No. 09-51 (Jan. 4, 2010) (JA__); FTC, Staff Report: Broadband Connectivity Competition Policy at 11 (2007) (JA__).  The FCC's conclusion that "open Internet rules will increase incentives to invest in broadband infrastructure," *Order* ¶ 40 (JA__), thus "runs counter to the evidence," *Nat'l Fuel*, 468 F.3d at 839 (quotation omitted).

The *Order* is also arbitrary and capricious because the rules discriminate between broadband providers subject to the rules and other players in the Internet ecosystem not so restrained.  *Order* ¶¶ 55-61 (JA__-__).  The latter entities have the same supposed incentives and abilities to engage in the behavior at which the rules are aimed, and distinctions among Internet players are increasingly illusory. *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005).  Finally, the FCC departed, without acknowledgement, from its precedent establishing a deregulatory framework for broadband.  *Fox*, 129 S. Ct. at 1811.

## <u>CONCLUSION</u>

Appellants respectfully request that the Court reverse and vacate the *Order.*

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51

(D.C. Cir. 1993); *Midwest Video II*, 440 U.S. at 695, 708 n.18 (affirming decision

"set[ting] aside" rules); *see Comcast*, 600 F.3d at 660 (vacating *Comcast Order*).

Vacatur is especially warranted because this is the Commission's second attempt to

establish authority in this area.  *See Comcast Corp. v. FCC*, 579 F.3d 1, 9-10 (D.C.

Cir. 2009).

Respectfully submitted,

/s/  Helgi C. Walker

By: _____

Walter E. Dellinger
Brianne Gorod
Anton Metlitsky
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
TEL: (202) 383-5300

Michael E. Glover
William H. Johnson
VERIZON
1320 North Courthouse Road
9th Floor
Arlington, VA 22201
TEL: (703) 351-3060

Helgi C. Walker*
Eve Klindera Reed
William S. Consovoy
Brett A. Shumate
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
TEL: (202) 719-7000
E-MAIL: hwalker@wileyrein.com

Samir C. Jain
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
TEL: (202) 663-6083

*Attorneys for Verizon*

*\*Counsel of Record*

Stephen B. Kinnaird*
PAUL, HASTINGS, JANOFSKY
& WALKER LLP
875 15th Street, NW
Washington, DC 20005
TEL: (202) 551-1842

Carl W. Northrop
Michael Lazarus
Andrew Morentz
TELECOMMUNICATIONS LAW
PROFESSIONALS PLLC
875 15th Street, NW, Suite 750
Washington, DC 20005
TEL: (202) 789-3120

Mark A. Stachiw
General Counsel, Secretary
& Vice Chairman
METROPCS COMMUNICATIONS, INC.
2250 Lakeside Blvd.
Richardson, TX 75082                    *Attorneys for MetroPCS*
TEL: (214) 570-4877                     *Communications, Inc. and its FCC-*
                                        *licensed affiliates*


Dated:  July 2, 2012                    *\*Counsel of Record*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 32(a)(3)(B) because this brief contains 11,931 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2003 version of Microsoft Word in 14 point Times New Roman.


/s/ Helgi C. Walker

_____

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

**PAGE**

47 U.S.C. § 153……………………………………………..…….…..………….3

47 U.S.C. § 154……………………………………………..…..…….…..… 4

47 U.S.C. § 201……………………………………………..…….…..… 4

47 U.S.C. § 202…………………………………………..…….…..………5

47 U.S.C. § 218………………………………………..…….…..………..…..6

47 U.S.C. § 230 ……………………………………………..……………..6

47 U.S.C. § 251……………………………………………..…….…..……..7

47 U.S.C. § 301……………………………………………..…….…..………7

47 U.S.C. § 303………………………………………….…….…..………8

47 U.S.C. § 304………………………………………………..………16

47 U.S.C. § 309…………………………………………………………..16

47 U.S.C. § 316……………………………………………..…….…..…...18

47 U.S.C. § 332……………………………………………….…...…..…...18

47 U.S.C. § 402……….………………………………………...…………..20

47 U.S.C. § 536……….…………………………………………..…….……21

47 U.S.C. § 548….………………………………………………...……..……22

47 U.S.C. § 1302 ………………………………………………...…………..23

47 C.F.R. § 8.1……………………………………….…...……………24

47 C.F.R. § 8.3……………..…………………………………………...…………….24

47 C.F.R. § 8.5……………..…………………………………………...…………….24

47 C.F.R. § 8.7……………..…………………………………………...…………….25

47 C.F.R. § 8.9……………..…………………………………………...…………….25

47 C.F.R. § 8.11……………..…………………………………………...………...…25

## 47 U.S.C. § 153

For the purposes of this chapter, unless the context otherwise requires—

***

(24) Information service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

***

(50) Telecommunications

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51) Telecommunications carrier

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

***

(53) Telecommunications service

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

3

## 47 U.S.C. § 154

\*\*\*

(k) Annual reports to Congress

The Commission shall make an annual report to Congress, copies of which shall be distributed as are other reports transmitted to Congress. Such reports shall contain--

(1) such information and data collected by the Commission as may be considered of value in the determination of questions connected with the regulation of interstate and foreign wire and radio communication and radio transmission of energy;

(2) such information and data concerning the functioning of the Commission as will be of value to Congress in appraising the amount and character of the work and accomplishments of the Commission and the adequacy of its staff and equipment;

(3) an itemized statement of all funds expended during the preceding year by the Commission, of the sources of such funds, and of the authority in this chapter or elsewhere under which such expenditures were made; and

(4) specific recommendations to Congress as to additional legislation which the Commission deems necessary or desirable, including all legislative proposals submitted for approval to the Director of the Office of Management and Budget.

\*\*\*

## 47 U.S.C. § 201

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the

divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

## **47 U.S.C. § 202**

(a) Charges, services, etc.

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

***

**47 U.S.C. § 218**

The Commission may inquire into the management of the business of all carriers subject to this chapter, and shall keep itself informed as to the manner and method in which the same is conducted and as to technical developments and improvements in wire and radio communication and radio transmission of energy to the end that the benefits of new inventions and developments may be made available to the people of the United States. The Commission may obtain from such carriers and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, such carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created.

**47 U.S.C. § 230**

(a) Findings

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States--

6

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

***

## 47 U.S.C. § 251

(a) General duty of telecommunications carriers

Each telecommunications carrier has the duty--

(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and

(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.

***

## 47 U.S.C. § 301

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use

7

of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or (f) upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

## 47 U.S.C. § 303

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall--

(a) Classify radio stations;

(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

(d) Determine the location of classes of stations or individual stations;

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: Provided, however, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

(h) Have authority to establish areas or zones to be served by any station;

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

(k) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

(l)(1) Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to persons who are found to be qualified by the Commission and who otherwise are legally eligible for employment in the United States, except that such requirement relating to eligibility for employment in the United States shall not apply in the case of licenses issued by the Commission to (A) persons holding United States pilot certificates; or (B) persons holding foreign aircraft pilot certificates which are valid in the United States, if the foreign government involved has entered into a reciprocal agreement under which such foreign government does not impose any similar requirement relating to eligibility for employment upon citizens of the United States;

(2) Notwithstanding paragraph (1) of this subsection, an individual to whom a radio station is licensed under the provisions of this chapter may be issued an operator's license to operate that station.

(3) In addition to amateur operator licenses which the Commission may issue to aliens pursuant to paragraph (2) of this subsection, and notwithstanding section 301 of this title and paragraph (1) of this subsection, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of Title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

(m)(1) Have authority to suspend the license of any operator upon proof sufficient to satisfy the Commission that the licensee--

(A) has violated, or caused, aided, or abetted the violation of, any provision of any Act, treaty, or convention binding on the United States, which the Commission is authorized to administer, or any regulation made by the Commission under any such Act, treaty, or convention; or

(B) has failed to carry out a lawful order of the master or person lawfully in charge of the ship or aircraft on which he is employed; or

(C) has willfully damaged or permitted radio apparatus or installations to be damaged; or

(D) has transmitted superfluous radio communications or signals or communications containing profane or obscene words, language, or meaning, or has knowingly transmitted--

(1) false or deceptive signals or communications, or

(2) a call signal or letter which has not been assigned by proper authority to the station he is operating; or

(E) has willfully or maliciously interfered with any other radio communications or signals; or

(F) has obtained or attempted to obtain, or has assisted another to obtain or attempt to obtain, an operator's license by fraudulent means.

(2) No order of suspension of any operator's license shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed suspension, has been given to the operator licensee who may make written application to the Commission at any time within said fifteen days for a hearing upon such order. The notice to the operator licensee shall not be effective until actually received by him, and from that time he shall have fifteen days in which to mail the said application. In the event that physical conditions prevent mailing of the application at the expiration of the fifteen-day period, the application shall then be mailed as soon as possible thereafter, accompanied by a satisfactory explanation of the delay. Upon receipt by the Commission of such application for hearing, said order of suspension shall be held in abeyance until the conclusion of the hearing which shall be conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of suspension.

(n) Have authority to inspect all radio installations associated with stations required to be licensed by any Act, or which the Commission by rule has authorized to operate without a license under section 307(e)(1) of this title, or which are subject to the provisions of any Act, treaty, or convention binding on the United States, to ascertain whether in construction, installation, and operation they conform to the requirements of the rules and regulations of the Commission, the provisions of any Act, the terms of any treaty or convention binding on the United States, and the conditions of the license or other instrument of authorization under which they are constructed, installed, or operated.

(o) Have authority to designate call letters of all stations;

(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this chapter;

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation. The permittee or licensee, and the tower owner in any case in which the owner is not the permittee or licensee, shall maintain the painting and/or illumination of the tower as prescribed by the Commission pursuant to this section. In the event that the tower ceases to be licensed by the Commission for the transmission of radio energy, the owner of the tower shall maintain the prescribed painting and/or illumination of such tower until it is dismantled, and the Commission may require the owner to dismantle and remove the tower when the Administrator of the Federal Aviation Agency determines that there is a reasonable possibility that it may constitute a menace to air navigation.

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

(s) Have authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting when such apparatus is shipped in interstate commerce, or is imported from any foreign country into the United States, for sale or resale to the public.

(t) Notwithstanding the provisions of section 301(e) of this title, have authority, in any case in which an aircraft registered in the United States is operated (pursuant to a lease, charter, or similar arrangement) by an aircraft operator who is subject to regulation by the government of a foreign nation, to enter into an agreement with such government under which the Commission shall recognize and accept any radio station licenses and radio operator licenses issued by such government with respect to such aircraft.

(u) Require that, if technically feasible--

(1) apparatus designed to receive or play back video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States and uses a picture screen of any size--

12

(A) be equipped with built-in closed caption decoder circuitry or capability designed to display closed-captioned video programming;

(B) have the capability to decode and make available the transmission and delivery of video description services as required by regulations reinstated and modified pursuant to section 613(f) of this title; and

(C) have the capability to decode and make available emergency information (as that term is defined in section 79.2 of the Commission's regulations (47 CFR 79.2)) in a manner that is accessible to individuals who are blind or visually impaired; and

(2) notwithstanding paragraph (1) of this subsection--

(A) apparatus described in such paragraph that use a picture screen that is less than 13 inches in size meet the requirements of subparagraph (A), (B), or (C) of such paragraph only if the requirements of such subparagraphs are achievable (as defined in section 617 of this title);

(B) any apparatus or class of apparatus that are display-only video monitors with no playback capability are exempt from the requirements of such paragraph; and

(C) the Commission shall have the authority, on its own motion or in response to a petition by a manufacturer, to waive the requirements of this subsection for any apparatus or class of apparatus--

(i) primarily designed for activities other than receiving or playing back video programming transmitted simultaneously with sound; or

(ii) for equipment designed for multiple purposes, capable of receiving or playing video programming transmitted simultaneously with sound but whose essential utility is derived from other purposes.

(v) Have exclusive jurisdiction to regulate the provision of direct-to-home satellite services. As used in this subsection, the term "direct-to-home satellite services" means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

(w) Omitted.

(x) Require, in the case of an apparatus designed to receive television signals that are shipped in interstate commerce or manufactured in the United States and that have a picture screen 13 inches or greater in size (measured diagonally), that such apparatus be equipped with a feature designed to enable viewers to block display of all programs with a common rating, except as otherwise permitted by regulations pursuant to section 330(c)(4) of this title.

(y) Have authority to allocate electromagnetic spectrum so as to provide flexibility of use, if--

(1) such use is consistent with international agreements to which the United States is a party; and

(2) the Commission finds, after notice and an opportunity for public comment, that--

(A) such an allocation would be in the public interest;

(B) such use would not deter investment in communications services and systems, or technology development; and

(C) such use would not result in harmful interference among users.

(z) Require that--

(1) if achievable (as defined in section 617 of this title), apparatus designed to record video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States, enable the rendering or the pass through of closed captions, video description signals, and emergency information (as that term is defined in section 79.2 of title 47, Code of Federal Regulations) such that viewers are able to activate and de-activate the closed captions and video description as the video programming is played back on a picture screen of any size; and

(2) interconnection mechanisms and standards for digital video source devices are available to carry from the source device to the consumer equipment the information necessary to permit or render the display of closed captions and to make encoded video description and emergency information audible.

14

(aa) Require--

(1) if achievable (as defined in section 617 of this title) that digital apparatus designed to receive or play back video programming transmitted in digital format simultaneously with sound, including apparatus designed to receive or display video programming transmitted in digital format using Internet protocol, be designed, developed, and fabricated so that control of appropriate built-in apparatus functions are accessible to and usable by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) that if on-screen text menus or other visual indicators built in to the digital apparatus are used to access the functions of the apparatus described in paragraph (1), such functions shall be accompanied by audio output that is either integrated or peripheral to the apparatus, so that such menus or indicators are accessible to and usable by individuals who are blind or visually impaired in real-time;

(3) that for such apparatus equipped with the functions described in paragraphs (1) and (2) built in access to those closed captioning and video description features through a mechanism that is reasonably comparable to a button, key, or icon designated for activating the closed captioning or accessibility features; and

(4) that in applying this subsection the term "apparatus" does not include a navigation device, as such term is defined in section 76.1200 of the Commission's rules (47 CFR 76.1200).

(bb) Require--

(1) if achievable (as defined in section 617 of this title), that the on-screen text menus and guides provided by navigation devices (as such term is defined in section 76.1200 of title 47, Code of Federal Regulations) for the display or selection of multichannel video programming are audibly accessible in real- time upon request by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) for navigation devices with built-in closed captioning capability, that access to that capability through a mechanism is reasonably comparable to a button, key, or icon designated for activating the closed captioning, or accessibility features; and

(3) that, with respect to navigation device features and functions--

(A) delivered in software, the requirements set forth in this subsection shall apply to the manufacturer of such software; and

(B) delivered in hardware, the requirements set forth in this subsection shall apply to the manufacturer of such hardware.

## **47 U.S.C. § 304**

No station license shall be granted by the Commission until the applicant therefor shall have waived any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise.

## **47 U.S.C. § 309**

(a) Considerations in granting application

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

***

(j) Use of competitive bidding

***

(3) Design of systems of competitive bidding

16

For each class of licenses or permits that the Commission grants through the use of a competitive bidding system, the Commission shall, by regulation, establish a competitive bidding methodology. The Commission shall seek to design and test multiple alternative methodologies under appropriate circumstances. The Commission shall, directly or by contract, provide for the design and conduct (for purposes of testing) of competitive bidding using a contingent combinatorial bidding system that permits prospective bidders to bid on combinations or groups of licenses in a single bid and to enter multiple alternative bids within a single bidding round. In identifying classes of licenses and permits to be issued by competitive bidding, in specifying eligibility and other characteristics of such licenses and permits, and in designing the methodologies for use under this subsection, the Commission shall include safeguards to protect the public interest in the use of the spectrum and shall seek to promote the purposes specified in section 151 of this title and the following objectives:

(A) the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;

(B) promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women;

(C) recovery for the public of a portion of the value of the public spectrum resource made available for commercial use and avoidance of unjust enrichment through the methods employed to award uses of that resource;

(D) efficient and intensive use of the electromagnetic spectrum;

(E) ensure that, in the scheduling of any competitive bidding under this subsection, an adequate period is allowed; and

(i) before issuance of bidding rules, to permit notice and comment on proposed auction procedures; and

(ii) after issuance of bidding rules, to ensure that interested parties have a sufficient time to develop business plans, assess market conditions, and evaluate the availability of equipment for the relevant services.

17

(F) for any auction of eligible frequencies described in section 923(g)(2) of this title, the recovery of 110 percent of estimated relocation costs as provided to the Commission pursuant to section 923(g)(4) of this title.

\*\*\*

## 47 U.S.C. § 316

(a)(1) Any station license or construction permit may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with. No such order of modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor, and shall be given reasonable opportunity, of at least thirty days, to protest such proposed order of modification; except that, where safety of life or property is involved, the Commission may by order provide, for a shorter period of notice.

\*\*\*

## 47 U.S.C. § 332

\*\*\*

(c) Regulatory treatment of mobile services

(1) Common carrier treatment of commercial mobile services

(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II of this chapter as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that--

(i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

(ii) enforcement of such provision is not necessary for the protection of consumers; and

(iii) specifying such provision is consistent with the public interest.

***

(2) Non-common carrier treatment of private mobile services

A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

***

(d) Definitions

For purposes of this section--

(1) the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

(2) the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B) of this section; and

19

(3) the term "private mobile service" means any mobile service (as defined in section 153 of this title) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

## 47 U.S.C. § 402

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

(b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8) By any radio operator whose license has been suspended by the Commission.

(9) By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

(10) By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

\*\*\*

## 47 U.S.C. § 536

(a) Regulations

Within one year after October 5, 1992, the Commission shall establish regulations governing program carriage agreements and related practices between cable operators or other multichannel video programming distributors and video programming vendors. Such regulations shall--

(1) include provisions designed to prevent a cable operator or other multichannel video programming distributor from requiring a financial interest in a program service as a condition for carriage on one or more of such operator's systems;

(2) include provisions designed to prohibit a cable operator or other multichannel video programming distributor from coercing a video programming vendor to provide, and from retaliating against such a vendor for failing to provide, exclusive rights against other multichannel video programming distributors as a condition of carriage on a system;

(3) contain provisions designed to prevent a multichannel video programming distributor from engaging in conduct the effect of which is to unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly by discriminating in video programming distribution on the basis of affiliation or nonaffiliation of vendors in the selection, terms, or conditions for carriage of video programming provided by such vendors;

21

(4) provide for expedited review of any complaints made by a video programming vendor pursuant to this section;

(5) provide for appropriate penalties and remedies for violations of this subsection, including carriage; and

(6) provide penalties to be assessed against any person filing a frivolous complaint pursuant to this section.

(b) "Video programming vendor" defined

As used in this section, the term "video programming vendor" means a person engaged in the production, creation, or wholesale distribution of video programming for sale.

## **47 U.S.C. § 548**

(a) Purpose

The purpose of this section is to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market, to increase the availability of satellite cable programming and satellite broadcast programming to persons in rural and other areas not currently able to receive such programming, and to spur the development of communications technologies.

(b) Prohibition

It shall be unlawful for a cable operator, a satellite cable programming vendor in which a cable operator has an attributable interest, or a satellite broadcast programming vendor to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers.

\* \* \*

## 47 U.S.C. § 1302

(a) In general

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1) of this section) and to the extent that data from the Census Bureau is available, determine, for each such unserved area--

(1) the population;

(2) the population density; and

(3) the average per capita income.

23

(d) Definitions

For purposes of this subsection:

(1) Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of Title 20.

## 47 C.F.R. § 8.1

The purpose of this part is to preserve the Internet as an open platform enabling consumer choice, freedom of expression, end-user control, competition, and the freedom to innovate without permission.

## 47 C.F.R. § 8.3

A person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings.

## 47 C.F.R. § 8.5

(a) A person engaged in the provision of fixed broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.

(b) A person engaged in the provision of mobile broadband Internet access service, insofar as such person is so engaged, shall not block consumers from accessing lawful Web sites, subject to reasonable network management; nor shall such

person block applications that compete with the provider's voice or video telephony services, subject to reasonable network management.

## 47 C.F.R. § 8.7

A person engaged in the provision of fixed broadband Internet access service, insofar as such person is so engaged, shall not unreasonably discriminate in transmitting lawful network traffic over a consumer's broadband Internet access service. Reasonable network management shall not constitute unreasonable discrimination.

## 47 C.F.R. § 8.9

(a) Nothing in this part supersedes any obligation or authorization a provider of broadband Internet access service may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so.

(b) Nothing in this part prohibits reasonable efforts by a provider of broadband Internet access service to address copyright infringement or other unlawful activity.

## 47 C.F.R. § 8.11

(a) Broadband Internet access service. A mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence, or that is used to evade the protections set forth in this part.

(b) Fixed broadband Internet access service. A broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment. Fixed broadband Internet access service includes fixed wireless services (including fixed unlicensed wireless services), and fixed satellite services.

(c) Mobile broadband Internet access service. A broadband Internet access service that serves end users primarily using mobile stations.

(d) Reasonable network management. A network management practice is reasonable if it is appropriate and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service.

## <u>CERTIFICATE OF SERVICE</u>

I, Helgi C. Walker, hereby certify that on July 2, 2012, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  I further certify that six copies of the foregoing will be filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit within two business days.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Some of the participants in the case, denoted with asterisks below, are not CM/ECF users.  I certify further that I have directed that copies of the foregoing document be mailed by First-Class Mail to those persons, unless another attorney representing the same party is receiving electronic service.

Austin C. Schlick
Richard K. Welch
Joel Marcus
Jacob M. Lewis
Peter Karanjia
Federal Communications Commission
Office of the General Counsel
445 12th Street, S.W.
Washington, DC 20554
*Counsel for the Federal Communications Commission*

Nancy C. Garrison
R. Craig Lawrence
Catherine G. O'Sullivan
Robert J. Wiggers
U.S. Department of Justice
(DOJ) Antitrust Division, Appellate Section
Room 3224
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
*Counsel for United States of America*

James B. Ramsay
National Association of Regulatory
    Utility Commissioners
1101 Vermont Avenue, N.W.
Suite 200
Washington, DC 20005

*Counsel for National Association of*
*Regulatory Utility Commissioners*

Harold J. Feld
Public Knowledge
1818 N Street, N.W.
Suite 410
Washington, DC 20036

*Counsel for Public Knowledge*

David Bergmann
Assistant Consumers' Counsel
Chair, NASUCA Telecommunications
Committee
Office of the Ohio Consumers'
Counsel
10 West Broad Street, Suite 800
Columbus, OH 43215

*Counsel for National Association of State*
*Utility Consumer Advocates*

Jeffrey J. Binder
Law Office of Jeffrey Binder
2510 Virginia Avenue, NW
Suite 1107
Washington, DC 20037

*Counsel for Vonage Holdings*
*Corporation*

Genevieve Morelli
Independent Telephone &
    Telecommunications Alliance
1101 Vermont Avenue, NW
Suite 501
Washington, DC 20005

*Counsel for Independent Telephone &*
*Telecommunications Alliance*

Henry Goldberg
Goldberg, Godles, Wiener & Wright
1229 19th Street, NW
Washington, DC 20036-2413

*Counsel for Open Internet Coalition*

Michael Field Altschul
CTIA-The Wireless Association®
Suite 600
1400 16th Street, NW
Suite 600
Washington, DC 20036-0000

*Council for CTIA-The Wireless*
*Association®*

Earle Duncan Getchell Jr.
Office of the Attorney General,
Commonwealth of Virginia
900 East Main Street
Richmond, VA 23219

*Counsel for the Commonwealth of*
*Virginia*

Brendan Daniel Kasper
Kurt Matthew Rogers*
Vonage Holdings Corp.
23 Main Street
Homdel, NJ 07333

*Counsel for Vonage Holdings Corporation*

Matthew F. Wood
Free Press
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036

*Counsel for Free Press*

Jonathan E. Nuechterlein
Elvis Stumbergs
Heather Marie Zachary
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006-1420

*Council for CTIA-The Wireless Association®*

/s/ Helgi C. Walker

_____