ORAL ARGUMENT NOT YET SCHEDULED
No. 11-1355

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

VERIZON, *Appellant*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION, *Appellee*.

_____

On Appeal from an Order of the
Federal Communications Commission
_____

BRIEF *AMICI CURIAE* OF TECHFREEDOM,
THE COMPETITIVE ENTERPRISE INSTITUTE,
THE FREE STATE FOUNDATION, AND THE CATO INSTITUTE
IN SUPPORT OF APPELLANT

_____

Berin Szoka
Matthew Starr
TechFreedom
1899 L St., NW, Suite 1260
Washington, DC 20036
(202) 455-8186
bszoka@techfreedom.org

Sam Kazman
Competitive Enterprise Institute
1899 L St., NW, Floor 12
Washington, D.C., 20036
(202) 331-1010
skazman@cei.org

John P. Elwood*
Eric A. White
Vinson & Elkins LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
(202) 639-6518
jelwood@velaw.com

*Counsel for Amici Curiae*

*Counsel of Record

**July 23, 2012**                    [Additional counsel listed on next page]

Randolph May
Free State Foundation
P.O. Box 60680
Potomac, MD 20859
(301) 984-8253
rmay@freestatefoundation.org

Ilya Shapiro
Cato Institute
1000 Massachusetts Ave., NW
Washington, DC 20036
(202) 842-0200
ishapiro@cato.org

Thomas S. Leatherbury
Vinson & Elkins LLP
2001 Ross Ave., Suite 3700
Dallas, TX  75201
(214) 220-7700
tleatherbury@velaw.com

*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

All parties have consented to the filing of this brief.[1]  *Amici* filed with this Court notice of their intent to participate on July 2, 2012.

Pursuant to D.C. Circuit Rule 29(d), *amici curiae* TechFreedom, the Competitive Enterprise Institute, the Free State Foundation, and the Cato Institute certify that no other non-government *amicus* brief of which we are aware addresses the constitutionality of the FCC's network-neutrality order.  We are the only nonprofit-public-interest-group *amici* of which we are aware; in light of our activities, discussed more fully in the Interest of *Amici Curiae*, we believe we are particularly well-suited to discuss the constitutional issues implicated by the FCC's action.  We understand that there will be a brief *amicus curiae* filed on behalf of the National Association of Manufacturers, which we are told will focus only on statutory issues.  Additionally, *amici* filed a Joint Unopposed Motion to Set Filing Deadlines for Briefs *Amicus Curiae* on July 2, 2012; that motion asked this Court to set a schedule for the filing of "all briefs of amici curiae on both sides."  The Court granted that motion on July 3, 2012.

---

[1] Pursuant to Fed. R. App. P. 29(c), *amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

i

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* TechFreedom, the Competitive Enterprise Institute, the Free State Foundation, and the Cato Institute certify that:

**(A)    Parties and Amici**

In addition to the parties, intervenors, and *amici* listed in the Joint Brief for Verizon and MetroPCS, the following *amici* may have an interest in the outcome of this case:

Cato Institute

Competitive Enterprise Institute

Free State Foundation

National Association of Manufacturers

TechFreedom

**(B)    Rulings under Review**

References to the rulings at issue appear in the Joint Brief for Verizon and MetroPCS.

**(C)    Related Cases**

References to the related cases appear in the Joint Brief for Verizon and MetroPCS.  Since that time, Cause No. 11-1411 has been dismissed at the request of the petitioner.

By: _____

John P. Elwood
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Tel.: (202) 639-6518

*Counsel for Amici Curiae TechFreedom, the Competitive Enterprise Institute, the Free State Foundation, and the Cato Institute*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *amici curiae* TechFreedom, the Competitive Enterprise Institute, the Free State Foundation, and the Cato Institute hereby submit the following corporate disclosure statements:

TechFreedom is a nonprofit, non-stock corporation organized under the laws of the District of Columbia.  TechFreedom has no parent corporation, and no company owns 10 percent or more of its stock.

The Competitive Enterprise Institute ("CEI") is a nonprofit, non-stock corporation organized under the laws of the District of Columbia.  CEI has no parent corporation, and no company owns 10 percent or more of its stock.

The Free State Foundation ("FSF") is a nonprofit, non-stock corporation organized under the laws of Maryland.  FSF has no parent corporation, and no company owns 10 percent or more of its stock.

The Cato Institute ("Cato") is a Kansas nonprofit corporation that is this month transitioning from having several private stockholders to being a non-stock corporation.  Cato has no parent corporation, and no company owns 10 percent or more of its stock.

By: _____

John P. Elwood
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Tel.: (202) 639-6518

*Counsel for Amici Curiae TechFreedom,
the Competitive Enterprise Institute, the
Free State Foundation, and the Cato
Institute*

v

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Statement Regarding Consent to File and Separate Briefing ....................................i

Certificate as to Parties, Rulings, and Related Cases ................................ii

Corporate Disclosure Statements..........................................................iv

Table of Authorities ...................................................................vii

Interest of *Amici Curiae*..............................................................1

Summary of Argument ...................................................................2

Argument ..............................................................................4

I.      The Order Violates the First Amendment by Compelling
        Broadband Providers to Speak. ....................................................4

II.     The Order Violates the Fifth Amendment by Granting
        Content Providers a Nearly Unfettered Right to Occupy
        Network Owners' Property...........................................................13

        A.      The Order Effects an Unconstitutional *Per Se* Taking
                Without Just Compensation ................................................13

        B.      If Not a *Per Se* Taking, the Order Constitutes a
                Regulatory Taking Under the Fifth Amendment ...............................19

III.    The FCC's Reliance on Ancillary Jurisdiction Calls for
        Heightened Scrutiny. ..............................................................24

Conclusion ............................................................................26

# TABLE OF AUTHORITIES

## CASES                                                                            Page(s)

*ACLU v. FCC*,
    823 F.2d 1554 (D.C. Cir. 1987)...............................................................25, 26

*Agostini v. Felton*,
    521 U.S. 203 (1997)........................................................................................26

*American Library Ass'n v. FCC*,
    406 F.3d 689 (D.C. Cir. 2005)................................................................25, 26

*Andrus v. Allard*,
    444 U.S. 51 (1979).................................................................................14, 20

* *Bell Atl. Tel. Cos. v. FCC*,
    24 F.3d 1441 (D.C. Cir. 1994)..........................................................13, 14, 15

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011).....................................................................................8

*Bldg.. Owners & Managers Ass'n Int'l v. FCC*,
    254 F.3d 89 (D.C. Cir. 2001)..........................................................17–18, 18

*Cablevision Sys. Corp. v. FCC*,
    570 F.3d 83 (2009) ........................................................................................21

*CBS, Inc. v. FCC*,
    453 U.S. 367 (1981).................................................................................11–12

*CFTC v. Schor*,
    478 U.S. 833 (1986)......................................................................................25

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984).................................................................................15, 25

* *Comcast Cablevision of Broward Cnty. v. Broward Cnty.*,
    124 F. Supp. 2d 685 (S.D. Fla. 2000)...............................................................5

* Authorities upon which we chiefly rely are marked with asterisks.

\* *Comcast Corp. v. FCC*,
  600 F.3d 642 (D.C. Cir. 2010).............................................................4, 24, 25

*CompuServe Inc. v. Cyber Promotions, Inc.*,
  962 F. Supp. 1015 (S.D. Ohio 1997) ...............................................16

*FCC v. Fla. Power Corp.*,
  480 U.S. 245 (1987)...........................................................................19

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)........................................................................4, 24

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)........................................................................4, 24

*Hodel v. Irving*,
  481 U.S. 704 (1987)........................................................................3, 20

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*,
  515 U.S. 557 (1995)..............................................................................6

*Illinois Bell Tele. Co. v. Village of Itasca*,
  503 F. Supp. 2d 928 (N.D. Ill. 2007)....................................................5

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs.*,
  175 F.3d 848 (10th Cir. 1999) ............................................................10

\* *Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)......................................................................*passim*

\* *Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992).......................................................................3, 13

*Malik v. Brown*,
  16 F.3d 330 (9th Cir. 1994) ..................................................................6

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974).............................................................................6

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001)..........................................................25

*Minority Television Project v. FCC,*
   676 F.3d 869 (9th Cir. 2012) .............................................................9

*NARUC v. FCC,*
   533 F.2d 601 (D.C. Cir. 1976).......................................................24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005)..................................................................8, 21

*Nixon v. United States,*
   978 F.2d 1269 (D.C. Cir. 1992).......................................................15

\* *Nollan v. Cal. Coastal Comm'n,*
   483 U.S. 825 (1987)..................................................................3, 17

*Pacific Gas & Elec. Co. v. Pub. Util. Comm'n,*
   475 U.S. 1 (1986).....................................................................6–7

*Palazzolo v. Rhode Island,*
   533 U.S. 606 (2001).....................................................................19

\* *Penn Cent. Transp. Co. v. City of New York,*
   438 U.S. 104 (1978)...........................................................19, 21, 22

*Police Dep't of Chicago v. Mosley,*
   408 U.S. 92 (1972).......................................................................7

*Preseault v. United States,*
   100 F.3d 1525 (Fed. Cir. 1996) ......................................................18

*R.A.V. v. City of St. Paul, Minn.,*
   505 U.S. 377 (1992).......................................................................7

*Reno v. ACLU,*
   521 U.S. 844 (1997).....................................................................12

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
   487 U.S. 781 (1988)....................................................................2, 6

*Syracuse Peace Council v. FCC,*
   867 F.2d 654 (D.C. Cir. 1989).......................................................19

4

\* *Turner Broad. Sys., Inc.  v. FCC*,
     512 U.S. 622 (1994)..................................................................................*passim*

*Turner Broad. Sys. v. FCC*,
     520 U.S. 180 (1997).........................................................................8, 10

*Turner Broad. Sys., Inc. v. FCC*,
     819 F. Supp. 32 (D.D.C. 1993),
     *vacated on other grounds*, 512 U.S. 622 (1994) ...............................16

*United States v. E.I. du Pont de Nemours & Co.*,
     366 U.S. 316 (1961).........................................................................23

*United States v. Microsoft Corp.*,
     253 F.3d 34 (D.C. Cir. 2001).........................................................10

*Vieth v. Jubelirer*,
     541 U.S. 267 (2004).........................................................................8

*Ward v. Rock Against Racism*,
     491 U.S. 781 (1989).........................................................................12

*Wooley v. Maynard*,
     430 U.S. 705 (1977)......................................................................2, 8

*Yee v. City of Escondido*,
     503 U.S. 519 (1992).........................................................................18

## FEDERAL STATUTES

15 U.S.C. §§ 1, 2 (2006).......................................................................23

47 U.S.C. § 230(b)(2) (2006)................................................................11

## LEGISLATIVE MATERIALS

H.R. 3458, 111th Cong. (2009) ............................................................11

H.R. 5273, 109th Cong. (2006) ............................................................11

H.R. 5353, 110th Cong. (2008) ............................................................11

S. 215, 110th Cong. (2007)....................................................................11

S. 2360, 109th Cong. (2006)..................................................................11

S. 2917, 109th Cong. (2006)..................................................................11


**ADMINISTRATIVE MATERIALS**

*Appropriate Regulatory Treatment for Broadband Access
    to the Internet over Wireless Networks,*
    22 F.C.C. Rcd. 5901 (2007)...........................................................22

*In re Inquiry Concerning High Speed Access to the Internet
    Over Cable and Other Facilities,*
    17 F.C.C. Rcd. 4798 (2002)....................................................21–22

* *Preserving the Open Internet, Report and Order,*
    25 F.C.C. Rcd. 17905 (Dec. 23, 2010),
    76 C.F.R. 59192 (Sept. 23, 2011)............................................*passim*


**MISCELLANEOUS**

Timothy K. Armstrong, *Chevron Deference and
    Agency Self-Interest,*
    13 Cornell J.L. & Pub. Pol'y 203 (2004) .......................................26

Seth L. Cooper, *Sledgehammering the False Narrative
    for Regulating Broadband Internet,*
    7 Perspectives from FSF Scholars 16 (2012), *available at*
    http://www.freestatefoundation.org/images/Sledge
    hammering_the_False_Narrative_For_Regulating
    _Broadband_Internet_071212.pdf.................................................20

Larry Downes, *The Net Neutrality Walk of Shame*
    (Sept. 28, 2009), *available at* http://larrydownes.com/
    the-net-neutrality-walk-of-shame/ .................................................8

* Larry Downes, *Unscrambling the FCC's Net Neutrality
    Order:  Preserving the Open Internet—But Which One?*
    20 CommLaw Conspectus 83 (2011-2012)...................................7, 9

\* Barbara Esbin, *FCC Could Mess Up Internet with 'Net Neutrality' Rules No One Needs*,
U.S. News & World Rep. (Nov. 24, 2009)....................................................3, 9

Thomas W. Hazlett & Anil Caliskan, *Natural Experiments in U.S. Broadband Regulation*,
7 Rev. Network Econ. 460 (2008)..................................................22

\* Daniel A. Lyons, *Virtual Takings: The Coming Fifth Amendment Challenge to Net Neutrality Regulation*,
86 Notre Dame L. Rev. 65 (2011).................................................15–16, 18, 20

\* Randolph J. May, *Net Neutrality Mandates: Neutering the First Amendment in the Digital Age*,
3 I/S: A J. of Law and Pol'y for the Info. Soc'y 198 (2007).................2, 20, 27

Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*,
80 Harv. L. Rev. 1165 (1967)...................................................16–17

Blake D. Morant, *Symposium: First Amendment Issues in Emerging Technology – The Search for a Viable Theory of Regulation in the Digital Age*,
47 Univ. of Louisville L. Rev. 661 (2009).....................................11

James B. Speta, *FCC Authority to Regulate the Internet: Creating It and Limiting It*,
35 Loy. U. Chi. L.J. 15 (2003) .......................................................24

Transcript of Oral Argument, *Comcast v. FCC*,
No. 08-1291, Jan. 8, 2010.........................................................24, 25

Verizon, *Industry Overview*,
http://www22.verizon.com/investor/industryoverview.htm............................22

Eugene Volokh & Donald Falk, *First Amendment Protection for Search Engine Search Results*
(Google, Working Paper, Apr. 20, 2012), *available at*
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2055364 ........................10

### INTEREST OF *AMICI CURIAE*

This brief is submitted by *amici curiae* TechFreedom, the Competitive Enterprise Institute, the Free State Foundation, and the Cato Institute in support of Appellant Verizon.

TechFreedom, a nonprofit, nonpartisan public policy think tank seeking 501(c)(3) status based in Washington, D.C., works on a wide range of information-technology policy issues under the core belief that technology enhances freedom and freedom enhances technology.

The Competitive Enterprise Institute is a nonprofit public interest organization dedicated to the principles of limited constitutional government and free enterprise. CEI engages in research, education, litigation, and advocacy on a broad range of regulatory and constitutional issues.

The Free State Foundation, a nonprofit, Section 501(c)(3) tax-exempt foundation, promotes through its research and educational activities free market, limited government, and rule of law principles, especially with respect to communications and high-tech markets.

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward those ends, Cato publishes books and

studies, conducts conferences and forums, publishes the annual *Cato Supreme Court Review*, and files amicus briefs.

## SUMMARY OF THE ARGUMENT

However noble the FCC's intentions, its network-neutrality regulation, *Preserving the Open Internet*[2] ("the Order"), benefits content providers at the expense of broadband providers' constitutional rights.

By denying Internet service providers their editorial discretion and by compelling them to convey content providers' messages with which they may disagree, the Order violates broadband providers' First Amendment rights. *E.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988); *see also* Randolph J. May, *Net Neutrality Mandates: Neutering the First Amendment in the Digital Age*, 3 I/S: A J. of Law and Pol'y for the Info. Soc'y 198 (2007). It is particularly pernicious because it applies only to *some* speakers. *See* Order ¶¶50, 94. The Order therefore requires strict-scrutiny review, *e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714–17 (1977), which it cannot survive.

The Order serves no compelling government interest: it "solves" a "problem" even the FCC admits is almost entirely theoretical. *See* Order ¶¶12, 24, 62, 38, 147. Empirical evidence suggests that the practices the Order purports to

---

[2] 25 F.C.C. Rcd. 17905 (Dec. 23, 2010), 76 C.F.R. 59192 (Sept. 23, 2011).

9

prevent have been, and most likely will continue to be, deterred by market forces. *See, e.g.*, Barbara Esbin, *FCC Could Mess Up Internet with 'Net Neutrality' Rules No One Needs*, U.S. News & World Rep. (Nov. 24, 2009).  Even if anticompetitive behavior became a problem, those rare instances could continue to be dealt with through existing antitrust laws.  And, far from being narrowly tailored, the Order establishes a blanket right of access.  Nothing justifies the FCC's regulation of the speech of Internet service providers, let alone by the sweeping means adopted here.

The Order also violates the Fifth Amendment's prohibition on takings without just compensation:  it works a *per se* taking by giving content providers a permanent easement for nearly unfettered use of network owners' physical property (the cables and wires constituting their networks).  *See, e.g.*, *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987).  The Order deprives network owners of their traditional right to exclude others from, and control the use of, their property.  *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). And, by requiring network owners to give content providers space on their networks, the Order leaves users to bear the full cost of funding networks, which in turn reduces the networks' value by discouraging consumers from adopting, and fully using, broadband. *Cf. Hodel v. Irving*, 481 U.S. 704, 714 (1987).  The Order "chops through the bundle" (*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)) of network owners' property rights—effecting a *per se*

10

physical taking.  At the very least, by displacing network owners' reasonable investment-backed expectations, the Order effects a regulatory taking in violation of the Fifth Amendment.

Finally, the FCC's assertion of "ancillary authority" to regulate the Internet arrogates a boundless, and therefore dangerous, amount of power to itself.  This Court has recognized that the FCC possesses some authority over matters ancillary to those Congress specifically delegated to it.  *See, e.g.*, *Comcast Corp. v. FCC*, 600 F.3d 642, 653 (D.C. Cir. 2010).  But agency "ancillary authority" is an increasingly anomalous doctrine grounded in pre-*Chevron* Supreme Court case law (*see, e.g.*, *id.* at 646 (collective authorities)) and conflicts with modern administrative-law limits on agency power, *see, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).  The continuing validity of that doctrine is therefore ripe for reconsideration; at a minimum, this Court should be cautious in allowing the FCC ancillary authority to regulate the Internet.

## ARGUMENT

## I.  The Order Violates the First Amendment by Compelling Broadband Providers to Speak

The Order compels speech by forcing Internet service providers to post, send, and allow access to nearly all types of content, even if a broadband provider prefers not to transmit such content.  *See* Order ¶1 ("Fixed broadband providers

11

may not block lawful content, applications, services, or non-harmful devices . . . .").  Courts have recognized that the First Amendment protects the editorial discretion of broadband providers in determining what content they transmit.  *See Comcast Cablevision of Broward Cnty. v. Broward Cnty.*, 124 F. Supp. 2d 685 (S.D. Fla. 2000) (holding a county ordinance requiring favorable-term access for all Internet service providers violates broadband cable owners' free-speech rights); *id.* at 692 ("Liberty of circulating is not confined to newspapers and periodicals, pamphlets and leaflets, but also to delivery of information by means of fiber optics, microprocessors and cable."); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("*Turner I*") ("[Through] original programming or by exercising editorial discretion over which stations or programs to include in its repertoire[, cable programmers and operators] see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.") (internal citations omitted); *Ill. Bell Tele. Co. v. Village of Itasca*, 503 F. Supp. 2d 928, 948 (N.D. Ill. 2007) (collecting cases recognizing that cable and satellite companies' activities are protected by the First Amendment).  Although, as Verizon, MetroPCS, *and even the FCC* note, alleged network-neutrality violations have been rare, *see* Joint Brief for Verizon and MetroPCS 47; Order ¶24, that does not diminish broadband providers' constitutional rights to decide for themselves what to transmit and on what terms.  A speaker's freely made choice to transmit the messages of others is

12

itself an exercise of First Amendment rights to control the content transmitted, and does not waive his right to determine the content he chooses to transmit in the future.  *Cf. Malik v. Brown*, 16 F.3d 330, 332 (9th Cir. 1994) ("A 'use it or lose it' approach [for constitutional rights] does not square with the Constitution.").

Nor is the Order any less constitutionally suspect because it compels speech rather than restricts it.  Constitutionally, it makes no difference whether the government forces broadband providers to speak in certain ways or not to speak at all.  Although "[t]here is certainly some difference between compelled speech and compelled silence, . . . in the context of protected speech, the difference is without constitutional significance . . . ."  *Riley*, 487 U.S. at 796–97; *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995) (extending the protections against compelled speech to "business corporations generally and [to] professional publishers"); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (holding unconstitutional a Florida statute requiring newspaper to publish political candidate's reply to critical editorial).  Most fundamentally, "the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."  *Riley*, 487 U.S. at 796–97; *cf. Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*, 475 U.S. 1, 9 (1986) (holding electric utility could not be compelled to include in its billing envelope an advocacy group's flyer with which it disagreed).

13

The Order demands particularly exacting scrutiny because it picks and chooses among speakers. *Cf., e.g.*, *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 386 (1992) ("The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed."); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 94–95 (1972) (finding general ban on picketing near schools impermissibly content-based because it contained an exclusion for labor picketing). The Order's nondiscrimination rule applies only to certain types of Internet service providers: for instance, to broadband providers but not to "edge" providers.[3] Thus Apple could continue to exercise editorial discretion in deciding which applications it will allow iPhone and iPad users to access.[4] Besides the economic disruption caused when the government regulates only certain speakers, the government's differential treatment of speakers violates basic First Amendment principles of, yes, neutrality. *Cf. Turner I*, 512 U.S. at 659 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns."); Larry Downes,

---

[3] *See* Order ¶50. According to the Commission, edge providers differ from Internet service providers in that they merely provide "content or applications over the Internet." *Id.* By contrast, according to the Commission, "broadband providers control access to the Internet for their subscribers and for anyone wishing to reach those subscribers."). *Id.*

[4] *See* Larry Downes, *Unscrambling the FCC's Net Neutrality Order: Preserving the Open Internet—But Which One?* 20 CommLaw Conspectus 83, 93 (2011–2012).

14

*The Net Neutrality Walk of Shame* (Sept. 28, 2009), *available at* http://
larrydownes.com/the-net-neutrality-walk-of-shame/.   Accordingly, the Order is
subject to strict scrutiny, *e.g.*, *Wooley*, 430 U.S. at 714–17, and can overcome the
"strong presumption of invalidity" that applies to all such laws, *Vieth v. Jubelirer*,
541 U.S. 267, 294 (2004), only if it is "justified by a compelling government
interest and is narrowly drawn to serve that interest," *Brown v. Entm't Merchs.
Ass'n*, 131 S. Ct. 2729, 2738 (2011).   The FCC cannot overcome that presumption
here.

Even were this Court to view broadband providers as common carriers—
which the Commission itself says they are not[5]—the FCC could not satisfy its
burden under intermediate-scrutiny review.   *Cf. Turner Broad. Sys. v. FCC*, 520
U.S. 180 (1997) ("*Turner II*") (applying intermediate scrutiny to cable must-carry
provisions).   After all, under intermediate scrutiny, "the guiding principle . . . is
that the government must 'demonstrate that the recited harms' to the substantial
government interest 'are real, not merely conjectural, and that the regulation will in
fact alleviate those harms in a direct and material way.'"   *Minority Television
Project, Inc. v. FCC*, 676 F.3d 869, 879 (9th Cir. 2012) (quoting *Turner I*, 512 U.S.

---

[5] *See* Order ¶¶79, 122 n.381; *see also Nat'l Cable & Telecomms. Ass'n v.
Brand X Internet Servs.*, 545 U.S. 967, 975–76 (2005); May, *supra*, at 209.   Of
course, this did not stop the FCC from regulating broadband providers *as if they
were* common carriers.   *See, e.g.*, Joint Brief for Verizon & MetroPCS 15–20.

at 664–65.)  But as discussed below, the harms here remain entirely conjectural. The Commission has failed to identify any material instances of denial of access, instead relying on *hypothetical* threats to the "open Internet."  *See* Order ¶¶12, 24, 62, 38, 147.

The Government identifies no compelling interest.  The evidence simply does not show discriminatory practices requiring new regulatory remedies.  *See, e.g.*, Joint Brief for Verizon and MetroPCS 47.[6]  As one scholar noted, although "there are some 121.2 million broadband Internet service lines in the United States," there are "few instances where network operators supposedly violated the FCC's network neutrality principles."  Esbin, *supra*.  That is unsurprising given how well market forces already discipline broadband providers:  consumers demand unfettered access and "[p]erceived violations [of network neutrality] are met with nearly immediate and widespread public backlash through the very medium that is allegedly at risk:  the free and open Internet."  *Id.*  If the FCC fears there is insufficient broadband competition, it could address that problem directly by ensuring adequate spectrum for competing wireless-broadband services.  *See*

---

[6] *See also* Downes, *supra*, at 101 (noting that examples in the Order "of instances where broadband providers acted to 'limit openness'" comprised just "four instances" in "three paragraphs"); *id.* at 101–05 (describing in detail these instances and noting that the Order's regulation might not even have covered a majority of them).

Department of Justice, Notice of Inquiry, *In the Matter of A National Broadband Plan for Our Future*, GN Docket No. 09-51 (Jan. 4, 2010), *available at* http://www.justice.gov/atr/public/comments/253393.pdf#page=8 (discussing importance of wireless competition). Finally, to the extent broadband providers abuse market power to block access to competitors, rather than infringe on providers' editorial discretion, such actions can be addressed through existing antitrust law.[7] *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (upholding monopolization claim under the Sherman Act).

The cable must-carry provisions upheld in *Turner II* were predicated on Congress's express finding (entitled to "considerable deference") that most cable systems had functional monopolies that gave them "undue market power," *Turner I*, 512 U.S. at 633, and that cable systems had "increasing ability and incentive to drop local broadcast stations." *Turner II*, 520 U.S. at 197. But no congressional findings support the FCC's rationale for the Order; indeed, Congress has

---

[7] But even violations of antitrust laws cannot be "predicated solely on protected speech." *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d 848, 860 (10th Cir. 1999); Eugene Volokh & Donald Falk, *First Amendment Protection for Search Engine Search Results* (Working Paper, Apr. 20, 2012) at 20, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2055364 ("[A]ntitrust law itself, like other laws, is limited by the First Amendment, and may not be used to control what speakers say or how they say it.").

repeatedly declined to enact network-neutrality legislation.[8]  In fact, the legislation Congress *has* enacted suggests it believes that minimizing Internet regulation is a more important governmental interest than FCC micromanagement of network access.  *See, e.g.*, Blake Morant, *Symposium: First Amendment Issues in Emerging Technology – The Search for a Viable Theory of Regulation in the Digital Age*, 47 Univ. of Louisville L. Rev. 661, 672 (2009) ("The Telecommunications Act of 1996 . . . clearly requires deference to the 'vibrant and competitive free market,' which should be 'unfettered by Federal or State regulation.'") (quoting 47 U.S.C. § 230(b)(2) (2006)).

Nor is the Order narrowly tailored to support the government's claimed interest.  It forces broadband providers to allow nearly all speech all the time.  By contrast, even under the long-abandoned "fairness doctrine," *see generally Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C. Cir. 1989), the Supreme Court permitted the government to compel speech only when that requirement was limited in time and scope.  In *CBS, Inc. v. FCC*, 453 U.S. 367, 396 (1981), for instance, the Court upheld "a *limited* right to 'reasonable' access that pertains only to legally qualified federal candidates and may be invoked by them only for the

---

[8] *See, e.g.*, H.R. 3458, 111th Cong. (2009); H.R. 5353, 110th Cong. (2008); S. 215, 110th Cong. (2007); S. 2917, 109th Cong. (2006); H.R. 5273, 109th Cong. (2006); S. 2360, 109th Cong. (2006).

purpose of advancing their candidacies once a campaign has commenced." (internal citations omitted).  The Court contrasted that limited right to a general right requiring granting access to all comers, noting, "[p]etitioners are correct that the Court has never approved a *general* right of access to the media," and adding, "[n]or do we do so today."  *Id.*  Yet the Order creates just such a general right, with only a carve-out for whatever category of speaker the FCC chooses to exclude from its largesse.  The beneficiaries are *all* those wishing to make content available through providers' networks, who will be able to do so *whenever* they want.  If a blanket order mandating nearly unfettered access is "narrow," it is difficult to imagine what a "broad" compulsion of speech would look like.

It is hornbook law that the "government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."  *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).  With few allegations of network discrimination (let alone whatever would fall into the presumably narrower category of "unreasonable" network discrimination), the Order would fail even if it only minimally burdened speech.  As it is, the Order forces broadband providers to substitute the editorial discretion of content providers for their own.  The Order goes too far; in essence, it "burn[s] the house to roast the pig."  *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

19

## II. The Order Violates the Fifth Amendment by Granting Content Providers a Nearly Unfettered Right to Occupy Network Owners' Property

### A. The Order Effects an Unconstitutional *Per Se* Taking Without Just Compensation

If the Order stands, content providers will enjoy a nearly unqualified right to occupy the cables and wires that constitute broadband networks. The Fifth Amendment prohibits permanent physical occupations without just compensation, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it." *Lucas*, 505 U.S. at 1015. In fact, a "permanent physical occupation" of property constitutes a *per se* taking, even if the occupation is on a "relatively insubstantial amount[] of space." *Loretto*, 458 U.S. at 430; *see also Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1446 (D.C. Cir. 1994). The Order here provides no compensation to network owners, yet curtails network owners' rights to exclude users and to control the use of their networks. This works a *per se* taking, regardless of the manner of and rationale behind that taking. *See Loretto*, 458 U.S. at 426 (noting traditional "ad hoc" factors applied in takings cases are irrelevant when a "permanent physical occupation" occurs).

*Loretto* concerned a state law requiring landlords to allow cable-television companies to install equipment on their property. *Id.* at 421. The Court found the statute unconstitutional because it permitted the company to occupy the landlord's physical property without compensation. *Id.* at 421–22. This was a *per se* taking,

20

it held, because that placement of cable equipment on the landlord's property did "not simply take a single 'strand' from the 'bundle' of property rights:  it chop[ped] through the bundle, taking a slice of every strand."  *Id.* at 435 (quoting *Andrus v. Allard*, 444 U.S. 51, 65-66 (1979)).  As the Court explained, "[p]roperty rights in a physical thing have been described as the rights to possess, use and dispose of it.  To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights."  *Id.* (internal quotations omitted).  And, the Court added, the government need not directly occupy property to create a *per se* taking; rather, a "permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant."  *Id.* at 432 n.9.

More recently, in *Bell Atlantic*, this Court invalidated a Commission order requiring local telephone companies to allow "physical co-location" by which a competitive access provider ("CAP") would string its own cable to a local telephone company's central office.  24 F.3d at 1444.  This Court held that the "Commission's decision to grant CAPs the right to exclusive use of a portion of the petitioners' central offices directly implicates the Just Compensation Clause of the Fifth Amendment, under which a 'permanent physical occupation authorized

by government is a taking without regard to the public interests that it may serve.'"[9] *Id.* at 1445 (quoting *Loretto*, 458 U.S. at 426).

Here, the Order authorizes an occupation of broadband networks that is both physical and permanent. The Order forbids network owners from excluding providers' content—much like the *Loretto* statute forbade landlords from excluding cable companies and the *Bell* order forbade local telephone companies from excluding CAPs. And, by extension, the Order gives content providers the right to occupy network cables and wires—just as the *Loretto* statute and *Bell* order gave third parties the right to occupy the plaintiffs' properties.

Although either "real or personal property" can be subject to a *per se* taking, *Nixon v. United States*, 978 F.2d 1269, 1284–85 (D.C. Cir. 1992), a proper understanding of broadband network communications shows that electrical networks resemble the physical property at issue in *Loretto*:

> [T]he transmission of content over broadband networks is not some metaphysical act. . . . Transmission of Internet content primarily involves the movement of electrons, which are physical particles that occupy rivalrous limited space on those [broadband] lines, en route from the Internet to the end-user consumer.

---

[9] Furthermore, in *Bell Atlantic*, this Court held that a regulation implicating a taking, even a compensated one, negates the usual deference to which an agency is entitled under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). 24 F.3d at 337. And, the Court added, a regulation that works an uncompensated taking compels courts to strike down the order, not grant compensation. *See id.* at 337–38.

Daniel Lyons, *Virtual Takings: The Coming Fifth Amendment Challenge to Net Neutrality Regulation*, 86 Notre Dame L. Rev. 65, 97 (2011); *cf. Turner Broad. Sys., Inc. v. FCC*, 819 F. Supp. 32, 67 n.10 (D.D.C. 1993) (Williams, J., dissenting) (acknowledging that "insertion of local stations' programs into a cable operator's line-up" implicates *Loretto* because such insertion "presumably is not a metaphysical act, and presumably takes place on real property"), *vacated on other grounds*, 512 U.S. 622 (1994); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1021 (S.D. Ohio 1997) ("Electronic signals generated and sent by computer have been held to be sufficiently physically tangible to support a trespass cause of action."). Moreover, as *Loretto* instructs, even though any given content provider's physical occupation of wires may involve only a small part of total network capacity, that is irrelevant in determining whether a taking occurred. *See* 458 U.S. at 430.

That content providers use network space intermittently rather than continuously does not distinguish this case from *Loretto* or *Bell*. The Order effectively grants content providers a permanent easement over private broadband networks by allowing them to "'regularly' use, or 'permanently' occupy . . . a thing which theretofore was understood to be under private ownership." *Id.* at 427 n.5 (quoting Frank Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165, 1184

(1967)).  Thus, the FCC has taken one element from the network owner's bundle of rights and permanently transferred it to content providers—however intermittent content providers' use of the easement might be.

The Court has squarely held that such easements constitute a permanent physical occupation under *Loretto*.  In *Nollan v. California Coastal Commission*, the Court considered California's decision to condition issuance of a rebuilding permit on a landowner's acceptance of an easement over his beachfront property, thus connecting two public beaches.  483 U.S. at 831.  The Court held that "a 'permanent physical occupation' has occurred, for purposes of the [*Loretto per se* takings] rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises."  *Id.* at 832.  Although here, no single content provider will permanently occupy some discrete physical portion of the network wires, the Order still allows content providers to traverse the network permanently and continuously without interference from the owner, just as the easement in *Nollan* allowed beachgoers to traverse the Nollans' property.

To be sure, this Court held in *Building Owners & Managers Ass'n Int'l v. FCC* that the Commission's order forbidding landlords from banning tenant use of satellite dishes was not a *per se* taking under *Loretto*.  254 F.3d 89, 97–99 (D.C.

24

Cir. 2001).  But as this Court noted, the government has heightened authority "to regulate various aspects of the landlord-tenant relationship without paying compensation for all economic injuries that such regulation entails, even though some of these regulations transfer wealth from the one who is regulated to another."  *Id.* at 98 (internal quotation omitted).  By contrast, Internet customers have no such "tenancy" rights in a network, but only a contractual easement to use a network under certain terms and conditions.  *See* Lyons, *supra*, at 74.  Expanding the scope of such an express easement (or, really, giving *another* easement to the content provider) constitutes a taking even where expansion of a tenant's rights would not.  *See, e.g.*, *Preseault v. United States*, 100 F.3d 1525, 1571 n.16 (Fed. Cir. 1996) (holding a law expanding an "expressly limited" easement for railroad use into a public easement was a taking).

Furthermore, the Order requires network owners to grant third-party access to all content providers, access to which the network owners did not automatically consent upon contracting with a subscriber.  Landlords, by contrast, consensually grant tenants access and cannot subsequently argue that "regulation of the terms of a landlord-tenant relationship constitutes on its face an invasion of the landlord's right to exclude" for purposes of showing a *per se* taking.  *Bldg. Owners*, 254 F.3d at 99 (citing *Yee v. City of Escondido*, 503 U.S. 519, 531 (1992)).  Here, a content provider is a more constitutionally suspect "interloper with a government license,"

25

not a lessee. *See id.* at 98 (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252–53 (1987)).

B.    If Not a *Per Se* Taking, the Order Constitutes a Regulatory Taking Under the Fifth Amendment

Even if the Order is not a *Loretto per se* physical taking, it nonetheless constitutes an unconstitutional regulatory taking without just compensation. Determining when a regulatory taking has occurred requires the traditional *ad hoc* three-factor inquiry: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with reasonable investment-backed expectations; and (3) the nature of the governmental action.  *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Although the FCC's action need not implicate all three factors to constitute a taking, *see, e.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 633–34 (2001) (O'Connor, J., concurring), it plainly does.

To begin with, the Order substantially undermines the ability of Verizon and other broadband providers to realize the full value of their networks, causing economic harm to providers.  *See, e.g.*, Joint Brief for Verizon and MetroPCS 6–7, 51–52; *see also Penn Central*, 438 U.S. at 126–27 (discussing how adverse economic impacts of a regulation evidence a regulatory taking).  The Order here plainly reduces the value of network property.  First, the Order's bans on discrimination and blocking prevent network owners from realizing the full

26

monetary potential of their networks via differentiated pricing. *See* Joint Brief for Verizon and MetroPCS 20, 43–44. By charging different rates for varying levels of network service or bandwidth to content providers, network owners would maximize revenue, *see* Lyons, *supra*, at 74, and consumers could choose the Internet experience they prefer, *cf.* May, *supra*, at 206–07. Instead, the Order essentially requires users alone to fund networks while allowing content providers free access. This reduces the current and future market value of network assets, a strong indication that regulation has had an adverse economic impact. *See Hodel*, 481 U.S. at 714 (looking to property's market value in considering whether regulation constituted a taking). Second, the Order fossilizes broadband networks as simply a "dumb" conduit for Internet traffic, which could deprive network owners of other potentially profitable network uses such as cable television or telephony. *See* Seth Cooper, *Sledgehammering the False Narrative For Regulating Broadband Internet*, 7 Perspectives from FSF Scholars 16, at *1–2 (2012), *available at* http://www.freestatefoundation.org/images/Sledgehammering _the_False_Narrative_For_Regulating_Broadband_Internet_071212.pdf;     *cf. Andrus*, 444 U.S. at 66 (assessing the economic impact of a law banning the sale of parts of protected birds by looking to the harm caused by the law's elimination of the primary economic use for them).

27

The Order also interferes with network owners' reasonable investment-backed expectations. In *Cablevision Systems Corp. v. FCC*, the case challenging the Commission's enforcement of a "must-carry" provision against a cable-television company, this Court noted that, to show a regulatory taking, "Cablevision was required to show that the regulation had an economic impact that interfered with 'distinct investment-backed expectations.'" 570 F.3d 83, 98–99 (2009) (citing *Penn Central*, 438 U.S. at 124). Absent any such showing, the Court held that "any regulatory taking theory must therefore fail." *Id.* at 99.

Here, the Commission's actions underscore the reasonableness of network owners' investment-backed expectations in developing advanced broadband networks. *See* Joint Brief for Verizon and MetroPCS 49. The Commission's 2002 declaratory ruling held that cable-modem services were exempt from "common carrier" obligations and would only be regulated under Title I of the Communications Act, *In re Inquiry Concerning High Speed Access to the Internet Over Cable and Other Facilities*, 17 F.C.C. Rcd. 4798 (2002), a conclusion the Supreme Court approved in *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). The 2002 declaratory ruling's conclusion that the Commission believed "broadband services should exist in a minimal regulatory environment that promotes investment and innovation in a competitive market" established network owners' expectation that they would be able to recoup

28

their investments over time under light-touch FCC regulatory policies. *See* 17 F.C.C. Rcd. at 4802. Indeed, following *Brand X*, the Commission issued a 2007 declaratory ruling freeing all broadband network owners, not just cable owners, from the requirement that they sell portions of their bandwidth at wholesale rates to competitors. *See Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 F.C.C. Rcd. 5901, 5909 (2007).

The understanding that network owners would not be regulated as *de facto* common carriers encouraged network owners to pour billions of dollars into building, maintaining, and modernizing broadband plants. *See, e.g.*, Thomas Hazlett & Anil Caliskan, *Natural Experiments in U.S. Broadband Regulation*, 7 Rev. Network Econ. 460, 477 (2008) (describing growth in the broadband industry following the 2007 declaratory ruling); *cf. Penn Central*, 438 U.S. at 124. Indeed, Verizon alone invested over $20 billion to replace millions of miles of copper wire with fiber-optic cables. Verizon, *Industry Overview*, at ch.4, http://www22. verizon.com/investor/industryoverview.htm. The Order undercuts these investment-backed expectations by subjecting network owners to a stringent regulatory regime.

Finally, the Order physically invades network owners' property. *See* 13–19, *supra*; *see also Penn Central*, 458 U.S. at 124 ("[A regulatory taking] may more readily be found when the interference with property can be characterized as a

29

physical invasion by the government.").  But even if the Order does not lead to the permanent physical *occupation* of networks, at the very least it facilitates a physical *invasion* of property because content providers are given unqualified access to physical network assets regardless of the owner's wishes.   As Commissioner McDowell noted in his dissent from the Order: "[T]he new regulatory regime effectively authorizes third-party occupation of some portion of a broadband ISP's transmission facilities by constraining the facility owner's ability to decide how to best manage the traffic running over the broadband platform."  Order, at 168 n.111 (McDowell, Comm'r, dissenting).  The Order's invasion is tantamount to a physical occupation.

Finally, invalidating the Order as a taking would not leave the government powerless to regulate anticompetitive behavior that harms consumers.  Antitrust violations, for example, may justify imposition of equitable remedies that would otherwise be unconstitutional takings.  *Cf. United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations [of antitrust law], whatever the adverse effect of such a decree on private interests.")  But that does not support the FCC's actions here.  Network owners have not engaged in any restraints of trade or other forms of anticompetitive conduct necessary to justify such a remedy.  *See* 15 U.S.C. §§ 1, 2 (2006).

30

### III.    The FCC's Reliance on "Ancillary Jurisdiction" Demands Heightened Scrutiny

Although existing case law recognizes that the FCC possesses some "ancillary jurisdiction" over matters for which it lacks explicit regulatory authority if "reasonably ancillary" to matters the Communications Act "*specifically delegate[s]*" to the agency, *see, e.g. Comcast*, 600 F.3d at 646, 653 (quoting *NARUC v. FCC*, 533 F.2d 601, 612 (D.C. Cir. 1976)) (emphasis in *Comcast*), that doctrine is increasingly "out of step with contemporary Supreme Court jurisprudence" (Tr. of Oral Argument 20, *Comcast v. FCC*, No. 08-1291, Jan. 8, 2010 (Randolph, J.)) limiting an agency's regulatory authority to that explicitly delegated by Congress, *see, e.g.*, *Gonzales*, 546 U.S. 243 at 267 ("The importance of the issue . . . makes the oblique form of the claimed delegation all the more suspect."); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160 ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."); *see also* James B. Speta, *FCC Authority to Regulate the Internet: Creating It and Limiting It*, 35 Loy. U. Chi. L.J. 15, 25 & n.56 (2003) (discussing the inconsistency between ancillary-authority cases and recent Supreme Court cases policing agency powers more strictly).

Allowing an agency that derives its regulatory authority solely from congressional delegation to claim ancillary authority beyond that grant of power

31

violates basic administrative-law principles.    Properly understood, "[t]he Commission 'has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress.'"    *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)).  But, by invoking its ancillary authority, the FCC grasps beyond the regulatory powers that Congress actually gave it.  *Cf. ACLU v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987) ("[I]t seems highly unlikely that a responsible Congress would implicitly delegate to an agency the power to define the scope of its own power.").

The Supreme Court precedents supporting the FCC's ancillary-authority claims predate the seminal decision in *Chevron*, *see Comcast*, 600 F.3d at 646 (collecting authorities).  The FCC's claims more closely resemble the discarded notion of "implied rights of action" than *Chevron* and its progeny.  Tr. of Oral Argument 20, *Comcast v. FCC*, No. 08-1291, Jan. 8, 2010 (Randolph, J.).  Underscoring how anomalous ancillary agency authority really is, the FCC is one of the few agencies that still invokes the concept as grounds for greater regulatory reach.  *Cf. CFTC v. Schor*, 478 U.S. 833, 852 (1986) (noting that the "wholesale importation of ancillary jurisdiction into the agency context" has the potential to "create great[] constitutional difficulties").

Agencies have every incentive to interpret the scope of their authority broadly. *See generally* Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13 Cornell J.L. & Pub. Pol'y 203 (2004) (discussing why courts should view skeptically interpretations advancing agencies' jurisdictional self-interest). For that reason, courts are well advised to recognize agency regulatory authority only where Congress has specifically granted it. At a minimum, *cf. Agostini v. Felton*, 521 U.S. 203, 215 (1997), these considerations warrant caution in recognizing ancillary authority: "[w]hen an agency's assertion of power into new arenas is under attack, . . . courts should perform a close and searching analysis of congressional intent, remaining skeptical of the proposition that Congress did not speak to such a fundamental issue." *ACLU*, 823 F.2d at 1567 n.32. Given the grave First- and Fifth-Amendment concerns present here, this case warrants that same "very cautious approach in deciding whether the Commission has validly invoked its ancillary jurisdiction." *Am. Library Ass'n*, 406 F.3d at 702. If the FCC can invent authority to regulate the Internet today, there is no limit to what it might do tomorrow.

## **CONCLUSION**

For the foregoing reasons, this Court should vacate the Order.

Respectfully submitted,

Berin Szoka
Matthew Starr
TechFreedom
1899 L St., NW, Suite 1260
Washington, DC 20036
(202) 455-8186
bszoka@techfreedom.org

John P. Elwood*
Eric A. White
Vinson & Elkins LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
(202) 639-6518
jelwood@velaw.com

Sam Kazman
Competitive Enterprise Institute
1899 L St., NW, Floor 12
Washington, D.C., 20036
(202) 331-1010
skazman@cei.org

Thomas S. Leatherbury
Vinson & Elkins LLP
2001 Ross Ave., Suite 3700
Dallas, TX  75201
(214) 220-7700
tleatherbury@velaw.com

Ilya Shapiro
Cato Institute
1000 Massachusetts Ave., NW
Washington, DC 20036
(202) 842-0200
ishapiro@cato.org

Randolph May
Free State Foundation
P.O. Box 60680
Potomac, MD 20859
(301) 984-8253
rmay@freestatefoundation.org

*Counsel for Amici Curiae*

*\* Counsel of Record*

July 23, 2012

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I certify the following:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) because it contains 5,968 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

John P. Elwood
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Tel.: (202) 639-6518

*Counsel for Amici Curiae TechFreedom,
the Competitive Enterprise Institute, the
Free State Foundation, and the Cato
Institute*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23d day of July, 2012, a true and correct copy of the foregoing instrument was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.  Others, marked with an asterisk, will receive service by mail unless another attorney for the same party is receiving service through CM/ECF.

Carl W. Northrop
Telecommunications Law
Professionals PLLC
875 15th Street, NW, Suite 750
Washington, DC 20005
*Counsel for MetroPCS*
*Communications, Inc., et al.*

Mark A. Stachiw
General Counsel, Secretary & Vice
Chairman
MetroPCS Communications, Inc.
2250 Lakeside Blvd.
Richardson, TX 75082
*Counsel for MetroPCS*
*Communications, Inc., et al.*

Helgi C. Walker
Eve Klindera Reed
Brett A. Shumate
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for Verizon*

*Michael E. Glover
Edward Shakin
William H. Johnson
Verizon
1320 North Courthouse Road, 9th Floor
Arlington, VA 22201
*Counsel for Verizon*

*John T. Scott, III
Verizon Wireless
1300 I Street, NW
Suite 400 West
Washington, DC 20005
*Counsel for Verizon*

Walter E. Dellinger
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
*Counsel for Verizon*

Samir C. Jain
Wilmer Cutler Pickering, et al.
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for Verizon*

Joel Marcus
Jacob M. Lewis
Austin C. Schlick
Richard Kiser Welch
FCC Office of General Counsel
445 12th Street, SW
Washington, DC 20554
*Counsel for FCC*

James Bradford Ramsay
General Counsel
National Association of Regulatory
Utility Commissioners
1101 Vermont Avenue
Suite 200
Washington, DC 20005
*Counsel for NASUCA*

Genevieve Morelli
ITTA
1101 Vermont Avenue, N.W.
Suite 501
Washington, DC 20005
*Counsel for ITTA*

Henry Goldberg
Goldberg, Godles, Wiener & Wright
1229 Nineteenth Street, NW
Washington, DC 20036
*Counsel for Open Internet
Coalition*

Harold J. Feld
Public Knowledge
1818 N Street, NW Ste. 410
Washington, DC 20036
*Counsel for Public Knowledge*

Nancy C. Garrison
Catherine G. O'Sullivan
Robert J. Wiggers
U.S. Department of Justice
Antitrust Div,, Appellate, Rm. 3224
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
*Counsel for the United States*

Matthew F. Wood
Free Press
501 Third Street, NW
Suite 875
Washington, DC 20001
*Counsel for Free Press*

R. Craig Lawrence
U.S. Attorney's Office
555 4th Street, NW
Washington, D.C. 20530
*Counsel for the United States*

E. Duncan Getchell, Jr.
Solicitor General of Virginia
Office of the
Attorney General
900 East Main Street
Richmond, Virginia 23219
*Counsel for the Commonwealth of
Virginia*

Russell Hanser
Wilkinson Barker Knauer LLP
2200 N Street NW
Suite 700
Washington, DC 20037
*Counsel for the National
Association of Manufacturers*

Jeffrey J. Binder
The Watergate
2510 Virginia Avenue, NW
Washington, DC 20036
*Counsel for Vonage Holdings Corp.*

Brendan Kasper
Vonage
23 Main Street
Holmdel, NJ 07733
*Counsel for Vonage Holdings Corp.*

*Counsel for TechFreedom,
the Competitive Enterprise Institute,
the Free State Foundation, and the
Cato Institute*