ORAL ARGUMENT NOT YET SCHEDULED
_____
No. 11-1355
(and consolidated cases)
_____

**In the United States Court of Appeals
for the District of Columbia Circuit**
_____

**VERIZON**,

Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION**,

Appellee.
_____

**On Petitions for Review
from the Federal Communications Commission**
_____

**BRIEF OF THE COMMONWEALTH OF VIRGINIA AND THE
STATES OF GEORGIA, MICHIGAN, OKLAHOMA, SOUTH
CAROLINA, AND WEST VIRGINIA AS AMICUS CURIAE
IN SUPPORT OF REVERSAL**

KENNETH T. CUCCINELLI, II
Attorney General of Virginia

E. DUNCAN GETCHELL, JR.
(VSB #14156)
Solicitor General of Virginia
dgetchell@oag.state.va.us
*Counsel of Record*

WESLEY G. RUSSELL, JR.
(VSB #38756)
Deputy Attorney General
wrussell@oag.state.va.us

CHARLES E. JAMES, JR.
Chief Deputy Attorney General

OFFICE OF THE ATTORNEY
GENERAL
900 East Main Street
Richmond, VA 23219
Telephone: (804) 786-2436
Facsimile: (804) 786-1991
*Counsel for the
Commonwealth of Virginia*

# CERTIFICATE OF PARTIES,
# <u>RULINGS UNDER REVIEW, AND RELATED CASES</u>

A.     <u>Parties and Amici</u>

The States of Georgia, Michigan, Oklahoma, South Carolina, West Virginia, and the Commonwealth of Virginia appear as amicus curiae in support of Appellants-Petitioners.

The principal parties in these consolidated cases are Appellant-Petitioner Verizon, Appellants-Petitioners MetroPCS Communications, Inc. and its FCC-licensed affiliates (MetroPCS 700 MHz, LLC; MetroPCS AWS, LLC; MetroPCS California, LLC; MetroPCS Florida, LLC; MetroPCS Georgia, LLC; MetroPCS Massachusetts, LLC; MetroPCS Michigan, Inc.; MetroPCS Networks California, LLC; MetroPCS Networks Florida LLC; MetroPCS Texas, LLC; and MetroPCS Wireless, Inc.) (collectively "MetroPCS"), Petitioner Free Press, Appellee-Respondent Federal Communications Commission, and Respondent United States of America.

ITTA – The Independent Telephone and Telecommunications Alliance has appeared as intervenor in support of Appellants-Petitioners. National Association of Regulatory Utility Commissioners,

i

National Association of State Utility Consumer Advocates, Public Knowledge, Vonage Holdings Corporation, the Open Internet Coalition, and CTIA – The Wireless Association® have appeared as intervenors in support of Appellee-Respondents.

As set forth in the appendix to the ruling on review, the persons who appeared before the agency in the proceedings below are:

100 Black Men of America *et al.*
2Wire, Inc.
4G Americas, LLC
4Info, Inc.
ACT 1 Group *et al.*
Adam Candeub and Daniel John McCartney
ADTRAN, Inc.
Adventia Innovative Systems
African American Chamber of Commerce - Milwaukee
African Methodist Episcopal Church
Aircell LLC
Akamai Technologies, Inc.
Alabama State Conference of the NAACP Alarm Industry
Communications Committee
Alcatel-Lucent
Allbritton Communications Company
Alliance for Digital Equality
Alliance for Telecommunications Industry Solutions
Amazon.com
American Arab Chamber of Commerce
American Association of Independent Music American Association of
People with Disabilities American Business Media
American Cable Association American Center for Law and Justice
American Civil Rights Union
American Consumer Institute CCR American Council of the Blind

American Federation of Television & Radio Artists, Directors Guild of America, International Alliance of Theatrical Stage Employees, Screen Actors Guild

American Homeowners Grassroots Alliance

American Indian Chamber of Commerce of Wisconsin

American Legislative Exchange Council

American Library Association, Association of Research Libraries, EDUCAUSE

Americans for Prosperity

Americans for Tax Reform and Media Freedom Project Americans for Tax Reform Digital Liberty Project Americans for Technology Leadership

Annie McGrady

Anti-Defamation League

AOL Inc. Arts+Labs

Asian American Justice Center Assemblywoman Debbie Smith Association for Competitive Technology

Association of Research Libraries

Association of Research Libraries, EDUCAUSE, Internet2, NYSERNet, and ACUTA AT&T Inc.

Automation Alley

Ball State University Center for Information and Communications Science

Barbara A. Cherry

Barbara S. Esbin

Big Brothers Big Sisters of Will and Grundy Counties

Black Leadership Forum, Inc.

Bret Swanson, President, Entropy Economics LLC Bright House Networks, LLC

Broadband Institute of California and Broadband Regulatory Clinic Broadcast Music, Inc. BT Americas Inc.

Cablevision Systems Corporation

California Consumers for Net Neutrality California Public Utilities Commission Camiant, Inc.

Carbon Disclosure Project

Career Link Inc.

Catherine Sandoval and Broadband Institute of California

CDMA Development Group, Inc. Center for Democracy & Technology
Center for Individual Freedom
Center for Media Justice, Consumers Union, Media Access Project, and
New America
Center for Rural Strategies
Center for Social Media
Central Washington Hispanic Chamber of Commerce
CenturyLink
Chairman Kenneth D. Koehler, McHenry County Board
Chamber of Commerce of St. Joseph County
Charter Communications
Christopher S. Yoo
Christopher Sacca
Cincinnati Bell Wireless LLC Cisco Systems, Inc.
City of Philadelphia
Clearwire Corporation
Coalition of Minority Chambers
ColorOfChange.org
Comcast Corporation
Communications Workers of America
Communications Workers of America—District 2 in West Virginia
Communications Workers of America—Local 3806
Communications Workers of America—Local 4900
Competitive Enterprise Institute
COMPTEL CompTIA
Computer & Communications Industry Association
Computer Communications Industry Association, Consumer Electronics
Association
Computing Technology Industry Association
CONNECT
Connecticut Association for United Spanish Action, Inc. Connecticut
Technology Council
Consumer Policy Solutions
Corning Incorporated
Corporation for National Research Initiatives
Council of Baptist Pastors of Detroit & Vicinity, Inc. Covad
Communications Company

Cox Communications, Inc.
Craig Settles (Successful.com) CREDO Action
Cricket Communications, Inc. CTIA - The Wireless Association CWA
Indiana State Council
CWA Local 4900
Damian Kulash
Daniel Lyons
Data Foundry, Inc.
David Clark, William Lehr, and Steve Bauer
David D.F. Uran, Mayor, City of Crown Point, Indiana
Deborah Turner Debra Brown Derek Leebaert
Dickinson Area Partnership Digital Education Coalition Digital
Entrepreneurs
Digital Society
DISH Network L.L.C.
Distributed Computing Industry Association
Downtown Springfield, Inc. EarthLink, Inc.
Eastern Kentucky's Youth Association for the Arts, Inc.
Economic Development Council of Livingston County
Eight Mile Boulevard Association
El Centro
Electronic Frontier Foundation
Elgin Area Chamber Elizabeth A. Dooley, Ed. D. Entertainment
Software Association Ericsson Inc.
Erie Neighborhood House
Fiber-to-the-Home Council
Free Press
Frontier Communications
Future of Music Coalition
Future of Privacy Forum
G. Baeslack
General Communication, Inc.
Genesee Regional Chamber of Commerce
George Ou
Georgetown/Scott County Kentucky Chamber of Commerce
Georgia Minority Supplier Development Council

v

Global Crossing North America, Inc. Global Intellectual Property
Center
Google Inc.
Great River Economic Development Foundation
Greater Kokomo Economic Development Alliance
GSM Association GVNW Consulting, Inc. Hamilton County Alliance
Hance Haney Hannah Miller Harris Corporation
HB Clark
Hispanic Leadership Fund
Hispanic Technology and Telecommunications Partnership
Hmong/American Friendship Association, Inc. Hughes Network
Systems, LLC
Illinois Hispanic Chamber of Commerce
Independent Creator Organizations
Independent Film & Television Alliance
Independent Telephone & Telecommunications Alliance
Indiana Secretary of State
Indianapolis Urban League
Information and Communications Manufacturers and Service Providers
Information Technology and Innovation Foundation
Information Technology Industry Council Institute for Emerging
Leaders, Inc. Institute for Liberty
Institute for Policy Innovation
Institute for Policy Integrity
Intellectual Property and Communications Law Program at Michigan
State
University College of Law
International Documentary Association, Film Independent, and others
Internet Freedom Coalition
Internet Innovation Alliance
Internet Society
Intrado Inc. and Intrado Communications Inc. Ionary Consulting
Jared Morris
Jeanne K. Magill, Pabst Farms Development Inc.
Joe Armstrong, Tennessee State Representative
Joe Homnick
John Palfrey

John Staurulakis, Inc.
Johnson County Board of Commissioners
Joint Center for Political and Economic Studies Joliet Region Chamber of Commerce & Industry Kankakee County Farm Bureau
Karen Kerrigan, President & CEO, Small Business & Entrepreneurship Council
Karen Maples
Kentucky Commission on the Deaf and Hard of Hearing
Labor Council for Latin American Advancement
Lake Superior Community Partnership
Lakewood Chamber of Commerce
Latin American Chamber of Commerce of Charlotte
Latin Chamber of Commerce of Nevada
Latinos for Internet Freedom and Media Action Grassroots Network
Latinos in Information Sciences & Technology Association
Laurence Brett Glass, d/b/a LARIAT
Lawerence E. Denney, Speaker of the House, State of Idaho
Lawrence County Economic Growth Council
Lawrence Morrow
Leadership East Kentucky
League of United Latin American Citizens
Leap Wireless International, Inc. and Cricket Communications, Inc.
Level 3 Communications LLC
Links Technology Solutions, Inc.
Lisa Marie Hanlon, TelTech Communications LLC M3X Media, Inc.
Mabuhay Alliance
Maneesh Pangasa Mary-Anne Wolf Matthew J. Cybulski Mayor Brad Stephens
Mayor George Pabey, City of East Chicago, Indiana
Mayor Leon Rockingham, Jr.
Mayor Rudolph Clay, Gary, Indiana
McAllen Solutions
Media Action Grassroots Network, ColorOfChange.org, Presente.org, Applied Research Center, Afro-Netizen, National Association of Hispanic Journalists, Native Public Media, and Rural Broadband Policy Group
MegaPath, Inc. and Covad Communications Company

Messaging Anti-Abuse Working Group MetroPCS Communications, Inc.
Michele Hodges, Troy Chamber Microsoft Corp.
Mid-Atlantic Community Papers Association, on behalf of Association of
Free Community Papers, Community Papers of Michigan, Free
Community Papers of New York, Community Papers of Florida,
Midwest Free Community Papers, Community Papers of Ohio and West
Virginia, Southeastern Advertising Publishers Association, Wisconsin
Community Papers
Mike Riley
Ministerial Alliance Against the Digital Divide
Mississippi Center for Education Innovation
Mississippi Center for Justice MLB Advanced Media, L.P. Mobile
Future
Mobile Internet Content Coalition
Motion Picture Association of America, Inc. Motorola, Inc.
Nacional Records
Nate Zolman
National Association for the Advancement of Colored People
National Association of Manufacturers
National Association of Realtors
National Association of State Utility Consumer Advocates
National Association of Telecommunications Office & Advisors
National Black Chamber of Commerce
National Cable & Telecommunications Association
National Coalition on Black Civic Participation
National Council of La Raza
National Emergency Number Association
National Exchange Carrier Association, Inc.
National Exchange Carrier Association, Inc., National
Telecommunications
Cooperative Association, Organization for the Promotion &
Advancement of Small Telecommunication Companies, Eastern Rural
Telecom Association, Western Telecommunications Alliance
National Farmers Union
National Foundation for Women Legislators High Speed Internet
Caucus
National Hispanic Caucus of State Legislators

National Hispanic Media Coalition
National Medical Association
National Organization of Black Elected Legislative Women *et al.*
National Organizations
National Rural Health Association National Spinal Cord Injury
Association National Taxpayers Union
National Telecommunications Cooperative Association
National Urban League
Netflix, Inc. Network 2010
New America Foundation
New Jersey Rate Counsel
New York State Office of Chief Information Officer/Office for
Technology
(CIO/OFT)
Nicholas Bramble, Information Society Project at Yale Law School
Nickolaus E. Leggett
Nippon Telegraph and Telephone Corporation
Nokia Siemens Networks US LLC
Northern Nevada Black Cultural Awareness Society
Office of the Attorney General of Virginia
Office of the Mayor, City of Peru
Older Adults Technology Services, Inc. Open Internet Coalition
Open Media and Information Companies Initiative
Operation Action U.P. Oregon State Grange
Organization for the Promotion & Advancement of Small
Telecommunication Companies
PAETEC Holding Corp. Patricia Dye
Performing Arts Alliance
Phil Kerpen, Vice President, Americans for Prosperity
Property Rights Alliance
Public Interest Advocates
Public Interest Commenters
QUALCOMM Incorporated
Qwest Communications International Inc. R. L. Barnes
Rainbow PUSH Coalition
Recording Industry Association of America
Red Hat, Inc.

Rev. W.L.T. Littleton
Richmond Chamber of Commerce
RNK Communications
Robert K. McEwen d/b/a PowerView Systems
Robert Steele, Cook County Commissioner
Rural Cellular Association
Safe Internet Alliance
Saint Xavier University
Sandvine Inc.
Satellite Broadband Commenters
SavetheInternet.com
Scott Cleland Scott Jordan Sean Kraft Sean Sowell Seth Johnson
Shelby County Development Corporation
Skype Communications S.A.R.L. Sling Media, Inc.
Smartcomm, LLC
Smithville Telephone Company
Software & Information Industry Association
Songwriters Guild of America
Sony Electronics Inc.
Southern Company Services, Inc.
Southern Wayne County Regional Chamber of Commerce
Sprint Nextel Corp.
St. Louis Society for the Blind and Visually Impaired
Stephen Beck
Steve Forte, Chief Strategy Officer, Telerik stic.man of Dead Prez
SureWest Communications
Susan Jacobi
TDS Telecommunications Corp. Tech Council of Maryland TechAmerica
Telecom Italia, S.P.A.
Telecom Manufacturer Coalition
Telecommunications Industry Association
TeleDimensions, Inc. Telefonica S.A.
Telephone Association of Maine
Texas Office of Public Utility Counsel
Texas Public Policy Foundation
Texas Statewide Telephone Cooperative, Inc.
The Ad Hoc Telecommunications Users Committee

The Berroteran Group
The Disability Network
The Free State Foundation
The Greater Centralia Chamber of Commerce & Tourism Office
The Greenlining Institute
The Heartland Institute
The Nebraska Rural Independent Companies
The Senior Alliance
Thomas C. Poorman, President, Zanesville-Muskingum County
Chamber of Commerce
Thomas D. Sydnor II, Senior Fellow and Director, Center for the Study
of Digital Property at the Progress & Freedom Foundation
Thomas Richard Reinsel, Executive in Residence, Sewickley Oak
Capital
Thomas W. Hazlett
Tim Wu
Time Warner Cable Inc. T-Mobile USA, Inc.
tw telecom inc.
U.S. Chamber of Commerce
Union Square Ventures
United Service Organizations of Illinois
United States Hispanic Chamber of Commerce
United States Telecom Association
UNITY: Journalists of Color, Inc.
Upper Peninsula Economic Development Alliance
Upper Peninsula Health Plan
Urban League of Metropolitan Seattle
Various Advocates for the Open Internet
Verizon and Verizon Wireless
Via Christi Health System eCare-ICU Village of Maywood
Vincent Watts of the Greater Stark County Urban League
Voice on the Net Coalition Vonage Holdings Corp. Voto Latino
Washington State Grange
Wayne Brough, James Gattuso, Hance Haney, Ryan Radia, and James
Lakely
Windstream Communications, Inc. Winston-Salem Urban League

xi

Wireless Communications Association International, Inc. Wireless
Internet Service Providers Association

World Institute on Disability *et al.*

Writers Guild of America, East AFL-CIO Writers Guild of America,
West, Inc.

XO Communications, LLC YWCA of St. Joseph County

B.    <u>Ruling Under Review</u>

Appellants-Petitioners appealed the final order of the Federal
Communications Commission captioned *In re Preserving the Open
Internet; Broadband Industry Practices*, Report and Order, Docket Nos.
09-191, 07-52, 25 F.C.C.R. 17905 (rel. Dec. 23, 2010), 76 Fed. Reg.
59192 (Sept. 23, 2011) (JA__).

C.    <u>Related Cases</u>

This case has been consolidated with Case Nos. 11-1356, 11-1403,
11-1404, and 11-1411.

This case is related to *Cellco Partnership d/b/a Verizon Wireless
v. FCC*, Nos. 11-1135 & 11-1136 (D.C. Cir.), in that both cases involve
substantially the same parties and the similar legal issue of the
Commission's statutory authority under Section 706 and Title III of the
Communications Act to regulate broadband Internet services and the

extent to which such regulation constitutes prohibited common-carrier

regulation under *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979).


By:  /s/ E. Duncan Getchell, Jr.
E. DUNCAN GETCHELL, JR.
(VSB #14156)
Solicitor General of Virginia
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Telephone:  (804) 786-7240
Facsimile:  (804) 371-0200
dgetchell@oag.state.va.us
*Counsel of Record*

# TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES,  RULINGS UNDER REVIEW, AND
    RELATED CASES ..............................................................................i

TABLE OF CONTENTS ....................................................................xiv

TABLE OF AUTHORITIES..................................................................xv

STATEMENT OF IDENTITY, INTERESTS, AND AUTHORITY TO
    FILE AS AMICI ...........................................................................1

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ......................................................................................2

    I.    The Order Subjects Broadband Internet Providers to
        Common-Carrier Regulation, in Contravention of Statute. ..2

        A.    Telecommunication Laws Prohibit Common-Carrier
             Regulation of Broadband Internet Providers. ...............3

        B.    The Order Imposes Common-Carrier Obligations on
             Broadband Internet Providers by Fixing Prices,
             Prohibiting Discrimination between Users and Uses,
             and Requiring Public Disclosure of Practices. ..............5

    II.    The Order's Assertion of Authority is Untethered to
        and Unbounded by the FCC's Statutory Delegations
        of Authority. ........................................................................10

        A.    There is No Express Statutory Authority for the FCC
             to Regulate Broadband Internet Providers as Such. ..12

        B.    The Order's Claim of Ancillary Authority Fails Because
             The Ancillary Authority Claimed is Unbounded. .......17

CONCLUSION ................................................................................19

CERTIFICATE OF COMPLIANCE  WITH TYPE-VOLUME
    LIMITATIONS..............................................................................21

CERTIFICATE OF SERVICE...............................................................22

xiv

# TABLE OF AUTHORITIES

Page

## Cases

*Am. Library Ass'n v. FCC*,
   406 F.3d 689 (D.C. Cir. 2005)....................................................... 3, 15, 26

*\*FCC v. Comcast*,
   600 F.3d 642 (D.C. Cir. 2010)..................7, 15, 16, 17, 18, 21, 22, 23, 25

*\*FCC v. Midwest Video Corp.*,
   440 U.S. 689 (1979) ........................................................ 8, 9, 10, 12, 13

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ....................................................................27

*National Ass'n of Regulatory Util. Comm'rs v. FCC*,
   533 F.2d 601 (D.C. Cir. 1976)...................................................23, 24, 26

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*,
   525 F.2d 630, 641 (D.C. Cir. 1976)............................................8, 12, 13

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................6

## Statutes

20 U.S.C. § 7801(18).................................................................15

20 U.S.C. § 7801(38).................................................................15

47 U.S.C. § 1302 ..................................................................13, 17

47 U.S.C. § 1302(a)..............................................................13, 15

*Authorities upon which we chiefly rely are marked with asterisks.

47 U.S.C. § 1302(b) ....................................................................... 13, 15

47 U.S.C. § 1302(c) ....................................................................... 13, 15

47 U.S.C. § 151 .................................................................................... 18

47 U.S.C. § 153(24) ............................................................................... 5

47 U.S.C. § 153(50) ............................................................................... 3

47 U.S.C. § 153(51) ............................................................................... 3

47 U.S.C. § 153(53) ............................................................................... 3

47 U.S.C. § 154(k)(1) ........................................................................... 16

47 U.S.C. § 201(a) ............................................................................... 10

47 U.S.C. § 202(a) ............................................................................... 10

47 U.S.C. § 203(a) ................................................................................. 9

47 U.S.C. § 218 ............................................................................... 10, 16

47 U.S.C. § 230 .................................................................................... 16

47 U.S.C. § 230(b)(2) ..................................................................... 16, 19

47 U.S.C. § 332(c)(1)(A) ....................................................................... 4

47 U.S.C. § 332(c)(2) ............................................................................. 5

47 U.S.C. § 332(d)(1) ............................................................................. 4

47 U.S.C. § 332(d)(3) ............................................................................. 4

47 U.S.C. §§ 151 - 621 ........................................................................... 3

47 U.S.C. §§ 201 - 231 ........................................................................... 3

## Rules

Fed. R. App. P. 29(a) ............................................................................. 1

# Administrative Materials

*Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*,
20 F.C.C.R. 14853 (2005) ........................................................................ 4

*Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*,
22 F.C.C.R. 5901 (2007) ........................................................................ 4

*In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*,
13 F.C.C.R. 24,012 (1998) .................................................................. 14

*Preserving the Open Internet*,
25 F.C.C.R. 17905 (rel. Dec. 23, 2010), 76 Fed. Reg. 59192
(Sept. 23, 2011) ............................................. 2, 5, 6, 7, 8, 12, 14, 15, 18

# Legislative Materials

Internet Freedom Preservation Act,
S. 2917, 109th Cong. (2006) ................................................................ 19

Internet Freedom, Broadband Promotion, and Consumer Protection Act of 2011,
S. 74, 112th Cong. (2011) .................................................................... 19

Internet Non-Discrimination Act of 2006,
S. 2360, 109th Cong. (2006) ................................................................ 19

Network Neutrality Act of 2006,
H.R. 5273, 109th Cong. (2006) ........................................................... 19

The Full-Year Continuing Appropriations Act of 2011,
H.R. 1, 112th Cong. (2011); H. Amdt. to H.R. 1,
112th Congress (2011).......................................................................... 19

xvii

## STATEMENT OF IDENTITY,
## <u>INTERESTS, AND AUTHORITY TO FILE AS AMICI</u>

The Commonwealth of Virginia, pursuant to Fed. R. App. P. 29(a), files this Amicus Brief in support of the argument made by the Joint Brief for Verizon and MetroPCS (Doc. 1381604) that the FCC's assertion of regulatory authority is without legal basis. Virginia and the other Amici States have an interest in preserving the actual statutory scheme established by Congress because of their policy in favor of property rights and free markets and of preserving the residual regulatory power retained by the States. The Congressional scheme, properly construed, leaves room for those closest and most accountable to regulate in the interests of their constituencies and reserves open space for individual innovation and free exchange unchecked by the heavy hand of distant, unaccountable bureaucracies. Because the FCC's interpretation of Congress' delegation, where it does not actually violate its express terms, is untethered to the statutory text and knows no logical limit, it should be rejected.

## <u>SUMMARY OF ARGUMENT</u>

Congress has delegated to the FCC certain, defined regulatory authority. Specifically, Congress elected to afford the FCC the power to

regulate, as common carriers, certain telecommunications providers, and to withhold from the FCC regulatory authority over information service providers and private mobile service providers ("broadband Internet providers"), such as appellants. Because the challenged order, *Preserving the Open Internet*, 25 F.C.C.R. 17905 (rel. Dec. 23, 2010), 76 Fed. Reg. 59192 (Sept. 23, 2011) ("Order"), subjects broadband Internet providers to common-carrier-type regulation, in violation of Congress' express limitation, the Order is beyond the FCC's authority.

Not only is the FCC regulating contrary to expressed intent, it has not identified any plausible, affirmative statutory authority for the FCC to regulate as the Order does. Instead, the FCC in the Order cites a number of disparate provisions, sharing only one commonality: no one provision standing alone, nor all of them standing together, confers the claimed authority. The FCC's attempt to override the settled judgment of Congress not to regulate in this way should be rejected.

## **ARGUMENT**

## I.    **The Order Subjects Broadband Internet Providers to Common-Carrier Regulation, in Contravention of Statute.**

Although it "is enough here for [the Court] to find that the Communications Act of 1934 does not indicate a legislative intent to

delegate authority to the Commission to regulate" as they desire to, *American Library Association v. FCC*, 406 F.3d 689, 706 (D.C. Cir. 2005), the services regulated by the Order are expressly defined to lie outside the purview of the FCC.

### A.    Telecommunication Laws Prohibit Common-Carrier Regulation of Broadband Internet Providers.

The Communications Act of 1934 ("Act"), 47 U.S.C. §§ 151 through 621, as amended, authorizes the broad regulation of "telecommunication carriers," which includes "any provider of telecommunication services" who offer "directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used," to transmit information, "for a fee," "between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." Section 3(50), (51), and (53); 47 U.S.C. § 153(50), (51), and (53).  The Act provides that "telecommunication carriers" are to "be treated as a common carrier" subject to broad FCC regulation under Title II, Sections 201 through 231; 47 U.S.C. §§ 201 through 231, but "only to the extent that it is engaged in providing telecommunication services."   Section 3(53); 47 U.S.C. § 153(53).

3

The Act also provides for common-carrier regulation of "commercial mobile service." That is, all mobile services "provided for profit [that] make[] interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public." Crucially, the Act expressly exempts "private mobile service" from common-carrier regulation "for any purpose." *See* Section 332(c)(1)(A) and (2), (d)(1) and (3); 47 U.S.C. § 332(c)(1)(A) and (2), (d)(1) and (3).

In providing broadband Internet service, telecommunication carriers are not providing "telecommunication services" that are subject to "mandatory common-carrier regulation."[1] *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 974 (2005). Rather, in providing that service, the carriers fall within the regulatory classification of "information service" providers. Section 3(24); 47

---

[1] The various types of broadband Internet service, whether wireline, *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14853, 14862-65 (2005) ("Wireline Order"), wireless, or mobile wireless, *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 F.C.C.R. 5901, 5909-12, 5915-21 (2007) ("Wireless Order"), have been defined, like the cable broadband Internet service in *Brand X*, as an "information service" that is "not subject to Title II regulation as common carriers." *Wireless Broadband Order*, 22 F.C.C.R. at 5916.

U.S.C. § 153(24).   Such providers "are not subject to mandatory common-carrier regulation" by the FCC, but only to the FCC's "Title I ancillary jurisdiction," contained in Section 4(i), 47 U.S.C. § 154(i).  *See Brand X*, 545 U.S. at 975-76 ("The Act regulates telecommunications carriers, but not information-service providers, as common carriers."); *see also*, Act § 332(c)(2); 47 U.S.C. § 332(c)(2) (prohibiting regulation of private mobile service providers as common carriers).  Thus, the FCC is duty bound to refrain from common-carrier regulation of broadband Internet providers, a point the FCC conceded in *FCC v. Comcast*, 600 F.3d 642, 645 (D.C. Cir. 2010), and did not dispute in the Order.  Yet the "fixed and mobile broadband providers" who are regulated by the Order are unquestionably being regulated as common carriers despite being only providers of information services and private mobile services. *See Order*, 76 Fed. Reg. at 59192.

**B.    The Order Imposes Common-Carrier Obligations on Broadband Internet Providers by Fixing Prices, Prohibiting Discrimination between Users and Uses, and Requiring Public Disclosure of Practices.**

Despite the FCC's conclusory claim to the contrary, the agency is imposing many common-carrier obligations on all broadband Internet providers.  Hence, the Order's requirements violate the limitation in

Section 332(c)(2), as well as the limitation in Section 3(24).  *See Order*, 76 Fed. Reg. at 59208 n.92.  It is the "character of [the] regulatory obligations" imposed on the carrier, not whether "the rules promote statutory objectives," that controls whether the FCC's regulation of entities not subject to common-carrier regulation exceed its authority. *See FCC v. Midwest Video Corp. (Midwest Video II)*, 440 U.S. 689, 702 (1979).  At bottom, a provider is made a "common carrier" whenever the law prohibits the provider from "'mak[ing] individualized decisions, in particular cases, whether and on what terms to deal.'"  *Id.* at 701 (quoting *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC (NARUC I)*, 525 F.2d 630, 641 (D.C. Cir. 1976)).

Significantly, for purposes of this appeal, the Order promulgates four rules, three of which are placed in Sections: the "Transparency," "No Blocking," and "No Unreasonable Discrimination" provisions, 8.3, 8.5, and 8.7, respectively.  The fourth requirement, the Order's ban on "charging . . . a fee" "for delivering traffic to or carrying traffic from the broadband provider's end-user customers" to "edge providers," those who provide "content, application[s], service[s], [or] device[s]" to end users, constitutes the "No Fee" rule. *Order*, 76 Fed. Reg. at 59192 n.1,

6

59205, 59232.   These four rules constitute "a series of interrelated obligations ensuring public access to [broadband Internet service] and regulat[ing] the manner in which access is to be afforded and the charges that may be levied for providing it." *Midwest Video II*, 440 U.S. at 692.   Therefore, "[e]ffectively, the Commission has relegated [broadband Internet service providers], *pro tanto,* to common-carrier status." *Id.* at 700-01.

First, the "No Blocking" rule prohibits "fixed broadband Internet access service" providers from blocking "lawful content, applications, services, or non-harmful devices" and "mobile broadband Internet access service" providers from blocking "consumers from accessing lawful Web sites" or blocking "applications that compete with the provider's voice or video telephony services." *Order*, 76 Fed. Reg. at 59232.   The rule also "bars broadband providers from impairing or degrading particular content, applications, services, or non-harmful devices so as to render them effectively unusable." *Id.* at 59205.   Thus, the rule imposes on all broadband Internet providers a duty to accept (and thus provide the infrastructure to facilitate) all edge provider

7

traffic, from whatever source and of whatever type, a key attribute of common-carrier status.

The "No Unreasonable Discrimination" rule prohibits "unreasonably discriminat[ing] in transmitting lawful network traffic over a consumer's broadband Internet access service." *Order*, 76 Fed. Reg. at 59232. Broadband Internet providers are prohibited from entering into "a commercial arrangement [with] a third party to directly or indirectly favor some traffic over other traffic," and from "prioritizing its own content, applications, or services, or those of its affiliates." *Id.* at 59206, 59207. Forbidding a private company from tying price to service or preferring certain classes of customers gives rise to common-carrier status.[2]

These restrictions, coupled with the "No Fee" rule, which serves to fix the price to be charged the public for service, completely prevent

---

[2] That the "No Blocking" and "No Unreasonable Discrimination" rules allow for "reasonable network management" have no effect upon whether common-carrier obligations are imposed, just as allowing a bus company to require would-be riders to enter the bus one at a time, and sit two to a seat, does not change the nature of the obligation to transport all persons at the same rate. *See NARUC I*, 525 F.2d at 641 (reciting that common carriers retain the right to "turn away" business "because it is not of the type normally accepted or because the carrier's capacity has been exhausted.").

8

broadband providers from "'mak[ing] individualized decisions, in particular cases, whether and on what terms to deal.'"  *Midwest Video II*, 440 U.S. at 701 (quoting *NARUC I*,  525 F.2d at 641).   And the "Transparency" rule imposes a modernized tariffing obligation on broadband Internet providers akin to that imposed on common carriers. *See* Section 203(a); 47 U.S.C. § 203(a) (requiring common carriers to file and publicly display schedules of charges for transmission).

According to *Midwest Video II*, courts should determine whether any portion of the service provided is made subject to common-carriage obligations, not whether the regulated entity remains free to control other portions of its enterprise.  *See* 440 U.S. at 700-01 n.9 (noting that "[a] cable system may operate as a common carrier with respect to a portion of its service only" in holding that access rules that required "cable operators to [allow all] members of the public who wish to communicate by the cable medium" to viewers to do so on their cable systems "relegated cable systems . . . to common-carrier status"); *see also NARUC I*, 525 F.2d at 641 (To be a common carrier, "a given carrier's services [need not] practically be available to the entire public. One may be a common carrier though the nature of the service rendered

9

is sufficiently specialized as to be of possible use to only a fraction of the total population.").

The fact that these rules would constitute valid exercises of the FCC's authority to regulate common carriers confirms the Order's character as one imposing common-carrier obligations for broadband Internet providers, in excess of the FCC's authority. *See* Section 201(a); 47 U.S.C. § 201(a) (requiring "every common carrier engaged in . . . communication by wire or radio to furnish such communication service upon reasonable request"); Section 201(b); 47 U.S.C. § 201(b) (requiring that "[a]ll charges . . . be just and reasonable"); Section 202; 47 U.S.C. § 202(a) (prohibiting "any common carrier [from] mak[ing] any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services"); Section 218; 47 U.S.C. § 218 (requiring common carriers to provide certain information to the FCC).

## II.    The Order's Assertion of Authority is Untethered to and Unbounded by the FCC's Statutory Delegations of Authority.

No provision of the Act may be fairly read to foreshadow, much less intend, FCC regulation of broadband Internet access as undertaken in the Order. "It is axiomatic that administrative agencies may issue

regulations only pursuant to authority delegated to them by Congress,"
and it is similarly axiomatic that "[t]he FCC may act either pursuant to
express statutory authority to promulgate regulations addressing a
variety of designated issues involving communications, . . . or pursuant
to ancillary jurisdiction," but may not act simply on its own sense of
good policy on all matters within its general sphere of interest. *Am.
Library Ass'n*, 406 F.3d at 691, 692, 698 ("[T]he FCC's power to
promulgate legislative regulations is limited to the scope of the
authority Congress has delegated to it.").   And the FCC's ancillary
authority may be exercised only over those "regulated subject[s]" within
the FCC's Title I jurisdictional grant and then only by regulations
"'reasonably ancillary to the Commission's effective performance of its
statutorily mandated responsibilities.'"    *Comcast*, 600 F.3d at 646
(quoting *Am. Library Ass'n*, 406 F.3d at 692).   Because the Order is not
within the FCC's expressly delegated regulatory authority over
broadband Internet service, or any authority ancillary to its express
authority, the Order exceeds the outer limits of the FCC's power.

11

### A.      There is No Express Statutory Authority for the FCC to Regulate Broadband Internet Providers as Such.

In the present case, as in the past, the FCC founds its regulations not on "delegations of regulatory authority" by Congress, but on mere generalized statements of Congressional purpose, policy, or objectives. *See Comcast*, 600 F.3d at 654.  But "statements of policy, by themselves, do not create 'statutorily mandated responsibilities.'"  *Comcast,* 600 F.3d at 644 (holding that "[t]he teaching" of the case law on the FCC's ancillary authority is "that policy statements alone cannot provide the basis for the Commission's exercise of ancillary authority").  And the requisite "close and searching analysis of congressional intent," *ACLU v. FCC*, 823 F.2d 1554, 1557 (D.C. Cir. 1987), turns up no evidence that the "broad authority" to regulate the Internet claimed by the FCC was delegated to it by Congress.  *See Order*, 76 Fed. Reg. at 59214.

As recently as 2010, the FCC conceded the lack of any express authority to regulate broadband Internet services.  *Comcast,* 600 F.3d at 645.   To defend this Order, however, the FCC cobbles together an array of statutory policy statements in lieu of statutory delegations of authority.  The only serious candidate of a source of express authority claimed by the Order is Section 706 of the 1996 Telecommunications

12

Act ("1996 Act"), 47 U.S.C. § 1302, entitled "Advanced telecommunications incentives."  That section provides:

> The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

1996 Act § 706(a); 47 U.S.C. § 1302(a).  The next subpart directs the Commission, upon finding that "advanced telecommunications capability is [not] being deployed to all Americans in a reasonable and timely fashion," to "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market," specifically targeting "unserved" "geographical areas."  1996 Act § 706(b); 47 U.S.C. § 1302(b) and (c).

After this Court concluded that the FCC was bound by an earlier interpretation of that provision as not providing "'an independent grant

13

of authority'" to which any regulation could be ancillary, *Comcast,* 600 F.3d at 658-59 (quoting *In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*, 13 F.C.C.R. 24,012, 24,047, ¶ 77 (1998) (*Advanced Series Order*)), the FCC, in the Order under review, refused to honor that earlier Order's plain meaning, as construed by this Court, and instead cited Section 706 as a font of "substantive authority." *Order*, 76 Fed. Reg. at 59215 n.126, n.128. In view of this Court's decision, the FCC is not free to simply ignore its earlier interpretation of Section 706. Nor does the text of that statute permit the construction the FCC has placed upon it.

First, it would be odd indeed to read a statute directing both "[t]he Commission *and each State commission with regulatory jurisdiction* over telecommunication services" to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans" as one delegating *federal* authority to regulate information services and private mobile services. Furthermore, both subparts of Section 706 of the 1996 Act speak only to the rate and extent of geographic deployment and distribution of telecommunications infrastructure, e.g., the laying of fiber optic lines and so forth, not to the

14

network management practices of broadband Internet providers nationally, putting the latter outside the scope of any supposed delegation. The fact that the aim of this section is ensuring the provision of necessary infrastructure to various parts of the country is confirmed by the repeated references to providing access to the Nation's "elementary and secondary schools and classrooms." 1996 Act § 706(a) and (b); 47 U.S.C. § 1302(a), (b), and (c); *cf.* 20 U.S.C. § 7801(18) and (38). Finally, by directing the use of specific regulatory powers already granted to the FCC, *see* (Doc. 1381604 at 29-30), and not simply authorizing the FCC to utilize all methods that seem advisable to accomplish the statutory end, Section 706 confirms that it was not Congress' intent to delegate to the FCC general regulatory authority over broadband Internet providers, but only to direct the FCC to use its conferred powers "to encourage . . . deployment" of network infrastructure. 1996 Act § 706; 47 U.S.C. § 1302(a).

No other provision cited, or theory postulated, by the FCC fares any better for none speak to broadband. So the agency is reduced to postulating statements of Congressional policy or purpose as statutory delegations. *See Order*, 76 Fed. Reg. at 59214 (citing Section 230(b)(2);

15

47 U.S.C. § 230(b)(2)).  But this argument was rejected by this Court expressly in *Comcast*.  *See* 600 F.3d at 654 (rejecting Act § 230; 47 U.S.C. § 230 as a basis for FCC regulatory authority over the Internet, for "policy statements alone cannot provide the basis for the Commission's exercise of ancillary authority").  In sum, there is no authority for the "No Blocking," "No Unreasonable Discrimination," and "No Fee" rules.

Finally, the "Transparency" provision similarly suffers from want of express statutory authorization.  Neither provision cited by the Order in support, *see Comcast,* 600 F.3d at 660 (holding that "the Commission must defend its action on the same grounds advanced in the *Order*"), confer upon the FCC a statutory duty to obtain information from broadband Internet providers.  *See* Section 4(k)(1); 47 U.S.C. § 154(k)(1) (merely identifying the contents of reports to be submitted to Congress); Section 218; 47 U.S.C. § 218 (authorizing the FCC to seek "full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created," but only from "all *carriers* subject to this Act" (emphasis added)).  Thus, the FCC

16

has again failed to "link[] the cited policies to express delegations of regulatory authority."  *Comcast,* 600 F.3d at 654.

**B.  The Order's Claim of Ancillary Authority Fails Because The Ancillary Authority Claimed is Unbounded.**

By offering a theory of ancillary authority that would create broad authority where none otherwise exists, the FCC has necessarily failed to show that the regulations are exercises of authority that "really [are] incidental to, and contingent upon, *specifically delegated powers under the Act.*'"  *Comcast*, 600 F.3d at 653 (quoting *National Ass'n of Regulatory Util. Comm'rs v. FCC* (*NARUC II*), 533 F.2d 601, 612 (D.C. Cir. 1976)).  For to treat as ancillary a claim of authority that would itself justify the plenary imposition of common-carrier-type access, public disclosure, non-discrimination, and price-fixing regulation upon a non-common carrier, "would [not] virtually[, but completely] free the Commission from its Congressional tether."  *Id.* at 655.

Accepting the FCC's theory of its own ancillary authority under Section 706 of the 1996 Act, or any other provision, would affirm that the FCC possesses unbounded authority to regulate broadband Internet.  This fact is demonstrated by the FCC's inability to identify in

17

the Order any substantive limits on its authority to regulate broadband Internet service under its theory.  The most it could do was to try to "obviate the concern of some commenters" by suggesting that it still is limited to regulating "'interstate and foreign commerce in communication by wire and radio,'" *Order*, 76 Fed. Reg. at 59215, 59216 n.129 (quoting Act § 1; 47 U.S.C. § 151), and so presumably could not regulate the medical industry or the waters of the United States, for example.  The FCC only confirms that it views itself as having plenary authority to regulate broadband Internet providers when it asserts that its "understanding of Section 706(a) is . . . harmonious with other statutory provisions that confer a broad mandate on the Commission," being "no broader than other provisions," such as various common-carrier regulations.  *Order*, 76 Fed. Reg. at 59216.

In obedience to the axiom that "administrative agencies may [act] only pursuant to authority delegated to them by Congress,'" *Comcast*, 600 F.3d at 654 (quoting *American Library Association*, 406 F.3d at 691), courts have uniformly, repeatedly, and rightly rejected "unbounded" interpretations of agency ancillary authority.  *See Midwest Video II*, 440 U.S. at 706; *see, e.g., Comcast,* 600 F.3d at 655; *Am.*

18

*Library Ass'n*, 406 F.3d at 694; *NARUC II*, 533 F.2d at 617 ("Commission power over the communications industries is not unlimited"). That should be the result here in deference both to the express Congressional command to leave the Internet "unfettered by Federal or State regulation," Section 230(b)(2); 47 U.S.C. § 230(b)(2), and Congress' implicit direction arising from its refusal to enact so-called net neutrality legislation.[3] In short, it is clear that the FCC presently lacks any broad authority over broadband Internet services. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Given this history [of Congressional engagement] and the breadth of the authority that the FDA has asserted, we are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the FDA this power.").

## CONCLUSION

The Order should be vacated as beyond the FCC's authority.

---

[3] Various unenacted bills regarding FCC regulation of the Internet include: Network Neutrality Act of 2006, H.R. 5273, 109th Cong. (2006); Internet Non-Discrimination Act of 2006, S. 2360, 109th Cong. (2006); Internet Freedom Preservation Act, S. 2917, 109th Cong. (2006); Internet Freedom, Broadband Promotion, and Consumer Protection Act of 2011, S. 74, 112th Cong. (2011); The Full-Year Continuing Appropriations Act of 2011, H.R. 1, 112th Cong. (2011); H. Amdt. to H.R. 1, 112th Congress (2011).

Respectfully submitted,


/s/  E. Duncan Getchell, Jr.
Solicitor General of Virginia

KENNETH T. CUCCINELLI, II
Attorney General of Virginia

E. DUNCAN GETCHELL, JR.
(VSB #14156)
Solicitor General of Virginia
dgetchell@oag.state.va.us
*Counsel of Record*

WESLEY G. RUSSELL, JR.
(VSB #38756)
Deputy Attorney General

SAMUEL S. OLENS
Georgia Attorney General
40 Capitol Sq.
Atlanta, GA 30334

BILL SCHUETTE
Michigan Attorney General
P. O. Box 30212
Lansing, MI  48909

E. SCOTT PRUITT
Attorney General of Oklahoma
313 N.E. 21st Street
Oklahoma City, Oklahoma
73105-4894

CHARLES E. JAMES, JR.
Chief Deputy Attorney General

OFFICE OF THE ATTORNEY
GENERAL
900 East Main Street
Richmond, VA 23219
Telephone:  (804) 786-7240
Facsimile:   (804) 371-0200
*Counsel for the
Commonwealth of Virginia*

ALAN WILSON
Attorney General
State of South Carolina
P.O. Box 11549
Columbia, SC  29211

DARRELL V. MCGRAW, JR.
West Virginia Attorney General
Office of the Attorney General
State Capitol, Room 26-E
Charleston, WV 25305

20

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATIONS

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 3,527 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Century Schoolbook 14-point font.

*/s/  E. Duncan Getchell, Jr.*
Solicitor General of Virginia

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing BRIEF OF THE COMMONWEALTH OF VIRGINIA AND THE STATES OF GEORGIA, MICHIGAN, OKLAHOMA, SOUTH CAROLINA, AND WEST VIRGINIA AS AMICUS CURIAE IN SUPPORT OF REVERSAL has been filed with the Clerk of the U.S. Court of Appeals for the District of Columbia Circuit this July 23, 2012, by using the appellate CM/ECF system, which will send notification of said filing to the attorneys of record, who have registered with the Court's CM/ECF system. Nine copies of the foregoing will be filed with the Clerk of the Court for the United States of Appeals for the D.C. Circuit within two business days.

*/s/  E. Duncan Getchell, Jr.*
Solicitor General of Virginia

July 23, 2012

22