BRIEF FOR APPELLEE/RESPONDENTS

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

NO. 11-1355

———————

VERIZON ET AL.,

APPELLANTS/PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

APPELLEE/RESPONDENTS.

———————

ON PETITIONS FOR REVIEW AND NOTICES OF
APPEAL OF AN ORDER OF THE FEDERAL
COMMUNICATIONS COMMISSION

———————

JOSEPH F. WAYLAND
ACTING ASSISTANT ATTORNEY GENERAL

CATHERINE G. O'SULLIVAN
NANCY C. GARRISON
NICKOLAI G. LEVIN
ATTORNEYS

UNITED STATES
  DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

SEAN A. LEV
GENERAL COUNSEL

PETER KARANJIA
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

JOEL MARCUS
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**1. Parties.**

<u>Appellants/Petitioners:</u>

Verizon
MetroPCS

<u>Appellee/Respondents:</u>

Federal Communications Commission
United States of America

<u>Intervenors:</u>

ITTA
Open Internet Coalition
Public Knowledge
Vonage

All parties that appeared before the agency are listed in the briefs of appellants/petitioners.

**2. Rulings under review.**

*Preserving the Open Internet*, Report and Order, 25 FCC Rcd 17905 (2010) (JA   ).

**3. Related cases.**

Verizon claims (Br. xii-xiii) that *Cellco P'ship v. FCC*, No. 11-1135, is

related; MetroPCS (Br. xiii) disagrees.  The *Cellco* case presents some legal

issues similar to those presented here, but it involves entirely different factual

and regulatory circumstances.  The Court's decision in either case does not

control the outcome of the other one.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iv

GLOSSARY ............................................................................... xi

JURISDICTION ..........................................................................1

QUESTIONS PRESENTED ...........................................................2

STATUTES AND REGULATIONS ..................................................2

INTRODUCTION.........................................................................2

COUNTERSTATEMENT ..............................................................5

    1.    Statutory And Regulatory Background...........................5

    2.    The *Open Internet* Proceeding. ......................................10

    3.    Openness Drives Investment.........................................11

    4.    Threats To Internet Openness And Investment. ............12

    5.    The Open Internet Rules. .............................................15

        a.    Fixed Service Rules. ..............................................16

        b.    Mobile Wireless Rules. ..........................................17

SUMMARY OF ARGUMENT .......................................................18

STANDARD OF REVIEW ...........................................................22

ARGUMENT ..............................................................................25

I.    THE FCC REASONABLY INTERPRETED SECTION 706
    AND TITLE III AS GRANTS OF DIRECT AUTHORITY
    TO IMPLEMENT THE OPEN INTERNET RULES. ...........................25

    A.    The Commission Reasonably Read Section 706 As A
        Grant Of Direct Authority And Properly Found That The
        Open Internet Rules Would Carry Out The Statutory
        Mandate. .................................................................25

1.    The Commission's Reading Of Section 706 Is
      Consistent With Its Plain Language And Entitled To
      Deference. ....................................................................25

2.    The Commission Reasonably Determined That The
      Open Internet Rules Would Advance The Statutory
      Mandate. ....................................................................37

      a.    Protecting Innovation That Drives Demand For And
            Investment In Internet Infrastructure. ........................37

      b.    Protecting A Stable Environment For Investment.....................41

      c.    Protecting Competition In Telecommunications
            Markets....................................................................42

B.    The Commission Reasonably Interpreted Title III Of The
      Communications Act To Grant Authority For The Mobile
      Rules. ....................................................................43

II.   THE FCC REASONABLY DETERMINED THAT THE
      OPEN INTERNET RULES FURTHER OTHER
      STATUTORY DUTIES ............................................................48

A.    Section 201(b) Of The Communications Act Grants
      Authority To Adopt Rules Protecting Telephone
      Competition. ....................................................................50

B.    Provisions In Titles VI And III Grant Authority To
      Protect Competition In Video Markets. ............................................53

      1.    Title VI. ....................................................................53

      2.    Title III. ....................................................................57

C.    The Transparency Rule Is Supported By Statutory
      Reporting Responsibilities. ...............................................59

III.  THE COMMISSION PROPERLY DETERMINED THAT
      THE OPEN INTERNET RULES DO NOT TREAT
      BROADBAND PROVIDERS AS COMMON CARRIERS...................60

IV.  THE OPEN INTERNET RULES ARE CONSISTENT
     WITH THE FIRST AND FIFTH AMENDMENTS. ..............................68

  A.   First Amendment. ................................................................68

  B.   Fifth Amendment. ...............................................................75

V.   THE OPEN INTERNET RULES ARE BASED ON
     SUBSTANTIAL EVIDENCE. ...............................................................77

CONCLUSION ...........................................................................................79

# TABLE OF AUTHORITIES

## CASES

\*    *Ad Hoc Telecommunications Users Committee v. FCC*, 572 F.3d 903 (D.C. Cir. 2009) ........................................ 24, 27, 36, 78

*Alascom, Inc. v. FCC*, 727 F.2d 1212 (D.C. Cir. 1984) ........................................................................52

*American Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005) ................................................................. 23, 49

*Ass'n of Civilian Techs. v. FLRA*, 22 F.3d 1150 (D.C. Cir. 1994) ........................................................................26

*AT&T Corp. v. FCC*, 394 F.3d 933 (D.C. Cir. 2005) ....................................24

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................24

*Building Owners v. FCC*, 254 F.3d 89 (2001) ................................................76

*Cablevision Systems Corp. v. FCC*, 570 F.3d 83 (2nd Cir. 2009) ......................................................................76

\*    *Cablevision Systems Corp. v. FCC*, 649 F.3d 695 (D.C. Cir. 2011) ................................................. 25, 37, 54, 56

*CBS v. Democratic National Committee*, 412 U.S. 94 (1973) ........................................................................44

*CCIA v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) ........................................ 6, 51

*Cellco Partnership* (No. 11-1135) ................................................48

*Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585 (D.C. Cir. 2001) ..................................................... 2, 44

*Charter Communications, Inc.*, 393 F.3d 771 (8th Cir. 2005) ......................................................................70

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ................................................75

\*    *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) ................................. 10, 27, 29, 30, 34, 49, 51, 59

*Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309 (D.C. Cir. 1995) ................................................44

*Consumer Electronics Ass'n v. FCC*, 347 F.3d 291 (D.C. Cir. 2003) ........................................................................24

*FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) .................... 63, 64, 65, 67

*FCC v. NCCB*, 436 U.S. 775 (1978) .............................................................46

*FCC v. Pottsville Broadcasting Co.*,
309 U.S. 134 (1940) .................................................... 5, 35, 44, 46

*FCC v. Sanders Bros. Radio Station*,
309 U.S. 470 (1940) ........................................................46

*FCC v. Storer Broadcasting Co.*,
351 U.S. 192 (1956) ........................................................46

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................... 23, 35, 36

*Full Value Advisors, LLC v. SEC*, 633 F.3d 1101
(D.C. Cir. 2011)........................................................77

*Howard v. America Online Inc.*, 208 F.3d 741
(9th Cir. 2000) ........................................................61

*Iowa Telecomms. Servs. v. Iowa Utils. Bd.*,
563 F.3d 743 (8th Cir. 2009)........................................66

*J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041
(D.C. Cir. 2009)........................................................24

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........................................................76

*MCI v. AT&T*, 512 U.S. 218 (1994)..........................................47

*Mobile Relay Assocs. v. FCC*, 457 F.3d 1
(D.C. Cir. 2006)........................................................46

*MPAA v. FCC*, 309 F.3d 796 (D.C. Cir. 2002) ...................... 23, 47

*NARUC v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) ...................... 61, 63

*NARUC v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ......................23

*Nat'l R.R. Passenger Corp. v. Boston & Maine
Corp.*, 503 U.S. 407 (1992)........................................23

*National Telephone Co-Op Ass'n v. FCC*,
563 F.3d 536 (D.C. Cir. 2009) ........................................37

*NBC v. United States*, 319 U.S. 190 (1943)................................ 33, 44, 45, 49

* *NCTA v. Brand X Internet Services*,
545 U.S. 967 (2005) ........................................ 6, 7, 9, 23, 30, 34

*Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003) ................................................51

*PBGC v. LTV Corp.*, 496 U.S. 633 (1990) ......................................................37

*Railway Labor Executives' Ass'n v. U.S. R.R.*
    *Retirement Bd.*, 749 F.2d 856 (D.C. Cir. 1984) ........................................78

\*   *Recording Indus. Ass'n v. Verizon Internet Servs.,*
    *Inc.*, 351 F.3d 1229 (D.C. Cir. 2003) ......................................................69

\*   *Rumsfeld v. Forum for Academic and Institutional*
    *Rights, Inc.*, 547 U.S. 47 (2006) ........................................ 70, 71, 73

*Schurz Communications, Inc. v. FCC,*
    982 F.2d 1043 (7th Cir. 1992) ..................................................44

*Secretary of Labor v. Federal Mine Safety and*
    *Health Review Comm'n*, 111 F.3d 913
    (D.C. Cir. 1997) ...................................................... 24, 40

*Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475
    (D.C. Cir. 1994) ....................................................63

*Tax Analysts v. IRS*, 350 F.3d 100 (D.C. Cir. 2003) ...................................37

*Turner Broadcasting System Inc. v. FCC,*
    512 U.S. 622 (1994) ...................................... 72, 73, 74

*United States v. Midwest Video Corp.,*
    406 U.S. 649 (1972) ..............................................51

\*   *United States v. Southwestern Cable Co.,*
    392 U.S. 157 (1968) .......................... 5, 35, 49, 57, 58, 67, 77

\*   *USTA v. FCC*, 295 F.3d 1326 (D.C. Cir. 2002) ...........................61

*Vernal Enters., Inc. v. FCC*, 355 F.3d 650
    (D.C. Cir. 2004) .........................................................1

*Vitelco v. FCC*, 198 F.3d 921 (D.C. Cir. 1999) ...........................65

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...........................................36

*Williamson County Regional Planning Commission*
    *v. Hamilton Bank*, 473 U.S. 172 (1985) .....................................76

**ADMINISTRATIVE DECISIONS**

*Amendment of Section 64.702 of the Commission's Rules and Regulations ("Second Computer Inquiry")*, 77 FCC 2d 384 (1980) ...............................5

*Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities ("Internet Policy Statement")*, 20 FCC Rcd 14,986 (2005).........................................9

\*     *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities ("Wireline Broadband Order")*, 20 FCC Rcd 14,853 (2005).................................. 8, 36

*Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks ("Wireless Broadband Order")*, 22 FCC Rcd 5,901 (2007) .........................................8

*Broadband Industry Practices ("Broadband Industry Practices")*, 22 FCC Rcd 7,894 (2007) ........................................11

*Comment Sought on Petition for Rulemaking to Establish Rules Governing Network Management Practices By Broadband Network Operators ("Network Management Practices")*, 23 FCC Rcd 343 (2008). ..........................................11

*Deployment of Wireline Services Offering Advanced Telecommunications Capability ("Advanced Services Order")*, 13 FCC Rcd 24,012 (1998) ..................................... 7, 29

*Formal Complaint of Free Press and Public Knowledge Against Comcast Corporation for Secretly Degrading Peer-To-Peer Applications ("Comcast Corp.")*, 23 FCC Rcd 13,028 (2008)........................................10

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities ("Cable Modem Order")*, 17 FCC Rcd 4,798 (2002)...........................................7, 8

*Inquiry Concerning the Deployment of Advanced
   Telecommunications Capability To All Americans
   in a Reasonable and Timely Fashion, and
   Possible Steps to Accelerate Such Deployment
   Purusant to Section 706 of the
   Telecommunications Act of 1996, As Amended by
   the Broadband Data Improvement Act ("Sixth
   Broadband Deployment Report"),*
   25 FCC Rcd 9,556 (2010) .................................................. 27, 34

*Madison River Communications, LLC and Affiliated
   Companies ("Madison River Communications"),*
   20 FCC Rcd 4,295 (2005) ..................................................... 9, 50

*Preserving the Open Internet Broadband Industry
   Practices ("Open Internet Notice"),*
   24 FCC Rcd 13,064 (2009) ........................................................11

*Service Rules for the 698-746, 747-762 and 777-
   792 MHZ Bands ("700 MHz Order"),*
   22 FCC Rcd 15,289 (2007) ........................................................9

## STATUTES AND REGULATIONS

17 U.S.C. § 512(a) ...............................................................70

28 U.S.C. § 2344 ...............................................................34

47 U.S.C. § 151 .......................................................... 5, 31, 48

47 U.S.C. § 152 ...............................................................31

47 U.S.C. § 152(a) ...................................................... 5, 34

47 U.S.C. § 153(11) ................................................... 62, 68

47 U.S.C. § 153(24) ..............................................................6

47 U.S.C. § 153(51) ................................................... 67, 68

47 U.S.C. § 153(53) ...................................................... 6, 62

47 U.S.C. § 154(i) ...............................................................48

47 U.S.C. § 154(k) ...............................................................59

* 47 U.S.C. § 201(a) ...................................................... 21, 62

47 U.S.C. § 201(b) ...............................................................50

47 U.S.C. § 218 ...............................................................59

*    47 U.S.C. § 230(b)(1) ..................................................................... 29

*    47 U.S.C. § 230(b)(2) ....................................................................... 7

*    47 U.S.C. § 230(b)(3) ................................................................. 7, 29

     47 U.S.C. § 230(c)(1) ..................................................................... 70

     47 U.S.C. § 257 .............................................................................. 59

     47 U.S.C. § 301 ......................................................................... 5, 43

*    47 U.S.C. § 303(b) ............................................................ 43, 46, 47

     47 U.S.C. § 303(g) .................................................................. 43, 57

     47 U.S.C. § 303(r) .......................................................................... 43

     47 U.S.C. § 307(a) ..................................................................... 5, 43

     47 U.S.C. § 309(j)(3)(A) ............................................................... 45

     47 U.S.C. § 309(j)(3)(B) ............................................................... 45

     47 U.S.C. § 315(b) ......................................................................... 67

*    47 U.S.C. § 316 ....................................................................... 44, 46

     47 U.S.C. § 332(c)(2) ............................................................... 67, 68

     47 U.S.C. § 405(a) ......................................................................... 60

     47 U.S.C. § 536 .............................................................................. 55

     47 U.S.C. § 536(a) ......................................................................... 55

     47 U.S.C. § 536(a)(3) ..................................................................... 55

     47 U.S.C. § 541(c) ......................................................................... 68

     47 U.S.C. § 548(b) ......................................................................... 53

     47 U.S.C. § 548(c)(1) ..................................................................... 53

     47 U.S.C. § 548(c)(2)(B) ............................................................... 67

*    47 U.S.C. § 1302(a) .............................................. 6, 25, 26, 29, 32

*    47 U.S.C. § 1302(b) ................................................................ 6, 7, 27

     47 U.S.C. § 1302(d)(1) .................................................................. 26

     Pub. L. No. 104-66, Title III, § 3003, 109 Stat. 707
       (Dec. 21, 1995) ......................................................................... 59

47 C.F.R. § 8.3 ...................................................................16

47 C.F.R. § 8.5(a) ..............................................................16

47 C.F.R. § 8.5(b) ..............................................................17

47 C.F.R. § 8.7 ...................................................................16

47 C.F.R. § 8.11(a) ............................................................16

**OTHERS**

\*    S. Rep. No. 104-23 (1995) ...........................................28

H.R.J. Res. 37, 112th Cong. (2011) ...............................37

http://computer.howstuffworks.com/internet/
   basics/internet.htm...............................................62

http://gigaom.com/2012/09/03/happy-birthday-
   skype-in-9-years-you-changed-telecom/.....................14

https://www.pwcmoneytree.com/MTPublic/ns/mon
   eytree/filesource/exhibits/11Q4MTPressrelease.
   pdf ..........................................................................40

Stuart Minor Benjamin, *Transmitting, Editing, And*
   *Communicating: Determining What "The*
   *Freedom Of Speech" Encompasses*,
   60 Duke L.J. 1673 (2011).......................................71

Telecommunicationons Industry Association, TIA's
   2012 ICT Market Review and Forecast 1-7 (2012)....................40

\*    Verizon Comments, CC Docket No. 02-33 (filed
   May 3, 2002) ........................................................ 8, 35

*\* Cases and other authorities principally relied upon are marked with asterisks.*

x

## GLOSSARY

| | |
|---|---|
| DSL | Digital Subscriber Line Service.  Broadband Internet access via telephone wires. |
| Edge Provider | An entity that makes content, applications, or services available via the Internet.  Includes web sites, blogs, twitter feeds, applications, and other services. |
| End User | A subscriber to broadband Internet access service. |
| VoIP | Voice over Internet Protocol.  An Internet-based telephone service. |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————

NO. 11-1355

—————————

VERIZON ET AL.,

APPELLANTS/PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

APPELLEE/RESPONDENTS.

—————————

ON PETITIONS FOR REVIEW AND NOTICES OF
APPEAL OF AN ORDER OF THE FEDERAL
COMMUNICATIONS COMMISSION

—————————

BRIEF FOR APPELLEE/RESPONDENTS

—————————

## JURISDICTION

The Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C.

§ 2342(1), but not under 47 U.S.C. § 402(b). Section 402(b) provides for

appeal of orders in ten specific categories; review of all other orders is under

Section 402(a). The provisions are "mutually exclusive." *Vernal Enters.,*

*Inc. v. FCC*, 355 F.3d 650, 655 (D.C. Cir. 2004). As demonstrated in

motions to dismiss filed October 5 and November 7, 2011, Section 402(b)(5),

invoked by petitioners, applies only when licenses are modified through

individual adjudications.  *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001).

## QUESTIONS PRESENTED

In the order on review, *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010) (*Order*), the Commission promulgated high-level rules to ensure that consumers retain the ability to access Internet sites of their choosing.  The questions presented are:

1)  Whether the Commission properly determined that it had statutory authority to adopt the Open Internet Rules;

2)  Whether the Commission properly determined that the Open Internet Rules do not impose common-carriage obligations on broadband Internet access service providers;

3)  Whether the rules are consistent with the First and Fifth Amendments; and

4)  Whether the rules are supported by substantial evidence.

## STATUTES AND REGULATIONS

Pertinent materials are included in the appendix.

## INTRODUCTION

The Internet was designed and developed as an open network in which a user can go to any website and use any application without his access provider acting as a gatekeeper.  By the same token, "edge providers" – the

2

providers of content, applications, and services, such as Amazon, Twitter, Netflix, or the *Wall Street Journal* – may be reached by any end user without permission from the end user's access provider.

Openness has been essential to the Internet's extraordinary success. By keeping barriers to entry low, openness enables anyone – from large corporations, to start-up companies, to college students – to create innovative applications. The resulting explosion of services has increased the Internet's usefulness in ways that have made it central to modern communications. As more services and applications have become available, especially ones like video delivery and cloud storage that require the transmission of voluminous data, consumer demand for high-speed Internet access has grown significantly. That demand has driven investment in Internet networks that enable consumers to use the latest innovations.

Prior to the Order under review, however, there were significant threats to openness, and thus to the engine that has driven investment in broadband facilities. Several broadband access providers had blocked or degraded service. Other providers have the technological capacity and the economic incentive to engage in similar acts. And with the majority of Americans having only two wireline broadband choices (many have only one), market discipline alone could not guarantee continued openness.

3

The Commission responded to these threats by adopting modest, high-level rules – in large measure continuations of longstanding, bipartisan FCC policies – that preserve Internet openness and its concomitant incentives for innovation and investment.  The rules prohibit blocking of access to lawful Internet content, prevent unreasonable discrimination (but not measures required to protect or manage the network), and require disclosure of key information.

These sensible rules of the road fulfill specific statutory directives to advance broadband investment and to ensure that wireless licensees act in the public interest.  They follow from decades of prior practice regarding access to the Internet and its precursors.

The rules have been accepted by access providers, edge providers, investors, and consumer groups.  Even Verizon has expressed the belief that it is "essential" that the "Internet remains an unrestricted and open platform, where people can access the lawful content, services, and applications of their choice."[1]

Of the entire Internet industry, Verizon and MetroPCS alone challenge the rules.  As we show below, their challenges are baseless.

---

[1] Verizon Jan. 14, 2010, *ex parte* at 2 (JA    ).

4

# COUNTERSTATEMENT

## 1.    Statutory And Regulatory Background.

Congress vested the FCC with authority over "all interstate and foreign communication by wire or radio." 47 U.S.C. § 152(a). Congress intended the Commission to be the country's "centraliz[ed] authority" for communications policy. 47 U.S.C. § 151; *see United States v. Southwestern Cable Co.*, 392 U.S. 157, 168 (1968).

Similarly, to "maintain the control of the United States over all the channels of radio transmission," 47 U.S.C. § 301, Congress allowed the Commission to grant licenses to use radio spectrum insofar as doing so would serve the "public convenience, interest, or necessity," 47 U.S.C. § 307(a). The authority granted by Congress was intentionally designed to accommodate "the dynamic aspects" of communications technology. *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138 (1940).

The Commission has long exercised authority over computer-based networks to implement policies governing access to the Internet and its precursors. In the early 1980s, the Commission adopted the "*Computer*" regime to ensure that wireline communications platforms were made available on equal terms to all companies seeking to provide service. *See Second Computer Inquiry*, 77 FCC 2d 384 (1980), *aff'd CCIA v. FCC*, 693

5

F.2d 198 (D.C. Cir. 1982); *see NCTA v. Brand X Internet Services*, 545 U.S. 967, 976-977 (2005).

In the Telecommunications Act of 1996, Congress granted the FCC a central role in making and implementing federal policy regarding the Internet. Congress left to the Commission's discretion the fundamental policy decision whether to classify broadband access as a "telecommunications service" subject to the common carrier provisions of Title II of the Communications Act or as an "information service" not subject to Title II.  *See* 47 U.S.C. § 153(24), (53); *Brand X*, 545 U.S. at 976-977.

Furthermore, in Section 706(a) of the Telecommunications Act of 1996, Congress directed the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans" by using "measures that promote competition in the local telecommunications market" and "other regulating methods that remove barriers to infrastructure investment."  47 U.S.C. § 1302(a) (hereafter, Section 706(a)).  Section 706(b), moreover, directs the Commission to determine periodically if broadband "is being deployed to all Americans in a reasonable and timely fashion."  47 U.S.C. § 1302(b) (hereinafter Section 706(b)).  If the Commission determines that "reasonable and timely" deployment is not occurring, the Commission "*shall take immediate action* to accelerate

6

deployment of such capability by removing barriers to infrastructure

investment and by promoting competition in the telecommunications

market." *Ibid*. (emphasis added). Congress also declared it to be "the policy

of the United States" to promote "technologies which maximize user control

over what information is received" over the Internet, and to "preserve the

vibrant and competitive free market that presently exists for the Internet." 47

U.S.C. § 230(b)(2) & (3).

     In 1998, the Commission decided that Internet access service provided

over existing wires by telephone companies (digital subscriber line or DSL

service) included elements of both telecommunications and information

services. *Advanced Services Order*, 13 FCC Rcd 24012, 24029-24031

(1998). DSL service thus was subject to regulation under both the common

carrier provisions of Title II (to the degree it involved transmission of

information) and the *Computer* regime (to the degree it involved processing

of information).

     In 2002, the Commission classified cable modem service as

exclusively an "information service" under Title I of the Act. *See Cable

Modem Order*, 17 FCC Rcd 4798 (2002), *aff'd*, *Brand X*, 545 U.S. 967.

Ultimately, the Commission classified all residential broadband, including

DSL, as exclusively "information services." *Wireline Broadband Order*, 20

7

FCC Rcd 14853 (2005); *Wireless Broadband Order*, 22 FCC Rcd 5901 (2007).

The Commission's decisions not to apply Title II common carrier regulation to wireline broadband access service were grounded in the understanding that it retained authority to set policy for broadband Internet access service, including any necessary "consumer protection, network reliability, or national security obligation." *Wireline Broadband*, 20 FCC Rcd at 14914; *see also Cable Modem Order*, 17 FCC Rcd at 4844 (expressing concern over the "threat that subscriber access to internet content or service could be blocked or impaired"). Then-Chairman Powell explained that the *Cable Modem Order* did not leave the Commission "powerless to protect the public interest," but that the Commission retained "ample authority under Title I." *Id.*, 17 FCC Rcd at 4867. Verizon expressed the same understanding, informing the Commission in the DSL reclassification proceeding that classification of broadband as an information service would not preclude regulation, but would "allow the Commission to write on a clean regulatory slate" and to impose "those regulations that are truly necessary in the public interest." Verizon Comments, CC Docket No. 02-33, at 18 (filed May 3, 2002) (http://apps.fcc.gov/ecfs/document/view?id=6513190589) ("Verizon 02-33 Comments").

Affirming the Commission's classification regime, the Supreme Court

likewise determined that, although under the Commission's decisions,

"information-service providers … are not subject to mandatory common-

carrier regulation," "the Commission remains free to impose special

regulatory duties on" broadband providers.  *Brand X*, 545 U.S. at 976, 996.

Under this regime, the Commission consistently has acted to protect

Internet openness.  On the same day it reclassified DSL as an information

service, the Commission unanimously issued an *Internet Policy Statement*, 20

FCC Rcd 14986 (2005), explaining that consumers of Internet access service

are entitled, among other things, to "access the lawful Internet content of their

choice" and "run applications and use services of their choice."  *Id*. at 14987-

14988.  The Commission likewise has conditioned spectrum licenses on the

requirement that the licensee maintain an "open platform" similar to Open

Internet protections.  *700 MHz Order*, 22 FCC Rcd 15289 (2007).

The Commission has also used enforcement proceedings to protect

openness.  When Madison River, a telephone-based broadband provider, was

alleged to have interfered with competing Internet-based voice services, the

Commission entered into a consent decree to stop the interference.  *Madison

River Communications*, 20 FCC Rcd 4295 (2005).  When Comcast, a cable-

based broadband provider, interfered with its subscribers' use of a file-

9

sharing application, the Commission declared that Comcast had violated

federal Internet policy.  *Comcast Corp.*, 23 FCC Rcd 13028 (2008).

In *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010), this Court

found that the *Comcast* administrative enforcement order had failed to tie the

agency's authority to a specific statutory grant of power.  Congress's

establishment of Internet policy in 47 U.S.C. § 230(b), the Court held, did not

grant the agency authority to regulate Internet access.  600 F.3d 652-658.

The Court recognized that Section 706 of the 1996 Act *could* "be read to

delegate regulatory authority," but the Commission itself in "an earlier, still-

binding order" had interpreted the statute otherwise and "remains bound by

its earlier conclusion."  *Id*. at 658, 659.  The Court declined to address several

other asserted bases for authority because the Commission had raised them

only in its brief on appeal.  *Id*. at 660.

## 2.    The *Open Internet* Proceeding.

While the *Comcast* matter was pending, the Commission began the

proceeding that resulted in the Open Internet rules.  The *Order* was issued,

however, after the *Comcast* decision, and it rested on full public comment

that did not exist in the *Comcast* matter and authorities that the Commission

had not relied on in that proceeding.

In 2007, the Commission issued a Notice of Inquiry seeking input on
industry practices. *Broadband Industry Practices*, 22 FCC Rcd 7894 (2007).
The following year, the Commission sought public comment on whether it
should propose openness rules. *Network Management Practices*, 23 FCC
Rcd 343 (2008). In 2009, the Commission took "the next step" in its
"longstanding effort" to preserve Internet openness, and sought comment on
proposed rules. *Open Internet Notice*, 24 FCC Rcd 13064, 13065 (2009).

After receiving more than 100,000 comments and conducting hearings
and workshops, *Order* ¶2 (JA    ), the Commission adopted high-level rules to
effectuate the agency's longstanding protection of Internet openness. The
comments were unanimous that the Internet should remain open. *Id*. ¶11 (JA
).

### 3.    Openness Drives Investment.

Citing economic analysis and other record evidence, the Commission
concluded that Internet openness has driven innovation and investment in
broadband facilities. Edge providers' low barriers to entry under an open
Internet led to "new uses of the network," in the form of "content,
applications, services, and devices" available to all end users. *Order* ¶3 (JA
). Each innovation, the Commission explained, promotes "increased end-user
demand for broadband," which drives broadband access providers to invest in

11

"network improvements," which in turn lead to "further innovative network uses," thus creating a demand-driven "virtuous circle" of innovation and investment. *Id.* ¶14 (JA   -   ).

### 4. Threats To Internet Openness And Investment.

There is, however, no technological requirement that the Internet remain open. "[S]ophisticated network management tools" now give broadband Internet access providers the "ability to make fine-grained distinctions in their handling of network traffic." *Order* ¶31 (JA   ). In particular, "deep packet inspection" allows broadband providers to determine the contents (telephone call, video, etc.) and source of a particular packet of Internet data. *See Open Internet Notice* ¶57 (JA   ). Using that information, the provider could slow, stop, or manipulate data to affect its delivery. A service provider could prevent an end user from accessing Netflix, or the *New York Times*, or even this Court's own website, unless the website paid the provider to allow customer access. Similarly, a service provider could demand payment from edge providers for delivery speeds that make viable data-intensive services like video delivery.

Demand for payment from an edge provider to allow end-user access would increase barriers to entry of new services and would make it more difficult to attract the necessary financing for start-up Internet ventures.

12

*Order* ¶42 (JA    -    ).  The next Google or Facebook might never begin.

Uncertainty over the regulatory environment could also discourage

investment.  *Id.* & n.137 (JA    -    ).  Increasing barriers to entry and limiting

end users' ability to choose which edge providers to patronize, the

Commission explained, "would reduce the rate of innovation at the edge and,

in turn, the likely rate of improvements to network infrastructure."  *Id.* ¶14

(JA    ).

     The Commission identified three service provider incentives to

interfere with customer choice and "reduce the current openness of the

Internet."  *Order* ¶21 (JA    ).

     First, some broadband providers have an economic incentive "to block

or otherwise disadvantage specific edge providers or classes of edge

providers … to benefit [their] own or affiliated offerings at the expense of

unaffiliated offerings."  *Ibid.*  For instance, cable companies that also provide

broadband access service have an incentive to interfere with their customers'

access to Internet-based video services like Netflix.  *Ibid.* (JA    -    ); *id.* ¶23 &

n.60 (JA    ).  Telephone companies such as Verizon have the same incentive

to interfere with Internet-based voice services like Vonage or Skype (which is

13

reported to account for one-third of all long distance minutes[2]).  *See id.* ¶22

(JA   ).  And companies that offer a "triple-play" of voice, cable, and

broadband – such as Verizon's FiOS – would have the incentive to

discriminate against competing providers of both video and voice services.

*See ibid.*

Second, although edge providers "already pay for their own

connections to the Internet," *Order* ¶24 (JA   ), an end-user's provider could

interfere with or block its customers' access to the edge provider unless the

edge provider paid another fee to that provider, *ibid*.  Because many edge

providers are small entrepreneurs, they are especially sensitive to such a

barrier to entry.  *Id.* ¶26 (JA   ).

Third, the Commission determined that, if broadband providers could

"profitably charge edge providers for prioritized access," they would have

"an incentive to degrade or decline to increase the quality of the service they

provide to non-prioritized traffic."  *Order* ¶29 (JA   ).

Moreover, the Commission found that the threats could be

"exacerbated by … market power" exercised by access providers.  As of

December 2009, nearly 70 percent of households live in areas served by one

---

[2] *See* http://gigaom.com/2012/09/03/happy-birthday-skype-in-9-years-you-changed-telecom/.

14

or two providers of broadband service, and 20 percent have only one option. *Order* ¶32 (JA    -    ).

Provider incentives to reduce openness were not merely theoretical; the record showed that broadband providers had acted to block or discriminate against disfavored applications.  In addition to the Comcast and Madison River incidents, Cox, another major cable modem provider, admitted to blocking file-sharing applications, and cable/telephone company RCN settled litigation alleging it had done the same thing.  *Order* ¶36 & nn.108-111 (JA    ).  AT&T admittedly restricted its mobile customers' ability to use various competing calling applications, such as Skype, from their cell phones.  *Ibid*. & n.107 (JA   -   ).  Indeed, Skype has "faced significant difficulty in gaining access across wireless Internet connections."  *Id*. ¶100 & n.308 (JA    ).  And a mobile broadband provider was charged with blocking credit card processing services that competed with affiliated operations.  *Id*. ¶35 (JA    ). The Commission also noted that "broadband providers' terms of service commonly reserve to the provider sweeping rights to block, degrade, or favor traffic."  *Ibid*. & nn.112-113 (JA    ).

### 5.    The Open Internet Rules.

The Commission adopted three rules that preserve a customer's ability to "go where [he or she] wants on the Internet and communicate with anyone

else on line." *Order* ¶43 (JA    ).  The rules apply to "broadband Internet

access service," which the Commission defined as "a mass-market retail

service that provides the capability to transmit data to and receive data from

all or substantially all Internet end points."  *Id*. ¶44 (JA    ); 47 C.F.R.

§ 8.11(a).

### a.    Fixed Service Rules.

The rules apply differently to fixed and mobile wireless service

providers; we describe the fixed service rules first.

**Transparency.**  A broadband provider must "publicly disclose

accurate information regarding the network management practices,

performance, and commercial terms of its broadband Internet access

services."  *Order* ¶54 (JA    ); 47 C.F.R. § 8.3.

**Anti-Blocking.**  Broadband providers may not block customer access

to lawful content, applications, services, or devices.  *Order* ¶63 (JA    ); 47

C.F.R. § 8.5(a).  The rule also prevents "impairing or degrading particular

content, applications, services, or non-harmful devices so as to render them

effectively unusable."  *Ibid*.; *see Order* ¶66 (JA   ).

**No Unreasonable Discrimination.**  Broadband providers "shall not

*unreasonably* discriminate in transmitting lawful network traffic" to their

customers.  *Order* ¶68 (JA    ) (emphasis added); 47 C.F.R. § 8.7.  Network

practices are reasonable if they are "tailored to achieving a legitimate network management purpose," *Order* ¶82 (JA   ), such as "ensuring network security and integrity," contending with "traffic that is unwanted by end users" (by implementing parental controls), or "reducing or mitigating the effects of congestion on the network." *Ibid.*

### b. Mobile Wireless Rules.

The Commission applied even lighter rules to mobile broadband service (*e.g.*, via cellular networks).  Mobile broadband is less mature and more rapidly evolving than fixed service; consumers have more choices for mobile broadband; and providers face "operational constraints" that fixed broadband networks do not.  *Order* ¶¶94-95 (JA   -   ).

The Commission applied to mobile providers the same transparency rule that applies to fixed service providers.  *Order* ¶98 (JA   ).  The Commission prohibited mobile Internet access providers from blocking customer access to lawful websites or applications that compete with the service providers' own voice or video telephony services.  *Id.* ¶99 (JA   ); 47 C.F.R. § 8.5(b).  The Commission declined, however, to apply to mobile service the rule forbidding unreasonable discrimination, deciding instead to rely on the anti-blocking rule while continuing to "monitor the development of the mobile broadband marketplace."  *Order* ¶104 (JA   ).

17

Verizon and MetroPCS (hereafter "Verizon") now ask that the Open

Internet Rules be vacated.

## SUMMARY OF ARGUMENT

The Internet developed and flourished in an environment of openness.

That openness has been essential to the creation of services and applications

that have driven consumer demand for and corresponding investment in

broadband access service.  Congress assigned the FCC – in which it vested

policy-making authority over all communication by wire and radio – a central

role in protecting Internet openness and the resulting investment in broadband

facilities.  Congress recognized that consumer demand for Internet access,

stimulated by vigorous innovation in services available on the Internet, is the

ultimate driver of such investment.

Verizon's attack on the Open Internet Rules rests on two fundamental –

and fundamentally flawed – premises.  Verizon first characterizes the

Commission as having "conjured a role" and "inserted itself" into broadband.

But that description cannot be squared with multiple indications to the

contrary:  the FCC's congressionally assigned role in communications, the

history of oversight of computer-based services, the agency's discretion,

confirmed by the Supreme Court, to classify broadband as an information or

telecommunications service, the specific commands of Section 706, the

Commission's established authority to issue and modify spectrum licenses in the public interest, and the Commission's longstanding authority to craft policy for information services to further its numerous other functions.

Verizon's second flawed premise is that the Open Internet Rules are a solution in search of a problem and serve no policy purpose. In fact, the record before the Commission showed multiple incidents of broadband providers interfering with their customers' ability to use Internet services, from file sharing services to Internet-based telephony. The Commission also identified a trio of powerful economic incentives, amplified by increasing technological capability and limited competition among broadband providers, to discriminate among edge providers and to block customer access to Internet sites of their choosing. That record itself justifies Commission action, but the law does not demand the Commission to wait until harm has already occurred.

The Open Internet Rules were a reasonable exercise of the Commission's discretion:

1. Sections 706(a) and (b) of the 1996 Act grant direct authority to set policy for broadband Internet access service. Both provisions state that the Commission "shall" – the language of command – take action to foster increased investment in broadband infrastructure. As the legislative history

19

establishes, Congress intended that command to be a "fail safe" source of authority in addition to other statutory powers.

2.  The Commission's plenary authority over spectrum licenses under Title III of the Communications Act separately authorizes the mobile broadband rules.  The Commission may issue a license only when doing so will serve the public interest, and it may modify licenses when the public interest requires.  The Commission also has authority to prescribe the nature of a licensee's service.  The mobile Open Internet Rules fall comfortably within the terms of the statute.

3.  The Commission has authority to adopt these rules to further its other statutory responsibilities.  Most particularly, Section 201(b) of the Act gives the Commission power to ensure that telephone rates are just and reasonable.  Rules that protect Internet-based telephone service from being blocked serve that mandate by preserving competition in the telephone market.  Section 628 of the Act gives the Commission authority to protect competition in video distribution.  With Internet-based video services becoming an increasingly important aspect of competition between cable systems and satellite systems, blocking or degrading of Internet traffic threatens to eviscerate Congress's intent to protect competition.

20

Because the Commission rooted its authority to promulgate the Open Internet Rules in the specific statutory mandates of Sections 706(a) and (b), Title III, Section 201, Section 628, and others, this case is not simply (as Verizon suggests) a rerun of *Comcast*.  There, the Court reversed the Commission's assertion of enforcement power because the Commission had not tied its authority to specific substantive statutes.  Here, by contrast, the Commission developed a comprehensive administrative record demonstrating that action was necessary to carry out the commands of several specific statutory mandates – none of which the *Comcast* panel addressed on its merits.  The Commission does not rely here on any substantive authority that *Comcast* rejected on the merits.

4.  The Commission reasonably concluded that the Open Internet Rules do not treat broadband providers as common carriers.  Under the Communications Act, common carriage is a service provided "upon reasonable request."  47 U.S.C. § 201(a).  Edge providers do not request service from the end users' broadband provider; they have their own Internet access provider.  It is the end user that makes the relevant "request" for service, and even Verizon does not argue that the rules create a common-carriage obligation as to the end user.  Access to a website on the Internet

21

therefore does not resemble carriage of programming on a cable system,

which is initiated at the request of the programmer and not the viewer.

5.  The Open Internet Rules are consistent with the First and Fifth

Amendments.  Internet access providers do not engage in speech; they

transport the speech of others, as a messenger delivers documents containing

speech.  Unlike cable systems, newspapers, and other curated media,

broadband providers do not exercise editorial discretion.  Verizon has

defended itself from lawsuits on that very ground.  If the First Amendment

applies at all, the Open Internet Rules are narrowly tailored to serve important

government interests.

The rules result in no taking without just compensation because, among

other things, broadband access providers are compensated for the use of their

networks.

6.  Finally, the record supports the rules, which are neither arbitrary nor

capricious.

## STANDARD OF REVIEW

1.  Review of the Commission's interpretation of the statutes it

administers is governed by *Chevron USA, Inc. v. NRDC*, 467 U.S. 837

(1984). Under *Chevron*, if the statutory language does not reveal the

"unambiguously expressed intent of Congress" on the "precise question" at

issue, 467 U.S. at 842-843, the Court must accept the agency's interpretation as long as it is reasonable and "is not in conflict with the plain language of the statute," *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417 (1992).  Deference applies equally when an agency changes its interpretation of a statute.  *Brand X*, 545 U.S. at 980-982.

      *Chevron* deference applies to an agency's interpretation of its own jurisdiction.  *See Transmission Agency of N. California v. FERC*, 495 F.3d 663, 673 (D.C. Cir. 2007); *accord FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000).  Verizon claims otherwise (Br. 13-14), arguing that *American Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005), *MPAA v. FCC*, 309 F.3d 796 (D.C. Cir. 2002), and *NARUC v. FCC*, 533 F.2d 601 (D.C. Cir. 1976), establish a standard of de novo review.

      Those cases say no such thing.  In *American Library*, the Court explicitly "appl[ied] the familiar standards of review enunciated … in *Chevron*."  *Id*. at 698.  The Court then determined that the plain meaning of the statute deprived the Commission of authority.  *See Transmission Agency*, 495 F.3d at 673.  The same is true of *MPAA*, 309 F.3d at 801.  In *NARUC*, which predated *Chevron*, the Court agreed that the FCC "is entitled to great deference in the construction of its own statute," but found "explicit statutory limitations" on FCC authority.  533 F.2d at 618.

2.  The Commission's interpretation of its own prior orders is "controlling" unless "plainly erroneous."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

3.  In determining whether the FCC acted arbitrarily and capriciously, the Court "presume[s] the validity of the Commission's action and will not intervene unless the Commission failed to consider relevant factors or made a manifest error in judgment."  *Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003).  "That standard is particularly deferential in matters … which implicate competing policy choices … and predictive market judgments."  *Ad Hoc Telecommunications Users Committee v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009).

4.  Challenges to the adequacy of the administrative record are reviewed for substantial evidence.  *AT&T Corp. v. FCC*, 394 F.3d 933, 936 (D.C. Cir. 2005).  The agency's conclusion "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view."  *Secretary of Labor v. Federal Mine Safety and Health Review Comm'n*, 111 F.3d 913, 918 (D.C. Cir. 1997) (internal quotations omitted).

5.  Constitutional claims are reviewed *de novo*.  *J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1045 (D.C. Cir. 2009).  The presence of a

24

constitutional claim, however, does not affect the standard of review of non-constitutional issues. *See Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 709 (D.C. Cir. 2011) (Court does not "abandon *Chevron* deference at the mere mention of a possible constitutional problem").

### ARGUMENT

I.   **THE FCC REASONABLY INTERPRETED SECTION 706 AND TITLE III AS GRANTS OF DIRECT AUTHORITY TO IMPLEMENT THE OPEN INTERNET RULES.**

    **A.   The Commission Reasonably Read Section 706 As A Grant Of Direct Authority And Properly Found That The Open Internet Rules Would Carry Out The Statutory Mandate.**

Consistent with the statutory language, the Commission reasonably construed Sections 706(a) and 706(b) to grant the Commission authority for the Open Internet Rules.

        **1.   The Commission's Reading Of Section 706 Is Consistent With Its Plain Language And Entitled To Deference.**

**a.** Section 706(a) of the Telecommunications Act of 1996 instructs that the Commission "shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans" by using "measures that promote competition in the local telecommunications market" and "other regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a). "[A]dvanced telecommunications

capability" includes broadband Internet access.  47 U.S.C. § 1302(d)(1); *see Order* ¶ 117 & n.359 (JA    ).

The Commission reasonably interpreted Section 706(a) as having "invested the Commission with the statutory authority to carry out" its commands.  *Order* ¶ 120 (JA    ); *accord id.* ¶ 122 (Section 706(a) "provides ... a specific delegation of legislative authority to promote the deployment of advanced services.") (JA    ).[3]  Congress's use of the word "shall" "generally indicates a command that admits of no discretion," *Ass'n of Civilian Techs. v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994), and thus requires the Commission to take action.  Here, Congress (1) told the Commission that it "shall" "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans"; and (2) gave the Commission the discretion to use its expert judgment to use not only specified tools, but also "measures that promote competition in the local telecommunications market" and "other regulating methods that remove barriers to infrastructure investment."   47 U.S.C. § 1302(a).

---

[3]  Verizon characterizes the Commission's reliance on Section 706(a) in the *Order* as resting on a theory of "ancillary" authority, Br. 24, 25, 26, but the agency determined that the statute granted direct authority.  *See Order* ¶ 122 (JA    ).

The Commission's interpretation of Section 706(a) is therefore consistent with the plain language of the statute.  Indeed, this Court has recognized that the statute "at least arguably … delegates" that authority to the FCC.  *Comcast,* 600 F.3d at 658.  Thus, at a minimum, the agency has discretion under *Chevron* to interpret the provision.  *See also Ad Hoc*, 572 F.3d at 906-907 (the "generous phrasing of § 706 means that the FCC possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband").

**b.**  Section 706(b) independently grants authority for the Open Internet Rules.  *Order* ¶123 (JA    ).  That provision directs the Commission to determine periodically if broadband "is being deployed to all Americans in a reasonable and timely fashion.  If the Commission's determination is negative it *shall take immediate action* to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market."  47 U.S.C. § 1302(b) (emphasis added).  In July 2010, the Commission concluded in the *Sixth Broadband Deployment Report*, 25 FCC Rcd 9556, 9558 ¶¶2-3 (2010), that "broadband deployment to *all* Americans is not reasonable and timely," thus triggering Section 706(b) "as a consequence of that conclusion."  *Order* ¶123 (JA    ).

27

In light of that finding, Section 706(b) authorizes – indeed requires –
the Commission to accelerate deployment of broadband and promote
competition in telecommunications markets.  The Open Internet Rules serve
both of those goals.  *Ibid*.  Accordingly, Section 706(b) independently
authorizes the Open Internet Rules.

**c.**  Legislative history buttresses the Commission's interpretation of
Sections 706(a) and (b).  The Senate Report for the bill that contained Section
706 explained that it was "intended to ensure that one of the primary
objectives of [the 1996 Act] – to accelerate deployment of advanced
telecommunications capability – is achieved," and that the FCC was
empowered to "provide the proper incentives for infrastructure investment."
S. Rep. No. 104-23 at 50 (1995); *see Order* ¶120 (JA    ).  Section 706, the
Senate Report stated, "is a *necessary fail-safe* to ensure ... accelerate[d]
deployment" of broadband infrastructure.  S. Rep. No. 104-23 at 51
(emphasis added).  "It would be odd," the Commission explained, for
Congress to have described Section 706 as a "fail safe" "if it conferred no
actual authority" the agency did not already have.  *Order* ¶120 (JA    ).

The Commission's interpretation of Section 706 is also bolstered by its
furtherance of several statutory "polic[ies] of the United States":  to "promote
the continued development of the Internet," to promote "technologies which

28

maximize user control over what information is received" over the Internet,
and to "preserve the vibrant and competitive free market *that presently exists*
for the Internet."  47 U.S.C. § 230(b)(1), (3) (emphasis added); *see Order*
¶¶71, 116 (JA    ,    ).  Such policy provisions may "shed light on … express
statutory delegation[s] of authority."  *Comcast*, 600 F.3d at 655.

    **d.**  Verizon argues (Br. 29-30) that Section 706(a) should be read to
allow the FCC to use only authority already granted in other statutory
provisions.  That claim has no basis in – and is certainly not mandated by –
the statutory text and, as discussed, is contrary to legislative history.
Congress could have enacted an explicit limitation in Section 706 of the kind
that Verizon imagines, or it could have created an exclusive list of the
authorities the Commission could exercise to further the statutory goal.  It did
neither.  Instead, Section 706(a) delegates to the Commission the authority to
use "other regulating methods that remove barriers to infrastructure
investment."  47 U.S.C. § 1302(a).  By its terms, that command is not tied to
other "specifically-enumerated" regulatory mechanisms.[4]

    Verizon's reliance (Br. 28-29, 32) on the *Advanced Services Order*, 13
FCC Rcd 24012, as interpreted in *Comcast*, 600 F.3d at 658-659, is

---

   [4]  That Section 706(a) also refers to state regulatory commissions is
immaterial.  *See* Br. 28.  As this Court indicated in *Comcast*, section 706
"contains a direct mandate" granting the FCC authority.

29

misplaced.   There, the Court read the *Advanced Services Order* as a holding

by the Commission that Section 706(a) did not "constitute an independent

grant of authority."  The Court found that interpretation "still binding"

because the Commission had "never questioned, let alone overruled it."  600

F.3d at 658.  In the *Order*, however, the Commission did just that.  It held

that if the *Advanced Services Order* could be interpreted as having declined to

read Section 706(a) as a grant of authority, "we reject that reading of the

statute," for the reasons set forth in paragraphs 117-123 of the *Order*.  *Order*

n.370 (JA    ).

That should end the matter.  An agency's reading of a statute is not

"carved in stone"; rather, the agency "must consider varying interpretations

and the wisdom of its policy on a continuing basis."  *Chevron*, 467 U.S. at

863-864.  *Chevron* deference thus applies even if the agency has previously

interpreted the statute differently.  *Brand X*, 545 U.S. at 981-982.  Here, the

Commission explained why its interpretation was the proper one.[5]  *See Order*

¶¶117-123 (JA    -    ).

_____

[5] The Commission also clarified that the *Advanced Services Order* did not
reject Section 706 as a source of *any* authority, but addressed only the
question whether Section 706 granted the Commission authority to act
"*through the mechanism of forbearance*," when a forbearance request does
not meet the standards for forbearance set out in 47 U.S.C. § 160.  *Order*
¶118 (JA    ) (emphasis added).

**e.**  Nor is Verizon correct that, if Section 706 grants the Commission authority for the Open Internet Rules, "there is no stopping point to the authority [the Commission] could assert over the Internet."  Br. 31; *see id*. 26-27.  The Commission recognized several inherent limitations on its authority.

First, the agency explained that its "mandate under Section 706(a) must be read consistently with Sections 1 and 2 of the Act," 47 U.S.C. §§ 151, 152, "which define the Commission's subject matter jurisdiction over 'interstate and foreign commerce in communications by wire and radio.'"  *Order* ¶121 (JA    ).  The same consideration would apply to Section 706(b).  Verizon wrongly suggests (Br. 26-27, 31) that the Commission claims authority over edge providers and others that utilize the services of wire- and radio-based communications providers.  Unless an edge provider renders services (such as voice service) that themselves fall within the Act, the Commission would have no more authority over an edge provider than it has over the customers

31

of ordinary telephone service, who also use fixed and mobile communications media.[6]

Second, the Commission recognized that the text of the statute requires that any regulation under Section 706(a) must "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans."  47 U.S.C. § 1302(a).  Thus, to invoke Section 706(a), the Commission must establish, as it did in detail here, *see* pp. 37-43, *infra*, that its regulatory actions will encourage deployment of broadband facilities.  Likewise, to act under Section 706(b), the Commission must find that broadband is not being deployed in a "reasonable and timely" way.

Third, as relevant here, Section 706(a) permits the FCC to take only two categories of action:  "measures that promote competition in the local telecommunications market" and "other regulating methods that remove barriers to infrastructure investment."  *Order* ¶121 (JA    ).  Section 706(b) is likewise limited to similar measures.  47 U.S.C. § 1302(b).

_____

[6] In its Statement of the Case, Verizon suggests that the Commission "expressly reserved the right to regulate the prices that broadband providers charge their own end-users," Br. 9, citing *Order* n.381 (JA    ).  The footnote cites the price regulation provision of Section 706 to illustrate that Congress did not authorize only deregulation.  The Commission said nothing about a "right" to regulate end-user pricing.

Section 706 of the 1996 Act thus is less open-ended than sections of the Communications Act that have been upheld against legal challenge. For instance, 47 U.S.C. § 201(b) authorizes the FCC to ensure "just" and "reasonable" common carrier rates and practices, and Title III allows regulation of wireless services in the "public interest." *See*, *e.g.*, *NBC v. United States*, 319 U.S. 190, 216 (1943) (public interest standard is "as concrete as the complicated factors for judgment in such a field of delegated authority permit"); *Order* ¶122 (JA    ). Indeed, in addition to the limits discussed above, Section 706(a) also contains the same public-interest limitations that apply to the FCC's grant of Title III licenses. *See id.* ¶121 (JA    ).

**f.** Verizon admits that Section 706(b) grants the FCC some authority, but contends that the grant of authority is limited to "geographical areas that are not served by any provider" of broadband service. Br. 33. But the statute contains no such limitation, and Verizon identifies none. The reference to "geographical areas" on which Verizon relies comes from Section 706(c), which does not limit 706(b), but merely specifies that the Commission is obligated to set forth a list of unserved geographical areas.

Verizon also fleetingly challenges (Br. 33) the FCC's 2010 finding that broadband was not being timely deployed, which triggered the agency's

33

Section 706(b) authority.  *Sixth Broadband Report*, 25 FCC Rcd at 9558.

That two-year-old decision is not subject to review here, *see* 28 U.S.C.

§ 2344 (60-day period for review)**,** and Verizon cites no precedent requiring

the Commission to reopen that issue now.

      **g.**  At bottom, Verizon's argument rests on the sweeping assertion that

Congress fenced Internet access off from FCC policymaking and thus that the

Commission's reading of Section 706 (and other provisions that grant

authority) departs from that established directive.  *See* Br. 2, 23.  That

argument is simply wrong.  The Act grants the FCC undisputed subject

matter jurisdiction over "all interstate and foreign communication by wire or

radio."  47 U.S.C. § 152(a).  When Congress enacted the 1996 Act, moreover,

it did so against the backdrop of the FCC's longstanding *Computer* regime.

*See* pp. 5-6, *supra*.  In the 1996 Act, Congress did not strip the FCC of that

authority, but left to the Commission's discretion the decision whether

broadband access should be regulated as a Title II telecommunications

service or a Title I information service.  *See Brand X*, 545 U.S. at 976-977.

And, in addition to Section 706, Congress enacted Section 230(b), which sets

forth policies – including consumers' control over the Internet content they

access – to guide the agency's exercise of its "statutorily mandated

responsibility."  *Comcast*, 600 F.3d at 661.

In its comments to the Commission during the rulemaking proceeding that considered whether to classify wireline broadband Internet access as a Title I information service, Verizon took a very different position. It contended then that "[r]egulating broadband under Title I *does not necessarily mean completely deregulating broadband facilities and services*; it means applying regulations tailored to suit the needs of the broadband market." Verizon 02-33 Comments at 42 (emphasis added). Verizon may believe that these particular rules are not "suit[ed]" to "the needs of the broadband market," but that second-guesses only the agency's policy judgment, not its statutory authority.

Verizon's reliance (Br. 12, 22, 23, 24) on *Brown & Williamson*, 529 U.S. 120, is misplaced. Contrary to Verizon's argument, "common sense," *id*. 133, suggests that the federal agency with "unified jurisdiction" over "all forms of electrical communication," *Southwestern Cable*, 392 U.S. at 168, and with the ability to establish policies to accommodate "the dynamic aspects" of communications technology, *Pottsville Broadcasting*, 309 U.S. at 138, has the authority to act to preserve the key attributes of the most significant medium of communication today. As discussed, the text and legislative history of the relevant statutes and the regulatory backdrop against which Congress acted confirm that conclusion. Unlike the FDA in *Brown &*

35

*Williamson*, the FCC has never "disavowed" its authority, *id*. 125, over

Internet access, but has continuously exercised that authority since the earliest

days of the Internet.  *See Wireline Broadband Order*, 20 FCC Rcd at 14914;

pp. 5-9, *supra*.  And unlike with tobacco, Verizon cannot show here that

"Congress has directly spoken to the issue here and precluded the [FCC's]

jurisdiction to regulate" broadband Internet access service through other

statutes.  529 U.S. at 133.

Verizon is similarly wrong to assert that Commission authority under

Section 706 (as well as Title III and other provisions discussed below), would

result in Congress's having "hid[den] elephants in mouseholes."  Br. 23,

quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Section

706 plainly envisions an FCC role in broadband policy, *see Ad Hoc*, 572 F.3d

at 907, and Section 706(b) commands the Commission to act immediately to

enhance broadband deployment and competition.  Congress described Section

706 as a "fail safe" provision to ensure the FCC's ability to promote

broadband deployment.  There is nothing trivial or obscure about such

explicit statutory commands.

**h.**  Finally, Verizon is incorrect in claiming that congressional inaction

on legislation granting the FCC specific authority to adopt Open Internet

Rules "confirms that the Commission lacks authority to promulgate" rules.

36

Br. 23. Such "subsequent legislative history" is "an unreliable guide to legislative intent," *Tax Analysts v. IRS*, 350 F.3d 100, 104 (D.C. Cir. 2003), particularly when it concerns "proposals that do not become law," *PBGC v. LTV Corp.*, 496 U.S. 633, 650 (1990) (citations omitted). In any event, the subsequent legislative history is mixed, as Congress also failed to pass a resolution that would have struck down the Open Internet Rules. *See* H.R.J. Res. 37, 112th Cong. (2011).

### 2. The Commission Reasonably Determined That The Open Internet Rules Would Advance The Statutory Mandate.

Determining how best to implement the mandate of Section 706 is a quintessential exercise of the FCC's discretion and expertise to make predictive judgments. This Court has recognized the "the substantial deference" it gives to such judgments, *Cablevision*, 649 F.3d at 716, and particularly the high degree of deference it accords to predictions about the "likely economic effects of a rule," *National Telephone Co-Op Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009).

### a. Protecting Innovation That Drives Demand For And Investment In Internet Infrastructure.

As the Commission explained, the Rules will encourage and accelerate deployment of broadband facilities through the virtuous circle, a concept acknowledged by numerous commenters, including Verizon. The value of

the Internet to users lies in the content, services, and applications it makes

available.  Continued innovation in services depends on low barriers to entry

and the assurance that users will be able to reach edge providers.  The Open

Internet Rules thus protect the creation of new services.  The resulting

consumer demand for more, faster, and better Internet connections drives

access provider investment in infrastructure to satisfy that demand, thus

serving the goals that the Commission must further under Section 706(a) and

(b).  *Order* ¶117 (JA   ).

　　　Verizon derides the Commission's prediction as a "triple cushion

shot." Br. 28.  But the Commission's prediction is both logical and rooted

firmly in the record.  Historically, the Commission found, demand for

Internet-based services has "led to major network improvements."  *Order* ¶14

(JA   ), citing, *inter alia*, Comcast Comments at 2, 8 (JA   ,   ); Sony

Comments at 5 (JA   ).  The record showed that "the increasing availability

of multimedia applications" (such as YouTube, Netflix, and Hulu) "helped

create demand for residential broadband services," and that broadband

providers "responded by adopting new network infrastructure, modem

technologies, and network protocols."  *Order* n.23 (JA   ), citing Chetan

Sharma, *Managing Growth and Profits in the Yottabyte Era* (2009) (JA   ).

A paper by economist Nicholas Economides, submitted by Google, similarly

concluded that preserving an open Internet "will be highly beneficial" in
preserving consumer demand-driven investment in broadband infrastructure.
Google Comments, App. A at 13, 14 (JA   ,   ).

 Other industry participants – including both petitioners here –
concurred that consumer demand could drive network investment. *See* CTIA
Reply at 22 (JA   ); CTIA Comments at 32 (JA   ); Sony Reply at 6 (JA   );
Google Comments at 5, 34-36 (JA   ,  -  ); Skype Reply at 14 (JA   );
Software & Information Industry Association Comments at 3 (JA  -  );
Earthlink Reply at 4 (JA   ); Clearwire Comments at 7 (JA   ).  Indeed,
petitioner MetroPCS called the Internet "the model of the virtuous cycle:
innovators are creating content and application products that consumers
desire, which drives consumers to purchase from service and equipment
providers, which in turn drives investment in infrastructure and new
technology in response to consumer demand."  MetroPCS Comments (Jan.
14, 2010) at 16 (JA   ).  Verizon, as part of a consortium of leading
broadband providers and trade associations, stated that innovation by both
edge providers and access providers "mutually expands opportunities for the
other," and that "the better the network capabilities available to 'edge'
providers, the greater the opportunity for them to develop innovative services

that increase consumer demand for broadband."  NCTA, Verizon, *et al*. Feb.

22, 2010, *ex parte* at 4 (JA    ).

Verizon relies on some commenters' assertions that Open Internet

Rules would not lead to greater investment.  Br. 7, 31.  But, as noted, the

record also contains considerable evidence ratifying the Commission's

judgment that innovation in edge services drives investment by access

providers, and the Commission concluded that its position was supported by

the weight of the evidence.  *Order* ¶40 (JA    -    ).  With evidence on both

sides, the agency's conclusions are supported by substantial evidence "even

though a plausible alternative interpretation of the evidence would support a

contrary view."  *Secretary of Labor*, 111 F.3d at 918.  In fact, subsequent to

the adoption of the Open Internet Rules, investment has surged, with venture

capital funding for Internet-specific companies rising 68 percent,[7] and

investment in wired and wireless network infrastructure rising by 24 percent

from 2010 to 2011.[8]

---

[7] *See* https://www.pwcmoneytree.com/MTPublic/ns/moneytree/
filesource/exhibits/11Q4MTPressrelease.pdf.

[8] Telecommunicationons Industry Association, TIA's 2012 ICT Market
Review and Forecast 1-7, fig. 1-1.3 (2012).

**b.   Protecting A Stable Environment For Investment.**

By creating greater certainty that the conditions essential to Internet innovation would persist, the rules strengthen the virtuous circle.  The Commission noted "significant uncertainty" in the industry concerning access providers' network practices.  Commenters, "including leading broadband providers," confirmed that "greater predictability" would "encourage investment and innovation."  *Order* ¶42 & n.137 (JA    -    ), citing Statement of AT&T (JA    ).  A number of leading venture capitalists explained that the rules "will promote investment in the Internet ecosystem by removing regulatory uncertainty."  *Order* n.137 (citing numerous sources).  *See also* Vonage Comments at 6, 16 (JA    ,    ); XO Comments at 4 (JA    ).

At the same time, the Commission calibrated its light-touch approach to retain broadband providers' investment incentives.  Despite calls for more extensive regulation under Title II, *see e.g.*, Free Press April 9, 2010, *ex parte* (JA    ), the Commission opted for high-level rules that preserve existing openness.

In keeping with its balanced approach, the Commission clarified broadband providers' ability to engage in a number of revenue-enhancing practices.  It did not, for instance, preclude usage-based pricing, under which heavier users of the network pay more than others.  *Order* ¶72 (JA    ).

41

Access providers may also offer revenue-generating specialized services, *id*.

¶112 (JA   ), as well as services that "provide[] access to a substantial subset

of Internet endpoints based on end users preference to avoid certain content,

applications, or services," *id*. ¶47 & n.148 (JA   ).

### c. Protecting Competition In Telecommunications Markets.

The Open Internet Rules foster "competition in the local

telecommunications market" as directed by Section 706(a) and "competition

in the telecommunications market" as directed by Section 706(b).  The

transparency rule, in particular, "ensures that end users can make informed

choices regarding the purchase and use of broadband service, which promotes

a more competitive market for broadband services."  *Order* ¶53 (JA   ).

The rules also promote competition by protecting Internet-based

telephone services from being blocked by incumbent providers.  The

Commission explained that Internet-based telephone services known as

"Voice over Internet Protocol" or "VoIP" "are increasingly being used as a

substitute for traditional telephone service."  *Order* ¶22 & nn.49-50 (JA   -

) (quotation marks omitted).  Broadband providers who also sell their

customers telephone service thus have the incentive to discriminate against

such competition.  *Id*. ¶¶22-24 (JA   -   ); *see* Vonage April 21, 2010, *ex*

*parte* at 3 (JA   ); Skype Nov. 30, 2010, *ex parte* at 2 (JA   ); NCTA Dec. 10,

42

2010 *ex parte* at 2-3 (JA   -   ).  The prohibitions on blocking and

unreasonable discrimination will protect competition in local

telecommunications markets and directly fulfill the statutory mandate.

**B.   The Commission Reasonably Interpreted Title III Of The Communications Act To Grant Authority For The Mobile Rules.**

Title III of the Communications Act separately grants the Commission

direct authority to promulgate Open Internet Rules for wireless broadband

Internet access.  Under Title III, the FCC is to "maintain the control of the

United States over all the channels of radio transmission."  47 U.S.C. § 301.

Congress empowered the agency to grant licenses to use radio spectrum only

when the "public convenience, interest, or necessity will be served" by a

grant.  47 U.S.C. § 307(a).  It directed the Commission to "[p]rescribe the

nature of the service to be rendered by … each [radio] station within any

class," 47 U.S.C. § 303(b), and to "encourage the larger and more effective

use of radio in the public interest," 47 U.S.C. § 303(g).

To effectuate these commands, Congress accorded the Commission the

authority to "[m]ake such rules and regulations and prescribe such restrictions

and conditions … as may be necessary to carry out the provisions" of the

Communications Act.  47 U.S.C. § 303(r).

43

Title III gives the Commission "expansive powers" and a "comprehensive mandate" over spectrum licenses. *NBC*, 319 U.S. at 219. The public interest standard "serves as a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." *Pottsville Broadcasting*, 309 U.S. at 137-138. *See CBS v. Democratic National Committee*, 412 U.S. 94, 122-123 (1973) (Congress left policy questions for the FCC); *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1048 (7th Cir. 1992) (Posner, J.) (Commission has "enormous discretion" to impose public interest obligations).

The Commission's plenary authority over spectrum licenses allows the Commission to place public interest conditions not only on newly issued licenses, but also on existing licenses, whenever doing so "will promote the public interest, convenience and necessity." 47 U.S.C. § 316. Because that grant of authority is not limited by any other provision in the Act, a licensee has "no vested right to any specific [license] terms." *Celtronix*, 272 F.3d at 589; *see Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309 (D.C. Cir. 1995) (affirming rule changes that effectively modified licenses).

The mobile Open Internet Rules fall well within these established standards. The rules "are necessary to advance the public interest in innovation and investment" using wireless licenses. *Order* ¶134 (JA    ). In

44

particular, for the reasons discussed in detail at pages 37-43 above, the rules (among other things) fulfill Congress's directives that the Commission use its spectrum licensing authority to "seek to promote … the development and rapid deployment of new technologies, products and services for the benefit of the public," 47 U.S.C. § 309(j)(3)(A), and "ensur[e] that new and innovative technologies are readily accessible to the American people," 47 U.S.C. § 309(j)(3)(B).  Indeed, as the Commission pointed out, in 2007 it had placed an open platform condition resembling the Open Internet Rules on licenses in the 700 MHz block.  (Notably, Verizon was the high bidder for and was awarded those licenses.)  *Order* ¶134 (JA    ).

Verizon would interpret Title III of the Communications Act as a straitjacket that grants only "specific authority relating to issues such as preventing interference and assigning classes of stations to particular frequency bands."  Br. 38.  That limitation has no basis in the statutory language, and Verizon cites none.  *See id.* 37-41.  Verizon's argument also clashes with the Supreme Court's holding, rejecting a substantially similar claim, that "[t]he [Communications] Act itself establishes that the Commission's [Title III] powers are not limited to the engineering and technical aspects of radio communication."  *NBC*, 319 U.S. at 215.

45

Verizon's claim that there is no legislative "grant of authority" over the terms of service offered by wireless licenses, Br. 38-39, is bewildering. The Act grants the FCC authority to, among other things, "[p]rescribe the nature of the service to be rendered by … each [radio] station within any class," 47 U.S.C. § 303(b), and "modify" the terms of such licenses in the public interest, *id.* § 316. Such provisions give the agency the authority to adapt to an ever-changing industry. *See Pottsville Broadcasting*, 309 U.S. at 137-138. Under them, the Supreme Court has upheld such FCC action as restrictions on broadcast stations' ownership of newspapers, *FCC v. NCCB*, 436 U.S. 775 (1978) (FCC can adopt rules to achieve "permissible public-interest goals"), and limits on the number of licenses an entity could hold, *FCC v. Storer Broadcasting Co.*, 351 U.S. 192 (1956); *see Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 12 (D.C. Cir. 2006).

Verizon's cases are inapt. *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470 (1940), does not bar the FCC from imposing any requirement that "regulate[s] the business" of an FCC licensee. There, contrasting the FCC's regulation of broadcasters with that of common carriers, the Court stated that the FCC "is given no supervisory control of the [broadcaster's] programs, of business management or of policy." 309 U.S. at 475. Verizon seriously misconstrues that passage to mean that the FCC cannot impose any regulation

46

affecting a licensee's business.  Every regulation will affect a licensee's business in *some* way.  But Congress gave the Commission authority to specify "the nature of the service to be rendered," by a licensee, 47 U.S.C. § 303(b), and the Commission merely exercised that authority.  *MPAA v. FCC*, 309 F.3d 796 (D.C. Cir. 2002), has no bearing here because, unlike the rules at issue there, the mobile wireless Open Internet Rules are authorized directly by statute, including Sections 303(b) and 316.

Finally, Verizon asserts that the Open Internet Rules unlawfully "fundamentally change" the terms of its wireless licenses.  Br. 40.  That assertion cannot be squared either with the reality of the Commission's action or with Verizon's own statements.  Verizon's licenses entitle it to provide mobile communications services, and Verizon may still provide the same wireless services over the same frequencies to the same customers.  Moreover, Verizon argues in its brief that "broadband providers today generally provide subscribers access to all lawful [Internet] content … and have strong economic incentives to continue to do so," Br. 51.  That, in addition to transparency, is all the wireless mobile rules require.  *MCI v. AT&T*, 512 U.S. 218 (1994), which Verizon cites (Br. 40), overturned an FCC order issued under authority to "modify" tariff filing rules but that *eliminated* a rule.  It is not to the contrary.

47

MetroPCS's separate attack on the Commission's assertion of authority under Title III is contrary to the arguments MetroPCS is simultaneously making to this Court in another pending case, *Cellco Partnership* (No. 11-1135).  There, MetroPCS has recognized that "by its plain language, §303(b) [of the Communications Act] may … be used to affirmatively expand a licensee's obligations."  Br. of MetroPCS in No. 11-1135 at 2.  Indeed, in making that argument, MetroPCS relies, *ibid*., on the 700 MHz Order that required – similar to the Open Internet Rules – licensees to maintain an open platform for Internet access.

## II.    THE FCC REASONABLY DETERMINED THAT THE OPEN INTERNET RULES FURTHER OTHER STATUTORY DUTIES.

Congress charged the Commission with regulating communications facilities "to make available … to all the people of the United States … a rapid, efficient, Nation-wide and world-wide wire and radio communication service."  47 U.S.C. § 151.  Congress granted the Commission authority to "perform any and all acts [and] make such rules and regulations … as may be necessary in the execution of its functions."  47 U.S.C. § 154(i).  Consistent with such flexible grants of authority, the Supreme Court has warned against "stereotyp[ing] the powers of the Commission to specific details in regulating

48

a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding." *NBC*, 319 U.S. at 219-220.

The Commission thus may have authority over communications matters even where Congress granted "no express authority." *Comcast*, 600 F.3d at 646. Such "ancillary" authority exists when (1) the subject matter falls under Title I of the Act, *i.e.* constitutes communication by wire or radio; and (2) when such authority is "reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." *Ibid.*, citing *American Library*, 406 F.3d at 691-692.[9]

There is no dispute concerning the first prong of that test. The Commission identified a number of provisions in the Communications Act that satisfy the second prong. *Order* ¶¶ 124-137 (JA    -    ).

Verizon asserts (Br. 23) that the Commission's reliance on multiple statutes to support its actions somehow indicates a lack of authority, paradoxically suggesting that an action supported by *more* statutory provisions is *less* likely to be within a grant of authority. But Congress granted the Commission authority over the telephone, broadcasting, and cable television industries, and the Internet is causing fundamental shifts in each of

---

[9] The Commission believes that this Court's test is more restrictive than the "various responsibilities" test established by the Supreme Court in *Southwestern Cable*, 392 U.S. at 178, and similar cases.

49

them.  The Commission must take account of those changes in discharging its

statutory responsibilities.  As we show below, the Commission demonstrated

how the Open Internet Rules further the Commission's performance of duties

assigned to the agency in Titles II, III, and VI of the Communications Act.

### A.   Section 201(b) Of The Communications Act Grants Authority To Adopt Rules Protecting Telephone Competition.

Section 201(b) makes it unlawful for any "charges, practices,

classifications, and regulations" for common carrier services to be "unjust or

unreasonable" and grants the Commission the authority to "prescribe such

rules and regulations as may be necessary in the public interest to carry out"

that command.  47 U.S.C. § 201(b).

VoIP service is "increasingly being used as a substitute for traditional

telephone service."  *Order* ¶125 (JA    ); *see id.* ¶22 (JA    ) (citing record

comments).  By presenting a competitive alternative to traditional telephone

service, VoIP therefore can "contribute to the marketplace discipline of voice

telecommunications services."  *Id.* ¶125 (JA    ).  Yet companies that provide

both Internet access and traditional telephone service (such as Verizon) "have

the incentive and ability to block, degrade, or otherwise disadvantage the

services of their online voice competitors."  *Ibid.* (JA    ).  Indeed, the

*Madison River* case, 20 FCC Rcd 4295, involved exactly that practice, *Order*

¶35 & n.104 (JA    ).  Similarly, AT&T has restricted its mobile customers'

ability to use competing calling applications, such as Skype, from their cell

phones.  *Ibid.* & n.107 (JA   -   ); *see also id.* ¶100 & n.308 (JA    ).

As a competitive alternative to local telephone companies, VoIP helps

ensure reasonable prices and practices that the Commission must police under

Section 201(b).  *Order* ¶125 (JA    ).  Thus, the FCC reasonably concluded

that the Open Internet Rules further the FCC's "statutorily mandated

responsibilities."  *Comcast*, 600 F.3d at 646.

Verizon asserts that the Commission may not rely on such market-

based economic mechanisms to fulfill its duties, but may only "address any

concerns about unreasonable common-carrier rates by regulating such rates"

directly.  Br. 34.  But rate regulation is at best a substitute for competitive

forces, and the Commission is entitled to rely on market forces in order to

avoid the need for such regulation.  *CCIA*, 693 F.2d at 211; *see also Orloff v.*

*FCC*, 352 F.3d 415, 419 (D.C. Cir. 2003) (upholding reliance on market

forces to ensure just and reasonable rates).  In any event, the Commission

may carry out its statutory responsibilities not only to protect, but also to

"promote" the policies for which it has been given authority.  *United States v.*

*Midwest Video Corp.*, 406 U.S. 649, 667 (1972).

51

Verizon also tries to distinguish *Madison River* on the ground that it did not involve a broadband provider.  Br. 34.  That is incorrect.  *Order* ¶35 (JA   ).  Indeed, the company was charged with blocking its customers' VoIP service – something that could be done only by a broadband provider.   In any event, the Commission reasonably concluded (and Verizon does not contest) that incumbent telephone companies have the incentive and the ability to interfere with Internet-based competitors.  Prophylactic rules would be justified even in the absence of documented abuses.

Verizon also asserts that Section 201(b) can authorize the Open Internet Rules only in connection with Internet-based telephony.  Br. 34.  As the Commission explained, however, "it is unlikely that broadband providers could reliably identify [VoIP] traffic in all circumstances, particularly if voice or video traffic originated from new services using uncommon protocols." *Order* ¶48 & n.151 (JA   ).  That is so "notwithstanding the increasing sophistication of network management tools."  *Ibid*.  In such cases of inseparability between regulated and unregulated activity, the Commission's authority extends to all matters necessary to achieve its policy goals.  *E.g.*, *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1220 n.30 (D.C. Cir. 1984) (Commission has authority over intrastate communications when inseparable from interstate communications).

52

### B.   Provisions In Titles VI And III Grant Authority To Protect Competition In Video Markets.

#### 1.   Title VI.

Two provisions of Title VI, which governs cable programming, support the Open Internet Rules.

First, Section 628, entitled "Development of Competition and Diversity in Video Programming Distribution," makes it unlawful for cable operators and their affiliated satellite cable programming vendors to "engage in unfair methods of competition … the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing" programming to its subscribers.  47 U.S.C. § 548(b).[10]

The administrative record showed that video programming distributors "are seeking to keep and win customers by expanding their [video] offerings to include online access to their programming."  *Order* ¶131 (JA    ).  For example, DISH, a satellite broadcast service, provides its customers access to on-line video programming to compete with other video distributors, like Verizon, that control the broadband Internet access networks on which DISH depends.  The Commission determined that "the competitive viability of stand-alone [video distributors such as DISH] depends on their ability to offer

_____

[10]   Because Congress expressly directed the Commission to adopt rules to implement Section 628, 47 U.S.C. § 548(c)(1), the statute grants direct as well as ancillary authority.  *Order* ¶129 (JA    ).

an online video experience of the same quality as the online video offerings

of integrated broadband providers." *Ibid*., quoting DISH Reply Comments 7

(JA    ).  The record also showed that broadband providers "view these

services as a … threat" to their video operations, *Order* ¶22 & n.54 (JA    ),

and can block competing Internet-based video distribution services.  DISH

Comments 5-6 (JA    -    ); Public Knowledge Dec. 14, 2010, *ex parte* (JA    ).

    In such circumstances, the Open Internet Rules "further [the agency's]

mandate under Section 628." *Order* ¶131 (JA    ).  By interfering with the

strategies of competing video distributors, which depend increasingly on

Internet-based distribution, *see id*., a broadband access provider's blocking or

degradation would "hinder or prevent" those companies from providing

programming to subscribers.  That outcome would "frustrate Congress's

stated goals" in enacting Section 628, which include "promoting

competition," increasing the availability of programming "to persons in rural

and other areas not currently able to receive such programming," and

"spurring the development of communications technologies." *Id*. ¶129 (JA    -

    ).  This Court has similarly recognized that reducing the "commercial

attractiveness" of programming can amount to a "significant[] hind[rance]"

under Section 628. *Cablevision*, 649 F.3d at 708.

Independently, Section 616, 47 U.S.C. § 536, requires the Commission to "establish regulations governing program carriage agreements and related practices between cable operators … and video programming vendors" to protect competition in the video distribution marketplace.  47 U.S.C. § 536(a).  Among the required regulations are those that prevent a video distributor from "engaging in … unreasonabl[e] restrain[t] [of] the ability of an unaffiliated video programming vendor to compete fairly by discriminating … on the basis of affiliation or nonaffiliation."  47 U.S.C. § 536(a)(3).  The Commission explained that video distributor practices "that discriminatorily impede competing video programming vendors' online delivery of programming to consumers affect the vendors' ability to 'compete fairly' for viewers just as surely as [video distributors'] discriminatory selection of video programming for carriage on cable systems has this effect." *Order* ¶132 (JA    ).  Such practices are "related" to program carriage agreements, the Commission found, and thus within the scope of Section 616(a).  *Ibid.*

Verizon provides only a cursory response.  Its principal argument is that Sections 628 and 616 apply only to "cable operators" (such as Verizon in its FiOS business) and thus supply authority only insofar as a cable operator

55

is acting in its capacity as a video distributor and not when it is acting as a broadband provider.  Br. 36.

Verizon reads these statutes too narrowly.  This Court has previously found that Section 628 applies to terrestrial programmers – which are not expressly addressed by the statute – when they withhold programming from a competing video provider in order to benefit a commonly controlled cable service provider.  *See Cablevision*, 649 F.3d at 719.  The same logic applies here.  Regardless of corporate organization, when a broadband provider blocks Internet-based competition in order to protect the profitability of its affiliated cable business, it is acting for the benefit of the cable system.

Verizon also contends that Sections 628 and 616 do not supply ancillary authority because the Open Internet Rules are not "necessary" to further their purposes.  Br. 37.  But as described above, the Commission found, and Verizon does not challenge, that Internet-based distribution is becoming essential to the success of video distributors and programming vendors and that cable companies have both the incentive and ability to interfere with competition from these new rivals.  The Commission reasonably concluded on that record that the congressional policy behind Sections 628 and 616 could be frustrated in the absence of protective rules.  Its predictive judgments are entitled to deference.

It is not enough, as Verizon wrongly contends, that "the FCC can address directly" any incidents of blocking.   Br. 37.  We refuted an analogous claim as to Title II at page 52, *supra*.  Moreover, the Commission should not be forced to play cat-and-mouse with broadband providers, whose customers may not even know that their access to a website is being blocked or degraded.  As to the argument that no cable-based broadband provider has been found interfering with competition, Br. 37, Verizon's own brief confirms that this is a live issue when it objects to the duty to "carry the traffic of all 'edge providers,'" Br. 2.  In any event, the Supreme Court has explained that the Commission may "plan in advance of foreseeable events, instead of waiting to react to them."  *Southwestern Cable*, 392 U.S. at 176-177.

### 2.    Title III.

Under Title III of the Communications Act, the Commission has authority to make rules that are necessary to ensure the "orderly development … of local television broadcasting," *Southwest Cable*, 392 U.S. at 177, and the "more effective use" of the radio spectrum, 47 U.S.C. § 303(g).  The Commission determined that "Internet video distribution is increasingly important to … local television broadcast service." *Order* ¶128 (JA    ).  For example, local television and radio stations "now provide news and other

57

information online via their own websites" and other websites such as Hulu.

*Id*. ¶16 (JA    ).  Thus, the Commission explained, "online distribution has a

strategic value for broadcasters," which, the agency predicted, "is likely to

provide an increasingly important source of funding for broadcast news and

entertainment programming."  *Ibid*.

Broadband providers offer video services and have the incentive and

ability to interfere with broadcasters' delivery of competing video

programming.  *Order* ¶¶21-23 & n.60 (JA   -   ).  In the absence of the Open

Internet Rules, such interference could "jeopardize broadcasters' ability to

offer … programming over the Internet" and would "threaten to impair

[broadcasters'] ability to offer high-quality broadcast content."  *Id*. ¶128 (JA

).

Thus, the Open Internet Rules are within the Commission's authority to

regulate over-the-air broadcasting under Title III in the same way that cable

television regulation was within the Commission's authority in *Southwestern*

*Cable*, 392 U.S. at 177.

The Commission explicitly relied on this theory in Paragraph 128 of

the *Order*, but Verizon does not respond to it and thus has waived any

objection.  Notably, NCTA, which represents cable operators that are among

the largest broadband providers in the country, argued that the Commission

58

had authority to adopt the Open Internet Rules on that ground.  NCTA Dec.

10, 2010, *ex parte* at 3 (JA    ).

### C.   The Transparency Rule Is Supported By Statutory Reporting Responsibilities.

The transparency rule is separately supported by the Commission's

responsibility to provide a variety of reports to Congress.  Specifically,

Congress directed the Commission to report triennially on "market entry

barriers" in services including information services.  47 U.S.C. § 257; *see*

*Order* n.444 (JA    ).[11]  Similarly, "to perform the duties and carry out the

objects for which it was created" the Commission may "inquire into the

management of the business" of any common carrier and its affiliates.  47

U.S.C. § 218.  That provision allows the Commission "to require the

provision of information such as that covered by the transparency rule."

*Order* ¶137 (JA    ).

In *Comcast*, this Court "readily accepted" that "disclosure

requirements" like the transparency rules "could be 'reasonably ancillary' to

the Commission's statutory responsibility to issue a report to Congress."  600

F.3d at 659.  The transparency rule fits that description.  *Order* ¶136 (JA    -

).

---

[11] We do not rely on 47 U.S.C. § 154(k) in light of Pub. L. No. 104-66,
Title III, § 3003, 109 Stat. 707, 734 (Dec. 21, 1995).

Verizon responds that "the transparency rule does not relate to any actual reporting or information collection requirement" but serves only "to advance the FCC's 'openness policies.'  Br. 42.  Verizon does not appear to have raised that claim before the agency, so it is now barred by 47 U.S.C. § 405(a).  In any event, the transparency requirement *both* allows end users access to information *and* allows the Commission to fulfill its statutory reporting duties (which may well be informed by public input based on information disclosed by broadband providers).

## III.    THE COMMISSION PROPERLY DETERMINED THAT THE OPEN INTERNET RULES DO NOT TREAT BROADBAND PROVIDERS AS COMMON CARRIERS.

Verizon argues that the Open Internet Rules unlawfully treat broadband providers as common carriers.  Verizon's claim is that, by forbidding access providers from blocking or charging edge providers, the Commission has required access providers to "carry" Internet programming for edge providers.  Br. 16-17.  That claim misstates both the nature of Internet access service and the Open Internet Rules.  It has no basis in the Communications Act or decisions interpreting the term "common carrier."

After the *Order*, as before, Verizon is free to offer or decline to sell broadband Internet access service to any end user.  Verizon need not hold itself out to offer service indifferently to *anyone*.  The only things that

Verizon (and other broadband Internet access providers) cannot do are blocking its end users from reaching lawful content and charging edge providers to allow end users to reach them. *See Order* ¶24 (JA   ). Verizon claims, at least sometimes, that it has not done those things and does not intend to do them. *E.g.* Br. 51.

In any event, the Commission properly concluded, in accord with the text of the Communications Act and court precedent, that, as long as Verizon is not required to serve end users indiscriminately, rules regarding blocking or charging edge providers do not create common carriage. The Commission has decades of experience with the concept of common carriage, and courts have recognized its discretion to interpret and apply common-carriage status under the Communications Act. *See USTA v. FCC*, 295 F.3d 1326, 1332 (D.C. Cir. 2002); *Howard v. America Online Inc.*, 208 F.3d 741, 752-753 (9th Cir. 2000).[12] The Commission acted well within that discretion here.

1. A common carrier relationship is established when a *customer* requests service offered by the carrier. Under the Communications Act, it is

---

[12] Verizon asserts that the Commission is not entitled to discretion in its interpretation of common carriage. Br. 14 n.4 (citing *NARUC v. FCC*, 525 F.2d 630, 644 (D.C. Cir. 1976)). Verizon fails to distinguish the more recent contrary decisions. Furthermore, in *NARUC* the Court rejected only "*unfettered* discretion in the Commission" as to common carrier status, not ordinary *Chevron* deference. 525 F.2d at 644 (emphasis added).

"the duty of every common carrier … to furnish … communication service

*upon reasonable request therefor.*"  47 U.S.C. § 201(a) (emphasis added).

Similarly, the Act defines a "common carrier" as a carrier available "for hire"

by a person requesting service.  47 U.S.C. § 153(11); *see also id.* § 153(53)

(defining a "telecommunications service," which is a common carrier service,

as the offering of service "for a fee").

Thus, as the Commission explained, the relevant customers are "the

end users who subscribe to broadband Internet access services" – the entities

that "request" service – and not edge providers.  *Order* ¶79 (JA    ).  That

determination follows from the structure of the Internet and the text of the

Communications Act.  Broadband Internet access service allows *an end-user*

*subscriber* – who pays for broadband access service – to "transmit data to and

receive data from all or substantially all Internet endpoints."  *Order* ¶44 (JA

).[13]  Indeed, an edge provider has no direct relationship with the end user's

access provider (Verizon, in this case) and typically does not know the access

---

[13] When an end user navigates to a website, he sends a request to his access
provider (*e.g.*, by entering the site address or clicking on a link) to retrieve
data from the requested site.  The access provider transports the request to the
Internet "backbone," transit networks operated by third parties.  The
backbone providers in turn transmit the request to the access provider to
which the edge provider subscribes.  The edge provider then transmits the
requested data (for example, a web page, blog post, or application data) back
to the end user through the reverse process.  *See generally*
http://computer.howstuffworks.com/internet/basics/internet.htm.

provider's identity.  As described in note 13, end users and edge providers

have independent subscriber relationships with their own access providers,

with typically at least one (and sometimes many) third-party backbone

networks between them.  As the Commission pointed out, the Open Internet

Rules "become effective only *after* … a provider has voluntarily entered into

a[n] … arrangement with the end user" that allows him to reach the content of

his choice.  *Id*. ¶79 (JA    ).  An edge provider does not "request" service from

or seek to "hire" Verizon.

This Court's decisions are consistent with that analysis.  The Court has

recognized "that to be a common carrier one must hold oneself out

indiscriminately *to the clientele one is suited to serve*."  *NARUC v. FCC*, 525

F.2d 630, 641 (D.C. Cir. 1976) (emphasis added); *see also Southwestern Bell

Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir. 1994) (where a carrier

"*chooses its clients* on an individual basis" it is not a common carrier).  In

other words, common carriage is a relationship between a carrier and its

customers, not between a carrier and another entity that has never requested

services from that carrier.

Verizon relies on *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979)

(*Midwest II*), a cable carriage case, but that case supports the Commission's

position, not Verizon's.  The differences between the rules at issue there and

63

those at issue here illustrate why the Open Internet Rules do not impose a

common carriage requirement on broadband access providers.

The *Midwest II* rules required cable operators to "hold out dedicated

channels," occupying up to 20 percent of the system's total capacity, for use

"on a first-come, nondiscriminatory basis" by any programmer that requested

carriage from the cable operator.  440 U.S. at 692-693, 701-702.  Moreover,

given the nature of cable television systems at the time, carrying unwanted

programming on reserved channels prevented the cable operator from

offering its subscribers other channels of the operator's choosing.  Carriage of

one program would thus "restrict expansion of other cable services" and

"interfere with … the [cable provider's] total service offering" on its finite

channels.  *Id.* at 707 n.17.  The Commission's rules there "transferred control

of the content of access cable channels from cable operators to

[programmers] who wish to communicate by the cable medium." 440 U.S. at

700.

The circumstances here are entirely different.  Unlike the programmers

in *Midwest II*, edge providers are *not* "requesting" any access from Verizon.

Rather, their content is delivered only at the request of an end user who is

Verizon's customer.  In the absence of the customer's request for its content,

the edge provider has no right to delivery.  Nor do edge providers use a

64

"dedicated channel" that is assigned on a "first-come" basis at their request. And, unlike in *Midwest II*, connecting an end user to an edge provider over the Internet does not by itself preclude connecting any other customer to the content of his choice. *See Order* n.246 (Open Internet Rules do not "requir[e] a broadband provider to 'hold out' any capacity for the exclusive use of third parties or make a public offering of its service") (JA    ).

There is also no "transferred control" here, because, as Verizon acknowledges, *see* Br. 43, 51, and unlike cable systems, Internet access providers traditionally have *not* decided what sites their end users visit. That is fundamentally different from *Midwest II*, where the Court emphasized that the requirement to hold out dedicated channels on a first-come, first served basis, *see* 440 U.S. at 701, 706 n.16, significantly impinged on the "editorial discretion" that cable operators had exercised in choosing their channel lineup. *Id.* at 707; *see id.* at 706-09 & n.15.

Verizon's reliance (Br. 18) on *Vitelco v. FCC*, 198 F.3d 921, 930 (D.C. Cir. 1999), is misplaced. There, a provider of submarine cable telephone service entered into customer relationships with a number of other carriers, who then resold the service to their own customers, the end users of the service. In affirming the FCC's determination that the initial sale of service did not constitute common carriage, the Court recognized that a carrier need

65

not sell service directly to the ultimate "end user" of the service in order to be deemed a common carrier.  The Court neither held nor suggested, however, that a common carriage relationship could exist with a party that did not request service.[14]

Despite Verizon's repeated claims (Br. 15-17), the Open Internet Rules do not set compensation for delivery of traffic at zero.  Rather, broadband providers set their own prices for service and may charge different rates to different end-user customers (or decide not to serve certain end users).  Edge providers similarly pay for their connections to the network under whatever prices, terms, and conditions their broadband provider wishes to charge.  *See Order* ¶24 (JA    ).  Verizon may wish to collect a second fee each time one of its customers seeks to visit a website connected to the Internet by a different access provider, but its inability to impose such a charge does not make its service free.

Finally, Verizon does not demonstrate why the *Order*'s nondiscrimination requirement (or the anti-blocking rule, which is the only restriction on mobile wireless providers) transforms providers into common carriers.  The Communications Act imposes non-discrimination requirements

---

[14] *Iowa Telecomms. Servs. v. Iowa Utils. Bd.*, 563 F.3d 743 (8th Cir. 2009), considered similar issues and is irrelevant for the same reason.

on many entities that are not common carriers.  *See, e.g.*, 47 U.S.C. § 315(b)

(requiring that broadcast stations charge political candidates non-

discriminatory lowest-unit rates); 47 U.S.C. §548(c)(2)(B) (prohibiting

discrimination by satellite cable programming vendors).  In this regard,

Verizon contends briefly (Br. 20-21) that even if the Open Internet rules do

not create common-carriage relationships, they impermissibly impose

requirements that are similar to Title II obligations.  The statute, however,

prohibits treatment "as a common carrier," *see* 47 U.S.C. §§ 153(51),

332(c)(2), and Verizon points to nothing in the statutory text that prohibits

rules that share some characteristics of Title II obligations but do not create

common carriage per se.  *See Order* n.250 (JA     ).

In any event, the Open Internet Rules do not "replicate key aspects of

Title II" (Br. 20), and whether any given requirement constitutes common

carriage is a matter for Commission discretion in the first instance.  Indeed, if

Verizon's broad assertions as to the scope of common carriage were correct,

the Supreme Court would have struck down the rules challenged in

*Southwestern Cable*, which required cable systems to carry, upon request, the

signals of local broadcast stations.  392 U.S. at 177.  The Court confirmed in

*Midwest II*, however, that those rules were permissible because they did not

create "a duty to hold out facilities indifferently for public use."  440 U.S. at

706 n.16.

2.  Even if the Open Internet Rules could be construed as imposing a

common-carriage obligation, they still would not violate Sections 153(51)

and 332(c)(2) of the Communications Act.  Those provisions prohibit

common-carriage treatment of information service providers only "under this

[Act]" – *i.e.*, the Communications Act of 1934, as amended.  47 U.S.C.

§§ 153(51) & 332(c)(2).  As explained above, the Commission has sufficient

authority to adopt the rules under Section 706 alone, without relying on any

other authority.  Section 706 is not part of the Communications Act of 1934

and thus not subject to the statutory limitations on common-carrier treatment.

*See Order* n.248 (JA    ).  Notably, not all Communications Act provisions

barring common-carriage treatment are limited to treatment under "this Act."

*See* 47 U.S.C. § 153(11) (no common carriage for broadcasters); *see also* 47

U.S.C. § 541(c).

## IV.    THE OPEN INTERNET RULES ARE CONSISTENT WITH THE FIRST AND FIFTH AMENDMENTS.

### A.  First Amendment.

Verizon asserts that the Open Internet Rules violate the First

Amendment because they "limit broadband providers' own speech and

compel carriage of others' speech."  Br. 43.  That claim fails.

1.  The Commission correctly determined that broadband providers are not "speakers" at all, but only "conduits for speech" of others and that the Open Internet Rules therefore do not implicate the First Amendment.  *Order* ¶141 (JA   ).  End users purchase service so that "they can obtain access to all or substantially all content that is available on the Internet," without editorial selection by the service provider.  *Ibid*.  Verizon admits as much when it argues that "broadband providers today generally provide subscribers access to all lawful [Internet] content."  Br. 51.

In fact, as the Commission pointed out, broadband providers obtain immunity from copyright violations and other liability for material distributed on their networks on the very ground that "they lack control over what end users transmit and receive."  *Order* ¶142 & n.456 (JA   ).  Thus, Verizon argued – and this Court agreed – that it is not subject to subpoena in a copyright infringement case because as a broadband provider it "act[s] as a mere conduit for the transmission of information sent by others."  *Recording Indus. Ass'n v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003); *see also Charter Communications, Inc.*, 393 F.3d 771, 777 (8th Cir.

2005) (no subpoena because broadband provider is "limited to acting as a conduit").[15]

That should be the end of the matter.  In that regard, this case is similar to *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) (*FAIR*).  There, a statute compelled law schools to grant military recruiters access to the schools' job recruiting facilities.  The schools claimed that the requirement amounted to compelled speech.  The Court unanimously rejected the claim.  The requirement, it ruled, "regulates conduct, not speech. It affects what law schools must *do* – afford equal access to military recruiters – not what they may or may not *say*."  *Id*. at 60.

That was so, the Court held, because:

> schools are not speaking when they host interviews and recruiting receptions.… A law school's recruiting services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper; its accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school.

---

[15] *See also* 47 U.S.C. § 230(c)(1) ("[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided" over its system); 17 U.S.C. § 512(a) (exempting broadband providers from liability "for infringement of copyright by reason of the provider's transmitting, routing, or providing connections" on their networks).

547 U.S. at 64.  As in that case, Verizon has articulated no plausible claim of expressive activity in providing its end users access to their chosen Internet content.  By delivering the information requested by its customers, Verizon is no different from a messenger delivering documents that contain speech.  *See* Stuart Minor Benjamin, *Transmitting, Editing, And Communicating: Determining What "The Freedom Of Speech" Encompasses*, 60 Duke L.J. 1673, 1685 (2011).

Moreover, the Open Internet requirements do not amount to compelled speech because they do not "interfere with any message" of the service provider.  *FAIR*, 547 U.S. at 63.  Verizon remains free to convey any content it wishes on its facilities, just as law schools "remain[ed] free … to express whatever views they may have on the military[]."  *Id*. at 60.  To the extent Verizon wishes to exercise editorial discretion, it may host its own website on which it may disseminate any content of its choice.  Moreover, the Open Internet Rules apply *only* to "broadband Internet access service," which the Commission defined to mean a service that enables user access to all Internet endpoints.  *Order* ¶44 (JA    ).  Verizon is free to provide to its customers "a wide range of 'edited' services," such as "Best of the Web," that reflect Verizon's selection of Internet content.  *Id*. ¶47 (JA    ).  It may also offer

Specialized Services such as "Internet Protocol-video offerings" that also reflect Verizon's editorial judgments. *Id.* ¶¶112, 143 (JA    ,    ).

The same reasoning distinguishes *Turner Broadcasting System Inc. v. FCC*, 512 U.S. 622 (1994). The Court determined there that cable television operators have First Amendment rights because they "engage in and transmit speech" through "original programming or by exercising editorial discretion over which stations or programs to include in [their] repertoire." *Id.* at 636 (quotation marks omitted). Thus, cable operators "see[k] to communicate messages on a wide variety of topics and in a wide variety of formats" and "exercis[e] editorial discretion over which stations or programs to include" in their channel lineup. *Id.* at 636 (quotation marks omitted). Verizon has provided no basis to believe that it performs a similar function.

Moreover, the must-carry rules "reduce[d] the number of channels over which cable operators exercise[d]" control and "render[ed] it more difficult for cable programmers to compete for carriage on the limited channels remaining." *Turner*, 512 U.S. at 637. No such circumstances exist here. As described at pages 63-65 above, Internet access does not function like a cable system.

Verizon never comes to terms with its self-described role as a mere conduit for others' speech or with its own characterization of that function

72

(on which this Court has relied) in copyright cases. It asserts, without foundation, that it acts "just as a newspaper" does, Br. 43, but that description cannot be reconciled with the reality of Internet access service, which, as the Commission found, "does not involve an exercise of editorial discretion." *Order* ¶141 (JA    ).

Verizon suggests that it would like to be able to "give differential pricing or priority access" to its own revenue-generating services, Br. 44, and to engage in "two sided pricing models" by charging edge providers, Br. 17. Those financial concerns do not transform Verizon into a speaker under the First Amendment and would "trivializ[e] the freedom protected" under the Constitution. *FAIR*, 547 U.S. at 62.

2. If the Court were to conclude that the First Amendment applies here, the Open Internet Rules satisfy intermediate scrutiny. Under that standard, a content-neutral restriction on speech will be upheld if it "furthers an important or substantial government interest" and if "the means chosen" to achieve that interest "do not burden substantially more speech than is necessary." *Turner*, 512 U.S. at 662 (citations omitted).

The government has at least three substantial interests in preserving the openness of the Internet. First, openness drives infrastructure investment, which fulfills numerous policies that benefit the public. *See* pp. 37-43, *supra*.

73

Verizon itself has opined that "the minute that anyone, whether from the government or the private sector, starts to control how people access and use the Internet, it is the beginning of the end of the Net as we know it."  Verizon Jan.14, 2010, *ex parte* at 7 (JA    ).

Second, as also discussed above, the Open Internet Rules protect competition both among edge providers and between edge providers and access providers.  Protecting consumers through market forces is plainly an important government interest.  *Turner*, 512 U.S. 662-663.

Third, the Open Internet Rules protect the ability of all Internet users to receive all content of their choice and to share that content with others through YouTube or a letter to the editor, thus "assuring that the public has access to a multiplicity of information sources," which "is a governmental purpose of the highest order." *Turner*, 512 U.S. at 663.

Balanced against those important governmental interests is the minimal effect (if any) on speech imposed by the Open Internet Rules.  The rules do not "burden substantially more speech than necessary" because they do not burden any identifiable speech (and, even if all of Verizon's arguments were accepted, the rules would still barely burden speech).  Verizon remains free to provide any information it chooses to its customers and other Internet users,

74

and it also may offer edited access services in which Verizon selects the content available to end users.

Verizon argues that the threat to Internet openness is speculative (Br. 46-47), but the Commission determined that broadband providers have the incentive and ability to block and degrade traffic and have done so.  *See* pp. 13-15, *supra*.

Finally, after arguing that the Open Internet Rules are unconstitutional because they sweep too *broadly*, Verizon fleetingly claims (Br. 48) that the rules are unconstitutionally *underinclusive*.  But this case is nothing like *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), on which Verizon relies.  That case involved differential regulation of signage, and the Court explained that "an exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people."  *Id*. at 51 (citation omitted). Verizon does not argue that any such concern exists here, nor does it provide evidence establishing that other parties are similarly situated to broadband Internet access providers that transmit content.

### B.  Fifth Amendment.

1.  Verizon argues (Br. 49) that the Open Internet rule prohibiting blocking amounts to a "permanent physical occupation" of broadband

75

providers' property without compensation in violation of the Takings Clause. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). But there is compensation here:  Verizon gets paid for carrying traffic at whatever rate it chooses to charge its end users, and it need not serve any end user it wishes not to.

If the Fifth Amendment is implicated at all, Verizon's recourse is a compensation complaint in the Court of Federal Claims.  *See Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 194-195 (1985); *Building Owners v. FCC*, 254 F.3d 89, 101 (2001) (Randolph, J., concurring).

In any event, transmission of Internet packets does not amount to "permanent physical occupation."  Indeed, the only appellate court to have considered the issue held that "electrons or photons [travelling] at the speed of light" through an owner's network "does not involve a physical occupation" of property.  *Cablevision Systems Corp. v. FCC*, 570 F.3d 83, 98 (2nd Cir. 2009).

Verizon also claims that the Open Internet Rules constitute a regulatory taking.  Br. 49.  Again, however, Verizon is *paid* for the use of its network at whatever rate it establishes.  Verizon thus has failed to show the "deprivation

of all or most economic use" required to state a claim of regulatory taking.

*Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011).

## V.    THE OPEN INTERNET RULES ARE BASED ON SUBSTANTIAL EVIDENCE.

Verizon argues briefly that the Open Internet Rules are arbitrary and capricious.  Br. 50-52.  The gist of the claim is that the record "fails to evince any problem sufficient to justify the rules."  Br. 51.

The Commission determined that broadband providers have economic incentives to reduce Internet openness.  *Order* ¶¶21-34 (JA  -  ).  They also have the technical capability to do so – and have interfered with Internet transmissions in the past.  *See* pp. 12-15, *supra*.  The Commission indicated that the number of blocking incidents would have been even higher were it not for the deterrent effect of the *Internet Policy Statement* and several merger conditions requiring adherence to its policies.  *Id.* ¶37 & nn.116-118 (JA   -   ).  It is of course impossible to "predict with certainty" the future course of a regulated market, but the Commission may "plan in advance of foreseeable events, instead of waiting to react to them."  *Southwestern Cable*, 392 U.S. at 176-177.  That is especially so when the "harms of open Internet violations"– such as preventing development of the next Facebook or other world-changing application – "may be substantial, costly, and in some cases potentially irreversible."  *Order* ¶4 (JA    ).

77

Finally, Verizon makes token arguments that the rules unfairly discriminate among similarly situated parties and that the FCC departed from a prior "deregulatory framework for broadband." Br. 52. Those passing mentions do not preserve the claims, *see Railway Labor Executives' Ass'n v. U.S. R.R. Retirement Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984). They are wrong in any event. On the first point, Verizon does not attempt to show that the other "players" are situated similarly to companies that provide – and control – Internet access. On the second, the FCC has never established an exclusively deregulatory framework, *see*, *e.g.*, *Ad Hoc*, 572 F.3d at 906-907, but has set policies to fit the situations before it. The Open Internet Rules adopt the minimum necessary restrictions to address the problems disclosed by the comprehensive record before the Commission.

# CONCLUSION

The notices of appeal should be dismissed and the petitions for review should be denied.

Respectfully submitted,

JOSEPH F. WAYLAND
ACTING ASSISTANT ATTORNEY
   GENERAL

CATHERINE G. O'SULLIVAN
NANCY C. GARRISON
NICKOLAI G. LEVIN
ATTORNEYS

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

SEAN A. LEV
   GENERAL COUNSEL

PETER KARANJIA
   DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
   ASSOCIATE GENERAL COUNSEL

/s/  Joel Marcus

JOEL MARCUS
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

September 10, 2012

79

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

VERIZON ET AL.,

          APPELLANTS/PETITIONERS,

     v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

          APPELLEE/RESPONDENTS.

NO. 11-1355

CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7), I hereby certify that the accompanying Brief for Appellee/Respondents in the captioned case contains 15,985 words.


/s/ Joel Marcus

Joel Marcus
Counsel
Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740 (Telephone)
(202) 418-2819 (Fax)

September 10, 2012

# STATUTORY APPENDIX

47 U.S.C. § 151
47 U.S.C. § 152(a)
47 U.S.C. § 153(11), (24), (53)
47 U.S.C. § 154(i)
47 U.S.C. § 201(a), (b)
47 U.S.C. § 218
47 U.S.C. § 230(a), (b)
47 U.S.C. § 301
47 U.S.C. § 303(a), (b), (g), (r)
47 U.S.C. § 307(a)
47 U.S.C. § 316
47 U.S.C. § 536
47 U.S.C. § 548(a), (b), (c)
47 U.S.C. § 1302

47 C.F.R. § 8.3
47 C.F.R. § 8.5
47 C.F.R. § 8.7
47 C.F.R. § 8.11

47 U.S.C. § 151

## § 151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

47 U.S.C. § 152

## § 152. Application of chapter

(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone. The provisions of this chapter shall apply with respect to cable service, to all persons engaged within the United States in providing such service, and to the facilities of cable operators which relate to such service, as provided in subchapter V-A.

47 U.S.C. § 153

## § 153. Definitions

(11) Common carrier

The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

(24) Information service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

(53) Telecommunications service

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

47 U.S.C. § 154

## § 154. Federal Communications Commission

(i) Duties and powers

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions

47 U.S.C. § 201

## § 201. Service and charges

**(a)** It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

**(b)** All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

47 U.S.C. § 218

## § 218. Management of business; inquiries by Commission

The Commission may inquire into the management of the business of all carriers subject to this chapter, and shall keep itself informed as to the manner and method in which the same is conducted and as to technical developments and improvements in wire and radio communication and radio transmission of energy to the end that the benefits of new inventions and developments may be made available to the people of the United States. The Commission may obtain from such carriers and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, such carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created.

47 U.S.C. § 230

## § 230. Protection for private blocking and screening of offensive material

(a) Findings

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

47 U.S.C. § 230 (con't)

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

47 U.S.C. § 301

## § 301. License for radio communication or transmission of energy

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or (f) upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

47 U.S.C. § 303

## § 303. Powers and duties of Commission

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall--

**(a)** Classify radio stations;

**(b)** Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

**(g)** Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest

**(r)** Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party

47 U.S.C. § 307

## § 307. Licenses

(a) Grant

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter

47 U.S.C. § 316

## § 316. Modification by Commission of station licenses or construction permits; burden of proof

**(a)(1)** Any station license or construction permit may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with. No such order of modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor, and shall be given reasonable opportunity, of at least thirty days, to protest such proposed order of modification; except that, where safety of life or property is involved, the Commission may by order provide, for a shorter period of notice.

**(2)** Any other licensee or permittee who believes its license or permit would be modified by the proposed action may also protest the proposed action before its effective date.

**(3)** A protest filed pursuant to this subsection shall be subject to the requirements of section 309 of this title for petitions to deny.

**(b)** In any case where a hearing is conducted pursuant to the provisions of this section, both the burden of proceeding with the introduction of evidence and the burden of proof shall be upon the Commission; except that, with respect to any issue that addresses the question of whether the proposed action would modify the license or permit of a person described in subsection (a)(2) of this section, such burdens shall be as determined by the Commission.

47 U.S.C. § 536

## § 536. Regulation of carriage agreements

(a) Regulations

Within one year after October 5, 1992, the Commission shall establish regulations governing program carriage agreements and related practices between cable operators or other multichannel video programming distributors and video programming vendors. Such regulations shall--

(1) include provisions designed to prevent a cable operator or other multichannel video programming distributor from requiring a financial interest in a program service as a condition for carriage on one or more of such operator's systems;

(2) include provisions designed to prohibit a cable operator or other multichannel video programming distributor from coercing a video programming vendor to provide, and from retaliating against such a vendor for failing to provide, exclusive rights against other multichannel video programming distributors as a condition of carriage on a system;

(3) contain provisions designed to prevent a multichannel video programming distributor from engaging in conduct the effect of which is to unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly by discriminating in video programming distribution on the basis of affiliation or nonaffiliation of vendors in the selection, terms, or conditions for carriage of video programming provided by such vendors;

(4) provide for expedited review of any complaints made by a video programming vendor pursuant to this section;

(5) provide for appropriate penalties and remedies for violations of this subsection, including carriage; and

(6) provide penalties to be assessed against any person filing a frivolous complaint pursuant to this section.

47 U.S.C. § 536 (con't)


(b) "Video programming vendor" defined

As used in this section, the term "video programming vendor" means a person engaged in the production, creation, or wholesale distribution of video programming for sale.

47 U.S.C. § 548

## § 548. Development of competition and diversity in video programming distribution

(a) Purpose

The purpose of this section is to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market, to increase the availability of satellite cable programming and satellite broadcast programming to persons in rural and other areas not currently able to receive such programming, and to spur the development of communications technologies.

(b) Prohibition

It shall be unlawful for a cable operator, a satellite cable programming vendor in which a cable operator has an attributable interest, or a satellite broadcast programming vendor to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers.

(c) Regulations required

(1) Proceeding required

Within 180 days after October 5, 1992, the Commission shall, in order to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market and the continuing development of communications technologies, prescribe regulations to specify particular conduct that is prohibited by subsection (b) of this section.

(2) Minimum contents of regulations

The regulations to be promulgated under this section shall--

47 U.S.C. § 548 (con't)

(**A**) establish effective safeguards to prevent a cable operator which has an attributable interest in a satellite cable programming vendor or a satellite broadcast programming vendor from unduly or improperly influencing the decision of such vendor to sell, or the prices, terms, and conditions of sale of, satellite cable programming or satellite broadcast programming to any unaffiliated multichannel video programming distributor;

(**B**) prohibit discrimination by a satellite cable programming vendor in which a cable operator has an attributable interest or by a satellite broadcast programming vendor in the prices, terms, and conditions of sale or delivery of satellite cable programming or satellite broadcast programming among or between cable systems, cable operators, or other multichannel video programming distributors, or their agents or buying groups; except that such a satellite cable programming vendor in which a cable operator has an attributable interest or such a satellite broadcast programming vendor shall not be prohibited from--

(**i**) imposing reasonable requirements for creditworthiness, offering of service, and financial stability and standards regarding character and technical quality;

(**ii**) establishing different prices, terms, and conditions to take into account actual and reasonable differences in the cost of creation, sale, delivery, or transmission of satellite cable programming or satellite broadcast programming;

(**iii**) establishing different prices, terms, and conditions which take into account economies of scale, cost savings, or other direct and legitimate economic benefits reasonably attributable to the number of subscribers served by the distributor; or

(**iv**) entering into an exclusive contract that is permitted under subparagraph (D);

(**C**) prohibit practices, understandings, arrangements, and activities, including exclusive contracts for satellite cable programming or satellite broadcast programming between a cable operator and a satellite cable programming vendor or satellite broadcast programming vendor, that prevent a

47 U.S.C. § 548 (con't)

multichannel video programming distributor from obtaining such programming from any satellite cable programming vendor in which a cable operator has an attributable interest or any satellite broadcast programming vendor in which a cable operator has an attributable interest for distribution to persons in areas not served by a cable operator as of October 5, 1992; and

**(D)** with respect to distribution to persons in areas served by a cable operator, prohibit exclusive contracts for satellite cable programming or satellite broadcast programming between a cable operator and a satellite cable programming vendor in which a cable operator has an attributable interest or a satellite broadcast programming vendor in which a cable operator has an attributable interest, unless the Commission determines (in accordance with paragraph (4)) that such contract is in the public interest.

(3) Limitations

(A) Geographic limitations

Nothing in this section shall require any person who is engaged in the national or regional distribution of video programming to make such programming available in any geographic area beyond which such programming has been authorized or licensed for distribution.

(B) Applicability to satellite retransmissions

Nothing in this section shall apply (i) to the signal of any broadcast affiliate of a national television network or other television signal that is retransmitted by satellite but that is not satellite broadcast programming, or (ii) to any internal satellite communication of any broadcast network or cable network that is not satellite broadcast programming.

(4) Public interest determinations on exclusive contracts

In determining whether an exclusive contract is in the public interest for purposes of paragraph (2)(D), the Commission shall consider each of the following factors with respect to the effect of such contract on the distribution of video programming in areas that are served by a cable operator:

47 U.S.C. § 548 (con't)


**(A)** the effect of such exclusive contract on the development of competition in local and national multichannel video programming distribution markets;

**(B)** the effect of such exclusive contract on competition from multichannel video programming distribution technologies other than cable;
**(C)** the effect of such exclusive contract on the attraction of capital investment in the production and distribution of new satellite cable programming;

**(D)** the effect of such exclusive contract on diversity of programming in the multichannel video programming distribution market; and

**(E)** the duration of the exclusive contract.

(5) Sunset provision

The prohibition required by paragraph (2)(D) shall cease to be effective 10 years after October 5, 1992, unless the Commission finds, in a proceeding conducted during the last year of such 10-year period, that such prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming.

47 U.S.C. § 1302

## § 1302. Advanced telecommunications incentives

(a) In general

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1) of this section) and to the extent that data from the Census Bureau is available, determine, for each such unserved area--

**(1)** the population;

47 U.S.C. § 1302 (con't)

**(2)** the population density; and

**(3)** the average per capita income.

(d) Definitions

For purposes of this subsection:

(1) Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of Title 20.

47 C.F.R. § 8.3

**§ 8.3 Transparency.**

A person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings.

47 C.F.R. § 8.5

**§ 8.5 No Blocking.**

(a) A person engaged in the provision of fixed broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.

(b) A person engaged in the provision of mobile broadband Internet access service, insofar as such person is so engaged, shall not block consumers from accessing lawful Web sites, subject to reasonable network management; nor shall such person block applications that compete with the provider's voice or video telephony services, subject to reasonable network management.

47 C.F.R. § 8.7

## § 8.7 No Unreasonable Discrimination.

A person engaged in the provision of fixed broadband Internet access service, insofar as such person is so engaged, shall not unreasonably discriminate in transmitting lawful network traffic over a consumer's broadband Internet access service. Reasonable network management shall not constitute unreasonable discrimination.

47 C.F.R. § 8.11

## § 8.11 Definitions.

(a) Broadband Internet access service. A mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence, or that is used to evade the protections set forth in this part.

(b) Fixed broadband Internet access service. A broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment. Fixed broadband Internet access service includes fixed wireless services (including fixed unlicensed wireless services), and fixed satellite services.

(c) Mobile broadband Internet access service. A broadband Internet access service that serves end users primarily using mobile stations.

(d) Reasonable network management. A network management practice is reasonable if it is appropriate and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service.

**CERTIFICATE OF SERVICE**

I, Joel Marcus hereby certify that on September 10, 2012, I electronically filed the foregoing Brief for Appellee/Respondent with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Others, marked with an asterisk, will receive service by mail unless another attorney for the same party is receiving service through CM/ECF.

Helgi C. Walker
Eve Klindera Reed
William S. Consovoy
Brett A. Shumate
Wiley Rein LLP
1776 K Street, N.W.
Washington, D.C.  20006
*Counsel for:  Verizon*

*Michael E. Glover
Edward Shakin
William H. Johnson
Verizon
1320 North Courthouse Road
9th Floor
Arlington, VA  22201
*Counsel for:  Verizon*

*John T. Scott, III
William D. Wallace
Verizon Wireless
1300 I Street, N.W.
Suite 400 West
Washington, D.C.  20005
*Counsel for:  Verizon*

Walter E. Dellinger
Brianne Gorod
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
*Counsel for:  Verizon*

Carl W. Northrop
Michael L. Lazarus
Andrew M. Morentz
Telecommunications Law
Professionals PLLC
875 15th Street, N.W., Suite 750
Washington, D.C.  20005
*Counsel for:  MetroPCS
Communications, Inc., et al.*

Mark A. Stachiw
General Counsel, Secretary & Vice
Chairman
MetroPCS Communications, Inc.
2250 Lakeside Blvd.
Richardson, TX  75082
*Counsel for:  MetroPCS
Communications, Inc., et al.*

Stephen B. Kinnaird
Paul & Hastings LLP
875 15th Street, NW
Washington D.C. 20005
*Counsel for:  MetroPCS
Communications, Inc.*

Samir C. Jain
Wilmer Cutler Pickering, et al.
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
*Counsel for:  Verizon*

Harold Feld
Public knowledge
1818 N Street, N.W.
Suite 410
Washington, D.C.  20036
*Counsel for:  Intervenor Public
Knowledge*

Henry Goldberg
Devendra T. Kumar
Goldberg, Godles, Wiener & Wright
1229 Nineteenth Street, N.W.
Washington, D.C.  20036
*Counsel for:  Open Internet
Coalition*

Markham C. Erickson
Executive Director
Open Internet Coalition
400 N. Capitol Street, N.W.
Suite 585
Washington, D.C.  20001
*Counsel for:  Open Internet
Coalition*

David Bergman
Law Office of David C. Bergmann
3293 Noreen Drive
Columbus, OH 43221
*Counsel for:  NASUCA*

Jeffrey J. Binder
Law Office of Jeffrey Binder
2510 Virginia Avenue, NW
Suite 1107
Washington, DC 20037
*Counsel for:  Vonage Holdings
Corporation*

*Kurt M. Rogers
Brendan D. Kasper
Vonage Holdings Corp.
23 Main Street
Homdel, NJ 07333
*Counsel for:  Vonage Holdings
Corporation*

Earle D. Getchell, Jr. Esq.
*Wesley G. Russell, Jr.
Office of the Attorney General,
Commonwealth of Virginia
900 East Main Street
Richmond, VA 23219
*Counsel for:  Commonwealth of
Virginia*

James Bradford Ramsay
General Counsel
National Association of Regulatory
Utility Commissioners
1101 Vermont Avenue, NW
Suite 200
Washington, D.C.  20005
*Counsel for:  NARUC*

Genevieve Morelli
ITTA
1101 Vermont Avenue, N.W.
Suite 501
Washington, D.C.  20005
*Counsel for:  ITTA*

John P. Elwood
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
*Counsel for:  Cato Institute,
Competitive Enterprise Institute,
Free State Foundation,
TechFreedom*

Ilya Shapiro, Esq.
The Cato Institute
1000 Massachusetts Avenue, NW
Washington, D.C. 20001
*Counsel for:  Cato Institute*

Russell P. Hanser
Bryan N. Tramont
Wilkinson Barker Knauer, LLP
2300 N Street, NW
Suite 700
Washington, D.C. 20037
*Counsel for:  NAM*

Quentin Riegel
Deputy General Counsel
National Association of
Manufacturers
1331 Pennsylvania Avenue, NW
North Tower – Suite 1500
Washington, D.C. 20004
*Counsel for:  NAM*

*Sam Kazman
Competitive Enterprise Institute
1899 L Street, NW
12th Floor
Washington, D.C. 20036
*Counsel for:  Competitive Enterprise
Institute*

*Randolph J. May
The Progress & Freedom Foundation
1444 Eye Street, NW
Suite 500
Washington, DC 20005
*Counsel for:  Free State Foundation*

/s/ Joel Marcus