**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 11-1355**

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

VERIZON,

Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION,

Appellee.

_____

**ON APPEAL FROM AN ORDER OF THE**
**FEDERAL COMMUNICATIONS COMMISSION**
_____

**JOINT REPLY BRIEF FOR VERIZON AND METROPCS**
_____

Walter E. Dellinger
Brianne Gorod
Anton Metlitsky
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
TEL: (202) 383-5300

Helgi C. Walker*
Eve Klindera Reed
William S. Consovoy
Brett A. Shumate
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
TEL: (202) 719-7000
E-MAIL: hwalker@wileyrein.com

*Attorneys for Verizon*

Dated: December 21, 2012      *Counsel of Record*

*Additional counsel listed on next page*

Michael E. Glover
William H. Johnson
VERIZON
1320 North Courthouse Road
9th Floor
Arlington, VA 22201
TEL: (703) 351-3060

Samir C. Jain
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
TEL: (202) 663-6083

*Attorneys for Verizon*

Stephen B. Kinnaird*
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC 20005
TEL: (202) 551-1842

Carl W. Northrop
Michael Lazarus
Andrew Morentz
TELECOMMUNICATIONS LAW
PROFESSIONALS PLLC
875 15th Street, NW, Suite 750
Washington, DC 20005
TEL: (202) 789-3120

Mark A. Stachiw
General Counsel, Secretary
& Vice Chairman
METROPCS COMMUNICATIONS, INC.
2250 Lakeside Blvd.
Richardson, TX 75082
TEL: (214) 570-4877

*Attorneys for MetroPCS
Communications, Inc. and its
FCC-licensed affiliates*

*\*Counsel of Record*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................... ii

GLOSSARY ............................................................................................ vi

PERTINENT STATUTES .................................................................. viii

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ............................................................................................ 3

I.      THE FCC IS NOT ENTITLED TO DEFERENCE. .................... 3

II.     THE RULES REGULATE BROADBAND PROVIDERS AS
        COMMON CARRIERS IN VIOLATION OF THE ACT. ........... 4

III.    THE FCC LACKS DELEGATED AUTHORITY TO ADOPT THE
        RULES. ............................................................................................ 9

IV.     THE *ORDER* VIOLATES THE FIRST AND FIFTH
        AMENDMENTS. ......................................................................... 24

V.      THE *ORDER* IS ARBITRARY AND CAPRICIOUS. ............ 28

CONCLUSION ...................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*ACLU v. FCC*,
    823 F.2d 1554 (D.C. Cir. 1987)...................................................................3

*Aeronautical Radio, Inc. v. FCC*,
    928 F.2d 428 (D.C. Cir. 1991)...................................................................18

*American Bar Ass'n v. FTC*,
    430 F.3d 457 (D.C. Cir. 2005)..................................................................10

*American Library Ass'n v. FCC*,
    406 F.3d 689 (D.C. Cir. 2005)..................................................................15

*AT&T Corp. v. FCC*,
    323 F.3d 1081 (D.C. Cir. 2003).................................................................3

*AT&T Corp. v. Iowa Utilities Board*,
    525 U.S. 366 (1999)...................................................................................8

*Cablevision Systems Corp. v. FCC*,
    649 F.3d 695 (D.C. Cir. 2011)..................................................................22

*Cellco Partnership v. FCC*,
    No. 11-1135, 2012 WL 6013416 (D.C. Cir. Dec. 4, 2012)...................................
    ........................................................ 1, 3, 4, 5, 6, 9, 12, 16, 17, 18, 19, 20, 21, 28

*Chamber of Commerce v. FEC*,
    69 F.3d 600 (D.C. Cir. 1995)....................................................................4

*Christopher v. SmithKline Beecham Corp.*,
    132 S. Ct. 2156 (2012).........................................................................15, 16

*Authorities upon which we chiefly rely are marked with asterisks.

*City of Arlington v. FCC*,
   No. 11-1545, 133 S. Ct. 524 (2012) .................................................................3

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994)........................................................................................27

*Comcast Corp. v. FCC*,
   600 F.3d 642 (D.C. Cir. 2010).......................................... 1, 9, 11, 12, 15, 16, 17

*EME Homer City Generation, L.P. v. EPA*,
   696 F.3d 7 (D.C. Cir. 2012) .....................................................................10, 13

*FCC v. Midwest Video Corp.*,
   440 U.S. 689 (1979)....................................................................................4, 23

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)..........................................................2, 3, 10, 11, 18

*Fourco Glass Co. v. Transmirra Products Corp.*,
   353 U.S. 222 (1957)..........................................................................................8

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)........................................................................................10

*Iowa Network Services, Inc. v. Qwest Corp.*,
   363 F.3d 683 (8th Cir. 2004) ...........................................................................7

*Iowa Telecommunications Services v. Iowa Utilities Board*,
   563 F.3d 743 (8th Cir. 2009) ...........................................................................7

*MCI Telecommunications Corp. v. AT&T Co.*,
   512 U.S. 218 (1994)...........................................................................10, 20, 21

*MCI Telecommunications Corp. v. FCC*,
   561 F.2d 365 (D.C. Cir. 1977).......................................................................18

*MD/DC/DE Broadcasters Ass'n v. FCC*,
   236 F.3d 13 (D.C. Cir. 2001)........................................................................22

*NARUC v. FCC*,
   525 F.2d 630 (D.C. Cir. 1976) ........................................................................7

iii

*NARUC v. FCC,
  533 F.2d 601 (D.C. Cir. 1976)........................................................4, 5

National Fuel Gas Supply Corp. v. FERC,
  468 F.3d 831 (D.C. Cir. 2006)..............................................24, 28, 29

PMCM TV, LLC v. FCC,
  No. 11-1330, 2012 WL 6216635 (D.C. Cir. Dec. 14, 2012).......................10, 11

Recording Industry Ass'n v. Verizon Internet Services, Inc.,
  351 F.3d 1229 (D.C. Cir. 2003)........................................................25

Regents of University System v. Carroll,
  338 U.S. 586 (1950)........................................................20

The Business Roundtable v. SEC,
  905 F.2d 406 (D.C. Cir. 1990)........................................................17

*Turner Broadcasting System, Inc. v. FCC,
  512 U.S. 622 (1994)..............................................24, 25, 26, 27

VITELCO v. FCC,
  198 F.3d 921 (D.C. Cir. 1999)........................................................7

Washington State Department of Social & Health Services v. Guardianship
  Estate of Keffeler,
  537 U.S. 371 (2003)........................................................13

United States v. Old Dominion Boat Club,
  630 F.3d 1039 (D.C. Cir. 2011)........................................................3

United States v. Southwestern Cable Co.,
  392 U.S. 157 (1968)........................................................23

## FEDERAL STATUTES

47 U.S.C. § 153(53) ........................................................6

47 U.S.C. § 154(i) ........................................................23

47 U.S.C. § 230(a)(4)........................................................11

iv

47 U.S.C. § 230(b)(2)...................................................................................11

47 U.S.C. § 303(a) .......................................................................................18

47 U.S.C. § 303(b) ..............................................................10, 17, 18, 19, 21

47 U.S.C. § 303(c) .......................................................................................18

47 U.S.C. § 303(f) .......................................................................................18

47 U.S.C. § 303(r) .......................................................................................21

47 U.S.C. § 309(j)(1) ...................................................................................21

47 U.S.C. § 312 ............................................................................................21

47 U.S.C. § 332(c)(1)(A) ............................................................................18

47 U.S.C. § 548(b) ......................................................................................22

47 U.S.C. § 1302(a) .....................................................................................13

47 U.S.C. § 1302(b) .....................................................................................16

47 U.S.C. § 1302(c) .....................................................................................16

## LEGISLATIVE MATERIAL

H.R. Rep. No. 112-51 (2011)........................................................................14

## ADMINISTRATIVE MATERIAL

*Data Roaming Order*,
    26 F.C.C.R. 5411 (2011)...................................................................17, 19

## MISCELLANEOUS

C. Scott Hemphill, *Network Neutrality and the False Promise of Zero-Price Regulation*, 25 Yale J. on Reg. 135 (2008) ...........................................................5

# GLOSSARY

| | |
|---|---|
| **3G** | Third-Generation Networks |
| **1996 Act** | Telecommunications Act of 1996 |
| **Act** | Communications Act of 1934 |
| ***Advanced Services Order*** | FCC order released on August 7, 1998 declaring that Section 706(a) of the 1996 Act does not constitute an independent grant of statutory authority to the FCC |
| **Br.** | Joint Brief for Verizon and MetroPCS |
| **CDT** | Center for Democracy & Technology |
| ***Comcast*** | 2010 D.C. Circuit opinion vacating the *Comcast Order* and holding that the FCC failed to justify the exercise of ancillary authority over Comcast's network management practices |
| ***Comcast Order*** | FCC order released on August 20, 2008 finding that Comcast violated "federal Internet policy" and requiring Comcast to cease certain network management practices |
| **FCC** | Federal Communications Commission |
| **JA** | Joint Appendix |
| ***Midwest Video II*** | 1979 Supreme Court opinion vacating FCC's public access rules as impermissible common-carrier obligations |
| **NAM** | National Association of Manufacturers |

vi

| | |
|---|---|
| ***NARUC I*** | 1976 D.C. Circuit opinion affirming FCC order classifying specialized mobile radio systems as non-common carriers |
| ***NARUC II*** | 1976 D.C. Circuit opinion vacating FCC order preempting state common-carrier regulation over the use of cable system leased access channels for two-way, point-to-point, non-video communications |
| ***Order*** | FCC order released on December 23, 2010 formally adopting "net neutrality" rules that regulate the broadband Internet access services offered by wireless and wireline providers |
| ***Turner I*** | 1994 Supreme Court opinion holding that the must-carry provisions of Cable Television Consumer Protection and Competition Act of 1992 are subject to intermediate scrutiny under the First Amendment |
| **VoIP** | Voice over Internet Protocol |
| **Wi-Fi** | A technology that allows wireless connectivity to the Internet |

## **PERTINENT STATUTES**

Pertinent statutes are contained in the addendum to Appellants' joint brief.

## SUMMARY OF ARGUMENT

As explained in our opening brief, the *Order* sets forth a sweeping assertion of statutory authority that arrogates to the FCC plenary power to control all aspects of broadband Internet access service—and, taken to its logical conclusion, all components of the Internet—without any evidence Congress ever intended such a dramatic result.  Nothing in the FCC's response cures the legal infirmities of the *Order*, particularly against the backdrop of *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010).

*First*, the FCC gives only one reason why the *Order* escapes the statutory bans on common-carrier regulation, and that reason is wrong.  The agency argues that the rules are permissible because they do not regulate services provided to retail end-users.  But this flatly conflicts with well-established common-carrier doctrine, which makes clear that a provider can be a common carrier not only with respect to retail end-users of a service but *also* as to wholesale purchasers and other providers that seek to deliver their services over the common carrier's facilities.  As to edge providers, the *Order* imposes *per se* common-carrier obligations on broadband providers—as this Court's recent decision in *Cellco Partnership v. FCC*, No. 11-1135, 2012 WL 6013416 (D.C. Cir. Dec. 4, 2012) confirms—by forcing them to carry the traffic of all edge providers indifferently at a uniform rate of zero.

1

*Second*, the FCC claims for the first time with clarity that it possesses direct authority to regulate the Internet (rather than the "ancillary authority" exclusively relied upon in prior proceedings), but fails to ground this authority firmly in the Communications Act.  Instead, the agency relies on supposed ambiguities in disparate provisions scattered throughout the Act that simply do not say that Internet service should be regulated by the FCC, much less in this intrusive fashion.  This is far too slender a reed to support the FCC's extension into an area of "such economic and political significance," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), as the Internet.  In any event, none of the cited provisions can bear the weight of these rules, particularly given Congress's clear statement that the Internet should remain *unregulated*.  Nor does ancillary authority exist; the agency has failed to show that the rules are necessary to accomplish any statutorily-mandated task.

*Third*, contrary to the FCC's assertion, broadband providers are speakers protected by the First Amendment.  This is so because they possess discretion to provide, for example, differentiated offerings that highlight their own or their partners' content.  The *Order* curtails providers' speech without demonstrating any actual problem in need of solution.  And the rules take private property without compensation by banning charges for the compelled carriage of edge providers' traffic.

2

*Finally*, the *Order* is arbitrary and capricious because the claimed record of abuse is nonexistent.[1]

## ARGUMENT

## I.    THE FCC IS NOT ENTITLED TO DEFERENCE.

As an initial matter, the FCC should not receive deference when opining on the existence and scope of its statutory authority (especially when, as here, Congress has imposed express limitations on the agency's powers).  Joint Br. 13-14 ("Br."); *see also AT&T Corp. v. FCC*, 323 F.3d 1081, 1086 (D.C. Cir. 2003) (citing *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc)); *ACLU v. FCC*, 823 F.2d 1554, 1567 & n.32 (D.C. Cir. 1987).[2]

But the FCC receives no deference here for additional reasons.  *First*, agencies receive no deference when, "[i]n extraordinary cases" such as this, they insert themselves into an area of "economic and political magnitude" based on mere ambiguity.  *Brown & Williamson*, 529 U.S. at 133, 159.  *Second*, although

---

[1]    MetroPCS does not join the arguments relating to common-carriage regulation, Section 303(b), or the Fifth Amendment.

[2]    Although the panel opinion in *Cellco* reached a different conclusion in dictum, slip op. 10-11, it did not address the circuit decisions cited here and in our opening brief going the other way, including cases that predate those relied upon in *Cellco, United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011) ("[W]hen a conflict exists within our own precedent, we are bound by the earlier decision.").  In any event, the Supreme Court recently granted certiorari on this issue.  *See City of Arlington v. FCC*, No. 11-1545, 133 S. Ct. 524 (2012).

3

*Cellco* concluded that the FCC sometimes enjoys deference on common-carrier determinations, *see* slip op. 17, *but see* Br. 13-14 & n.4 (citing *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 & n.10 (1979) ("*Midwest Video II*"); *NARUC v. FCC*, 533 F.2d 601, 618 (D.C. Cir. 1976) ("*NARUC II*")), no deference is due here because these rules are "*per se* common carriage," *Cellco*, slip op. 21-22. *Third*, deference is inapplicable where, as here, a case presents "serious constitutional difficulties." *Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995). *Fourth*, ancillary authority is incompatible with *Chevron* deference: *Chevron* assumes that Congress made some delegation of authority, but in the case of ancillary authority there has been no delegation at all. In all events, the *Order*'s construction of the Act is unreasonable and cannot stand.

## II.  THE RULES REGULATE BROADBAND PROVIDERS AS COMMON CARRIERS IN VIOLATION OF THE ACT.

The *Order* subjects broadband providers to common-carrier duties in direct violation of the Act. Br. 14-18. This Court's decision in *Cellco* confirms that this is so. "If a carrier is forced to offer service indiscriminately and on general terms, then that carrier is being relegated to common carrier status." *Cellco*, slip op. 21. The Court held that the data roaming rule was not "*per se* common carriage" because it "leaves substantial room for individualized bargaining and discrimination in terms." *Id*. at 23. By contrast, the rules invalidated in *Midwest Video II* imposed "core common carriage," the Court reasoned, because they

4

required cable operators to allow "members of the public to broadcast any message they might choose either at no cost or at a price dictated by the Commission." *Id.* at 22.

The rules at issue here are "*per se* common carriage" under *Cellco* because they "force[]" broadband providers "to offer service indiscriminately and on general terms." Slip op. 21. Specifically, the no-blocking rule compels broadband providers to hold out their networks for use by all edge providers—that is, "to offer service indiscriminately." Br. 16-17. The *Order* also requires the provision of service "on general terms" by mandating a common, nondiscriminatory rate of zero for edge-provider traffic. Br. 17-18; C. Scott Hemphill, *Network Neutrality and the False Promise of Zero-Price Regulation*, 25 Yale J. on Reg. 135, 141 (2008). Indeed, far from allowing flexibility for "individualized bargaining and discrimination in terms," *Cellco*, slip op. 23, these rules *preclude* individually negotiated arrangements and any differences in terms, Br. 17, by requiring, as in *Midwest Video II*, the carriage of all edge providers "at no cost," *Cellco*, slip op. 22. As to fixed providers, the rules even include an express nondiscrimination requirement. Br. 18.[3]

---

[3]      The FCC attempts to distinguish *Midwest Video II* because broadband providers, unlike cable operators, generally have not charged edge providers for access or offered them differentiated services. FCC Br. 65. But that has no legal significance because the avowed purpose of the rules is to deny providers the discretion to do so now and in the future. *NARUC II*, 533 F.2d at 609 (finding

The FCC does not dispute that these substantive features of the *Order*
amount to core common-carrier regulation.  Rather, the agency's sole defense is
that the rules do not regulate the terms of service to "'the end users who subscribe
to broadband Internet access services,'" FCC Br. 61-62 (quoting *Order* ¶ 79), and
thus fall outside of the common-carrier framework.  This is wrong.  Both the
statute and long-established precedent demonstrate that a service provider can be a
common carrier with respect to wholesale purchasers and other providers that seek
to deliver their own services over the common carrier's facilities, not just retail
end-users.[4]  The Act defines common-carrier services as those provided "directly
to the public, or to *such classes of users* as to be effectively available directly to the
public."  47 U.S.C. § 153(53) (emphasis added).  The FCC and the courts have
made clear that other service providers are among the "classes of users" to whom a

---

common carriage despite absence of "any actual operations").  The FCC also tries
to distinguish *Midwest Video II* on technical grounds, FCC Br. 64-65, but the fact
that technological advances allow broadband providers to carry more traffic than
cable systems of the 1970s is not a legitimate distinction.  The FCC cannot—and
does not—dispute that these rules, like the *Midwest Video II* rules, limit broadband
providers' discretion in deciding which traffic to carry and on what terms, and the
rules plainly impose nondiscrimination requirements.  That is the pertinent legal
issue.  *See Cellco*, slip op. 22.

[4]     Indeed, by banning charges for edge-provider access, the *Order* in effect
regulates broadband providers' relationship with end-users by shifting the cost of
that service to those customers.

common carrier may provide services. *VITELCO v. FCC*, 198 F.3d 921, 930 (D.C. Cir. 1999); *NARUC v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) ("*NARUC I*").[5]

For example, a local telephone company not only provides common-carriage local telephone service to its retail end-user customers, but also provides access service to long distance telephone companies that deliver their services to end-users over the local phone network. When this occurs, the local telephone company imposes switched access charges on the long distance provider to help recover network costs. Those services (and others like them) are common-carrier services even though they are not provided to end-users. *Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683, 686 (8th Cir. 2004).

Internet service is a similarly "two-sided" market: on one side of the market, retail end-users pay fees to broadband providers for Internet access subscriptions, and on the other side edge providers use broadband providers' networks to reach those end-users. Declaration of Michael D. Topper ¶¶ 129-30 (JA__). A "pricing model where both consumers and content providers pay fees"

---

[5]    The FCC's assertion that there must be a "direct relationship" between broadband providers and their edge-provider customers, FCC Br. 62, is likewise refuted by precedent, *Iowa Telecomms. Servs. v. Iowa Utils. Bd.*, 563 F.3d 743, 747, 750 (8th Cir. 2009). In any event, the *Order* itself found that edge providers work directly with broadband providers, *Order* ¶ 35 n.107 (JA__), and the record contains specific examples of such cooperation, *see, e.g.*, Letter from David L. Cohen, Comcast Corp., to Chairman Kevin J. Martin, FCC, Docket No. 07-52 (Mar. 27, 2008) (Comcast/BitTorrent agreement) (JA__).

would allow broadband providers to enter into innovative arrangements (such as advertiser-supported services) that would help recover the costs of building and maintaining broadband networks. *Id.* Retail end-users and edge providers are *both* "customers" of broadband providers. The fact that broadband providers are "free to offer or decline to sell broadband Internet access service to any end user," FCC Br. 60, is thus beside the point.

For these same reasons, the Commission has no cogent response to the fact that its rules require broadband providers to carry edge providers' traffic at a common, regulated rate of zero. The FCC falls back on the notion that providers may charge retail customers "different rates," *id.* 66, but, again, common-carrier relationships are not limited to retail customers. They include entities such as edge providers; and as to *those* entities, as explained above, the *Order* imposes core common-carriage obligations.

Finally, the FCC's effort to sidestep the common-carrier bans because "Section 706 is not part of the Communications Act," *id.* 68, is meritless. "Since Congress expressly directed that the 1996 Act … be inserted into the Communications Act," *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377 (1999), Congress plainly intended Section 706 to be part of "the Communications Act." Section 706's subsequent recodification did not change that. *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957).

8

### III.  THE FCC LACKS DELEGATED AUTHORITY TO ADOPT THE RULES.

As previously explained, the FCC cannot identify any statutory authority to support its far-reaching claim of "plenary authority" over the Internet.  FCC Br. 44. The FCC now concedes that Congress did not grant the agency "specific authority to adopt [the] rules," *id.* 36, but nonetheless claims, for the first time with any clarity, that it has "direct" statutory authority, *id.* 25.  Its theory is one of implicit delegation, based on an argument that it "reasonably construed" ambiguities in various, unrelated provisions of the Act, *id.*, as a delegation of broad authority to control Internet access service.

Of course, these supposed ambiguities cannot overcome the express prohibitions on common-carrier regulation discussed above.  *See supra* Part II.  As the Court recently observed in *Cellco*, wireless broadband providers "are statutorily immune, perhaps twice over, from treatment as common carriers," slip op. 4, and, as there, the Commission concedes that this immunity applies in the case of information services such as wireline and wireless broadband Internet access.  Accordingly, if the rules constitute common-carrier treatment, that is the end of the matter.  But even so, the FCC's theory of affirmative authority fails.

1.  Until now, the FCC never clearly articulated any particular source of authority over broadband Internet access service.  Br. 22.  The agency has long disclaimed any "express statutory authority," *Comcast*, 600 F.3d at 644, in this

9

area, historically asserting only ancillary authority.  When that argument failed in *Comcast*, the agency took an opaque approach to defining the legal foundation for these rules.  *Order* ¶¶ 115-37 (JA__-__).  On appeal, again shifting positions, the FCC puts forward a claim of "direct" authority, abandoning 5 of the approximately 24 provisions relied on in the *Order* (§§ 4(k), 251, 254, 256 and 304) and adding 2 new ones (§§ 303(b) & (r)).  This *post hoc* theory cannot sustain the *Order*.

     2.  The FCC's concession that it lacks any "specific" authority for the rules and thus must resort to a theory of implicit delegation is itself sufficient to resolve this appeal.  FCC Br. 36.  Congress must expressly delegate authority to "regulate an industry constituting a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 159, or take action that is "the subject of an 'earnest and profound debate' across the country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).  In such important areas, statutory ambiguity does *not* "constitute[] an implicit delegation from Congress to [an] agency to fill in the statutory gaps." *Brown & Williamson*, 529 U.S. at 159.  Instead, courts require a clear statement because they will not presume that Congress granted authority over an issue of "economic and political significance to an agency in so cryptic a fashion."  *Id*. at 160; *see, e.g.*, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994); *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 28 (D.C. Cir. 2012); *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 467 (D.C. Cir. 2005); *see also PMCM TV, LLC v.*

*FCC*, No. 11-1330, 2012 WL 6216635, slip op. 8 (D.C. Cir. Dec. 14, 2012) ("Had Congress intended to alter this fundamental element of telecommunications policy, we doubt it would have done so without hearings and in a two-sentence rider to an entirely unrelated tax bill.").

The *Brown & Williamson* principle applies with special force here.  Not only does the FCC concede that it lacks express authority for the *Order*, it states that the Internet is "the most significant medium of communication today."  FCC Br. 35. Further, Congress made clear that it wanted the Internet to remain "unfettered by Federal or State regulation."  47 U.S.C. § 230(b)(2); *see also id*. § 230(a)(4).  The *Order*'s pervasive regulation of the Internet is the kind of nationally important issue that Congress would be expected to expressly empower the FCC to undertake if it intended such a major policy shift.  Br. 22-23.  The absence of any clear delegation of authority for the rules is proof that Congress has "not given the [agency] the authority that it seeks to exercise here."  *Brown & Williamson*, 529 U.S. at 159.

The FCC's effort to distinguish *Brown & Williamson* is unavailing.  FCC Br. 35-36.  Here, as there, Congress "squarely rejected proposals" to give the agency express authority.  *Brown & Williamson*, 529 U.S. at 159; Br. 23; NAM Amicus Br. 12-16.  And just as the FDA "disavowed" authority over tobacco, FCC Br. 36, the FCC disclaimed "express statutory authority" over Internet services, *Comcast*,

11

600 F.3d at 644, and historically asserted only ancillary authority, which logically concedes the absence of *any* delegation of authority.  The FCC also, until recently, consistently endorsed a hands-off approach to the regulation of Internet services. Br. 5, 23.  With regard to the applicability of *Brown & Williamson*, the contrast with *Cellco* is instructive.  There, the FCC asserted and the Court agreed that the agency "has long imposed 'roaming' requirements on wireless telephone companies," *Cellco*, slip op. 2, and that adoption of a lesser version of that requirement for data services was not a fundamentally new assertion of regulatory authority.  Not so here, given the agency's prior hands-off approach and acknowledgment that it lacks any express authority in this area.

3.  Even if the absence of an express delegation of authority were not enough to invalidate the *Order*, the FCC's claim that it "reasonably construed" purported ambiguities in Section 706, Title III, and Title VI as conferring direct authority to adopt sweeping regulation of Internet service—and, taken to its logical conclusion, all corners of the Internet—is meritless.

**Section 706**.  Section 706(a) is not a standalone grant of authority.  Br. 28-30.  The statute provides that the FCC and state regulatory commissions "shall encourage" broadband deployment "by utilizing" three specific methods—(1) "price cap regulation," (2) "regulatory forbearance," and (3) "measures that promote competition in the local telecommunications market"—or, generically,

12

"other regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a). The FCC does not deny that each of the three enumerated methods is tied to express statutory authority contained elsewhere in the Act, and does not argue that any of them apply here.

Instead, the FCC relies exclusively on the phrase "other regulating methods" as "a grant of direct" authority. FCC Br. 25, 29. Under established canons of construction, however, that generalized phrase must be interpreted as "similar in nature" to the specifically enumerated methods that precede it, *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (quotation omitted), and thus, like those items, as referring to methods grounded in separate statutory authority.

Regardless, the FCC's argument that this brief, generalized phrase allows extensive regulation of Internet service "reaches far beyond what the text will bear." *EME*, 696 F.3d at 28. Nothing in Section 706(a) suggests that these restrictive rules are remotely the type of tool Congress intended the FCC to employ to "remove barriers to infrastructure investment." 47 U.S.C. § 1302(a); *Order* at 88 (JA__) (McDowell Statement) ("Instead of '*remov[ing]* barriers to infrastructure investment,' ... the Order fashions a legal fiction to construct *additional* barriers." (alteration and emphasis in original)). Previously, broadband providers were free to adopt their own no-blocking and nondiscrimination policies

13

based on the determination that, as the *Order* theorizes, such action promised growth, and some did so.  But mandating these policies in no sense removes any barrier to investment that providers may actually face, such as access to capital. Indeed, these rules may increase the barriers by requiring Internet providers to provide service indiscriminately.  Moreover, the explicit purpose of Section 706(a) is for the FCC to encourage broadband deployment, not to impose substantive content and other burdensome regulation on providers.  And the reference to *state* commissions renders the FCC's interpretation of Section 706(a) as a standalone source of *federal* power nonsensical.[6]

The triple-cushion shot theory underlying the FCC's reliance on Section 706(a)—*viz.*, more regulation equals more content and applications, which will increase broadband demand, which will drive greater deployment—also defies common sense and lacks any economic foundation.  Br. 7, 30-31; NAM Amicus Br. 18-27.  By prohibiting broadband providers from experimenting with different business models that could enable them to recover and earn a return on the billions of dollars needed to deploy broadband infrastructure, the "rules will stifle broadband deployment, innovation, and jobs."  H.R. Rep. No. 112-51, at 6 (2011).

---

[6]   This reference is not "immaterial" because, contrary to the FCC's suggestion, FCC Br. 27, 29 n.4, *Comcast* did not hold that Section 706(a) provides substantive regulatory power to the FCC.

14

Another persistent problem with the FCC's theory is that it is unbounded: the "limitations" that the agency proffers are illusory.  Reliance on the FCC's "subject matter jurisdiction" limitation, FCC Br. 31, would render "meaningless" any distinction between that threshold jurisdictional question and substantive delegated authority, *Am. Library Ass'n v. FCC*, 406 F.3d 689, 704 (D.C. Cir. 2005).  And to say that the FCC must find that its desired action "will encourage deployment," FCC Br. 32, is no limit at all because, on the Commission's approach, anything that arguably encourages (no matter how remotely) the creation or availability of additional content, applications, and services could be justified under the statute, Br. 31.  The FCC's interpretation "would virtually free the Commission from its congressional tether," *Comcast*, 600 F.3d at 655, and raise the specter of an unconstitutional delegation in which nothing but regulatory grace would prevent the FCC from reaching all corners of the Internet.

In all events, the *Order*'s conditional statement in a conclusory footnote is not adequate to overrule the FCC's previous considered judgment that Section 706 provides no independent regulatory authority.  FCC Br. 29-30.  Despite *Comcast*'s directly contrary holding, the agency blithely declared its new view of Section 706 "consistent with" the *Advanced Services Order.  Order* ¶ 119 (JA__).  This current interpretation is "nothing more than a 'convenient litigating position'" to manufacture authority in the wake of *Comcast*, *Christopher v. SmithKline*

15

*Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (citation omitted), and the FCC

"remains bound by its earlier conclusion that Section 706 grants no regulatory

authority," *Comcast*, 600 F.3d at 659.[7]

     **Title III.**  Neither Title III in general nor its specific provisions authorize the

FCC to adopt these heavy-handed regulations.  Br. 37-41.  Although the FCC

claims "plenary authority" over Title III licensees, FCC Br. 44, *Cellco* reiterates

that "'Title III does not confer an unlimited power,'" slip op. 12 (citing *NBC v.*

*United States*, 319 U.S. 216 (1943)).  Further, as *Cellco* also recognized, Title III

does not empower the FCC to regulate licensees "whenever doing so 'will promote

the public interest,'" FCC Br. 44; instead the agency must "moor[] its action to a

distinct grant of authority" in Title III, *Cellco*, slip op. 13.  Moreover, unlike the

data roaming rule in *Cellco*, the instant rules do not merely require that wireless

broadband providers negotiate individualized, commercially-reasonable

arrangements to allow customers of other such providers to utilize their networks.

Instead, they effectively invalidate, *ex ante*, entire categories of potential

---

[7]    The FCC's passing contention that Section 706(b) "independently"
authorizes these rules, FCC Br. 27-28, also fails.  Nothing in the statute indicates
that the rules—which go far beyond specific "geographical areas that are not
served," 47 U.S.C. § 1302(c), by any broadband provider—are the type of
"immediate action" that Congress intended the FCC to take "to accelerate
deployment of" broadband, *id.* § 1302(b).  Finally, the FCC cannot justify its rules
as "promoting competition in the telecommunications market," *id.*; FCC Br. 42-43,
because they are not limited to the protection of Internet-based telecommunications
service providers or the disclosure of telecommunications rates.

commercial agreements by prohibiting individually-negotiated agreements in favor of a regulatory command of nondiscriminatory access at a mandated rate of zero— thus intruding deeply into the business models of broadband providers.

The specific Title III provisions on which the FCC relies in its brief— primarily Sections 303(b) and 316—provide no anchor for these invasive rules. *First*, Section 303(b) is not available as a basis for affirmance here because "the Commission did not rely" on this provision in its *Order*.  *The Business Roundtable v. SEC*, 905 F.2d 406, 417 n.10 (D.C. Cir. 1990).  Unlike the order on review in *Cellco*, the *Order* did not address Section 303(b).  *Compare Data Roaming Order*, 26 F.C.C.R. 5411, 5440-41 (¶ 62) (2011), *with Order* ¶¶ 133-35 (JA__-__); *see also Cellco*, slip op. 8, 11-12, 13.  Indeed, although the agency now refers to Section 303(b) as one of its "principal authorities," the *Order* nowhere discusses— or even cites—that section.  This argument is therefore precluded because "the Commission must defend its action on the same grounds advanced in the Order." *Comcast*, 600 F.3d at 660.

*Second*, the FCC's reliance on Sections 303(b) and 316 fails on the merits. Although the FCC argues that Section 303(b) authorizes regulation of "the *terms* of service offered by wireless licenses," FCC Br. 46 (emphasis added), the statute says no such thing.  Where Congress wanted to impose nondiscriminatory access requirements on mobile wireless services, it did so expressly by rendering them

17

subject to common-carrier regulation.  Similarly, where Congress wanted to give the FCC authority to dictate service terms, such as price, it likewise said so expressly.  47 U.S.C. § 332(c)(1)(A); Br. 20-21.  Section 303(b), by contrast, permits the FCC to "[p]rescribe the nature of the service to be rendered by each class of licensed stations," 47 U.S.C. § 303(b), and thus set "limitations on services to be offered over radio facilities," *MCI Telecomms. Corp. v. FCC*, 561 F.2d 365, 373 (D.C. Cir. 1977).  The FCC has consistently exercised this power to determine the "classes"—or *types*—of services that can be used in certain spectrum bands, such as AM or FM radio service or commercial mobile radio service, *see, e.g.*, *Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428, 441-43 (D.C. Cir. 1991), and, under *Cellco*, data roaming service, slip op. 13.  Moreover, as the statutory context shows, *see Brown & Williamson*, 529 U.S. at 132-33 (relying on larger "context" within the "overall statutory scheme"), the FCC's core duty under Section 303(b) is spectrum management, *see* 47 U.S.C. § 303(a) ("[c]lassify radio stations"); *id.* § 303(c) ("[a]ssign bands of frequencies to the various classes of stations"); *id.* § 303(f) ("prevent interference between stations").

The *Order* falls outside the FCC's authority under Section 303(b).  It does not contain a single reference to spectrum management and thus does not even purport to "manage spectrum … in the public interest."  *Cellco*, slip op. 11 (quotation omitted).  Instead, the FCC stated, in the specific context of Title III,

that the rules promote "innovation and investment." *Order* ¶ 134 (JA__).  By

contrast, in the order upheld in *Cellco*, the FCC repeatedly said that it was engaged

in spectrum management under Section 303(b).  *Data Roaming Order*, 26 F.C.C.R.

at 5412, 5441 (¶¶ 2, 62-63).  The absence of any reference to spectrum

management is not surprising given the *Order*'s stated goals.  For the no-blocking

rule is not about the effective use of the airwaves, but turns on a broader, stand-

alone policy judgment by the FCC to strip broadband network owners of the

flexibility to design their service offerings and of their editorial discretion, *see*

*infra* Part IV.1, in order to advance the Commission's analytically distinct agenda

of preserving the "openness" of the Internet, Br. 25.  Similarly, the *Order* by its

terms dictates the business models for a type of service offering, requiring free

services for all edge providers, toward that same non-spectrum-management-based

end.

  Furthermore, as noted above, the rules here are far more intrusive than those

at issue in *Cellco*.  The Court sustained the data roaming rule because, in the

panel's view, its burdens were relatively modest, "requir[ing] nothing more than

the offering of 'commercially reasonable' roaming agreements" with "substantial

room for individualized bargaining."  *Cellco*, slip op. 15, 23.  The *Order* here does

something entirely different: it imposes a flat mandate of nondiscriminatory

carriage for all edge providers at an across-the-board, FCC-mandated price of

19

zero—thus intruding much farther on the core terms on which service providers must deal with third parties and entirely foreclosing any negotiations.  And by outlawing such agreements between broadband providers and edge providers, the *Order* declares "the [in]validity of contracts between licensees and others," *Regents of Univ. Sys. v. Carroll*, 338 U.S. 586, 602 (1950); Br. 39, thereby exceeding this established outer "limit on the Commission's ... authority," *Cellco*, slip op. 14.

The FCC's reliance on its power to "modify" licenses under Section 316 likewise stretches the term beyond its ordinary meaning.  FCC Br. 46-47.  Because the word modify "connotes moderate change," *MCI*, 512 U.S. at 228, the "Commission's section 316 power to 'modif[y]' existing licenses does not enable it to fundamentally change those licenses," *Cellco*, slip op. 15.  Unlike the data roaming rule, which "impos[es] a limited obligation to offer data-roaming agreements to other mobile-data providers," *id.*, these rules effect "fundamental changes" to wireless licenses because they introduce "a whole new," mandatory, open-access "regime of regulation," with access at a price of zero, for previously-unregulated Internet services, *MCI*, 512 U.S. at 228, 234.  If these sweeping rules do not effect a fundamental change, it is difficult to imagine what would meet that standard; the FCC could impose almost any type of duty on wireless licensees, enjoying unfettered discretion that makes the rest of Title III pointless.

20

The FCC claims that the rules work a mere "modification" because Appellants can still provide "the same wireless services over the same frequencies to the same customers."  FCC Br. 47.  This ignores the separate statutory limitations that would govern any attempt to eliminate their authority to provide these services.  47 U.S.C. § 312 (license revocation).  And it strains credulity to suggest that Congress intended to allow the FCC to take any action short of this extreme example as a minor "modification."  *MCI*, 512 U.S. at 231.  This is all the more true when major changes are adopted after licensees have relied on FCC representations regarding license conditions in bidding in spectrum auctions.  Br. 40-41.[8]

*Finally*, Sections 303(b) and 316 can provide no authority for the fixed rules (nor could any other provision of Title III).  Like the set of rules invalidated in *Midwest Video II*, the rules adopted here are not severable, *see* 440 U.S. at 708 n.18, and therefore the *Order* must be vacated whether or not these provisions of Title III apply.  The FCC's adoption of a comprehensive "framework" for regulating the Internet, *Order* ¶ 10 (JA__), under which it purported to "carefully balance preserving the open Internet against avoiding unduly burdensome

---

[8]    The FCC does not seriously contend that any other Title III provision directly authorizes the rules.  Section 303(r) was not relied upon in the *Order* and "confers no independent authority."  *Cellco*, slip op. 13 (citing *MPAA, Inc. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002)).  Section 309(j)(3) is inapplicable because the rules do not govern "competitive bidding" "for any initial license."  47 U.S.C. § 309(j)(1).  Sections 301 and 303(g) delegate no regulatory authority.

21

regulation," *id.* ¶ 39 (JA__), indicates that this regulatory regime could not

"function sensibly" if the fixed rules were invalidated but the mobile rules left

intact, *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).  In fact,

the *Order*'s predominant focus is on fixed services, and the FCC expressly

determined that mobile broadband should be subject to less onerous regulation than

fixed.  *See Order* ¶¶ 8, 93-96 (JA__, __-__).  As MetroPCS explained, MetroPCS

Br. 19, freeing fixed broadband service from regulation but leaving mobile

broadband regulated "would severely distort the Commission's program and

produce a [framework] strikingly different from any the Commission has ever

considered," *MD/DC/DE Broad. Ass'n*, 236 F.3d at 23.

　　　　**Title VI.**  The FCC's attempt to claim direct authority under Title VI, FCC

Br. 53-57, fares no better.  Title VI does not apply to broadband providers, and

thus cannot directly authorize these rules.  Br. 36-37.  The rule upheld in

*Cablevision Systems Corp. v. FCC*, 649 F.3d 695 (D.C. Cir. 2011), does not apply

to all "terrestrial programmers," FCC Br. 56, but only to those affiliated with a

"cable operator," *Cablevision*, 649 F.3d at 319-20.  The *Order*, by contrast,

stretches Section 628 to reach all broadband providers' actions with respect to all

content (not even just video programming), irrespective of any connection to a

"cable operator."  47 U.S.C. § 548(b).

4.  More broadly, the FCC's reading of Section 706, Title III, and Title VI is unreasonable because it imports the basic terms of Title II into other parts of the Act.  Br. 20-21.  That is, even apart from whether the rules constitute common-carrier obligations, FCC Br. 67, "the general framework of one title of the Act" cannot reasonably "be grafted" onto another as a matter of statutory construction, *Order* at 160 (JA__) (McDowell Statement).

5.  Finally, the FCC's assertion that various provisions of the Act provide ancillary authority for the rules lacks merit.  Even aside from questions about the continuing validity of the doctrine, Br. 24; TechFreedom *et al.* Amicus Br. 31-33, the FCC misstates the test.  It is not enough that the rules "further," "advance," or "promote" the agency's duties.  FCC Br. 48, 50-51, 54.  The rules must be "*necessary* to ensure the achievement of the Commission's statutory responsibilities."  *Midwest Video II*, 440 U.S. at 706 (emphasis added); *United States v. Sw. Cable Co.*, 392 U.S. 157, 173 (1968) ("imperative"); 47 U.S.C. § 154(i) ("necessary").  The FCC fails to argue, much less show, that the rules satisfy *that* requirement.[9]  Even if it had, the rules, which cover all Internet traffic,

---

[9]      Contrary to the FCC's claim, FCC Br. 58, 60, Appellants argued that Title III does not justify the exercise of ancillary authority, Br. 41, and the challenge to the FCC's authority to adopt the rules pursuant to its statutory reporting obligations was raised below, *see* Barbara Esbin Comments at 65-66, Docket No. 09-191 (Jan. 14, 2010) (JA__-__).

go much further than protecting against the blocking of online voice or video service providers under Titles II or III.  Br. 35, 37.

There is also no record foundation to justify the exercise of ancillary authority.  Br. 34, 37, 41.  The FCC does not dispute that the only adjudicated finding of misconduct was the *Comcast Order*, which was set aside by this Court, Br. 50, but argues that it can regulate "even in the absence of documented abuses," FCC Br. 52.  Regulation based on pure speculation is inadequate.  Br. 51. Regardless, the *Order* "relied on *both* an asserted theoretical threat … and a claimed record of abuse," *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (emphasis added); *Order* ¶¶ 20-37 (JA __-__), without any "evidence of a real problem," and the rules thus must be vacated, *Nat'l Fuel*, 468 F.3d at 840-41.  The FCC's reliance on conjectural claims of potential harm is all the more problematic given the First Amendment interests involved, as explained below.

## IV.    THE *ORDER* VIOLATES THE FIRST AND FIFTH AMENDMENTS.

1.  Broadband providers exercise editorial discretion in selecting which speech to transmit and how to transmit it and thus are "speakers" entitled to First Amendment protection.  Br. 42-44; *see Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("*Turner I*").  The FCC argues otherwise, asserting that "'broadband providers today generally provide subscribers access to all lawful

24

[Internet] content.'"  FCC Br. 69; *see* Hundt *et al.* Amicus Br. 15.[10]  True enough, but a provider's decisionmaking about what content to provide is itself an exercise of editorial discretion.  On the FCC's view, only publishers who exercise their editorial discretion by deciding *not* to transmit speech are protected by the First Amendment, whereas publishers who decide to transmit a wider range of speech are not.  That cannot be right.  There is certainly no reason that providers should not be able to offer differentiated service—highlighting their own selected content or that of their partners.  Br. 43-44.

The FCC suggests that broadband providers have acknowledged that they "'lack control over what end users transmit and receive.'"  FCC Br. 69 (quoting *Order* ¶ 142 & n.456).  Not so.  To be sure, Verizon has recognized that it sometimes acts as a "conduit" for content owned and provided by others, *Recording Indus. Ass'n v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003), which can be relevant under copyright law, *id.*  But that is a separate issue from whether Verizon acts as a speaker for First Amendment purposes— here, the relevant point is that Verizon has the editorial discretion to determine

---

[10]    The FCC also argues that *Turner I* is distinguishable because the must-carry rules at issue there "'reduce[d] the number of channels over which cable operators exercise[d]'" control, and "Internet access does not function like a cable system." FCC Br. 72.  But the quoted language from *Turner I* did not bear on the question whether cable operators were engaged in protected speech but on the question whether the must-carry rules infringed their speech.  512 U.S. at 637.

whether and to what extent it acts as a conduit for speech or to offer differentiated services.  In *Turner I*, the Supreme Court described cable operators as "conduit[s]" after they "select[] the programming sources," yet they nevertheless received First Amendment protection.  512 U.S. at 629.  So too here.

The *Order*'s broad "prophylactic rules" infringe broadband providers' speech by, among other things, stripping providers of control over which speech they transmit and how they transmit it.  The FCC's only response is that providers "remain[] free to convey any content [they] wish[] on [their] facilities."  FCC Br. 71.  That is irrelevant.  The government cannot force a newspaper to publish editorials of its choosing, just because the newspaper can also publish its own editorials.  Indeed, the same could have been said in *Turner I*—the must-carry rules "leave cable operators free to carry whatever programming they wish on all channels not subject to must-carry requirements."  512 U.S. at 647.

The *Order* fails under any form of heightened scrutiny.  The FCC barely even tries to "demonstrate that the recited harms are real," *id.* at 664 (plurality opinion), instead asserting that broadband providers have the "incentive and ability" to engage in harmful practices, FCC Br. 75.  As an initial matter, the "harm" posited by the FCC is that providers could exercise the very editorial discretion that the First Amendment protects.  Regardless, any theoretical motive or ability to engage in any truly harmful practices in today's intensely competitive

broadband market does not mean that providers are actually doing so.  The government has not met its burden to show that they are.[11]

Moreover, even if the FCC and its *amici* could show an actual problem, they fail to demonstrate that the *Order* is sufficiently tailored to that problem.  The FCC does not address Appellants' argument that the *Order* is over-inclusive because the rules are "prophylactic."  Br. 47-48.  And it does not deny that the *Order* is under-inclusive; instead, it tries to shift the burden to Appellants to prove that the under-inclusiveness is problematic.  FCC Br. 75.  If the government wishes to apply a restriction on speech to a subset of speakers, it bears the burden of explaining why that selectivity is appropriate.  *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).  The FCC does not even try.[12]

2.  The *Order* also violates the Fifth Amendment.  The FCC argues that there is compensation because broadband providers "get[] paid for carrying traffic."  FCC Br. 76.  But broadband providers are paid by end-users, not by the

---

[11]    In *Turner I*, cable had a bottleneck monopoly and a documented history of abuse;  here, the broadband market is highly competitive and no such record exists.  Br. 46.

[12]    Some *amici* suggest that affording broadband providers any role in determining what is transmitted over their private networks would imperil First Amendment interests.  *E.g.*, CDT *et al.* Amicus Br. 7-11.  That has matters backwards.  The First Amendment prohibits the *government* from infringing speech, precisely so that private actors can decide for themselves how to use their property for expressive purposes.

edge providers who are in effect being granted a permanent easement on private networks.  The *Order* does not provide compensation for that easement or the disruption of providers' investment-backed expectations.  Br. 49.  Unlike the Court's conclusion with respect to the data roaming rule, broadband providers are not "compensated by a 'commercially reasonable' payment," *Cellco*, slip op. 26, for the squatting rights the *Order* grants edge providers.  They are not compensated at all.

## V.     THE *ORDER* IS ARBITRARY AND CAPRICIOUS.

To show a problem sufficient to justify industry-wide regulation, the FCC relies on the *Comcast Order* and the *Madison River* consent decree.  But it does not dispute that the former was vacated and that the latter was really about intercarrier compensation.  The FCC also claims that AT&T restricted VoIP applications over its 3G network, but "every major wireless provider offers handsets that support VoIP over Wi-Fi and over 3G services."  AT&T Comments at 155, Docket No. 09-191 (Jan. 14, 2010) (JA__).  Finally, the agency asserts that a "mobile broadband provider was charged with blocking credit card processing services," FCC Br. 15, but that did not involve the provision of Internet access service.

"Perhaps recognizing the deficiency of the record evidence," *Nat'l Fuel*, 468 F.3d at 364, the FCC points to "the deterrent effect of" the rules, FCC Br. 77.

Because the "Order relied in part on record evidence of abuse, … explaining away the *absence* of such evidence merely underscores the need to vacate the Order." *Nat'l Fuel*, 468 F.3d at 364.  Last, the FCC ignores evidence that entities such as Apple and Google have no less theoretical incentive and ability than broadband providers to prevent the "development of the next Facebook or other world-changing application."  FCC Br. 77; Verizon Comments at 36-39, 129-30, Docket No. 09-191 (Jan. 14, 2010) (JA__-__, __-__).

## <u>CONCLUSION</u>

Appellants respectfully request that the Court reverse and vacate the *Order*.

Respectfully submitted,

/s/  Helgi C. Walker

By: _____

Walter E. Dellinger

Brianne Gorod

Anton Metlitsky

O'MELVENY & MYERS LLP

1625 Eye Street, NW

Washington, DC 20006

TEL: (202) 383-5300


Michael E. Glover

William H. Johnson

VERIZON

1320 North Courthouse Road

9th Floor

Arlington, VA 22201

TEL: (703) 351-3060


Helgi C. Walker*

Eve Klindera Reed

William S. Consovoy

Brett A. Shumate

WILEY REIN LLP

1776 K Street, NW

Washington, DC 20006

TEL: (202) 719-7000

E-MAIL: hwalker@wileyrein.com


Samir C. Jain

WILMER CUTLER PICKERING

HALE AND DORR LLP

1875 Pennsylvania Ave., NW

Washington, DC 20006

TEL: (202) 663-6083


*Attorneys for Verizon*

*\*Counsel of Record*


Stephen B. Kinnaird*

PAUL HASTINGS LLP

875 15th Street, NW

Washington, DC 20005

TEL: (202) 551-1842


Carl W. Northrop

Michael Lazarus

Andrew Morentz

TELECOMMUNICATIONS LAW

PROFESSIONALS PLLC

875 15th Street, NW, Suite 750

Washington, DC 20005

TEL: (202) 789-3120

Mark A. Stachiw
General Counsel, Secretary
& Vice Chairman
METROPCS COMMUNICATIONS, INC.
2250 Lakeside Blvd.
Richardson, TX 75082                        *Attorneys for MetroPCS*
TEL: (214) 570-4877                         *Communications, Inc. and its FCC-*
                                            *licensed affiliates*

Dated:  December 21, 2012                   *Counsel of Record*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 32(a)(3)(B) because this brief contains 6,977 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2010 version of Microsoft Word in 14 point Times New Roman.

/s/ Helgi C. Walker

_____

## CERTIFICATE OF SERVICE

I, Helgi C. Walker, hereby certify that on December 21, 2012, I

electronically filed the foregoing document with the Clerk of the Court for the

United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.

I further certify that six copies of the foregoing will be filed with the Clerk of the

Court for the United States Court of Appeals for the D.C. Circuit within two

business days.  All participants in the case are registered CM/ECF users and will

be served by the CM/ECF system.

Peter Karanjia
Jacob M. Lewis
Joel Marcus
Federal Communications Commission
Office of the General Counsel
445 12th Street, S.W.
Washington, DC 20554

*Counsel for the Federal
Communications Commission*

Catherine G. O'Sullivan
Robert J. Wiggers
Nickolai G. Levin
U.S. Department of Justice
(DOJ) Antitrust Division, Appellate
Section
Room 3224
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Counsel for United States of America*

James B. Ramsay
National Association of Regulatory
   Utility Commissioners
1101 Vermont Avenue, N.W.
Suite 200
Washington, DC 20005

*Counsel for National Association of
Regulatory Utility Commissioners*

Genevieve Morelli
Independent Telephone &
   Telecommunications Alliance
1101 Vermont Avenue, NW
Suite 501
Washington, DC 20005

*Counsel for Independent Telephone &
Telecommunications Alliance*

Harold J. Feld
Public Knowledge
1818 N Street, N.W.
Suite 410
Washington, DC 20036

*Counsel for Public Knowledge*

David Bergmann
National Association Of State Utility
Consumer Advocates
3293 Noreen Drive
Columbus, OH 43215

*Counsel for National Association of
State Utility Consumer Advocates*

E. Joshua Rosenkranz
Orrick, Herrington & Sutcliffe, LLP
51 West 52nd Street
New York, NY 10019-6142
TEL: (212) 506-5000

*Counsel for Venture Capital Investors*

Jeffrey J. Binder
Law Office of Jeffrey Binder
2510 Virginia Avenue, NW
Suite 1107
Washington, DC 20037

*Counsel for Vonage Holdings
Corporation*

Henry Goldberg
Goldberg, Godles, Wiener & Wright
1229 19th Street, NW
Washington, DC 20036-2413

*Counsel for Open Internet Coalition*

Brendan Daniel Kasper
Kurt Matthew Rogers
Vonage Holdings Corp.
23 Main Street
Homdel, NJ 07333

*Counsel for Vonage Holdings
Corporation*

Andrew Jay Schwartzman
2000 Pennsylvania Avenue, NW
Suite 4300
Washington, DC 20006
TEL: (202) 232-4300

*Counsel for Tim Wu*

Wesley G. Russell, Jr.
Office of the Attorney General
Commonwealth of Virginia
900 East Main Street
Richmond, VA 23219

*Counsel for the Commonwealth of
Virginia*

Ilya Shapiro
Cato Institute
1000 Massachusetts Ave., NW
Washington, DC 20036

*Counsel for Cato Institute*

John P. Elwood
Eric A. White
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037

*Counsel for TechFreedom, The*
*Competitive Enterprise Institute, The*
*Free State Foundation, and The Cato*
*Institute*

Russell P. Hanser
Bryan N. Tramont
Wilkinson Barker Knauer, LLP
2300 N Street, N.W.
Suite 700
Washington, DC 20037

*Counsel for the National Association*
*of Manufacturers*

David T. Goldberg
Donahue & Goldberg, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
TEL: (212) 334-8813

*Counsel for Reed Hundt, Tyrone Brown,*
*Michael Copps, Nicholas Johnson, Susan*
*Crawford and The National Association*
*of Telecommunications Officers and*
*Advisors*

Randolph May
Free State Foundation
P.O. Box 60680
Potomac, MD 20859

*Counsel for Free State Foundation*

John Blevins
Loyola University New Orleans
College of Law
7214 St. Charles Ave., Box 901
New Orleans, LA 70118
TEL: (504) 861-5853

*Counsel for Internet Engineers And*
*Technologists*

Quentin Riegel
National Association of Manufacturers
733 10th Street, N.W.
Suite 700
Washington, DC 20001

*Counsel for the National Association of Manufacturers*

Kevin S. Bankston
Emma J. Llansó
Center For Democracy & Technology
1634 I Street, NW
Suite 1100
Washington, DC 20006
Tel: (202) 637-9800

*Counsel for the Center For Democracy & Technology And Legal Scholars*

Sam Kazman
Competitive Enterprise Institute
1899 L St., NW, Floor 12
Washington, DC, 20036

*Counsel for Competitive Enterprise Institute*

/s/ Helgi C. Walker
_____