Pantelis Michalopoulos
202 429 6494
pmichalo@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

May 24, 2013

Mark J. Langer
Clerk
Circuit Court for the
District of Columbia Circuit
333 Constitution Ave., NW
Washington, DC 20001

Re:    Verizon v. FCC; Case No. 11-1355

Dear Mr. Langer:

       Pursuant to Federal Rule of Appellate Procedure 28(j), Intervenors[1] file this letter to bring to the Court's attention the Supreme Court's recent decision in *City of Arlington v. FCC*, No. 11-1545 (May 20, 2013).

       The Supreme Court held that *Chevron*'s requirement of deference to an agency applies equally to the agency's interpretation of the scope of its authority. *Id.* at 16-17. This is an important decision for this case, which hinges precisely on the Federal Communications Commission's ("FCC's") jurisdiction to promulgate the Open Internet rules. It lays to rest Verizon's contention that no deference is due when the FCC opines on the existence and scope of its primary or ancillary statutory authority. *See* Joint Br. at 13-14; Reply Br. at 3; Letter from Helgi C. Walker, Counsel for Verizon, to Mark J. Langer, Clerk (Jan. 23, 2013). Rather than requiring litigants to quibble over whether an agency's interpretation goes to its own jurisdiction, the Supreme Court has instructed that "the question in every case is, simply, whether the statutory text forecloses an agency's assertion of authority or not." Slip op. at 9.

---

[1] Intervenors include the Open Internet Coalition, Public Knowledge, Vonage Holdings Corporation, and the National Association of State Utility Consumer Advocates.



The answer to that question here is clear. The communications laws do not foreclose the FCC from issuing the Open Internet rules. *See* Intervenors Br. at 8 (noting that Section 706 of the Telecommunications Act of 1996 requires the FCC to "encourage the deployment" of broadband Internet services through "regulating methods that remove barriers to infrastructure investment") (quoting 47 U.S.C. § 1302(a)); FCC Br. at 25-26 (same).

Notably, the Supreme Court devoted considerable space to a pointed hypothetical, assuming a statute that prohibited certain common carrier practices and an agency ruling that the term "common carrier" includes Internet Service Providers. Slip op. at 6-7. The Court observed that such a ruling—which is more pervasive than what was promulgated below, *see* Intervenors Br. at 30-33—would also command deference.

Respectfully Submitted,

/s/ Pantelis Michalopoulos
Pantelis Michalopoulos
Markham C. Erickson
Stephanie A. Roy
Andrew W. Guhr
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
*Counsel for Open Internet Coalition*

Harold Feld
PUBLIC KNOWLEDGE
1818 N Street, NW, Suite 410
Washington, DC  20036
(202) 861-0020

Kurt Matthew Rogers
Brendan Daniel Kasper
VONAGE HOLDINGS
CORPORATION
23 Main Street
Holmdel, NJ 07333
(732) 528-2600

David C. Bergmann
NATIONAL ASSOCIATION OF STATE
UTILITY CONSUMER ADVOCATES
3293 Noreen Drive
Columbus, OH 43221-4568
(614) 771-5979

(Slip Opinion)        OCTOBER TERM, 2012        1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY OF ARLINGTON, TEXAS, ET AL. *v.* FEDERAL COMMUNICATIONS COMMISSION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 11–1545.   Argued January 16, 2013—Decided May 20, 2013*

The Communications Act of 1934, as amended, requires state or local governments to act on siting applications for wireless facilities "within a reasonable period of time after the request is duly filed." 47 U. S. C. §332(c)(7)(B)(ii). Relying on its broad authority to implement the Communications Act, see 47 U. S. C. §201(b), the Federal Communications Commission (FCC) issued a Declaratory Ruling concluding that the phrase "reasonable period of time" is presumptively (but rebuttably) 90 days to process an application to place a new antenna on an existing tower and 150 days to process all other applications. The cities of Arlington and San Antonio, Texas, sought review of the Declaratory Ruling in the Fifth Circuit. They argued that the Commission lacked authority to interpret §332(c)(7)(B)'s limitations. The Court of Appeals, relying on Circuit precedent holding that *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, applies to an agency's interpretation of its own statutory jurisdiction, applied *Chevron* to that question. Finding the statute ambiguous, it upheld as a permissible construction of the statute the FCC's view that §201(b)'s broad grant of regulatory authority empowered it to administer §332(c)(7)(B).

*Held*: Courts must apply the *Chevron* framework to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority (*i.e.,* its jurisdiction). Pp. 4–17.

---

*Together with No. 11–1547, *Cable, Telecommunications, and Technology Committee of New Orleans City Council* v. *Federal Communications Commission,* also on certiorari to the same court.

2                         ARLINGTON *v.* FCC

Syllabus

(a) Under *Chevron,* a reviewing court must first ask whether Congress has directly spoken to the precise question at issue; if so, the court must give effect to Congress' unambiguously expressed intent. 467 U. S., at 842–843. However, if "the statute is silent or ambiguous," the court must defer to the administering agency's construction of the statute so long as it is permissible. *Id.,* at 843. Pp. 4–5.

(b) When a court reviews an agency's interpretation of a statute it administers, the question is always, simply, whether the agency has stayed within the bounds of its statutory authority. There is no distinction between an agency's "jurisdictional" and "nonjurisdictional" interpretations. The "jurisdictional-nonjurisdictional" line is meaningful in the judicial context because Congress has the power to tell the courts what classes of cases they may decide—that is, to define their jurisdiction—but not to prescribe how they decide those cases. But for agencies charged with administering congressional statutes, both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. Because the question is always whether the agency has gone beyond what Congress has permitted it to do, there is no principled basis for carving out an arbitrary subset of "jurisdictional" questions from the *Chevron* framework. See, *e.g., National Cable & Telecommunications Assn., Inc.* v. *Gulf Power Co.,* 534 U. S. 327, 333, 339. Pp. 5–10.

(c) This Court has consistently afforded *Chevron* deference to agencies' constructions of the scope of their own jurisdiction. See, *e.g., Commodity Futures Trading Commission* v. *Schor,* 478 U. S. 833; *United States* v. *Eurodif S. A.,* 555 U. S. 305, 316. *Chevron* applies to statutes designed to curtail the scope of agency discretion, see *Chemical Mfrs. Assn.* v. *Natural Resources Defense Council, Inc.,* 470 U. S. 116, 123, and even where concerns about agency self-aggrandizement are at their apogee—*i.e.,* where an agency's expansive construction of the extent of its own power would have wrought a fundamental change in the regulatory scheme, see *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U. S. 120, 132. Pp. 10–14.

(d) The contention that *Chevron* deference is not appropriate here because the FCC asserted jurisdiction over matters of traditional state and local concern is meritless. These cases have nothing to do with federalism: The statute explicitly supplants state authority, so the question is simply whether a federal agency or federal courts will draw the lines to which the States must hew. P. 14.

(e) *United States* v. *Mead Corp.,* 533 U. S. 218, requires that, for *Chevron* deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted. But *Mead* denied *Chevron* deference to

Cite as: 569 U. S. ____ (2013)     3

Syllabus

action, by an agency with rulemaking authority, that was not rule-making. There is no case in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field. A general conferral of rulemaking authority validates rules for *all* the matters the agency is charged with administering. It suffices to decide this case that the preconditions to deference under *Chevron* are satisfied because Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority. Pp. 14–16.

668 F. 3d 229, affirmed.

SCALIA, J., delivered the opinion of the Court, in which THOMAS, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. BREYER, J., filed an opinion concurring in part and concurring in the judgment. ROBERTS, C. J., filed a dissenting opinion, in which KENNEDY and ALITO, JJ., joined.

Cite as: 569 U. S. ____ (2013)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 11–1545 and 11–1547

_____

### CITY OF ARLINGTON, TEXAS, ET AL., PETITIONERS

11–1545             *v.*

### FEDERAL COMMUNICATIONS COMMISSION ET AL.


### CABLE, TELECOMMUNICATIONS, AND TECHNOLOGY COMMITTEE OF THE NEW ORLEANS CITY COUNCIL, PETITIONER

11–1547             *v.*

### FEDERAL COMMUNICATIONS COMMISSION ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 20, 2013]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether an agency's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority (that is, its jurisdiction) is entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

## I

Wireless telecommunications networks require towers and antennas; proposed sites for those towers and anten-

Opinion of the Court

nas must be approved by local zoning authorities. In the
Telecommunications Act of 1996, Congress "impose[d]
specific limitations on the traditional authority of state
and local governments to regulate the location, construc-
tion, and modification of such facilities," *Rancho Palos
Verdes* v. *Abrams*, 544 U. S. 113, 115 (2005), and incorpo-
rated those limitations into the Communications Act of
1934, see 110 Stat. 56, 151. Section 201(b) of that Act
empowers the Federal Communications Commission to
"prescribe such rules and regulations as may be necessary
in the public interest to carry out [its] provisions." Ch.
296, 52 Stat. 588, codified at 47 U. S. C. §201(b). Of
course, that rulemaking authority extends to the subse-
quently added portions of the Act. See *AT&T Corp.* v.
*Iowa Utilities Bd.*, 525 U. S. 366, 377–378 (1999).

The Act imposes five substantive limitations, which are
codified in 47 U. S. C. §332(c)(7)(B); only one of them,
§332(c)(7)(B)(ii), is at issue here. That provision requires
state or local governments to act on wireless siting appli-
cations "within a reasonable period of time after the re-
quest is duly filed." Two other features of §332(c)(7) are
relevant. First, subparagraph (A), known as the "saving
clause," provides that nothing in the Act, *except* those
limitations provided in §332(c)(7)(B), "shall limit or affect
the authority of a State or local government" over siting
decisions. Second, §332(c)(7)(B)(v) authorizes a person
who believes a state or local government's wireless-siting
decision to be inconsistent with any of the limitations in
§332(c)(7)(B) to "commence an action in any court of com-
petent jurisdiction."

In theory, §332(c)(7)(B)(ii) requires state and local
zoning authorities to take prompt action on siting applica-
tions for wireless facilities. But in practice, wireless pro-
viders often faced long delays. In July 2008, CTIA—The

Opinion of the Court

Wireless Association,[1] which represents wireless service providers, petitioned the FCC to clarify the meaning of §332(c)(7)(B)(ii)'s requirement that zoning authorities act on siting requests "within a reasonable period of time." In November 2009, the Commission, relying on its broad statutory authority to implement the provisions of the Communications Act, issued a declaratory ruling responding to CTIA's petition. *In re Petition for Declaratory Ruling*, 24 FCC Rcd. 13994, 14001. The Commission found that the "record evidence demonstrates that unreasonable delays in the personal wireless service facility siting process have obstructed the provision of wireless services" and that such delays "impede the promotion of advanced services and competition that Congress deemed critical in the Telecommunications Act of 1996." *Id.,* at 14006, 14008. A "reasonable period of time" under §332(c)(7)(B)(ii), the Commission determined, is presumptively (but rebuttably) 90 days to process a collocation application (that is, an application to place a new antenna on an existing tower) and 150 days to process all other applications. *Id.,* at 14005.

Some state and local governments opposed adoption of the *Declaratory Ruling* on the ground that the Commission lacked "authority to interpret ambiguous provisions of Section 332(c)(7)." *Id.,* at 14000. Specifically, they argued that the saving clause, §332(c)(7)(A), and the judicial review provision, §337(c)(7)(B)(v), together display a congressional intent to withhold from the Commission authority to interpret the limitations in §332(c)(7)(B). Asserting that ground of objection, the cities of Arlington and San Antonio, Texas, petitioned for review of the *Declaratory*

─────────

[1]This is not a typographical error. CTIA—The Wireless Association was the name of the petitioner. CTIA is presumably an (unpronounceable) acronym, but even the organization's website does not say what it stands for. That secret, known only to wireless-service-provider insiders, we will not disclose here.

4                    ARLINGTON *v.* FCC

*Ruling* in the Court of Appeals for the Fifth Circuit.

Relying on Circuit precedent, the Court of Appeals held that the *Chevron* framework applied to the threshold question whether the FCC possessed statutory authority to adopt the 90- and 150-day timeframes.  668 F. 3d 229, 248 (CA5 2012) (citing *Texas* v. *United States*, 497 F. 3d 491, 501 (CA5 2007)).  Applying *Chevron*, the Court of Appeals found "§332(c)(7)(A)'s effect on the FCC's authority to administer §332(c)(7)(B)'s limitations ambiguous," 668 F. 3d, at 250, and held that "the FCC's interpretation of its statutory authority" was a permissible construction of the statute.  *Id.,* at 254.  On the merits, the court upheld the presumptive 90- and 150-day deadlines as a "permissible construction of §332(c)(7)(B)(ii) and (v) . . . entitled to *Chevron* deference."  *Id.,* at 256.

We granted certiorari, 568 U. S. ___ (2012), limited to the first question presented: "Whether . . . a court should apply *Chevron* to . . . an agency's determination of its own jurisdiction."  Pet. for Cert. in No. 11–1545, p. i.

                              II
                              A

As this case turns on the scope of the doctrine enshrined in *Chevron*, we begin with a description of that case's now-canonical formulation.  "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions."  467 U. S., at 842.  First, applying the ordinary tools of statutory construction, the court must determine "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.,* at 842–843.  But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of

the statute." *Id.,* at 843.

*Chevron* is rooted in a background presumption of congressional intent: namely, "that Congress, when it left ambiguity in a statute" administered by an agency, "understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 740–741 (1996). *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency. See *Iowa Utilities Bd.*, 525 U. S., at 397. Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.

## B

The question here is whether a court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority (that is, its jurisdiction). The argument against deference rests on the premise that there exist two distinct classes of agency interpretations: Some interpretations—the big, important ones, presumably—define the agency's "jurisdiction." Others—humdrum, run-of-the-mill stuff—are simply applications of jurisdiction the agency plainly has. That premise is false, because the distinction between "jurisdictional" and "nonjurisdictional" interpretations is a mirage. No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority.*

The misconception that there are, for *Chevron* purposes, separate "jurisdictional" questions on which no deference

6                          ARLINGTON *v.* FCC

Opinion of the Court

is due derives, perhaps, from a reflexive extension to agencies of the very real division between the jurisdictional and nonjurisdictional that is applicable to courts. In the judicial context, there *is* a meaningful line: Whether the court decided *correctly* is a question that has different consequences from the question whether it had the power to decide *at all*. Congress has the power (within limits) to tell the courts what classes of cases they may decide, see *Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U. S. 50, 63–64 (1944); *Lauf* v. *E. G. Shinner & Co.*, 303 U. S. 323, 330 (1938), but not to prescribe or superintend how they decide those cases, see *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218–219 (1995). A court's power to decide a case is independent of whether its decision is correct, which is why even an erroneous judgment is entitled to res judicata effect. Put differently, a jurisdictionally proper but substantively incorrect judicial decision is not ultra vires.

That is not so for agencies charged with administering congressional statutes. Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. Because the question—whether framed as an incorrect application of agency authority or an assertion of authority not conferred—is always whether the agency has gone beyond what Congress has permitted it to do, there is no principled basis for carving out some arbitrary subset of such claims as "jurisdictional."

An example will illustrate just how illusory the proposed line between "jurisdictional" and "nonjurisdictional" agency interpretations is. Imagine the following validly-enacted statute:

COMMON CARRIER ACT
SECTION 1. The Agency shall have jurisdiction to prohibit any common carrier from imposing an unreason-

Opinion of the Court

able condition upon access to its facilities.

There is no question that this provision—including the terms "common carrier" and "unreasonable condition"—defines the Agency's jurisdiction. Surely, the argument goes, a court must determine *de novo* the scope of that jurisdiction.

Consider, however, this alternative formulation of the statute:

> COMMON CARRIER ACT
> SECTION 1. No common carrier shall impose an un-reasonable condition upon access to its facilities.
> SECTION 2. The Agency may prescribe rules and regu-lations necessary in the public interest to effectuate Section 1 of this Act.

Now imagine that the Agency, invoking its Section 2 authority, promulgates this Rule: "(1) The term 'common carrier' in Section 1 includes Internet Service Providers. (2) The term 'unreasonable condition' in Section 1 includes unreasonably high prices. (3) A monthly fee greater than $25 is an unreasonable condition on access to Internet service." By this Rule, the Agency has claimed for itself jurisdiction that is doubly questionable: Does its authority extend to Internet Service Providers? And does it extend to setting prices? Yet Section 2 makes clear that Con-gress, in petitioners' words, "conferred interpretive power on the agency" with respect to Section 1. Brief for Peti-tioners in No. 1545, p. 14. Even under petitioners' theory, then, a court should defer to the Agency's interpretation of the terms "common carrier" and "unreasonable condi-tion"—that is to say, its assertion that its "jurisdiction" extends to regulating Internet Service Providers and setting prices.

In the first case, by contrast, petitioners' theory would accord the agency no deference. The trouble with this is that in both cases, the underlying question is *exactly the*

Opinion of the Court

*same*: Does the statute give the agency authority to regu-
late Internet Service Providers and cap prices, or not?[2]
The reality, laid bare, is that there is *no difference*, insofar
as the validity of agency action is concerned, between an
agency's exceeding the scope of its authority (its "jurisdic-
tion") and its exceeding authorized application of authority
that it unquestionably has. "To exceed authorized applica-
tion is to exceed authority. Virtually any administrative
action can be characterized as either the one or the other,
depending on how generally one wishes to describe the
'authority.'" *Mississippi Power & Light Co.* v. *Mississippi
ex rel. Moore*, 487 U. S. 354, 381 (1988) (SCALIA, J., con-
curring in judgment); see also Monaghan, Marbury and
the Administrative State, 83 Colum. L. Rev. 1, 29 (1983)
("Administrative application of law is administrative
formulation of law whenever it involves elaboration of the
statutory norm.").

   This point is nicely illustrated by our decision in *Na-
tional Cable & Telecommunications Assn., Inc.* v. *Gulf
Power Co.,* 534 U. S. 327 (2002). That case considered
whether the FCC's "jurisdiction" to regulate the rents
utility-pole owners charge for "pole attachments" (defined
as attachments by a cable television system or provider of
telecommunications service) extended to attachments that
provided both cable television and high-speed Internet
access (attachments for so-called "commingled services").
*Id*., at 331–336. We held, sensibly, that *Chevron* applied.
534 U. S., at 333, 339. Whether framed as going to the

---

   [2]The dissent's non-answer to this example reveals the hollowness of
its theory. It "might," the dissent claims, be "harder" to interpret the
first Act, because it is (somehow) less "clear" than the second Act. *Post,*
at 15–16 (opinion of ROBERTS, C. J.). That it is even *possible* that the
two could come out differently under the dissent's test (whatever it is)
shows that that test must be wrong. The two statutes are substantively
identical. Any difference in outcome would be arbitrary, so a sound
interpretive approach should yield none.

Opinion of the Court

*scope* of the FCC's delegated authority or the FCC's *application* of its delegated authority, the underlying question was the same: Did the FCC exceed the bounds of its statutory authority to regulate rents for "pole attachments" when it sought to regulate rents for pole attachments providing commingled services?

The label is an empty distraction because every new application of a broad statutory term can be reframed as a questionable extension of the agency's jurisdiction. One of the briefs in support of petitioners explains, helpfully, that "[j]urisdictional questions concern the *who, what, where,* and *when* of regulatory power: which subject matters may an agency regulate and under what conditions." Brief for IMLA Respondents 18–19. But an agency's *application* of its authority pursuant to statutory text answers the same questions. *Who* is an "outside salesman"? *What* is a "pole attachment"? *Where* do the "waters of the United States" end? *When* must a Medicare provider challenge a reimbursement determination in order to be entitled to an administrative appeal? These can all be reframed as questions about the scope of agencies' regulatory jurisdiction— and they are all questions to which the *Chevron* framework applies. See *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. ___, ___, ___ (2012) (slip op., at 2, 8); *National Cable & Telecommunications Assn., supra,* at 331, 333; *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 123, 131 (1985); *Sebelius* v. *Auburn Regional Medical Center,* 568 U. S. ___, ___, ___ (2013) (slip op., at 1, 11).

In sum, judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is "jurisdictional" or "nonjurisdictional." Once those labels are sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not. See H. Edwards & L. Elliott,

Federal Standards of Review 146 (2007) ("In practice, it does not appear to matter whether delegated authority is viewed as a threshold inquiry."). The federal judge as haruspex, sifting the entrails of vast statutory schemes to divine whether a particular agency interpretation qualifies as "jurisdictional," is not engaged in reasoned decisionmaking.

C

Fortunately, then, we have consistently held "that *Chevron* applies to cases in which an agency adopts a construction of a jurisdictional provision of a statute it administers." 1 R. Pierce, Administrative Law Treatise §3.5, p. 187 (2010). One of our opinions explicitly says that no "exception exists to the normal [deferential] standard of review" for "'jurisdictional or legal question[s] concerning the coverage'" of an Act. *NLRB* v. *City Disposal Systems, Inc.*, 465 U. S. 822, 830, n. 7 (1984). A prime example of deferential review for questions of jurisdiction is *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986). That case involved a CFTC interpretation of 7 U. S. C. §18(c), which provides that before the Commission takes action on a complaint, the complainant must file a bond to cover "any reparation award that may be issued by the Commission against the complainant *on any counterclaim*" by respondent." (Emphasis added.) The CFTC, pursuant to its broad rulemaking authority, see §12a(5), interpreted that oblique reference to counterclaims as granting it "the power to take jurisdiction over" not just federal-law counterclaims, but state-law counterclaims as well. *Schor*, *supra*, at 844. We not only deferred under *Chevron* to the Commission's "eminently reasonable . . . interpretation of the statute it is entrusted to administer," but also chided the Court of Appeals for declining to afford deference because of the putatively "'statutory interpretation-jurisdictional' nature of the question at issue." 478 U. S.*,*

Opinion of the Court

at 844–845.

Similar examples abound. We have afforded *Chevron* deference to the Commerce Department's determination that its authority to seek antidumping duties extended to uranium imported under contracts for enrichment services, *United States* v. *Eurodif S. A.*, 555 U. S. 305, 316 (2009); to the Interstate Commerce Commission's view that courts, not the Commission, possessed "initial jurisdiction with respect to the award of reparations" for unreasonable shipping charges, *Reiter* v. *Cooper,* 507 U. S. 258, 269 (1993) (internal quotation marks and ellipsis omitted); and to the Army Corps of Engineers' assertion that its permitting authority over discharges into "waters of the United States" extended to "freshwater wetlands" adjacent to covered waters, *Riverside Bayview Homes, supra*, at 123–124, 131. We have even deferred to the FCC's assertion that its broad regulatory authority extends to pre-empting conflicting state rules. *City of New York* v. *FCC*, 486 U. S. 57, 64 (1988); *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 700 (1984).[3]

_____

[3]The dissent's reliance on dicta in *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638 (1990), see *post*, at 8–9, is misplaced. In that case, the Department of Labor had interpreted a statute creating a private right of action for migrant or seasonal farmworkers as providing no remedy where a state workers'-compensation law covered the worker. 494 U. S., at 649. We held that we had no need to "defer to the Secretary of Labor's view of the scope of" that private right of action "because Congress has expressly established the Judiciary and not the Department of Labor as the adjudicator of private rights of action arising under the statute." *Ibid*. *Adams Fruit* stands for the modest proposition that the Judiciary, not any executive agency, determines "the scope"—including the available remedies—"of judicial power vested by" statutes establishing private rights of action. *Id.,* at 650. *Adams Fruit* explicitly affirmed the Department's authority to promulgate the substantive standards enforced through that private right of action. See *ibid.*

The dissent's invocation of *Gonzales* v. *Oregon*, 546 U. S. 243 (2006), see *post*, at 10–11, is simply perplexing: The majority opinion in that

12                    ARLINGTON *v.* FCC

Our cases hold that *Chevron* applies equally to statutes designed to *curtail* the scope of agency discretion. For instance, in *Chemical Mfrs. Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 123 (1985), we considered a statute prohibiting the Environmental Protection Agency from "modify[ing] any requirement of this section as it applies to any specific pollutant which is on the toxic pollutant list." The EPA construed the statute as not precluding it from granting variances with respect to certain toxic pollutants. Finding no "clear congressional intent to forbid EPA's sensible variance mechanism," *id.,* at 134, we deferred to the EPA's construction of this express limitation on its own regulatory authority, *id.,* at 125 (citing *Chevron,* 467 U. S. 837); see also, *e.g., Japan Whaling Assn.* v. *American Cetacean Soc.*, 478 U. S. 221, 226, 232–234 (1986).

The U. S. Reports are shot through with applications of *Chevron* to agencies' constructions of the scope of their own jurisdiction. And we have applied *Chevron* where concerns about agency self-aggrandizement are at their apogee: in cases where an agency's expansive construction of the extent of its own power would have wrought a fundamental change in the regulatory scheme. In *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120 (2000), the threshold question was the "appropriate framework for analyzing" the FDA's assertion of "jurisdiction to regulate tobacco products," *id.,* at 126, 132—a question of vast "economic and political magnitude," *id.,* at 133. "Because this case involves an administrative agency's construction

—————

case expressly lists the Communications Act as an example of a statute under which an agency's "authority is clear because the statute gives an agency broad power to enforce *all* provisions of the statute." 546 U. S., at 258–259 (citing 47 U. S. C. §201(b); emphasis added). That statement cannot be squared with the dissent's proposed remand for the Fifth Circuit to determine "whether Congress delegated interpretive authority over §332(c)(7)(B)(ii) to the FCC." *Post,* at 18.

of a statute that it administers," we held, *Chevron* applied.
529 U. S., at 132. Similarly, in *MCI Telecommunications
Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S.
218, 224, 229, 231 (1994), we applied the *Chevron* frame-
work to the FCC's assertion that the statutory phrase
"modify any requirement" gave it authority to eliminate
rate-filing requirements, "the essential characteristic of a
rate-regulated industry," for long-distance telephone
carriers.

   The false dichotomy between "jurisdictional" and "non-
jurisdictional" agency interpretations may be no more
than a bogeyman, but it is dangerous all the same. Like
the Hound of the Baskervilles, it is conjured by those with
greater quarry in sight: Make no mistake—the ultimate
target here is *Chevron* itself. Savvy challengers of agency
action would play the "jurisdictional" card in every case.
See, *e.g., Cellco Partnership* v. *FCC*, 700 F. 3d 534,
541 (CADC 2012). Some judges would be deceived by
the specious, but scary-sounding, "jurisdictional"-
"nonjurisdictional" line; others tempted by the prospect of
making public policy by prescribing the meaning of am-
biguous statutory commands. The effect would be to
transfer any number of interpretive decisions—archetypal
*Chevron* questions, about how best to construe an ambigu-
ous term in light of competing policy interests—from the
agencies that administer the statutes to federal courts.[4]

———————

   [4] THE CHIEF JUSTICE's discomfort with the growth of agency power,
see *post,* at 2–4, is perhaps understandable. But the dissent overstates
when it claims that agencies exercise "legislative power" and "judicial
power." *Post,* at 2; see also *post,* at 16. The former is vested exclusively
in Congress, U. S. Const., Art. I, §1, the latter in the "one supreme
Court" and "such inferior Courts as the Congress may from time to time
ordain and establish," Art. III, §1. Agencies make rules ("Private cattle
may be grazed on public lands *X, Y,* and *Z* subject to certain condi-
tions") and conduct adjudications ("This rancher's grazing permit is
revoked for violation of the conditions") and have done so since the
beginning of the Republic. These activities take "legislative" and

14               ARLINGTON *v.* FCC

We have cautioned that "judges ought to refrain from substituting their own interstitial lawmaking" for that of an agency. *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 568 (1980). That is precisely what *Chevron* prevents.

### III

### A

One group of respondents contends that *Chevron* deference is inappropriate here because the FCC has "assert[ed] jurisdiction over matters of traditional state and local concern." Brief for IMLA Respondents 35. But this case has nothing to do with federalism. Section 332(c)(7)(B)(ii) explicitly supplants state authority by *requiring* zoning authorities to render a decision "within a reasonable period of time," and the meaning of that phrase is indisputably a question of federal law. We rejected a similar faux-federalism argument in the *Iowa Utilities Board* case, in terms that apply equally here: "This is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the FCC or the federal courts that draw the lines to which they must hew." 525 U. S., at 379, n. 6. These lines will be drawn either by unelected federal bureaucrats, or by unelected (and even less politically accountable) federal judges. "[I]t is hard to spark a passionate 'States' rights' debate over that detail." *Ibid.*

### B

A few words in response to the dissent. The question on which we granted certiorari was whether "a court should apply *Chevron* to review an agency's determination of its own jurisdiction." Pet. for Cert. i.[5] Perhaps sensing the

---

"judicial" forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the "executive Power." Art. II, §1, cl. 1.

[5]The dissent—apparently with no attempt at irony—accuses us of

Opinion of the Court

incoherence of the "jurisdictional-nonjurisdictional" line, the dissent does not even attempt to defend it, see *post,* at 5, but proposes a much broader scope for *de novo* judicial review: Jurisdictional or not, and even where a rule is at issue and the statute contains a broad grant of rulemaking authority, the dissent would have a court search provision-by-provision to determine "whether [that] delegation covers the 'specific provision' and 'particular question' before the court." *Post,* at 11–12.

The dissent is correct that *United States* v. *Mead Corp.*, 533 U. S. 218 (2001), requires that, for *Chevron* deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted.  No one disputes that. But *Mead* denied *Chevron* deference to action, by an agency with rulemaking authority, that was not rulemaking. What the dissent needs, and fails to produce, is a single case in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field.  There is no such case, and what the dissent proposes is a massive revision of our *Chevron* jurisprudence.

Where we differ from the dissent is in its apparent rejection of the theorem that the whole includes all of its parts—its view that a general conferral of rulemaking authority does not validate rules for *all* the matters the agency is charged with administering.  Rather, the dissent proposes that even when general rulemaking authority is clear, *every* agency rule must be subjected to a *de novo* judicial determination of whether *the particular issue* was committed to agency discretion.  It offers no standards at

_____

"misunderstand[ing]" the question presented as one of "jurisdiction." *Post,* at 5.  Whatever imprecision inheres in our understanding of the question presented derives solely from our having read it.

all to guide this open-ended hunt for congressional intent (that is to say, for evidence of congressional intent more specific than the conferral of general rulemaking authority). It would simply punt that question back to the Court of Appeals, presumably for application of some sort of totality-of-the-circumstances test—which is really, of course, not a test at all but an invitation to make an ad hoc judgment regarding congressional intent. Thirteen Courts of Appeals applying a totality-of-the-circumstances test would render the binding effect of agency rules unpredictable and destroy the whole stabilizing purpose of *Chevron*. The excessive agency power that the dissent fears would be replaced by chaos. There is no need to wade into these murky waters. It suffices to decide this case that the preconditions to deference under *Chevron* are satisfied because Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority.

*          *          *

Those who assert that applying *Chevron* to "jurisdictional" interpretations "leaves the fox in charge of the henhouse" overlook the reality that a separate category of "jurisdictional" interpretations does not exist. The fox-in-the-henhouse syndrome is to be avoided not by establishing an arbitrary and undefinable category of agency decisionmaking that is accorded no deference, but by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority. Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow. But in rigorously applying the latter rule, a court need not pause to puzzle over whether the interpretive

Opinion of the Court

question presented is "jurisdictional."  If "the agency's answer is based on a permissible construction of the statute," that is the end of the matter.  *Chevron*, 467 U. S., at 842.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

Opinion of BREYER, J.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 11–1545 and 11–1547

————————

## CITY OF ARLINGTON, TEXAS, ET AL., PETITIONERS

11–1545            *v.*
FEDERAL COMMUNICATIONS
COMMISSION ET AL.

## CABLE, TELECOMMUNICATIONS, AND TECHNOLOGY COMMITTEE OF THE NEW ORLEANS CITY COUNCIL, PETITIONER

11–1547            *v.*
FEDERAL COMMUNICATIONS
COMMISSION ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 20, 2013]

JUSTICE BREYER, concurring in part and concurring in the judgment.

I agree with the Court that normally "the question a court faces when confronted with an agency's interpretation of a statute it administers" is, "simply, *whether the agency has stayed within the bounds of its statutory authority." Ante,* at 5–6. In this context, "the distinction between 'jurisdictional' and 'non-jurisdictional' interpretations is a mirage." *Ante,* at 5.

Deciding just what those statutory bounds are, however, is not always an easy matter, and the Court's case law abounds with discussion of the subject. A reviewing judge, for example, will have to decide independently whether Congress delegated authority to the agency to provide

2             ARLINGTON *v.* FCC

Opinion of BREYER, J.

interpretations of, or to enact rules pursuant to, the statute at issue—interpretations or rules that carry with them "the force of law." *United States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001). If so, the reviewing court must give special leeway or "deference" to the agency's interpretation. See *id.,* at 227–228.

We have added that, if "[e]mploying traditional tools of statutory construction," *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446 (1987), the court determines that Congress has spoken clearly on the disputed question, then "that is the end of the matter," *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). The agency is due no deference, for Congress has left no gap for the agency to fill. *Id.,* at 842–844. If, on the other hand, Congress has not spoken clearly, if, for example it has written ambiguously, then that ambiguity is a sign—but not always a conclusive sign—that Congress intends a reviewing court to pay particular attention to (*i.e.*, to give a degree of deference to) the agency's interpretation. See *Gonzales* v. *Oregon*, 546 U. S. 243, 258–269 (2006); *Mead, supra,* at 229.

I say that the existence of statutory ambiguity is sometimes not enough to warrant the conclusion that Congress has left a deference-warranting gap for the agency to fill because our cases make clear that other, sometimes context-specific, factors will on occasion prove relevant. (And, given the vast number of government statutes, regulatory programs, and underlying circumstances, that variety is hardly surprising.) In *Mead,* for example, we looked to several factors other than simple ambiguity to help determine whether Congress left a statutory gap, thus delegating to the agency the authority to fill that gap with an interpretation that would carry "the force of law." 533 U. S., at 229–231. Elsewhere, we have assessed

"the interstitial nature of the legal question, the re-

Opinion of BREYER, J.

lated expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Barnhart* v. *Walton*, 535 U. S. 212, 222 (2002).

The subject matter of the relevant provision—for instance, its distance from the agency's ordinary statutory duties or its falling within the scope of another agency's authority— has also proved relevant.  See *Gonzalez*, *supra*, at 265– 266.  See also Gellhorn & Verkuil, Controlling *Chevron*- Based Delegations, 20 Cardozo L. Rev. 989, 1007–1010 (1999).

Moreover, the statute's text, its context, the structure of the statutory scheme, and canons of textual construction are relevant in determining whether the statute is ambiguous and can be equally helpful in determining whether such ambiguity comes accompanied with agency authority to fill a gap with an interpretation that carries the force of law.  See *Household Credit Services, Inc.* v. *Pfennig*, 541 U. S. 232, 239–242 (2004); *Zuni Public School Dist. No. 89* v. *Department of Education*, 550 U. S. 81, 98–99 (2007); *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000);  *Dole* v. *Steelworkers*, 494 U. S. 26, 36 (1990). Statutory purposes, including those revealed in part by legislative and regulatory history, can be similarly relevant.  See *Brown & Williamson Tobacco Corp.*, *supra,* at 143–147; *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 649 (1990); *Global Crossing Telecommunications, Inc.* v. *Metrophones Telecommunications, Inc.*, 550 U. S. 45, 48–49 (2007).  See also *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 412–413 (1999) (BREYER, J., concurring in part and dissenting in part).

Although seemingly complex in abstract description, in practice this framework has proved a workable way to

approximate how Congress would likely have meant to allocate interpretive law-determining authority between reviewing court and agency. The question whether Congress has delegated to an agency the authority to provide an interpretation that carries the force of law is for the judge to answer independently. The judge, considering "traditional tools of statutory construction," *Cardoza-Fonseca, supra,* at 446, will ask whether Congress has spoken unambiguously. If so, the text controls. If not, the judge will ask whether Congress would have intended the agency to resolve the resulting ambiguity. If so, deference is warranted. See *Mead, supra,* at 229. Even if not, however, sometimes an agency interpretation, in light of the agency's special expertise, will still have the "power to persuade, if lacking power to control," *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944).

The case before us offers an example. The relevant statutory provision requires state or local governments to act on wireless siting applications "within a reasonable period of time after" a wireless service provider files such a request. 47 U. S. C. §332(c)(7)(B)(ii). The Federal Communications Commission (FCC) argued that this provision granted it a degree of leeway in determining the amount of time that is reasonable. Many factors favor the agency's view: (1) the language of the Telecommunications Act grants the FCC broad authority (including rulemaking authority) to administer the Act; (2) the words are open-ended—*i.e.* "ambiguous"; (3) the provision concerns an interstitial administrative matter, in respect to which the agency's expertise could have an important role to play; and (4) the matter, in context, is complex, likely making the agency's expertise useful in helping to answer the "reasonableness" question that the statute poses. See §151 (creating the FCC); §201(b) (providing rulemaking authority); *National Cable & Telecommunications Assn.* v. *Brand X Internet Services,* 545 U. S. 967, 980–981 (2005)

Cite as: 569 U. S. ____ (2013)           5

Opinion of BREYER, J.

(acknowledging the FCC's authority to administer the Act).

On the other side of the coin, petitioners point to two statutory provisions which, they believe, require a different conclusion—namely, that the FCC lacked authority altogether to interpret §332(c)(7)(B)(ii).   First, a nearby saving clause says: "Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." §332(c)(7)(A).   Second, a judicial review provision, says: "Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." §332(c)(7)(B)(v).

In my view, however, these two provisions cannot provide good reason for reaching the conclusion advocated by petitioners. The first provision begins with an exception, stating that it does *not* apply to (among other things) the "reasonableness" provision here at issue.  The second simply sets forth a procedure for judicial review, a review that applies to most government actions.  Both are consistent with a statutory scheme that gives States, localities, the FCC, and reviewing courts each some role to play in the location of wireless service facilities.  And neither "expressly describ[es] an exception" to the FCC's plenary authority to interpret the Act.  *American Hospital Assn.* v. *NLRB*, 499 U. S. 606, 613 (1991).

For these reasons, I would reject petitioners' argument and conclude that §332(c)(7)(B)(ii)—the "reasonableness" statute—leaves a gap for the FCC to fill.  I would hold that the FCC's lawful efforts to do so carry "the force of law." *Mead,* 533 U. S., at 229.  The Court of Appeals ultimately

6                    ARLINGTON *v.* FCC

                  Opinion of BREYER, J.

reached the same conclusion (though for somewhat dif-
ferent reasons), and the majority affirms the lower court.
I consequently join the majority's judgment and such por-
tions of its opinion as are consistent with what I have
written here.

Cite as: 569 U. S. ____ (2013)          1

ROBERTS, C. J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 11–1545 and 11–1547

_____

CITY OF ARLINGTON, TEXAS, ET AL.,
PETITIONERS

11–1545          *v.*

FEDERAL COMMUNICATIONS
COMMISSION ET AL.


CABLE, TELECOMMUNICATIONS, AND
TECHNOLOGY COMMITTEE OF THE
NEW ORLEANS CITY COUNCIL,
PETITIONER

11–1547          *v.*

FEDERAL COMMUNICATIONS
COMMISSION ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 20, 2013]

CHIEF JUSTICE ROBERTS, with whom JUSTICE KENNEDY
and JUSTICE ALITO join, dissenting.

My disagreement with the Court is fundamental. It is
also easily expressed: A court should not defer to an agency
until the court decides, on its own, that the agency is
entitled to deference. Courts defer to an agency's interpre-
tation of law when and because Congress has conferred on
the agency interpretive authority over the question at
issue. An agency cannot exercise interpretive authority
until it has it; the question whether an agency enjoys that
authority must be decided by a court, without deference to
the agency.

2                    ARLINGTON *v.* FCC

I

One of the principal authors of the Constitution famously wrote that the "accumulation of all powers, legislative, executive, and judiciary, in the same hands, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 324 (J. Cooke ed. 1961) (J. Madison). Although modern administrative agencies fit most comfortably within the Executive Branch, as a practical matter they exercise legislative power, by promulgating regulations with the force of law; executive power, by policing compliance with those regulations; and judicial power, by adjudicating enforcement actions and imposing sanctions on those found to have violated their rules. The accumulation of these powers in the same hands is not an occasional or isolated exception to the constitutional plan; it is a central feature of modern American government.

The administrative state "wields vast power and touches almost every aspect of daily life." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. ___, ___ (2010) (slip op., at 18). The Framers could hardly have envisioned today's "vast and varied federal bureaucracy" and the authority administrative agencies now hold over our economic, social, and political activities. *Ibid.* "[T]he administrative state with its reams of regulations would leave them rubbing their eyes." *Alden* v. *Maine*, 527 U. S. 706, 807 (1999) (Souter, J., dissenting), quoted in *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 755 (2002). And the federal bureaucracy continues to grow; in the last 15 years, Congress has launched more than 50 new agencies. Compare Office of the Federal Register, United States Government Manual 1997/1998, with Office of the Federal Register, United States Government Manual 2012. And more are on the way. See, *e.g.,* Congressional Research Service, C. Copeland, New Entities Created Pursuant to the Patient Protection and Affordable Care Act 1 (2010) (The PPACA "creates, re-

ROBERTS, C. J., dissenting

quires others to create, or authorizes dozens of new enti-
ties to implement the legislation").

Although the Constitution empowers the President to
keep federal officers accountable, administrative agencies
enjoy in practice a significant degree of independence. As
scholars have noted, "no President (or his executive office
staff) could, and presumably none would wish to, super-
vise so broad a swath of regulatory activity." Kagan,
Presidential Administration, 114 Harv. L. Rev. 2245, 2250
(2001); see also S. Breyer, Making Our Democracy Work
110 (2010) ("the president may not have the time or will-
ingness to review [agency] decisions"). President Truman
colorfully described his power over the administrative
state by complaining, "I thought I was the president, but
when it comes to these bureaucrats, I can't do a damn
thing." See R. Nathan, The Administrative Presidency 2
(1986). President Kennedy once told a constituent, "I
agree with you, but I don't know if the government will."
See *id.,* at 1. The collection of agencies housed outside the
traditional executive departments, including the Federal
Communications Commission, is routinely described as
the "headless fourth branch of government," reflecting not
only the scope of their authority but their practical inde-
pendence. See, *e.g.,* Administrative Conference of United
States, D. Lewis & J. Selin, Sourcebook of United States
Executive Agencies 11 (2012).

As for judicial oversight, agencies enjoy broad power to
construe statutory provisions over which they have been
given interpretive authority. In *Chevron U. S. A. Inc.* v.
*Natural Resources Defense Council, Inc.*, we established a
test for reviewing "an agency's construction of the statute
which it administers." 467 U. S. 837, 842 (1984). If Con-
gress has "directly spoken to the precise question at issue,"
we said, "that is the end of the matter." *Ibid.* A contrary
agency interpretation must give way. But if Congress has
not expressed a specific intent, a court is bound to defer to

4                         ARLINGTON *v.* FCC

any "permissible construction of the statute," even if that is not "the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.,* at 843, and n. 11.

When it applies, *Chevron* is a powerful weapon in an agency's regulatory arsenal. Congressional delegations to agencies are often ambiguous—expressing "a mood rather than a message." Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv. L. Rev. 1263, 1311 (1962). By design or default, Congress often fails to speak to "the precise question" before an agency. In the absence of such an answer, an agency's interpretation has the full force and effect of law, unless it "exceeds the bounds of the permissible." *Barnhart* v. *Walton*, 535 U. S. 212, 218 (2002).

It would be a bit much to describe the result as "the very definition of tyranny," but the danger posed by the growing power of the administrative state cannot be dismissed. See, *e.g., Talk America, Inc.* v. *Michigan Bell Telephone Co.*, 564 U. S. ___, ___ (2011) (SCALIA, J., concurring) (slip op., at 3) (noting that the FCC "has repeatedly been rebuked in its attempts to expand the statute beyond its text, and has repeatedly sought new means to the same ends"); *Sackett* v. *EPA*, 566 U. S. ___, ___–___ (2012) (slip op., at 9–10) (rejecting agency argument that would "enable the strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review").

What the Court says in footnote 4 of its opinion is good, and true (except of course for the "dissent overstates" part). *Ante,* at 13–14, n. 4. The Framers did divide governmental power in the manner the Court describes, for the purpose of safeguarding liberty. And yet . . . the citizen confronting thousands of pages of regulations—promulgated by an agency directed by Congress to regulate, say, "in the public interest"—can perhaps be excused for thinking that it is the agency really doing the legislat-

ROBERTS, C. J., dissenting

ing.  And with hundreds of federal agencies poking into every nook and cranny of daily life, that citizen might also understandably question whether Presidential oversight—a critical part of the Constitutional plan—is always an effective safeguard against agency overreaching.

It is against this background that we consider whether the authority of administrative agencies should be augmented even further, to include not only broad power to give definitive answers to questions left to them by Congress, but also the same power to decide when Congress has given them that power.

Before proceeding to answer that question, however, it is necessary to sort through some confusion over what this litigation is about.  The source of the confusion is a familiar culprit: the concept of "jurisdiction," which we have repeatedly described as a word with "'many, too many, meanings.'"  *Union Pacific R. Co.* v. *Locomotive Engineers*, 558 U. S. 67, 81 (2009).

The Court states that the question "is whether a court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority (that is, its jurisdiction)."  *Ante*, at 5.  That is fine—until the parenthetical.  The parties, *amici*, and court below too often use the term "jurisdiction" imprecisely, which leads the Court to misunderstand the argument it must confront.  That argument is not that "there exist two distinct classes of agency interpretations," some "big, important ones" that "define the agency's 'jurisdiction,'" and other "humdrum, run-of-the-mill" ones that "are simply applications of jurisdiction the agency plainly has."  *Ibid.*  The argument is instead that a court should not defer to an agency on whether Congress has granted the agency interpretive authority over the statutory ambiguity at issue.

You can call that "jurisdiction" if you'd like, as petitioners do in the question presented.  But given that the term

is ambiguous, more is required to understand its use in
that question than simply "having read it." *Ante,* at 15,
n. 5. It is important to keep in mind that the term, in the
present context, has the more precise meaning noted
above, encompassing congressionally delegated authority
to issue interpretations with the force and effect of law.
See 668 F. 3d 229, 248 (CA5 2012) (case below) ("The issue
in the instant case is whether the FCC possessed statutory
authority to administer §332(c)(7)(B)(ii) and (v) by adopt-
ing the 90- and 150-day time frames"). And that has
nothing do with whether the statutory provisions at issue
are "big" or "small."

## II

"It is emphatically the province and duty of the judicial
department to say what the law is." *Marbury* v. *Madison*,
1 Cranch 137, 177 (1803). The rise of the modern admin-
istrative state has not changed that duty. Indeed, the
Administrative Procedure Act, governing judicial review of
most agency action, instructs reviewing courts to decide
"all relevant questions of law." 5 U. S. C. §706.

We do not ignore that command when we afford an
agency's statutory interpretation *Chevron* deference; we
respect it. We give binding deference to permissible agency
interpretations of statutory ambiguities *because* Con-
gress has delegated to the agency the authority to inter-
pret those ambiguities "with the force of law." *United
States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001); see also
Monaghan, *Marbury* and the Administrative State, 83
Colum. L. Rev. 1, 27–28 (1983) ("the court is not abdicat-
ing its constitutional duty to 'say what the law is' by defer-
ring to agency interpretations of law: it is simply applying
the law as 'made' by the authorized law-making entity").

But before a court may grant such deference, it must on
its own decide whether Congress—the branch vested with
lawmaking authority under the Constitution—has in fact

Cite as: 569 U. S. \_\_\_\_ (2013)          7

ROBERTS, C. J., dissenting

delegated to the agency lawmaking power over the ambiguity at issue. See *ante,* at 4 (BREYER, J., concurring in part and concurring in judgment) ("The question whether Congress has delegated to an agency the authority to provide an interpretation that carries the force of law is for the judge to answer independently."). Agencies are creatures of Congress; "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355, 374 (1986). Whether Congress has conferred such power is the "relevant question[ ] of law" that must be answered before affording *Chevron* deference. 5 U. S. C. §706.

III

A

Our precedents confirm this conclusion—beginning with *Chevron* itself. In *Chevron*, the EPA promulgated a regulation interpreting the term "stationary sources" in the Clean Air Act. 467 U. S., at 840 (quoting 42 U. S. C. §7502(b)(6)(1982 ed.)). An environmental group petitioned for review of the rule, challenging it as an impermissible interpretation of the Act. 467 U. S., at 841, 859. Finding the statutory text "not dispositive" and the legislative history "silent on the precise issue," we upheld the rule. *Id.,* at 862, 866.

In our view, the challenge to the agency's interpretation "center[ed] on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress." *Id.,* at 866. Judges, we said, "are not experts in the field, and are not part of either political branch of the Government." *Id.,* at 865. Thus, because Congress had not answered the specific question at issue, judges had no business providing their own resolution on the basis of their "personal policy preferences." *Ibid.* Instead, the "agency to which Congress ha[d] delegated policymaking responsibilities" was the appropriate politi-

8                          ARLINGTON *v.* FCC

cal actor to resolve the competing interests at stake, "within
the limits of that delegation." *Ibid.*

   *Chevron*'s rule of deference was based on—and limited
by—this congressional delegation.  And the Court did not
ask simply whether Congress had delegated to the EPA
the authority to administer the Clean Air Act generally.
We asked whether Congress had "delegat[ed] authority to
the agency to elucidate a *specific provision* of the statute
by regulation." *Id.,* at 843–844 (emphasis added); see *id.*,
at 844 (discussing "the legislative delegation to an agency
on a *particular question*" (emphasis added)).  We deferred
to the EPA's interpretation of "stationary sources" based
on our conclusion that the agency had been "charged with
responsibility for administering *the provision.*" *Id.,* at 865
(emphasis added).

                                 B

   We have never faltered in our understanding of this
straightforward principle, that whether a particular agency
interpretation warrants *Chevron* deference turns on the
court's determination whether Congress has delegated to
the agency the authority to interpret the statutory ambi-
guity at issue.

   We made the point perhaps most clearly in *Adams Fruit
Co.* v. *Barrett,* 494 U. S. 638 (1990).  In that case, the
Department of Labor contended the Court should defer to
its interpretation of the scope of the private right of action
provided by the Migrant and Seasonal Agriculture Worker
Protection Act (AWPA), 29 U. S. C. §1854, against employ-
ers who intentionally violated the Act's motor vehicle
safety provisions.  We refused to do so.  Although "as an
initial matter" we rejected the idea that Congress left a
"statutory 'gap'" for the agency to fill, we reasoned that if
the "AWPA's language establishing a private right of
action is ambiguous," the Secretary of Labor's interpreta-
tion of its scope did not warrant *Chevron* deference.  494

ROBERTS, C. J., dissenting

U. S., at 649.

In language directly applicable to the question before us, we explained that "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Ibid.* Although "Congress clearly envisioned, indeed expressly mandated, a role for the Department of Labor in administering the statute by requiring the Secretary to promulgate *standards* implementing AWPA's *motor vehicle provisions*," we found "[n]o such delegation regarding AWPA's *enforcement provisions*." *Id.,* at 650 (emphasis added). It would therefore be "inappropriate," we said, "to consult executive interpretations" of the enforcement provisions to resolve ambiguities "surrounding the scope of AWPA's judicially enforceable remedy." *Ibid.* Without questioning the principle that agency determinations "within the scope of delegated authority are entitled to deference," we explained that "it is fundamental 'that an agency may not bootstrap itself into an area in which it has no jurisdiction.'" *Ibid.* (quoting *Federal Maritime Comm'n* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 745 (1973)).

Our subsequent cases follow the same approach. In *United States* v. *Mead Corp., supra,* for example, *Chevron* deference turned on whether Congress had delegated to the agency authority to interpret the statutory ambiguity by a particular means. The Customs Service had issued a "classification ruling," interpreting the term "diaries" in a tariff schedule to include "day planners" of the type Mead imported, and on that basis subjected the planners to a four-percent tariff. Mead protested the imposition of the tariff, the Customs Service claimed *Chevron* deference for its interpretation, and the controversy made its way to our Court. *Id.,* at 224–226.

In *Mead*, we again made clear that the "category of interpretative choices" to which *Chevron* deference applies is defined by congressional intent. *Id.,* at 229. *Chevron* deference, we said, rests on a recognition that Congress

10                 ARLINGTON *v.* FCC

ROBERTS, C. J., dissenting

has delegated to an agency the interpretive authority to
implement "a particular provision" or answer "'a particu-
lar question.'" *Ibid.* (quoting *Chevron*, 467 U. S., at 844).
An agency's interpretation of "a particular statutory provi-
sion" thus qualifies for *Chevron* deference only "when it
appears that Congress delegated authority to the agency
generally to make rules carrying the force of law, and that
the agency interpretation claiming deference was pro-
mulgated in the exercise of that authority."  533 U. S., at
226–227.

   The Court did not defer to the agency's views but in-
stead determined that Congress had not delegated inter-
pretive authority to the Customs Service to definitively
construe the tariff schedule through classification rulings.
Neither the statutory authorization for the classification
rulings, nor the Customs Service's practice in issuing such
rulings, "reasonably suggest[ed] that Congress ever
thought of [such] classification rulings as deserving the
deference claimed for them." *Id.,* at 231.  And in the ab-
sence of such a delegation, we concluded the interpreta-
tions adopted in those rulings were "beyond the *Chevron*
pale." *Id.,* at 234.

   *Gonzales* v. *Oregon*, 546 U. S. 243 (2006), is in the same
line of precedent.  In that case, as here, deference turned
on whether a congressional delegation of interpretive
authority reached a particular statutory ambiguity.  The
Attorney General claimed *Chevron* deference for his inter-
pretation of the phrase "legitimate medical purpose" in the
Controlled Substances Act (CSA) to exclude the prescrib-
ing and dispensing of controlled substances for the pur-
pose of assisting suicide. *Id.,* at 254, 258.  No one disputed
that "legitimate medical purpose" was "ambiguous in the
relevant sense." *Id.,* at 258.  Nor did any Justice dispute
that the Attorney General had been granted the power in
the CSA to promulgate rules with the force of law. *Ibid.*;
see *id.,* at 281 (SCALIA, J., dissenting).  Nevertheless, the

ROBERTS, C. J., dissenting

Court explained, "*Chevron* deference . . . is not accorded merely because the statute is ambiguous and an administrative official is involved." *Id.,* at 258. The regulation advancing the interpretation, we said, "must be promulgated pursuant to authority Congress has delegated to the official." *Ibid.* (citing *Mead*, *supra,* at 226–227).

In the CSA, Congress delegated to the Attorney General the authority to promulgate regulations "relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances," 21 U. S. C. §821, or "for the efficient execution of his functions under [the CSA]," §871(b). After considering the text, structure, and purpose of the Act, the Court concluded *on its own* that interpreting "legitimate medical purpose" fell under neither delegation. *Gonzales,* 546 U. S., at 258–269. Because the regulation "was not promulgated pursuant to the Attorney General's authority, its interpretation of 'legitimate medical purpose' d[id] not receive *Chevron* deference." *Id.,* at 268.

*Adams Fruit*, *Mead*, and *Gonzales* thus confirm that *Chevron* deference is based on, and finds legitimacy as, a congressional delegation of interpretive authority. An agency interpretation warrants such deference only if Congress has delegated authority to definitively interpret a particular ambiguity in a particular manner. Whether Congress has done so must be determined by the court on its own before *Chevron* can apply. See H. Edwards, L. Elliot, & M. Levy, Federal Courts Standards of Review 168 (2d ed. 2013) ("a court decides *de novo* whether an agency has acted within the bounds of congressionally delegated authority" (citing *Mead*, *supra,* at 226–227, and *Gonzales*, *supra,* at 258)); Sales & Adler, The Rest is Silence: *Chevron* Deference, Agency Jurisdiction, and Statutory Silences**,** 2009 U. Ill. L. Rev. 1497, 1564 (2009) ("if delegation really is antecedent to deference, as *Mead* insists, it cannot be that courts should defer to an agency's views on

12                     ARLINGTON *v.* FCC

whether a delegation has taken place").

In other words, we do not defer to an agency's interpretation of an ambiguous provision unless Congress wants us to, and whether Congress wants us to is a question that courts, not agencies, must decide. Simply put, that question is "beyond the *Chevron* pale." *Mead*, *supra*, at 234.

### IV

Despite these precedents, the FCC argues that a court need only locate an agency and a grant of general rule-making authority over a statute. *Chevron* deference then applies, it contends, to the agency's interpretation of any ambiguity in the Act, including ambiguity in a provision said to carve out specific provisions from the agency's general rulemaking authority. If Congress intends to exempt part of the statute from the agency's interpretive authority, the FCC says, Congress "can ordinarily be expected to state that intent explicitly." Brief for Federal Respondents 30 (citing *American Hospital Assn.* v. *NLRB*, 499 U. S. 606 (1991)).

If a congressional delegation of interpretive authority is to support *Chevron* deference, however, that delegation must extend to the specific statutory ambiguity at issue. The appropriate question is whether the delegation covers the "specific provision" and "particular question" before the court. *Chevron*, 467 U. S., at 844. A congressional grant of authority over some portion of a statute does not necessarily mean that Congress granted the agency interpretive authority over all its provisions. See *Adams Fruit*, 494 U. S., at 650.

An example that might highlight the point concerns statutes that parcel out authority to multiple agencies, which "may be the norm, rather than an exception." Gersen, Overlapping and Underlapping Jurisdiction in Administrative Law, 2006 S. Ct. Rev. 201, 208; see, *e.g., Gonzales*, 546 U. S, at 250–251 (describing shared author-

ROBERTS, C. J., dissenting

ity over the CSA between the Attorney General and the
Secretary of Health and Human Services); *Sutton* v. *United
Air Lines, Inc.*, 527 U. S. 471, 478 (1999) (authority to
issue regulations implementing the Americans with Disa-
bilities Act "is split primarily among three Government
agencies").    The Dodd-Frank Wall Street Reform and
Consumer Protection Act, for example, authorizes rule-
making by at least eight different agencies.    See Con-
gressional Research Service, C. Copeland, Rulemaking
Requirements and Authorities in the Dodd-Frank Wall
Street Reform and Consumer Protection Act 7 (2010).
When presented with an agency's interpretation of such a
statute, a court cannot simply ask whether the statute is
one that the agency administers; the question is whether
authority over the particular ambiguity at issue has been
delegated to the particular agency.

By the same logic, even when Congress provides inter-
pretive authority to a single agency, a court must decide if
the ambiguity the agency has purported to interpret with
the force of law is one to which the congressional delega-
tion extends.    A general delegation to the agency to admin-
ister the statute will often suffice to satisfy the court that
Congress has delegated interpretive authority over the
ambiguity at issue.    But if Congress has exempted particu-
lar provisions from that authority, that exemption must be
respected, and the determination whether Congress has
done so is for the courts alone.

The FCC's argument that Congress "can ordinarily be
expected to state that intent explicitly," Brief for Federal
Respondents 30 (citing *American Hospital, supra*), goes to
the merits of that determination, not to whether a court
should decide the question *de novo* or defer to the agency.
Indeed, that is how the Court in *American Hospital* con-
sidered it.    It was in the process of "employing the tradi-
tional tools of statutory construction" that the Court said
it would have expected Congress to speak more clearly if it

had intended to exclude an entire subject area—employee units for collecting bargaining—from the NLRB's general rulemaking authority. *Id.,* at 613, 614. The Court concluded, after considering the language, structure, policy, and legislative history of the Act on its own—without deferring to the agency—that the meaning of the statute was "clear and contrary to the meaning advanced by petitioner." *Id.,* at 609–614. To be sure, the Court also noted that "[e]ven if we *could* find any ambiguity in [the provision] after employing the traditional tools of statutory construction, we would still defer to Board's reasonable interpretation." *Id.,* at 614 (emphasis added). But that single sentence of dictum cannot carry the day for the FCC here.

                                    V

  As the preceding analysis makes clear, I do not understand petitioners to ask the Court—nor do I think it necessary—to draw a "specious, but scary-sounding" line between "big, important" interpretations on the one hand and "humdrum, run-of-the-mill" ones on the other. *Ante,* at 5, 12. Drawing such a line may well be difficult. Distinguishing between whether an agency's interpretation of an ambiguous term is reasonable and whether that term is for the agency to interpret is not nearly so difficult. It certainly did not confuse the FCC in this proceeding. Compare *In re Petition for Declaratory Ruling*, 24 FCC Rcd. 13994, 14000–14003 (2009) (addressing the latter question), with *id.,* at 14003–14015 (addressing the former). Nor did it confound the Fifth Circuit. Compare 668 F. 3d, at 247–254 (deciding "whether the FCC possessed statutory authority to administer §332(c)(7)(B)(ii)"), with *id.,* at 254–260 (considering "whether the 90- and 150-day time frames themselves also pass muster under *Chevron*"). More importantly, if the legitimacy of *Chevron* deference is based on a congressional delegation of interpretive author-

ROBERTS, C. J., dissenting

ity, then the line is one the Court must draw.

The majority's hypothetical Common Carrier Acts do not demonstrate anything different. *Ante,* at 6–8. The majority states that in its second Common Carrier Act, Section 2 makes clear that Congress "'conferred interpretative power on the agency'" to interpret the ambiguous terms "common carrier" and "unreasonable condition." *Ante,* at 7 (quoting Brief for Petitioners in No. 1545, p. 14). Thus, it says, under anyone's theory a court must defer to the agency's reasonable interpretations of those terms. Correct.

The majority claims, however, that "petitioners' theory would accord the agency no deference" in its interpretation of the same ambiguous terms in the first Common Carrier Act. *Ante,* at 7–8. But as I understand petitioners' argument—and certainly in my own view—a court, in both cases, need only decide for itself whether Congress has delegated to the agency authority to interpret the ambiguous terms, before affording the agency's interpretation *Chevron* deference.

For the second Common Carrier Act, the answer is easy. The majority's hypothetical Congress has spoken clearly and specifically in Section 2 of the Act about its delegation of authority to interpret Section 1. As for the first Act, it is harder to analyze the question, given only one section of a presumably much larger statute. But if the first Common Carrier Act is like most agencies' organic statutes, I have no reason to doubt that the agency would likewise have interpretive authority over the same ambiguous terms, and therefore be entitled to deference in construing them, just as with the second Common Carrier Act. There is no new "test" to worry about, cf. *ante,* at 16; courts would simply apply the normal rules of statutory construction.

That the question might be harder with respect to the first Common Carrier Act should come as no surprise. The

ROBERTS, C. J., dissenting

second hypothetical Congress has more carefully defined the agency's authority than the first. *Whatever* standard of review applies, it is more difficult to interpret an unclear statute than a clear one. My point is simply that before a court can defer to the agency's interpretation of the ambiguous terms in either Act, it must determine for itself that Congress has delegated authority to the agency to issue those interpretations with the force of law.

The majority also expresses concern that adopting petitioners' position would undermine *Chevron*'s stable background rule against which Congress legislates. *Ante,* at 5. That, of course, begs the question of what that stable background rule is. See Merrill & Hickman, *Chevron*'s Domain, 89 Geo. L. Rev. 833, 910 (2001) ("Courts have never deferred to agencies with respect to questions such as whether Congress has delegated to an agency the power to act with the force of law through either legislative rules or binding adjudications. Similarly, it has never been maintained that Congress would want courts to give *Chevron* deference to an agency's determination that it is entitled to *Chevron* deference, or should give *Chevron* deference to an agency's determination of what types of interpretations are entitled to *Chevron* deference" (footnote omitted)).

## VI

The Court sees something nefarious behind the view that courts must decide on their own whether Congress has delegated interpretative authority to an agency, before deferring to that agency's interpretation of law. What is afoot, according to the Court, is a judicial power-grab, with nothing less than "*Chevron* itself" as "the ultimate target." *Ante,* at 12.

The Court touches on a legitimate concern: *Chevron* importantly guards against the Judiciary arrogating to itself policymaking properly left, under the separation of

powers, to the Executive. But there is another concern at play, no less firmly rooted in our constitutional structure. That is the obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well.

An agency's interpretive authority, entitling the agency to judicial deference, acquires its legitimacy from a delegation of lawmaking power from Congress to the Executive. Our duty to police the boundary between the Legislature and the Executive is as critical as our duty to respect that between the Judiciary and the Executive. See *Zivotofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (slip op., at 8). In the present context, that means ensuring that the Legislative Branch has in fact delegated lawmaking power to an agency within the Executive Branch, before the Judiciary defers to the Executive on what the law is. That concern is heightened, not diminished, by the fact that the administrative agencies, as a practical matter, draw upon a potent brew of executive, legislative, and judicial power. And it is heightened, not diminished, by the dramatic shift in power over the last 50 years from Congress to the Executive—a shift effected through the administrative agencies.

We reconcile our competing responsibilities in this area by ensuring judicial deference to agency interpretations under *Chevron*—but only after we have determined on our own that Congress has given interpretive authority to the agency. Our "task is to fix the boundaries of delegated authority," Monaghan, 83 Colum. L. Rev., at 27; that is not a task we can delegate to the agency. We do not leave it to the agency to decide when it is in charge.

\*     \*     \*

In these cases, the FCC issued a declaratory ruling interpreting the term "reasonable period of time" in 47 U. S. C. §332(c)(7)(B)(ii). The Fifth Circuit correctly rec-

18                    ARLINGTON *v.* FCC

ognized that it could not apply *Chevron* deference to the
FCC's interpretation unless the agency "possessed statu-
tory authority to administer §332(c)(7)(B)(ii)," but it erred
by granting *Chevron* deference to the FCC's view on that
antecedent question.  See 668 F. 3d, at 248.  Because the
court should have determined on its own whether Con-
gress delegated interpretive authority over §332(c)(7)(B)(ii)
to the FCC before affording *Chevron* deference, I would
vacate the decision below and remand the cases to the
Fifth Circuit to perform the proper inquiry in the first
instance.

   I respectfully dissent.

CERTIFICATE OF SERVICE

I hereby certify that, pursuant to D.C. Circuit Rule 25(c), service of the foregoing will be made electronically via CM/ECF system upon the following counsels of record this 24th day of May 2013. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Others, marked with an asterisk, will receive service by mail unless another attorney for the same party is receiving service through CM/ECF.

Helgi C. Walker
William S. Consovoy
Eve Klindera Reed
Brett A. Shumate
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for Verizon*

Michael E. Glover
Edward Shakin
William H. Johnson
*Verizon*
1320 North Courthouse Road,
9th Floor
Arlington, VA 22201

John T. Scott, III
Verizon Wireless
1300 I Street, NW
Suite 400 West
Washington, DC 20005
*Counsel for Verizon*

Carl W. Northrop
Michael Lazarus
Andrew Morentz
Telecommunications Law
Professionals PLLC
875 15th Street, NW, Suite 750
Washington, DC 20005
*Counsel for MetroPCS*

Mark A. Stachiw
General Counsel, Secretary & Vice
Chairman
*MetroPCS Communications, Inc.*
2250 Lakeside Blvd.
Richardson, TX 75082

Stephen B. Kinnaird
Paul, Hastings, Janofsky &
Walker LLP
875 15th Street, NW
Washington, DC 20005
*Counsel for MetroPCS*

Walter E. Dellinger
Brianne Gorod
Anton Metlitsky
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
*Counsel for Verizon*

Samir C. Jain
Wilmer Cutler Pickering, et al.
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for Verizon*

Genevieve Morelli
*Independent Telephone &
Telecommunications Alliance*
1101 Vermont Avenue, N.W.,
Suite 501
Washington, DC 20005

Michael F. Altschul
*CTIA – The Wireless Association®*
1400 16th Street, NW, Suite 600
Washington, DC 20036

Matthew F. Wood
*Free Press*
1025 Connecticut Avenue, NW,
Suite 1110
Washington, DC 20036

James Ramsay
*National Association of Regulatory
Utility Commissioners*
1101 Vermont Avenue, NW,
Suite 200
Washington, DC 20005

*Sean Lev
Peter Karanjia
Jacob M. Lewis
Richard K. Welch
Joel Marcus
*Federal Communications Commission*
445 12th Street, SW
Washington, DC 20554

Nancy C. Garrison
Catherine G. O'Sullivan
Robert J. Wiggers
*U.S. Department of Justice*
Antitrust Div., Appellate, Rm. 3224
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
*Counsel for the United States*

R. Craig Lawrence
U.S. Attorney's Office
555 4th Street, NW
Washington, DC 20530
*Counsel for the United States*

John P. Elwood
Eric A. White
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW,
Suite 500 West
Washington, DC 20037
*Counsel for the Cato Institute,
Competitive Enterprise Institute, Free
State Foundation, and TechFreedom*

Andrew Jay Schwartzman
2000 Pennsylvania Avenue, NW
Suite 4300
Washington, DC 20006
*Counsel for Amicus Tim Wu*

Jonathan E. Nuechterlein
Elvis Stumbergs
Heather M. Zachary
Wilmer Cutler Pickering Hale &
Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006-1420
*Counsel for CTIA – The Wireless
Association*®

E. Duncan Getchell, Jr.
Wesley Glenn Russell, Jr.
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
*Counsel for the Commonwealth of
Virginia*

*Sam Kazman
*Competitive Enterprise Institute*
1899 L Street, NW
12th Floor
Washington, DC 20036

Quentin Riegel
*National Association of Manufacturers*
733 10th Street, N.W.
Suite 700
Washington, DC 20001
(202) 637-3058

*Randolph J. May
*Free State Foundation*
P.O. Box 60680
Potomac, MD 20859

Reed Hundt
Tyrone Brown
Michael Copps
Nicholas Johnson
Susan Crawford
*National Association of
Telecommunications Officers and
Advisors*
Sean H. Donahue
Donahue & Goldberg, LLP
2000 L St., NW, Suite 808
Washington, D.C. 20036

Russell P. Hanser
Bryan N. Tramont
Wilkinson Barker Knauer, LLP
2300 N Street, N.W.
Suite 700
Washington, DC 20037
(202) 783-4141
*Counsel for the National Association
of Manufacturers*

John Blevins
Loyola University New Orleans
College of Law
7214 St. Charles Ave, Box 901
New Orleans, LA 70118
*Counsel for Amici Internet Engineers
and Technologists*

Dated: May 24, 2013

/s/ Erik Stallman
Erik Stallman